**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
:
In re:                                          :      Chapter 11
:
TGHI, INC., et al.,                             :      Case No. 16-10300(MEW)
:
Debtors.[1]                    :      Joint Administration Pending
:
------------------------------------------------------------------ X

## DECLARATION OF CHRISTOPHER LAYDEN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

CHRISTOPHER LAYDEN, declares as follows:

1.      I am the President for Parent THI, Inc. ("**Parent**") and TGHI, Inc.

("**Holdings**"), as chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively

the "**Debtors**") in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**") .  I am also

the Secretary and Treasurer of Parent and Holdings, as well as a Managing Member or Managing

Director with the York Street Entities (defined below).  I am generally familiar with the Debtors'

day-to-day operations, business affairs, books, and records.  As discussed more fully below, the

Debtors are holding companies that formerly held all of the equity interests in an operating

company that was one of the world's leading suppliers of carrying cases and accessory products

for the mobile lifestyle.

2.      On February 8, 2016 (the "**Petition Date**"), the Debtors filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

**Code**") in the United States Bankruptcy Court for the Southern District of New York (the

"**Chapter 11 Cases**").

---

[1] The Debtors, and, if applicable, the last four digits of their taxpayer identification numbers are as follows: Parent THI, Inc. (5521), TGHI, Inc. (3814).

3.      I am authorized to submit this Declaration on behalf of the Debtors under Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  All facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and/or information supplied to me by members of the Debtors' former management team and the Debtors' advisors.  If called upon to testify, I would testify to the facts set forth herein on that basis.

4.      This declaration describes the Debtors' businesses, their capital structure, and the circumstances surrounding the commencement of these Chapter 11 Cases as required by Local Bankruptcy Rule 1007-2(a)(1).  Annexed to this declaration are schedules providing additional information about the Debtors, as required by Local Bankruptcy Rule 1007-2(a)(3)-(12) and (b)(1)-(3).[2]

## I. BACKGROUND

### A. The Debtors' Businesses

5.      The Debtors were the former direct (Holdings) or indirect (Parent) holding companies of Targus Group International, Inc. ("**TGII**") and its operating subsidiaries (together with TGII, the "**Operating Company**") – *which are now unaffiliated with the Debtors and are not "Debtors" in the Chapter 11 Cases* – and were a leading global supplier of carrying cases and accessory products for the mobile lifestyle.  As discussed in detail in the *Disclosure Statement for the Prepackaged Plan of Liquidation of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**"), as a result of the consummation of the

---

[2] Local Bankruptcy Rule 1007-2(a)(2) is inapplicable because this case was not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code.

Collateral Agent Stock Turnover[3], the Debtors no longer hold the equity interests in TGII.[4] Nevertheless, this Declaration provides a brief description of the Operating Company's business for background purposes only, the capital structure of the Debtors, and a brief description of the events leading to the Collateral Agent Stock Turnover and the commencement of the Chapter 11 Cases. Further detail may be found in the Disclosure Statement.

6.      Founded in 1983, the Operating Company pioneered the notebook computer carrying case category. In 1998, to complement its carrying case business, the Operating Company began to market laptop computer accessory products. The introduction of the iPad in 2010 also created the tablet computer market. In response, the Operating Company expanded its product line to include cases and accessories for tablets. The Formerly Owned Operating Businesses sold their products to, among others: (i) original equipment manufacturers of notebook computers and tablets; (ii) wholesale distributors to resellers and corporate end-customers, (iii) retail outlets that sell products directly to end consumers, and (iv) online consumers. TGII and its subsidiaries operated worldwide, with principal offices, distribution centers, and/or warehouses located in Anaheim, Mississauga, Ontario, London, Hong Kong, and Meadowbank, Australia. Their corporate headquarters were located in Anaheim, California, with offices in London and Hong Kong serving as regional headquarters for the Europe, Middle East and Africa and Asia Pacific regions, respectively.

7.      The Debtors have no employees as they are holdings companies. Since the Collateral Agent Stock Turnover, I have served as the Senior Vice President – Restructuring,

---

[3] Defined terms used but not defined herein shall have the meaning ascribed to them in the Disclosure Statement.

[4] Prior to the consummation of the Collateral Agent Stock Turnover, Targus' corporate structure was comprised of: (i) Debtors Parent and its wholly-owned subsidiary Holdings; and (ii) the non-Debtor Operating Company, TGII, which was wholly owned subsidiary of Holdings and the parent company of Targus' domestic and foreign operating subsidiaries.

and now I serve as the President, Secretary and Treasurer of the Debtors.  I have also served as a member of the Board of Directors of Parent since 2009 and on the Board of Directors of Holdings since 2015.  Prior to the Collateral Agent Stock Turnover, I also served on the Board of Directors of the domestic Formerly Owned Operating Businesses.  In addition, I am a Managing Member of GL Capital Partners, LLC and a Managing Director of York Street Capital Partners, LLC, York Street Capital Partners II, LLC, York Street Mezzanine Partners, LP and York Street Mezzanine Partners II, LP (collectively the "**York Street Entities**").  York Street Mezzanine Partners, LP and York Street Mezzanine Partners II, LP are equity holders of Parent and holders of the payment-in-kind notes issued by both Holdings and Parent.

8.      The Debtors have no operations and no offices.  The Debtors' only assets are the Transaction Consideration (as such term is defined below) to be distributed to creditors of Holdings, which is located in New York, New York, and their rights under the Transaction Support Agreement (as such term is defined below) which is governed by New York law.  In addition, the stock certificate of Holdings is held in New York, New York.

9.      The Debtors' board of directors ("**Boards**"), which are mirror-boards, have been overseeing the negotiations, documentation and entry into the Transaction Support Agreement and Amendment (as defined below) and the solicitation and commencement of these Chapter 11 Cases.  Certain members of the Board of Directors are employed by funds that hold common stock of Parent and payment-in-kind notes issued by Holdings and Parent.  These funds obtained these holdings in connection with TGII's 2009 out-of-court restructuring.  There is one independent director on the Boards who has been actively involved.

## II.  PREPETITION CAPITAL STRUCTURE[5]

10.     As of October 31, 2015, the Debtors had approximately $205 million in funded debt, consisting of (i) guarantees under (x) a secured, asset-based revolving loan ("**ABL Facility**") and (y) two secured term loans: the Prepetition $185 Million Facility and the Prepetition $20 Million Facility, and (ii) two issues of unsecured notes.  Each of these obligations is discussed below, including the collateral securing each facility (if any), the material terms, and outstanding amounts.

11.     The current capital structure is in part the result of months of negotiations among the Debtors, certain former subsidiaries of the Debtors, and their primary secured and unsecured lenders, which culminated in the entry on May 21, 2015 into the Global Forbearance and Transaction Support Agreement (the "**Transaction Support Agreement**").  Pursuant to the Transaction Support Agreement, the Debtors began a process for achieving a sale or financing transaction for the Debtors' former primary operating subsidiary, TGII, that would satisfy the Debtors' obligations to their secured lenders or, alternatively, transfer ownership of TGII at the direction of the Prepetition $185 Million Facility Lenders (defined below).  The events leading up to entry into the Transaction Support Agreement and the process that followed are summarized below and described in more detail in the Disclosure Statement.  Based on the events, discussed below, as of February 3, 2016, the Debtors total funded debt is approximately $82 million consisting of the following facilities:

12.     Prepetition $20 Million Facility.  On May 21, 2015, non-Debtor TGII as borrower and Holdings and each of TGII's domestic subsidiaries as guarantors, entered into the

---

[5] Nothing herein constitutes a concession or acknowledgment of any amount owed or on the validity of any debt, claim or lien.  The descriptions of the collateral securing the underlying obligations are intended to provide brief summaries.  In the event of any inconsistencies between the summaries set forth herein and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

$20 million secured term loan with Wilmington Trust, National Association as successor administrative and collateral agent and security trustee (the "**Prepetition $20 Million Facility Agent**"), which was amended and restated (the "**Prepetition $20 Million Facility**").   The lenders under the Prepetition $20 Million Facility are the same as the lenders holding the requisite majority under the Prepetition $185 Million Facility (as such term is defined in the Disclosure Statement).   The Prepetition $20 Million Facility has a first priority lien on the Prepetition $185 Million Facility Collateral.   As of January 31, 2016, approximately $21 million is outstanding under the Prepetition $20 Million Facility.   Interest is charged at an annual rate of 15%.

13.     Parent PIK Notes.   On December 14, 2009, Parent issued 10% Senior Unsecured Notes due June 14, 2019 ("**Parent PIK Notes**") in the aggregate amount of $26.15 million.   The notes were issued under a Note Purchase Agreement among Parent and the purchasers signatory thereto, and bear interest at a rate of 10% per annum payable in kind. These Parent PIK Notes were issued, together with shares of common stock of Parent, as part of a restructuring of the Company's equity and debt capitalization in 2009, in exchange for the then-outstanding second lien debt issued by Parent.   The Note Purchase Agreement was amended on May 24, 2011.

14.     On or about November 1, 2012, Parent issued approximately $5.3 million in Parent PIK Notes under a separate Note Purchase Agreement to the former equity holders of Oten, Inc., as part of the consideration for the acquisition of Oten, Inc.'s common stock by non-Debtor Targus, Inc.

15.    As of January 31, 2016, based upon the accrual of interest, approximately $52.7 million in Parent PIK Notes are outstanding.  Law Debenture Trust Company of New York ("**Law Debenture**") serves as administrative agent for the Parent PIK Notes.

16.    Holdings PIK Notes.  On October 26, 2012, Holdings issued $5 million in 16% Senior Unsecured Notes due October 26, 2018 ("**Holdings PIK Notes**") under a Note Purchase Agreement, among Holdings and the purchasers signatory thereto, in connection with the Company's acquisition of Sena Brands.  This issuance bears interest at a rate of 16% payable in kind.  The Holdings PIK Notes have seniority relative to the Parent PIK Notes due to the structural relationship between Holdings and Parent.  As of January 31, 2016, the outstanding amount on the Holdings PIK Notes is approximately $8.3 million.  The Holdings PIK Notes are held by the equity holders in the parent company and former members of senior management. Law Debenture serves as administrative agent for the Holdings PIK Notes.

17.    Equity.  As of the date hereof, there are 1,228,147 outstanding shares of privately-held common stock in Parent, the majority of which were issued in connection with the 2009 Restructuring.

## III.  EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    Changes in the Computer Carrying Case and Accessory Markets

18.    As discussed in greater detail in the Disclosure Statement, the performance of the Formerly Owned Operating Businesses was tied to the underlying dynamics of the laptop computer and tablet markets.  The laptop computer market has shown year-over-year declines in sales since 2012.  This negative trend has been largely driven by (i) consumers' migration from laptops to tablets and smartphones and (ii) slower re-fresh cycles within the laptop market.  Further, the advent of the tablet and the smartphone has created excess and

obsolete inventory.  In addition, retail customer shopping patterns have also changed with the shift towards online shopping, a channel in which the Formerly Owned Operating Businesses are less established.  These market factors resulted in a decline in revenues and this financial performance directly impacted the ability of the Debtors, Holdings and Parent to satisfy their secured and unsecured debt obligations. By the first half of 2014, declines in the Formerly Owned Operating Businesses' financial results jeopardized continued compliance with leverage and revenue covenants under the ABL Facility and the Prepetition $185 Million Facility.

### B.    December 2014 Covenant Defaults

19.    The inability of the Formerly Owned Operating Businesses to comply with their operating covenants impacted Holdings, which guaranteed the secured debt at TGII. Notably, the ABL Facility and the Prepetition $185 Million Facility required the Formerly Owned Operating Businesses and Holdings to deliver a business plan and clean-audited financials at the end of December 2014.  However, the Formerly Owned Operating Businesses and Holdings did not believe that they would be able to deliver clean-audited financials and a business plan evidencing future compliance with such covenants.  A failure to deliver these reports would constitute (i) an immediate event of default under the ABL Facility and (ii) a default, subject to a 30-day grace period, under the Prepetition $185 Million Facility.

20.    In anticipation of the impending covenant defaults, in December 2014, the Debtors and Formerly Owned Operating Businesses engaged Kramer Levin Naftalis & Frankel LLP, as counsel, to assist in a restructuring process. Immediately thereafter, the Boards of Directors of the Debtors and the Formerly Owned Operating Businesses formed a four-member Restructuring Committee, which included one independent member.  Because there was no grace period under the ABL Facility, the Debtors and Formerly Owned Operating Businesses then engaged in negotiations with Bank of America to enter into an amendment to the ABL Facility.

These negotiations resulted in an amendment extending the deadline for delivery of the required financial reporting until January 29, 2015 (to be concurrent with the expiration of the 30-day grace period under the Prepetition $185 Million Facility) and instituting certain other financial restrictions, including implementing a $7.5 million reserve on availability. One of the conditions imposed by Bank of America was the retention of a Chief Restructuring Officer. The Restructuring Committee, at the direction of the Boards, commenced the process of interviewing potential candidates to serve as the chief restructuring advisor for the Company. In mid-December, the Debtors and Formerly Owned Operating Businesses retained Alvarez & Marsal North America, LLC, to serve as restructuring advisors.

> **C.** **Prepetition Negotiations with the $185 Million Facility Requisite Majority Lenders.**

21.    During January 2015, the Debtors and Formerly Owned Operating Businesses and their advisors engaged in discussions with the agent under the Prepetition $185 Million Facility and a group of lenders holding approximately 51% of the outstanding aggregate principal of that facility (the Prepetition $185 Million Facility Requisite Majority Lenders) to seek a waiver, amendment or forbearance agreement relating to the Prepetition $185 Million Facility. While expressing a willingness to provide additional time, the Prepetition $185 Million Facility Requisite Majority Lenders were unwilling to provide a waiver or enter into a long term (multi-month) forbearance. Instead, they were amenable to providing a two-week forbearance, which was subsequently entered into (through separate agreements) with the Prepetition $185 Million Facility Requisite Majority Lenders and Bank of America (the "**January Forbearances**"). The January Forbearances generally required that the Debtors and Formerly Owned Operating Businesses: (i) begin accruing default interest for both secured credit facilities; (ii) increase the reserve on availability under the ABL Facility from $7.5 million to $12.5

million; (iii) provide an updated financial presentation to the respective secured lenders; (iv) provide the respective secured lenders with a budget and other financial reporting; and (v) importantly, engage an investment banker to evaluate options for refinancing, sale(s) or other strategic alternatives.  In connection with the January Forbearances, the Debtors and Formerly Owned Operating Businesses interviewed several investment bankers, before hiring PJT Partners L.P. (formerly known as Blackstone Advisory Partners, L.P.) ("**Blackstone/PJT**") to advise on restructuring and strategic alternatives.

22.     Before the expiration of the January Forbearances, the secured lenders agreed to further extend the forbearance period to February 26, 2015 ("**February Forbearances**"), during which time the Debtors and Formerly Owned Operating Businesses sought to negotiate the terms of a consensual restructuring with representatives of their secured lenders.  Subsequently, these secured lenders agreed to 17 additional short-term forbearance extensions through April 2, 2015 for the Prepetition $185 Million Facility and 25 additional short-term forbearance extensions through April 24, 2015 for the ABL Facility; often times in 24-hour increments.  These short-term forbearances provided the parties with additional time to engage in out-of-court restructuring discussions on the same terms and conditions as the February Forbearances.

### D.    **Prepetition $20 Million Facility**

23.     As noted, as a consequence of the covenant defaults, various reserves on availability were imposed under the ABL Facility.  This, in turn, impacted the ability of the Debtors and the Formerly Owned Operating Entities to pay certain obligations.  For example, the reduced availability impacted the ability to pay current interest under the Prepetition $185 Million Facility.  Because of the liquidity constraints imposed under the ABL Facility and the unwillingness of the Prepetition $185 Million Facility Requisite Majority Lenders to defer

interest payments (other than on a short term basis as part of the interim forbearances), one of the key issues impacting the ability for the Debtors and Formerly Owned Operating Businesses to properly market the businesses was solving for additional liquidity.  It was believed that the most efficient, cost-effective and/or expedient manner to proceed was to obtain new funding from the Prepetition $185 Million Facility Requisite Majority Lenders who were willing to advance sufficient new monies to meet these objectives, and whose approvals likely would have been necessary had the Debtors and the Formerly Owned Operating Businesses sought to obtain alternative financing.  As such, the Debtors and the Formerly Owned Operating Businesses negotiated a $20 million new term loan facility that was used to improve liquidity and make the interest payments.  Importantly, this improved liquidity facilitated an orderly process to market the Formerly Owned Operating Businesses which, in turn, was the cornerstone of the purpose of the Forbearance and Marketing Period.  Proceeds of the new $20 million term loan were used to pay down the ABL Facility, thereby increasing cash availability, and to pay the accrued interest outstanding on the Prepetition $185 Million Facility as of May 21, 2015.

### E.     ABL Facility Amendment and Forbearance Agreements

24.     On April 24, 2015, the Formerly Owned Operating Businesses and Holdings entered into a forbearance agreement and seventh amendment for the ABL Facility. This amendment provided, among other financial restrictions, that any long-term forbearance would be conditioned upon obtaining new liquidity (through the Prepetition $20 Million Facility) and receipt of final bids in the marketing process by August 31, 2015.  This process continued to be managed through short-term forbearances while the parties finalized negotiations on the definitive documentation of the Transaction Support Agreement, the Prepetition $20 Million Facility, and a separate long-term forbearance agreement with Bank of America for the ABL Facility which would also expire on October 20, 2015 ("**ABL Forbearance Agreement**").  The

ABL Forbearance Agreement required weekly cash flow and borrowing base reporting, a cap on maximum revolver borrowing, and a restriction of principal payments on the Prepetition $185 Million Facility.  Payment of interest under the Prepetition $185 Million Facility was permitted so long as there was compliance with Net Sales and GTSA Adjusted EBITDA covenants. Importantly, the ABL Forbearance Agreement reduced certain of the availability reserves imposed following the initial defaults under the ABL Facility, reducing the reserves from $12.5 million to $9 million.  This improved availability under the ABL Facility ensured that the Formerly Owned Operating Businesses would have a sufficient time frame to conduct the marketing process and operate.  If final bids were not submitted by the end of August 2015, the availability reserve would increase by $2 million.  (Because final bids were received within this deadline, the reserve was not increased).  Finally, the ABL Forbearance Agreement provided for an automatic forbearance extension for an equal duration to that provided by the Prepetition $185 Million Facility Requisite Majority Lenders upon termination of the Forbearance and Marketing Period.

F.      **Negotiation and Entry into the Transaction Support Agreement**

25.      Between February 13 and April 2, 2015, the Debtors and the Formerly Owned Operating Businesses and the Prepetition $185 Million Facility Requisite Majority Lenders arduously negotiated the salient terms of a long-term forbearance period memorialized in a term sheet annexed to the forbearance agreement dated April 2, 2015 for the Prepetition $185 Million Facility.  Thereafter, 11 additional short-term forbearance extensions were negotiated with the Prepetition $185 Million Facility Requisite Majority Lenders to negotiate definitive documentation, again often times for 24-48 hours.  Accordingly, the parties'

negotiations culminated in the Transaction Support Agreement on May 21, 2015.[6]    The negotiation of the Transaction Support Agreement had the active involvement of the Boards and representatives of each creditor constituency seeking to maximize the overall value of the Debtors and the Formerly Operating Owned Businesses, while also seeking to obtain the best recovery for each creditor constituency.

26.    The lynchpin of the Transaction Support Agreement was an agreement by Holdings to place the common stock of TGII into escrow in exchange for soliciting offers for a sale or refinancing transaction with a third-party (either transaction, an "**Escrow Release Transaction**") prior to the end of the Forbearance and Marketing Period (October 20, 2015).[7] Accordingly, the common stock of TGII was held in the legal title of the Supplemental Agent for the Prepetition $185 Million Facility from May 21, 2015 until the date of the Collateral Agent Stock Turnover.[8]  Importantly, pursuant to the terms of the Transaction Support Agreement, the beneficial ownership of the TGII common stock was retained by Holdings and a change in control did not occur when the TGII common stock was placed into escrow.

27.    As noted above, the transfer of the TGII common stock to an escrow account was a condition precedent to Holdings (and the other entities) obtaining the benefit of the Forbearance and Marketing Period and, without such action, the Prepetition $185 Million Facility Requisite Majority Lenders and the ABL Facility Lender would not have agreed to a continued forbearance and would have been able to exercise remedies under their respective

---

[6] The description of the Transaction Support Agreement and the other related agreements are for summary purposes only.  In the event of any inconsistency between the agreements and this summary, the agreements will govern. Capitalized terms not defined herein shall have the meaning ascribed to them in the Transaction Support Agreement.

[7] As described in further detail below, if either of these transactions were achieved, the common stock in TGII would be released from escrow back to Holdings.

[8] During this time, the TGII common stock was held in escrow by U.S. Bank National Association, as Escrow Agent.

agreements, including foreclosing on their collateral.  Continued forbearance, however, would provide the Debtors and the Formerly Owned Operating Businesses with the requisite stability and liquidity to continue ordinary course operations and allow Blackstone/PJT to market thoroughly the businesses to pursue a third-party transaction that would provide all stakeholders, including the Debtors, with the best opportunity to identify a viable Escrow Release Transaction that would transfer the value of the TGII common stock back to Holdings.  All parties to the Transaction Support Agreement, and based upon the advice of Blackstone/PJT, determined that a 7-month out of court process on these terms was the best way to maximize the value of the Debtors and the Formerly Owned Operating Businesses.

28.    In exchange for agreeing to transfer the TGII common stock into escrow, Holdings negotiated for a guaranteed recovery – in the form of the Transaction Consideration – to be paid even if the Debtors and the Formerly Owned Operating Businesses were unable to consummate an Escrow Release Transaction. The Prepetition $185 Million Facility Requisite Majority Lenders also agreed, in furtherance of the administration of the bankruptcy cases and the wind-down of the Debtors' estates, to the transfer of the "Funded Amount" consisting of $700,000.  Ultimately, the Holdings Board of Directors determined that, in the event the marketing process failed to obtain value in excess of the debt and a turnover of the stock was triggered, the value given in exchange for that stock turnover was the best available under the circumstances, and would maximize the value potentially available to Holdings.

29.    The Transaction Support Agreement originally set forth a complex calculation of the Transaction Consideration, certain covenant testing that if failed could result in an acceleration of the stock turnover, creditor Prepack Plan support provisions, and release and

indemnification, amongst other things.  The Transaction Support Agreement is described in detail in the Disclosure Statement and annexed thereto.

### G.    Collateral Agent Stock Turnover

30.    Blackstone/PJT conducted a thorough marketing process where they contacted approximately 80 parties to sign nondisclosure agreements.  Of those parties, five submitted preliminary indications of interest and participated in management meetings.  Thereafter, due to declining performance of the Formerly Owned Operating Businesses, certain financial information related to the business performance was revised downward and three of the remaining parties declined to continue with the process.  Two parties submitted final bids which were well below the values of the secured debt.  The results of the marketing process established that the value of the Formerly Owned Operating Businesses fell well below the secured debt obligations – let alone all obligations – of those entities.  It also established that Holdings had no equity value in TGII (and, in turn, that Parent had no equity value in Holdings).

31.    In order to facilitate a more orderly stock turnover, the Outside Date was extended from October 20, 2015 through October 30, 2015.  Upon the eventual occurrence of the Outside Date, the Collateral Agent Stock Turnover occurred and the TGII common stock was released from the Escrow.  At the direction of the Prepetition $185 Million Facility Requisite Majority Lenders, the Supplemental Agent transferred beneficial control (as well as legal title) of the TGII common stock to a newly-created entity TGII HoldCo, LLC, pursuant to a trust agreement between TGII HoldCo, LLC and the Supplemental Agent.  TGII HoldCo, LLC operates as a blind trust, with John Brecker appointed and acting as sole manager and member of the trust.  In addition, Mr. Brecker was also appointed as a director and officer of TGII.  In connection with the occurrence of the Outside Date, the existing members of the Boards of Directors for TGII and its subsidiaries (other than the Chief Executive Officer and Chief

Financial Officer) were removed and resigned.[9] After the Collateral Agent Stock Turnover occurred, the Formerly Owned Operating Businesses continued their business operations uninterrupted.

32.    As discussed above, following the Stock Turnover Date, the parties to the Transaction Support Agreement continued their efforts to settle and liquidate the Transaction Consideration, which resulted in the Amendment entered into on December 31, 2015 that would streamline the Chapter 11 Cases.  Among other things, the Amendment provided for: (i) the liquidation and settlement of the Transaction Consideration; (ii) the release of the Holdings' guarantee of the Prepetition $185 Million Facility; (iii) coordination of the public foreclosure process for the Formerly Owned Operating Businesses and these Chapter 11 Cases; and (iv) cooperation and wind down services including tax filing, reporting, and communication plans to be provided by the post-foreclosure owner of the businesses.  Contemporaneous with the Amendment, the Debtors also entered into letter agreements with former officers and directors whereby those officers and directors resigned from the Debtors and Alvarez & Marsal resigned as restructuring advisors to the Debtors, all effective as of the Stock Turnover Date.

33.    Following the Amendment, the Prepetition $185 Million Facility Requisite Majority Lenders directed the Collateral Agent to commence a publicly-noticed auction and foreclosure process for certain assets of the Formerly Owned Operating Businesses.  In connection with the consummation of such foreclosure proceeding, the purchaser entities are domestic and foreign entities whose ultimate equity owners are the Prepetition $185 Million Facility Lenders.  Certain of the purchaser entities have assumed the monetary and cooperation obligations owed to Holdings under the Transaction Support Agreement and the Amendment.

---

[9] Subsequently, the Chief Executive Officer and Chief Financial Officer also resigned from the Boards of Directors of TGII and its domestic subsidiaries effective as of the Collateral Agent Stock Turnover Date.

As discussed in the Disclosure Statement, the ABL Facility was assumed by certain of the purchasers of the foreclosed upon assets in connection with consummation of the foreclosure proceeding for the Formerly Owned Operating Entities, was refinanced substantially contemporaneously with such assumption and, therefore, the ABL Facility does not hold any claims against the Debtors in these Chapter 11 Cases.

34.     Pursuant to the terms of the Transaction Support Agreement and the Amendment, Holdings received the Funded Amount contemporaneous with the stock turnover and the Fixed Transaction Consideration Payment (as such term is defined in the Disclosure Statement) consisting of $750,000 upon consummation of the foreclosure sale proceeding. The aggregate amount of the Transaction Consideration is insufficient to satisfy the Allowed Claims against Holdings' estate in full. Thus, these Chapter 11 Cases contemplate the distribution of the Transaction Consideration pursuant to a waterfall of right to payment at Holdings with no distribution to Parent and thereafter the dissolution of Parent and Holdings.

## IV.  GOALS OF CHAPTER 11 CASES

35.     The Debtors filed these Chapter 11 Cases to effectuate the wind down and dissolution contemplated by the Transaction Support Agreement subsequent to the Collateral Agent Stock Turnover. Specifically, the Chapter 11 Cases are intended to (i) achieve an orderly wind-down of the Debtors' estates and (ii) allocate distributions from the Transaction Consideration to the holders of unsecured claims at Holdings. The Debtors expect to proceed expeditiously through the Chapter 11 Cases.

## V.  FIRST DAY MOTIONS

36.     To facilitate the Chapter 11 Cases and an orderly wind-down of the Debtors' assets, the Debtors filed certain "first day" motions and applications (each, a "**First**

**Day Pleading**" and, collectively, the "**First Day Pleadings**"), filed concurrently herewith.  I have reviewed the factual background in support of each First Day Motion and Application and certify that the facts contained therein are true and correct to the best of my information, knowledge, and belief.

37.    I believe that the relief sought in the First Day Pleadings therein is necessary to permit an effective transition into chapter 11.

38.    In particular, the relief sought in the First Day pleadings will enable an orderly wind-down of the Debtors' estates and be in the best interests of the Debtors' estates and creditors.

## VI.  LOCAL BANKRUPTCY RULE 1007-2 SCHEDULES

39.     Attached hereto and incorporated herein by this reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-2(a)(3)-(12) and (b)(1)-(3).  The information requested in Local Rule 1007-2(a)(1) is set forth in Section I through III above.  The capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meanings ascribed to them in preceding paragraphs of this Declaration.

*        *        *

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 9th day of February, 2016.

By:     /s/ Christopher Layden

## **Exhibit A**

**Consolidated List of Thirty (30) Largest Unsecured Creditors**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X
                                                            :
In re:                                                      :    Chapter 11
                                                            :
TGHI, INC.,                                                 :    Case No. 16-10300 (MEW)
                                                            :
                          Debtor[10].                       :    Joint Administration Requested
                                                            :
---------------------------------------------------------------- X
                                                            :
In re:                                                      :    Chapter 11
                                                            :
PARENT THI, INC.,                                           :    Case No. 16-10301(MEW)
                                                            :
                          Debtor.                           :    Joint Administration Requested
                                                            :
---------------------------------------------------------------- X

## CONSOLIDATED LIST OF CREDITORS HOLDING
## 30 LARGEST UNSECURED CLAIMS

Following is a consolidated list of creditors holding the 30 largest unsecured claims against the above-captioned debtors and debtors-in-possession.

The list was prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure for filing in this chapter 11 case. The list does not include (i) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101(31), or (ii) any secured creditor among the holders of the 30 largest unsecured claims.

The list was prepared with information existing as of approximately February 5, 2016. The Debtor reserves its right to amend the list based on information obtained subsequent to that date.

The information contained in the list shall not constitute an admission by, nor shall it be binding upon the Debtors.

---

[10] The Debtors, and, if applicable, the last four digits of their taxpayer identification numbers are as follows: Parent THI, Inc. (5521) and TGHI, Inc. (3814).

| | Name of creditor and complete mailing address including zip code | Name, telephone number, fax number, and complete mailing address including zip code of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured state value of security)[11] |
|---|---|---|---|---|---|
| 1 | Carlyle Mezzanine Partners, LP The Carlyle Group 520 Madison Avenue New York, NY 10022 | | 10% Senior PIK Notes | | $6,460,588.24 |
| 2 | York Street Mezzanine Partners II, L.P. 364 Main Street, Suite 200 Bedminster, NJ 07921 | | 10% Senior PIK Notes | | $2,963,894.00 |
| 3 | York Street Mezzanine Partners, L.P. 364 Main Street, Suite 200 Bedminster, NJ 07921 | | 10% Senior PIK Notes | | $2,757,110.71 |
| 4 | Remzi Oten 2 Gardenia Irvine, CA 92620 | | 10% Senior PIK Notes | | $2,670,000.00 |
| 5 | Fevzi Oten 4831 E. Copa de Oro Drive Anaheim, CA 92807 | | 10% Senior PIK Notes | | $2,670,000.00 |
| 6 | Farallon Capital Offshore Investors II, LP One Maritime Plaza – Suite 2100 San Francisco, CA 94171 | | 10% Senior PIK Notes | | $2,535,303.52 |
| 7 | Saratoga Investment Funding Saratoga Partners 525 Madison Avenue New York, NY 10022 | | 10% Senior PIK Notes | | $1,538,235.29 |
| 8 | Invesco Dynamic Credit Opportunities Fund 3500 Lacey Road, Suite 700 Downers Grove, IL 60515 | | 10% Senior PIK Notes | | $1,538,235.29 |
| 9 | Hare & Co. c/o The Bank of New York Mellon One Wall Street – 3rd Floor New York, NY 10286 Attn: Transfer Section | | 10% Senior PIK Notes | | $1,384,411.76 |

[11] Face amount of claim, without any accrued interest.
* Claim against TGHI, Inc. only.
** Claim against Parent THI, Inc. only.

| | Name of creditor and complete mailing address including zip code | Name, telephone number, fax number, and complete mailing address including zip code of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured state value of security)[11] |
|---|---|---|---|---|---|
| 10 | Carlyle Mezzanine Partners, LP The Carlyle Group 520 Madison Avenue New York, NY 10022 | | 16% PIK Notes | | $1,374,388.60 |
| 11 | Farallon Capital Investors, LP One Maritime Plaza – Suite 2100 San Francisco, CA 94171 | | 10% Senior PIK Notes | | $1,360,896.94 |
| 12 | Farallon Capital Institutional Partners, LP One Maritime Plaza – Suite 2100 San Francisco, CA 94171 | | 10% Senior PIK Notes | | $1,182,287.65 |
| 13 | York Street Mezzanine Partners II, L.P. 364 Main Street, Suite 200 Bedminster, NJ 07921 | | 16% PIK Notes | | $712,032.65 |
| 14 | Invesco Senior Income Trust Invesco Dynamic Credit Opportunity Fund 3500 Lacey Road, Suite 700 Downers Grove, IL 60515 | | 10% Senior PIK Notes | | $676,823.53 |
| 15 | York Street Mezzanine Partners, L.P. 364 Main Street, Suite 200 Bedminster, NJ 07921 | | 16% PIK Notes | | $662,355.95 |
| 16 | GSC Partners CDO Fund VII GSC Group 300 Campus Drive Florham Park, NJ 07932 | | 10% Senior PIK Notes | | $615,294.12 |
| 17 | Farallon Capital Partners, LP One Maritime Plaza – Suite 2100 San Francisco, CA 94171 | | 16% PIK Notes | | $589,574.87 |
| 18 | Invesco Senior Loan Fund 3500 Lacey Road, Suite 700 Downers Grove, IL 60515 | | 10% Senior PIK Notes | | $553,764.71 |
| 19 | Farallon Capital Institutional Partners, LP One Maritime Plaza – Suite 2100 San Francisco, CA 94171 | | 16% PIK Notes | | $512,197.06 |
| 20 | Madison Park Funding II, Ltd. Credit Suisse Alternative Capital Inc. 1 Madison Avenue, 10th Floor New York, NY 10010 | | 10% Senior PIK Notes | | $461,470.59 |

| | Name of creditor and complete mailing address including zip code | Name, telephone number, fax number, and complete mailing address including zip code of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured state value of security)[11] |
|---|---|---|---|---|---|
| 21 | Castle Garden Funding<br>Credit Suisse Alternative Capital Inc.<br>1 Madison Avenue, 10th Floor<br>New York, NY 10010 | | 10% Senior PIK Notes | | $461,470.59 |
| 22 | Saratoga Investment Funding<br>535 Madison Avenue<br>New York, NY 10022 | | 16% PIK Notes | | $319,711.21 |
| 23 | Madison Park Funding III, Ltd.<br>Credit Suisse Alternative Capital Inc.<br>1 Madison Avenue, 10th Floor<br>New York, NY 10010 | | 10% Senior PIK Notes | | $307,647.06 |
| 24 | Gulf Stream-Compass CLO 2005-1<br>Apollo Management<br>9 West 57th Street, 37th Floor<br>New York, NY 10119 | | 10% Senior PIK Notes | | $307,647.06 |
| 25 | Farallon Capital AA Investors, L.P.<br>One Maritime Plaza – Suite 2100<br>San Francisco, CA 94171 | | 10% Senior PIK Notes | | $287,476.00 |
| 26 | Mudrick Distressed<br>Mudrick Capital Management<br>477 Madison Avenue, 12th Floor<br>New York, NY 10022 | | 10% Senior PIK Notes | | $246,456.05 |
| 27 | Farallon Capital AA Investors, L.P.<br>One Maritime Plaza – Suite 2100<br>San Francisco, CA 94171 | | 16% PIK Notes | | $124,524.00 |
| 28 | Farallon Capital Institutional Partners II, LP<br>One Maritime Plaza – Suite 2100<br>San Francisco, CA 94171 | | 16% PIK Notes | | $81,434.22 |
| 29 | Farallon Capital Institutional Partners III, LP<br>One Maritime Plaza – Suite 2100<br>San Francisco, CA 94171 | | 16% PIK Notes | | $66,640.45 |
| 30 | | | | | |

## Exhibit B

**Five (5) Largest Secured Creditors**

| | Name of creditor and complete mailing address including zip code | Name, telephone number, fax number, and complete mailing address including zip code of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured state value of security) |
|---|---|---|---|---|---|
| 1 | NZC Guggenheim Fund LLC<br>330 Madison Avenue, 10th Floor<br>New York, New York 10017 | | Loan | | $12,853,381.00 |
| 2 | Mudrick Distressed Opportunity Fund Global, LP<br>527 Madison Avenue, 6th Floor<br>New York, New York 10022 | | Loan | | $5,842,361.00 |
| 3 | Blackwell Partners LLC – Series A<br>527 Madison Avenue, 6th Floor<br>New York, New York 10022 | | Loan | | $1,304,258.00 |
| 4 | | | | | |
| 5 | | | | | |

**Exhibit C**

**Summary of Assets and Liabilities**

| Assets | $1,323,489 |
|---|---|
| Liabilities | $56,490,000 |

**<u>Exhibit E</u>**

**Location of Debtors' Books and Records**

Parent THI, Inc.
TGHI, Inc.
1211 North Miller Street
Anaheim, CA 92806