THIS SOLICITATION IS BEING COMMENCED TO OBTAIN ACCEPTANCES OF THE PLANS OF THE DEBTORS *PRIOR* TO THE FILING BY THE DEBTORS OF ITS CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE OR COMPLYING WITH APPLICABLE NON-BANKRUPTCY LAW, ALTHOUGH THE DEBTORS BELIEVE IT DOES.  FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION WITH RESPECT TO THE PLAN AND BEING IN COMPLIANCE WITH APPLICABLE NON-BANKRUPTCY LAW AND (B) THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE AND (II) CONFIRMING THE PLAN. THE VOTING DEADLINE IS **FEBRUARY 5, 2016** AT 4:00 P.M. **(PREVAILING NEW YORK TIME)** UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.  THE DEBTORS MAY COMMENCE THEIR CHAPTER 11 CASES PRIOR TO THE VOTING DEADLINE.  THESE MATERIALS HAVE NOT BEEN REVIEWED OR APPROVED BY ANY SECURITIES REGULATORY BODY.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TGHI, INC., et. al., | : | Case No. |
| | : | |
| Debtors.[1] | : | Joint Administration Pending |
| | : | |

------------------------------------------------------------------ x

**DISCLOSURE STATEMENT FOR THE PREPACKAGED PLAN OF LIQUIDATION OF THE DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph Corneau
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Adam C. Rogoff
Anupama Yerramalli
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Proposed Special Counsel for the Debtors*
*and Debtors in Possession*

Dated: February 3, 2016

---

[1] The Debtors, and, if applicable, the last four digits of their taxpayer identification numbers are as follows: Parent THI, Inc. (5521), and TGHI, Inc. (3814).

| **DISCLAIMER** |
| --- |

The information contained in this disclosure statement including the Exhibits attached hereto (collectively, the "**Disclosure Statement**") is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan.  No person is authorized by the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation regarding this Disclosure Statement or the Plan other than as contained in this Disclosure Statement and the Exhibits, Appendices, and/or other Schedules attached hereto, incorporated by reference or referred to herein, and if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

The Disclosure Statement shall not be construed to be advice on the tax, securities or other legal effects of the Plan as to holders of Claims against, or Equity Interests in, the Debtors,  or any other person.  Each holder of a Claim or Equity Interest should consult with its own legal, business, financial, and tax advisors with respect to any matters concerning this Disclosure Statement, the solicitation of votes to accept the Plan, the Plan, and the transactions contemplated hereby and thereby.

Each holder of an Impaired Claim entitled to vote on the Plan should carefully review the Plan, this Disclosure Statement and the Exhibits, Appendices and/or Schedules to both documents in their entirety before casting a ballot.  Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Exhibits, Appendices, and/or Schedules annexed to the Plan and this Disclosure Statement.  Please be advised, however, that the statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and holders of Claims reviewing this Disclosure Statement should not infer at the time of such review that there has not been any change in the information set forth herein since the date hereof unless so specified.  *In the event of any conflict between the descriptions set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan shall govern.*

As to contested matters, existing litigation involving, or possible litigation to be brought by, or against, the Debtors, adversary proceedings, and other actions or threatened actions, this Disclosure Statement and Plan shall not constitute or be construed as an admission of any fact or liability, a stipulation, or a waiver, but rather as a statement made without prejudice solely for settlement purposes in accordance with Federal Rule of Evidence 408, with full reservation of rights, and is not to be used for any litigation purpose whatsoever by any person, party, or entity.

**The Board of Directors of the Debtors have approved the Plan and recommend that the holders of Claims in all Impaired Classes entitled to vote (Classes 3**

and 5), vote to accept the Plan. **The Plan has been negotiated with and has the support of the Debtors' secured lenders and major unsecured creditor constituency. This Disclosure Statement, the Plan and the accompanying documents have been negotiated with the legal and/or financial advisors for, among others, the parties to the Transaction Support Agreement.**

The Debtors intend to confirm the Plan and cause the Effective Date to occur promptly after confirmation of the Plan. There can be no assurance, however, as to when and whether confirmation of the Plan and the Effective Date actually will occur. The confirmation and effectiveness of the Plan are subject to material conditions precedent. *See* Plan Section VII.A -- "Conditions Precedent to Effectiveness." There is no assurance that these conditions will be satisfied or waived. Procedures for distributions under the Plan are described under Section VI.F -- "Distributions Under the Plan." Distributions will be made only in compliance with these procedures.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against, and Equity Interests in, the Debtors (including, without limitation, those holders of Claims and Equity Interests that do not submit ballots to accept or reject the Plan or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

If the Plan is not approved and consummated, there can be no assurance that the Debtors will be able to successfully emerge from their chapter 11 cases, and the Debtors may be forced into a liquidation under chapter 7 of the Bankruptcy Code or under any other laws. As reflected in the Liquidation Analysis, ***the Debtors believe that if they are liquidated under chapter 7 of the Bankruptcy Code or otherwise, the value of the distributable assets available for payment of creditors, if any, would be significantly lower than the value of the distributions contemplated by and under the Plan.***

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

---

**As of the date of distribution, neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court and neither this Disclosure Statement nor the Plan has been filed with any state authority. The Plan has not been approved or disapproved by any state securities commission and no state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.**

**This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) (but has not been approved by the Bankruptcy Court as complying with section 1125 of the Bankruptcy Code and**

**Bankruptcy Rule 3016(b)).**

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "should," "could," "intend," "consider," "expect," "plan," "anticipate," "believe," "predict," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.  You are cautioned that all forward-looking statements involve risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  Important factors that could cause or contribute to such differences include those in Article X: "Certain Risk Factors to be Considered," generally and in particular "Additional Factors to be Considered--Forward-Looking Statements are not Assured, and Actual Results May Vary."  The Liquidation Analysis set forth in Exhibit I, distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND EXECUTIVE SUMMARY .................................................................9
    A.      Overview of Chapter 11..............................................................................14
    B.      Voting Rights..............................................................................................14
    C.      Claims Entitled to Vote...............................................................................15
    D.      Solicitation and Voting Process...................................................................16
    E.      Beneficial Owners of the PIK Notes...........................................................18
    F.      The Confirmation Hearing...........................................................................18

II. SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER
    THE PLAN ......................................................................................................................18
    A.      Summary ....................................................................................................19

III. BACKGROUND ...........................................................................................................21
    A.      The Debtors' Businesses..............................................................................21
    B.      The Prepetition Capital Structure.................................................................22
           1.      The ABL Facility.............................................................................22
           2.      The Prepetition $185 Million Facility...............................................23
           3.      The Prepetition $20 Million Facility.................................................23
           4.      The Parent PIK Notes.......................................................................24
           5.      The Holdings PIK Notes ...................................................................24
    C.      Equity .........................................................................................................24

IV. EVENTS LEADING TO THE  COMMENCEMENT OF THE CHAPTER 11
    CASES ...........................................................................................................................24
    A.      Changes in the Computer Carrying Case and Accessory Markets ................24
    B.      December 2014 Covenant Defaults ..............................................................25
    C.      Prepetition Negotiations with the Prepetition $185 Million Facility
           Requisite Majority Lenders...........................................................................26
    D.      Prepetition $20 Million Facility...................................................................27
    E.      ABL Facility Amendment and Forbearance Agreements..............................27
    F.      Negotiation and Entry into the Transaction Support Agreement....................28
           1.      Forbearance and Marketing Period ....................................................29
           2.      Transaction Consideration .................................................................30
           3.      Covenant Testing .............................................................................31
            4.      Plan Support.....................................................................................32
           5.      Releases and Indemnification ............................................................32
    G.      Marketing Process.......................................................................................32
    H.      Collateral Agent Stock Turnover .................................................................33

V. THE ANTICIPATED CHAPTER 11 CASES....................................................................35
    A.      First Day Motions and Retention of Professionals. ......................................35
           1.      Scheduling Motion............................................................................35
           2.      Procedural Motions and Professional Retention Applications .................35

iv

VI. SUMMARY OF THE PREPACKAGED PLAN ............................................36
    A.    Classification and Treatment of Administrative and Priority Claims,
        Claims and Equity Interests the Plan ............................................36
        1.    Description and Treatment of Unclassified Claims. ...................36
        2.    Classification and Treatment of Claims and Equity Interests. ...............38
    B.    Means for Implementation of the Plan ............................................42
        1.    Effectuating Transaction Support Agreement and Subordination ............42
        2.    Dissolution of the Debtors ............................................43
        3.    Liquidation of Assets ............................................43
        4.    Post-Confirmation Reports and Fees ............................................43
        5.    Funded Amount and Wind-Down Reserve ............................................43
        6.    Release of Liens ............................................44
        7.    Voting of Claims. ............................................44
        8.    Treatment of Intercreditor Agreements ............................................44
        9.    Nonconsensual Confirmation. ............................................44
        10.    Indemnification of Directors, Officers and Employees. ............................................44
    C.    Effect of Confirmation of the Plan ............................................45
        1.    Compromise and Settlement of Claims and Controversies ...................45
        2.    Injunction. ............................................45
        3.    Preservation of Causes of Action. ............................................47
        4.    Release of Avoidance Actions ............................................48
        5.    Votes Solicited in Good Faith. ............................................48
        6.    Payment of PIK Notes Administrative Agent ............................................48
        7.    Cancellation of Certain Indebtedness and Existing Securities. ...............48
        8.    Claims Incurred After the Effective Date. ............................................49
        9.    Releases, Exculpations and Injunctions of Released Parties. ...................49
    D.    Distributions Under the Plan ............................................53
        1.    Procedures for Treating Disputed Claims ............................................53
        2.    Allowed Claims. ............................................53
        3.    Distributions to Holders of Claims: ............................................54
        4.    Allocation of Consideration. ............................................54
        5.    Estimation. ............................................55
        6.    Claims Paid by Third Parties ............................................55
        7.    Insured Claims. ............................................55
    E.    Retention of Jurisdiction. ............................................55
    F.    Executory Contracts and Unexpired Leases. ............................................56
        1.    Assumption of Executory Contracts and Unexpired Leases ...................57
        2.    Cure Claims. ............................................57
        3.    Reservation of Rights. ............................................58
        4.    Rejection of Executory Contracts and Unexpired Leases ...................58
        5.    Assignment. ............................................58
        6.    Insurance Policies. ............................................59
        7.    Benefit Plans and Indemnification Agreements ............................................59
    G.    Miscellaneous Provisions ............................................59
        1.    Immediate Binding Effect. ............................................59
        2.    Governing Law. ............................................59

3.    Filing or Execution of Additional Documents............................................59
4.    Term of Injunctions of Stays..................................................................60
5.    Withholding and Reporting Requirements. ..............................................60
6.    Conflicts. ...............................................................................................60

VII. CONFIRMATION AND EFFECTIVENESS OF THE PLAN ............................60
A.    Conditions Precedent to Confirmation....................................................60
B.    Waiver of Conditions Precedent to Confirmation. ..................................60
C.    Conditions Precedent to Effectiveness....................................................61
D.    Waiver of Conditions Precedent to Effectiveness. ..................................61
E.    Effect of Failure of Conditions. .............................................................61
F.    Vacatur of Confirmation Order...............................................................61
G.    Modification of the Plan. .......................................................................62
H.    Revocation, Withdrawal, or Non-Consummation. ..................................62
1.    Right to Revoke or Withdraw. ...............................................................62
2.    Effect of Withdrawal, Revocation, or Non-Consummation. ....................62

VIII. CONFIRMATION PROCEDURES ...................................................................62
A.    Combined Disclosure Statement and Confirmation Hearing....................62
B.    Confirmation of the Plan........................................................................63
1.    Acceptance.............................................................................................63
2.    Standards for Confirmation....................................................................63
3.    Feasibility. .............................................................................................67
4.    Best Interests Test. .................................................................................67

IX. CERTAIN RISK FACTORS TO BE CONSIDERED .........................................68
A.    Certain Bankruptcy Law Considerations. ...............................................69
1.    Financial Information; Disclaimer ..........................................................69
2.    Parties in Interest May Object to the Debtors' Classification of
       Claims and Interests...............................................................................69
3.    Contingencies Not to Affect Votes of Impaired Classes to Accept
       or Reject the Plan ..................................................................................69
4.    The Debtors May Fail to Satisfy the Solicitation Requirements
       Requiring a Re-Solicitation....................................................................69
5.    Risk of Non-Confirmation. ....................................................................70
6.    Delays of Confirmation or Effective Date. .............................................70
7.    Estimation of Claims..............................................................................70
8.    Withdrawal or Conversion of Parent Debtor Case ..................................71
9.    Insufficiency of the Funded Amount and the Wind-Down Reserve..........71
B.    Additional Factors to Be Considered.......................................................71
1.    The Debtors Have No Duty to Update.....................................................71
2.    No Representations Outside this Disclosure Statement Are
       Authorized..............................................................................................71
3.    Forward-Looking Statements Are Not Assured, and Actual Results
       May Vary. ..............................................................................................71
4.    No Legal or Tax Advice Is Provided to You by This Disclosure
       Statement................................................................................................72

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.........72

    A.    Alternative Plan of Liquidation. ............................................................72

    B.    Liquidation Under Chapter 7. ..............................................................72

    C.    Dismissal of Debtors' Chapter 11 Cases ..............................................73

XI. CERTAIN UNITED STATES FEDERAL INCOME TAX  CONSEQUENCES OF

    THE PLAN .................................................................................................73

    A.    Introduction..........................................................................................73

    B.    Certain United States Federal Income Tax Consequences to the Debtors.............74

    C.    Certain United States Federal Income Tax Consequences to Holders of

        Claims. .................................................................................................74

XII. RECOMMENDATION AND CONCLUSION .................................................75

## TABLE OF EXHIBITS

**Exhibit A:**    Prepackaged Plan of Liquidation of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code

**Exhibit B:**    Global Forbearance and Transaction Support Agreement, dated May 21, 2015[2]

**Exhibit C:**    First Amendment to Global Forbearance and Transaction Support Agreement and Wind Down Cooperation Agreement, dated December 31, 2015

**Exhibit D:**    Conformed Copy of the Global Forbearance and Transaction Support Agreement (for informational purposes only)

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

---

[2] Exhibits to the agreement may be provided upon request.

# I. INTRODUCTION AND EXECUTIVE SUMMARY

Parent THI, Inc. (f/k/a Targus Holdings, Inc.) ("**Parent**") and TGHI, Inc. (f/k/a Targus Group Holdings, Inc.) ("**Holdings**")[3], as chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively the "**Debtors**") in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**") submit this Disclosure Statement pursuant to section 1126 of title 11 of the United States Code (the "**Bankruptcy Code**"), for use in the solicitation of votes on the Plan of Liquidation of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated as of February 2, 2016 (as the same may be amended from time to time) (the "**Plan**").  A copy of the Plan is annexed as **Exhibit B** to this Disclosure Statement.  **Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.**

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make informed decisions on whether to vote to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding (i) the prepetition operating and financial history of the Debtors and, to the extent relevant for background, the formerly affiliated non-debtor businesses, (ii) the purposes of these Chapter 11 Cases and the key prepetition agreements supporting these cases, and (iii) projected financial information and liquidation analyses relating to the Debtors.

These Chapter 11 Cases represent the culmination of a consensual process that, prior to filing, allowed the Debtors, in coordination with Blackstone Advisory Partners, L.P., now known as PJT Partners L.P. ("**Blackstone/PJT**"), to obtain time and liquidity to thoroughly market the businesses previously owned by Holdings and operated by non-debtor Targus Group International, Inc. ("**TGII**," together with TGII's direct and indirect subsidiaries, the "**Formerly Owned Operating Businesses**"), and thereby market test the value of those underlying businesses.  Despite various events of default commencing in December 2014 under each of the operative senior secured revolving loan and term loan credit facilities for the Debtors and the Formerly Owned Operating Businesses, the Debtors obtained multiple short and long term forbearances and, importantly, ample time to analyze and pursue strategic alternatives, including a potential sale of the Formerly Owned Operating Businesses and/or refinancing of the defaulted senior secured facilities. To avoid the potential disruption to the domestic and international operations (and value) of the Formerly Owned Operating Businesses that might otherwise result from a chapter 11 filing for those businesses, and following months of negotiations, the Debtors entered into a comprehensive Global Forbearance and Transaction Support Agreement dated May 21, 2015 (the "**Transaction Support Agreement**").  The agreement was entered into with, among others, a group of funds holding or controlling the requisite majority of the Prepetition $185 Million Facility (the "**Prepetition $185 Million Facility Requisite Majority Lenders**").[4] As discussed below, this agreement avoided the need for an immediate bankruptcy filing by the operating entities, allowed for a thorough pursuit of non-bankruptcy solutions to maximize value

---

[3] Contemporaneous with the commencement of solicitation of the Plan, the Debtors amended their corporate names.

[4] As discussed in detail below, the Prepetition $185 Million Facility was previously guaranteed by Holdings, which guarantee was waived as part of an amendment to the Transaction Support Agreement entered into in December 2015.

for all stakeholders and, importantly, provided for an immediate infusion of new liquidity (in the form of a $20 million new term loan facility provided by the Prepetition $185 Million Facility Requisite Majority Lenders) to stabilize operating needs.  Ultimately, this market test process failed to yield a result that would repay or refinance a meaningful portion – let alone all – of the senior secured debt facilities against the Formerly Owned Operating Businesses (or the Debtors).  However, the process definitively established that Holdings had no equity value in TGII.

Prior to the transactions described below, the Debtors were the ultimate direct or indirect holding companies of TGII and the other Formerly Owned Operating Businesses.  The Parent owns 100% of the equity interests in Holdings.  Prior to October 30, 2015 (the "**Stock Turnover Date**"), subject to the provisions of the Transaction Support Agreement (including the transfer of TGII stock into escrow), Holdings owned 100% of the equity interests in TGII.[5]  On the Stock Turnover Date, however, Holdings' remaining interests in the equity of TGII terminated.  Accordingly, as of the Stock Turnover Date, the Debtors' estates consist of their rights under the Transaction Support Agreement and they have no ownership or other interest in TGII or the other Formerly Owned Operating Businesses.

As noted, the operative transactions underlying these cases are memorialized by the Transaction Support Agreement, which, together with numerous, shorter-term forbearances, negotiated with the Prepetition $185 Million Facility Requisite Majority Lenders enabled the Debtors to obtain the benefit of a 210-day[6] marketing period to achieve either (i) a financing transaction that would pay the secured lenders in full or (ii) a sale transaction on terms acceptable to the secured lenders on or before October 20, 2015 (the "**Outside Date**,"[7] and the forbearance and marketing period, the "**Forbearance and Marketing Period**").  In other words, the Forbearance and Marketing Period allowed for a determination of whether the senior secured creditors holding claims against the Formerly Owned Operating Businesses were over- or undersecured and in turn whether there was any value available for the general unsecured creditors at Holdings, and thereafter, Parent.  It was also a condition of the Prepetition $185 Million Facility Requisite Majority Lenders that, in exchange for a longer forbearance that provided adequate time to conclude the marketing process through the Outside Date, Holdings conveyed legal title to (but not beneficial control over) its equity interests in TGII (which was subject to a pre-existing lien in favor of the lenders under the Prepetition $185 Million Facility) to the term loan's supplemental collateral agent.  The transferred TGII stock was deposited into escrow pending the outcome of the marketing process.  If neither a refinancing nor a sale transaction could be achieved prior to the termination of the Forbearance and Marketing Period, the terms of the Transaction Support Agreement provide that the stock of TGII would be automatically released from the escrow account and distributed by the supplemental collateral

---

[5] The prepetition transactions regarding the deposit of the TGII stock into escrow, transfer of legal title for the TGII stock into the name of Cortland Capital Market Services, as Supplemental Agent, and the retention of beneficial control by Holdings with respect to the TGII stock, are described more fully below.

[6] The 210-day marketing period was agreed during one of the interim forbearances and prior to the Transaction Support Agreement being executed and factored into setting October 20, 2015 as the deadline.

[7] Through a series of short-term agreements, the Outside Date was extended until 5:00 p.m. (Eastern Time) on October 30, 2015.  In connection with the expiration of the Outside Date extensions, the Stock Turnover occurred.

agent at the direction of the Prepetition $185 Million Facility Lenders. The parties referred to this as a "Stock Turnover." Notably, during the Forbearance and Marketing Period, although legal title to the TGII stock had been transferred to the supplemental collateral agent for the term lenders, Holdings retained its beneficial control over the governance of TGII and, in turn, TGII's business operations, which beneficial control would terminate if the TGII stock were released from the escrow account in connection with the Stock Turnover. The Stock Turnover is what subsequently occurred on the Stock Turnover Date when a transaction could not be achieved prior to the Outside Date.

During the Forbearance and Marketing Period, the Debtors and their advisors conducted a thorough marketing of TGII and its subsidiaries (including seeking bids for a potential stock and/or asset sales and refinancing). While there were certain negotiated covenants in the Transaction Support Agreement (e.g., minimum net sales and minimum EBITDA) that could terminate the Forbearance and Marketing Period prior to the Outside Date, the Debtors obtained the full benefit of their planned marketing process.[8] During this time, however, TGII continued to face significant business challenges, and its updated forecast included lower sales and earnings projections than previously shown to potential bidders. Final bids were received by the end of August 2015 and such bids failed to provide for an acceptable transaction. These bids were not sufficient to satisfy all or even a substantial portion of the secured debt. Thus, while the marketing process was not successful in facilitating an alternative transaction to that embodied by the Transaction Support Agreement, it established that the fulcrum value of TGII's operations did not exceed the secured debt asserted against TGII and its subsidiaries, and, as such, both Holdings, and by definition Parent, are insolvent.

The Transaction Support Agreement provided material benefits to Holdings and Parent in exchange for Holdings agreeing to transfer the TGII stock into escrow and thereby facilitating the necessary forbearance and liquidity for TGII and, importantly for the Debtors, the opportunity for Blackstone/PJT to fully market the Formerly Owned Operating Businesses in an out-of-court environment. Specifically, the Prepetition $185 Million Facility Requisite Majority Lenders agreed to, among other things, (i) fund $500,000 for the administration of these bankruptcy cases through confirmation and $200,000 for the post-confirmation wind-down and administration of the Debtors' estates (collectively, the "**Funded Amount**"), and (ii) facilitate (and cause the Prepetition $185 Million Facility lenders to ensure through subordination) the payment of the Transaction Consideration to Holdings. As of the Stock Turnover Date, Holdings' distributable assets consisted of the rights to the Transaction Consideration and other amounts payable under the Transaction Support Agreement.

Subsequent to the Stock Turnover Date, the Debtors and other parties to the Transaction Support Agreement resumed negotiations in an effort to fix and liquidate the value of the Transaction Consideration prior to the commencement of these Chapter 11 Cases. As a result of those negotiations, the parties entered into an amendment to the Transaction Support Agreement (the "**Amendment**"), pursuant to which the parties agreed to liquidate and settle the

---

[8] Despite not meeting the minimum net sales covenant in August 2015, the Requisite Prepetition $185 Million Facility Lenders did not exercise a right to terminate the forbearance period and accelerate the Outside Date. As such, the breach of this covenant did not impact the marketing process.

amount of the Transaction Consideration at: (i) $750,000 to be funded to Holdings after the consummation of a publicly-noticed asset foreclosure sale process – whereby the Prepetition $185 Million Facility Lenders submitted the highest bid and became the new owners of certain of the assets of TGII,[9] and (ii) any unused portion of the $700,000 Funded Amount. Thus, to the extent any portion of the Funded Amount remains after the consummation of the Chapter 11 Cases and the wind-down of the estates, such amount will be distributed to holders of General Unsecured Claims against Holdings that vote to accept the Plan. The Amendment definitively established that the holders of the Holdings PIK Note Claims would, at best, only receive a small distribution on account of their claims. Ultimately, because the value of the Transaction Consideration was significantly less than the outstanding amount of the Holdings PIK Notes Claims, there are not projected to be any distributable assets for the holders of general unsecured claims of Parent, including the Parent PIK Claims. As such, creditors of Parent will not receive any distribution under the Plan.

In addition to the settlement of the Transaction Consideration, as part of the Amendment, the Prepetition $185 Million Facility Lenders agreed to waive and release all of their claims against Holdings on account of Holding's guarantee of the Prepetition $185 Million Facility. As a result, the Prepetition $185 Million Facility Lenders have no remaining claims against the Debtors in these Chapter 11 Cases.

In accordance with the Transaction Support Agreement and the Amendment, the Debtors and the parties thereto have negotiated the terms of a chapter 11 plan that provides for a recovery to unsecured creditors of Holdings that, based upon Holdings' insolvency, would otherwise be unavailable absent the settlement regarding the Transaction Consideration. The key components of the Plan are as follows:

- Holders of the Allowed Prepetition $20 Million Facility Claims will allocate their distribution on account of any claims they hold against Holdings under the applicable debt documents (secured or unsecured) to holders of General Unsecured Claims against Holdings.

- As a result of the allocation of distributions by the lenders under the Prepetition $20 Million Facility, holders of Allowed General Unsecured Claims against Holdings will receive their pro rata share of the Fixed Transaction Consideration Payment and any other Distributable Holdings Assets. Only those Holders of General Unsecured Claims against Holdings that vote in favor of the Plan will receive their pro rata share of the Residual Funded Amount.[10]

---

[9] Nothing herein purports to describe the foreclosure process undertaken by the secured creditors of the Formerly Owned Operating Businesses.

[10] The Allowed General Unsecured Claims against Holdings consist of the Holdings PIK Note Claims and any other Unsecured Claims asserted against Holdings. However, the Debtors are not aware of any Unsecured Claims against Holdings other than the Holdings PIK Note Claims, and believe that the Class of General Unsecured Claims against Holdings consists solely of the Holdings PIK Note Claims.

- Payment in full, in cash, of all Allowed Administrative Claims, statutory fees, and, to the extent applicable, Priority Tax Claims, Other Priority Claims and Other Secured Claims against Holdings.[11]

- Equity Interests in Holdings will be cancelled and Parent will not receive any distribution on account of those Equity Interests. Because the Debtors believe that Parent has no other assets or distributable value, no creditors of Parent, including General Unsecured Claims against Parent are projected to receive any distribution on account of their claims.[12] As a result, the Debtors are not soliciting votes on the Plan from holders of General Unsecured Claims against Parent.

- Equity Interests in Parent will be cancelled on the Effective Date and will receive no distribution on account of those Equity Interests.

Pursuant to the Transaction Support Agreement, the Plan has the support of (i) 100% of the Prepetition $20 Million Facility Lenders, (ii) a majority of the holders of the Holdings PIK Notes, which notes represent all of the unsecured claims against Holdings, and (iii) pursuant to the direction of a majority of the holders of the Holdings PIK Notes, the Administrative Agent for the Holdings PIK Notes.

**Additionally, as described in Section VI.C.9 herein, the Plan provides for the exculpation and release of Claims against, among others, the Debtors, the parties to the Transaction Support Agreement, and each of their professionals, employees, officers, and directors, among others.**

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the instructions accompanying the Ballots, in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. The statements contained in this Disclosure Statement are made only as of the date hereof unless otherwise specified, and there can be no assurance that the statements contained herein will be correct at

---

[11] There are not projected to be any Priority Tax Claims, Other Priority Claims and Other Secured Claims against Parent.

[12] The Allowed General Unsecured Claims against Parent consist of the Parent PIK Note Claims and any other Unsecured Claims asserted against Parent. However, the Debtors are not aware of any Unsecured Claims against Parent other than the Parent PIK Note Claims.

any time hereafter.    All creditors should also carefully read Section VIII of this Disclosure Statement – the "Risk Factors" – before voting to accept or reject the Plan.

THE DEBTORS BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR STAKEHOLDERS.  FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (*I.E.*, THE DATE BY WHICH YOUR BALLOT MUST BE **ACTUALLY RECEIVED**), WHICH IS **FEBRUARY 5, 2016 AT 4:00 P.M. (PREVAILING NEW YORK TIME**).

A.    **Overview of Chapter 11**.

While chapter 11 is the principal business reorganization chapter of the Bankruptcy Code, under chapter 11, a debtor is authorized to either reorganize its business or engage in an orderly liquidation of its business for the benefit of itself, its creditors, and its equity interest holders.

Consummation of a Chapter 11 plan is the principal objective of a chapter 11 case.  A Chapter 11 plan sets forth the means for satisfying claims against and equity interests in the debtor.  Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any holder of a claim or equity interest in a debtor.

The Debtors' Plan is a plan of liquidation.  In general, a Chapter 11 plan of liquidation (i) divides claims and interests into separate classes, (ii) specifies the property that each Class is to receive under the plan, (iii) provides for the orderly liquidation of the Debtors' assets, and (iv) contains other provisions necessary to implement the plan.  The Bankruptcy Code authorizes a debtor to solicit votes for the acceptance of a chapter 11 plan prior to the filing of a chapter 11 case through a so-called "prepackaged" plan process. Because solicitation of acceptances takes place all or in part before the bankruptcy filing, the duration of the bankruptcy case is often less than in conventional bankruptcy cases. Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require the plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to, and soliciting votes from, the Holders of Impaired Claims against them in order to satisfy the requirements of sections 1125(a) and 1126(b) of the Bankruptcy Code.

B.    **Voting Rights**.

Only administrative expenses, claims, and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  An "allowed" administrative expense, claim or equity interest means that a debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, a debtor.  The Bankruptcy Code also requires that, for purposes of treatment and voting, a plan categorize the different claims against,

and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are typically classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (*i.e.*, altered by the plan) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or equity interests, such as the right to vote on the plan (unless the plan deems the holder to reject the plan), and the right to receive an amount under the Chapter 11 plan that is not less than the value that the holder would receive if the debtor against which such claims or equity interests are asserted were liquidated under chapter 7.

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.

**Only holders of allowed claims or equity interests in impaired classes of claims or equity interests that receive or retain property under a proposed plan of liquidation, but are not otherwise deemed to reject the plan, are entitled to vote on such a plan.** Holders of unimpaired claims or equity interests are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Holders of claims or equity interests that do not receive or retain any property on account of such claims or equity interests are deemed to reject the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote.

C.    **Claims Entitled to Vote**.

As discussed in further detail below, pursuant to the Plan:

- Holders of Claims and Equity Interests in Classes 3 and 5 are Impaired and will either receive distributions under the Plan on account of their Claims or are allocating their right to receive distributions under the Plan on account of their Claims to certain creditors in other Classes. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

- Holders of Claims and Equity Interests in Classes 1 and 2 are Unimpaired. As a result Holders of Claims and Equity Interests in those Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

15

- Holders of Claims in Class 4 are Impaired, but because the Debtors believe that Parent does not have any assets available for distribution to holders of Claims in Class 4, holders of Claims in Class 4 have been deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

- Holders of Claims and Equity Interests in Classes 6, 7, and 8 are Impaired and will not receive or retain any property on account of such Claims or Equity Interests, and are deemed to have rejected the Plan.  As a result, holders of Claims and Equity Interests in Classes 6, 7, and 8 are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims actually voted to accept or reject the plan.  **Your vote on the Plan is important.**  The Bankruptcy Code requires as a condition to confirmation of a Chapter 11 plan that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

Section 1129(b) permits confirmation of a plan notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims votes to accept a proposed plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  The Debtors intend to pursue a "cram down" of the Holders of Claims and Equity Interests in Classes 4, 6, 7 and 8, who are deemed to have rejected the Plan.

### D.    Solicitation and Voting Process.

The following summarizes the procedures to accept or reject the Plan.  Holders of Claims entitled to vote are encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or to consult their own attorneys.

### 1.    The "Solicitation Package."

The following materials are provided to each holder of a Claim that is entitled to vote on the Plan:

- the applicable Ballot and voting instructions;

- a Disclosure Statement with all exhibits; and

- the Plan.

The holders of Claims in Classes 3 and 5 will receive the Solicitation Package, including the ballot, via electronic mail.

If you (a) did not receive a Ballot and believe you are entitled to one; (b) received a damaged Ballot; (c) lost your Ballot; (d) have any questions concerning this Disclosure Statement, the Plan, the procedures for voting on the Plan, or the solicitation packet of materials you received; or (e) want to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, **please contact the Debtors' voting agent, Kurtzman Carson Consultants LLC ("KCC") at (917) 281-4833.**

2.      **Voting Deadlines.**

**To be counted, your Ballot(s) must be actually received by KCC no later than: February 5, 2016 at 4:00 p.m. (prevailing New York time).**

3.      **Voting Instructions.**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. Separate forms of Ballots are provided for the holders of Claims in different Voting Classes entitled to vote on the Plan.  **A separate Ballot must be used for each Voting Class.**  Any Person who holds Claims in more than one Voting Class is required to submit a separate ballot for its Claims in each Voting Class.  Except as provided below, **holders of Claims are required to vote all of their Claims within a Class either to accept or reject the Plan and may not split their votes.  Any Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will not be counted.  Any Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be an invalid Ballot and will not be counted.**

If you are the record holder of Claims that are beneficially owned by another party, you may submit a separate Ballot with respect to such portion of Claims that are beneficially owned by such third party, and the vote indicated on such separate Ballot may differ from the vote indicated on Ballots submitted with respect to Claims that you beneficially own yourself or that are beneficially owned by other parties.  In no event may you submit Ballots with respect to Claims in excess of the amount of Claims for which you are the record holder as of the Voting Record Date.

In accordance with Bankruptcy Rule 3018(c), the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this Chapter 11 Case.

Please sign and complete a separate Ballot with respect to each Claim, and return your Ballot(s) **directly to KCC by one of the following methods**:

- by hand delivery, overnight courier, or first class mail to: TGHI Ballot Processing, c/o KCC, 1290 Avenue of the Americas, 9th Floor, New York, New York 10104; or

- by e-mail to: TGHIInfo@kccllc.com.

**Only Ballots with a signature will be counted.  Email submission of ballots is preferred.  Only Ballots received by KCC by the applicable voting deadline will be counted.**

**If delivery of a Ballot is by mail, it is recommended that voters use an air courier with guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery. The method of such delivery is at the election and risk of the voter.**

A Ballot may be withdrawn by delivering a written notice of withdrawal to KCC, so that KCC receives the notice before the Voting Deadline.  In order to be valid, a notice of withdrawal must (a) specify the name of the creditor who submitted the Ballot to be withdrawn, (b) contain a description of the Claim(s) to which it relates, and (c) be signed by the creditor in the same manner as on the Ballot.  The Debtors expressly reserve the right to contest the validity of any withdrawals of votes on the Plan.

After the Voting Deadline, any creditor who has timely submitted a properly-completed Ballot to KCC may change or withdraw its vote only with the approval of the Bankruptcy Court.  If more than one timely, properly-completed Ballot is received with respect to the same Claim and no order of the Bankruptcy Court allowing the creditor to change its vote has been entered before the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly-completed Ballot determined by KCC to have been received last.

E.    **Beneficial Owners of the PIK Notes**.

By voting on the Plan, you are certifying that you are the beneficial owner of the Holdings PIK Notes as of the Record Date being voted or an authorized signatory for the beneficial owner.  Your submission of a Ballot will also constitute a request that you (or in the case of an authorized signatory, the beneficial owner) be treated as the record holder of those securities for purposes of voting on the Plan.

F.    **The Confirmation Hearing.**

The Debtors will request that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), as soon as possible, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408. The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and have reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## II.  SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

The following table summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Equity Interests thereunder.  The summaries in this table are qualified in

their entirety by the description of the treatment of such Claims in Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, U.S. Trustee Fees, Fee Claims, and Priority Tax Claims have not been classified.

Although the Plan applies to all of the Debtors, the Plan constitutes two (2) distinct chapter 11 plans, one for each Debtor. The classification of Claims and Equity Interests set forth in the Plan will apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein and in the Plan. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (i.e., there will be two (2) sub-Classes in each Class and many of such sub-Classes may be vacant).

### A.    Summary

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[13] | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 1 | Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement and release and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will receive payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim. | Unimpaired | Deemed to Accept | None | 100% |

---

[13] The estimated aggregate Allowed amount of the Claims in each Class is as of January 31, 2016, and does not include potential damages claims that may arise as a result of the rejection of executory contracts or unexpired leases.

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[13] | Projected Recovery |
|-------|------|------|------|------|------|------|
| Class 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors, in full and final satisfaction, settlement and release of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim will either: (i) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (ii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim. | Unimpaired | Deemed to Accept | None | 100% |
| Class 3 | Prepetition $20 Million Facility Claims | In exchange for each Prepetition $20 Million Facility Claim, each holder of an Allowed Prepetition $20 Million Facility Claim will, on the Effective Date, will allocate its right to receive a distribution of the Transaction Consideration and any Distributable Holdings Assets to the holders of Allowed Class 7 Unsecured Claims against Holdings, provided, however, that for the avoidance of doubt the treatment of the Prepetition $20 Million Facility Claims pursuant to the Plan will not constitute a release of any Prepetition $20 Million Facility Claims held by holders of Allowed Prepetition $20 Million Claims against any entity other than the Debtors. | Impaired | Entitled to Vote | $21,019,178.08 | 0% |
| Class 4 | General Unsecured Claims against Parent | In full and final satisfaction, settlement and release of and in exchange for each Allowed General Unsecured Claim against Parent, each holder of an Allowed General Unsecured Claim against Parent will receive its pro rata share of the Distributable Parent Assets, if any. ***There are not projected to be any Distributable Parent Assets.*** | Impaired | Deemed to Reject | $52,733,222.82 | 0% |

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[13] | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 5 | General Unsecured Claims against Holdings | In full and final satisfaction, settlement and release of and in exchange for each Allowed General Unsecured Claim against Holdings, on the Effective Date, (i) each holder of an Allowed Class 6 Claim that votes to accept the Plan by the Voting Deadline will receive its pro rata share of: (x) the Fixed Transaction Consideration Payment, (y) any Distributable Holdings Assets, and (z) the Residual Funded Amount; and (ii) alternatively, each holder of an Allowed Class 6 Claim that either votes to reject the Plan or does not vote on the Plan by the Voting Deadline will receive its pro rata share of (a) the Fixed Transaction Consideration Payment, and (b) any Distributable Holdings Assets. | Impaired | Entitled to Vote | $8,323,999.13 | 11-13% |
| Class 6 | Intercompany Claims | On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims will be deemed extinguished and released, and will not receive any distributions under the Plan. | Impaired | Deemed to Reject | N/A | 0% |
| Class 7 | Equity Interests in Holdings | On the Effective Date, Equity Interests in Holdings will be cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Equity Interests will not receive or retain any property under the Plan on account of such Equity Interests in Holdings. | Impaired | Deemed to Reject | N/A | 0% |
| Class 8 | Equity Interests in Parent | On the Effective Date, Equity Interests in Parent will be cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Equity Interests will not receive or retain any property under the Plan on account of such Equity Interests in Parent. | Impaired | Deemed to Reject | N/A | 0% |

## III. BACKGROUND

### A.    The Debtors' Businesses.

The Debtors were the former direct (Holdings) or indirect (Parent) holding companies of TGII and its subsidiaries.  The Formerly Owned Operating Businesses – *__which are now unaffiliated with the Debtors and are not "Debtors" in the Chapter 11 Cases__* – were a leading global supplier of carrying cases and accessory products for the mobile lifestyle.  As discussed in detail in section IV.H below, as a result of the consummation of the Collateral Agent Stock Turnover, the Equity Interests in TGII were transferred to a newly created entity, TGII Holdco, LLC. For background purposes only, this Disclosure Statement briefly describes

the businesses of the Formerly Owned Operating Businesses founded in 1983 and which pioneered the notebook computer carrying case category.

In 1998, to complement its carrying case business, the Formerly Owned Operating Businesses began to market laptop computer accessory products. The introduction of the iPad in 2010 also created the tablet computer market. In response, the Formerly Owned Operating Businesses expanded their product line to include cases and accessories for tablets. In 2012, one of TGII's subsidiaries, Targus, Inc., acquired the common stock of Oten Inc. (d/b/a Sena Cases), a leading designer and manufacturer of cases for tablets and smartphones.

The Formerly Owned Operating Businesses sold their products to, among others: (i) original equipment manufacturers of notebook computers and tablets ("**OEMs**"), (ii) wholesale distributors to resellers and corporate end-customers, (iii) retail outlets that sell products directly to end consumers, and (iv) online consumers. TGII and its subsidiaries operated worldwide, with principal offices, distribution centers, and/or warehouses located in Anaheim, Mississauga, Ontario, London, Hong Kong, and Meadowbank, Australia. Their corporate headquarters were located in Anaheim, California, with offices in London and Hong Kong serving as regional headquarters for the Europe, Middle East and Africa ("**EMEA**") and Asia Pacific regions, respectively.

## B.    **The Prepetition Capital Structure**.[14]

As of October 31, 2015, the Debtors had approximately $205 million in funded debt, consisting of (i) guarantees under (x) a secured, asset-based revolving loan and (y) two secured term loans, and (ii) two issues of unsecured notes. Each of these obligations is discussed below, including the collateral securing each facility (if any), the material terms, and outstanding amounts. Due to events discussed below, as of January 31, 2016, the Debtors total funded debt is approximately $82 million.

### 1.    **The ABL Facility**.

On May 24, 2011, TGII and Targus, Inc., as borrowers, with Holdings and Targus Group US LLC and Targus USA, Inc., as guarantors, entered into the $75 million asset-based secured revolving credit facility with Bank of America (as amended on September 26, 2011, September 17, 2012, October 26, 2012, August 27, 2013, December 29, 2014, January 28, 2015, April 24, 2015 and May 21, 2015, the "**ABL Facility**"), which matures on February 24, 2016. The ABL Facility is secured by substantially all the assets of the Debtors as well as the assets of TGII and its direct and indirect subsidiaries. Pursuant to an intercreditor agreement (as amended on May 21, 2015, the "**Intercreditor Agreement**") between Bank of America, the agent under the Prepetition $185 Million Facility and the agent under the Prepetition $20 Million Facility, the ABL Facility has a first priority lien on all of Holdings' cash, deposits, receivables, certain

---

[14] Nothing herein constitutes a concession or acknowledgment of any amount owed or on the validity of any debt, claim or lien. The descriptions of the collateral securing the underlying obligations are intended to provide brief summaries. In the event of any inconsistencies between the summaries set forth herein and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

accounts and inventory ("**ABL Priority Collateral**"), and a third priority lien on the Prepetition $185 Million Facility Priority Collateral (as defined below). Interest is payable at a rate of LIBOR plus 2.25% with a LIBOR floor of 1.5%. As discussed below, as a result of the January Forbearances, default interest has been accruing on the ABL Facility since January 28, 2015.

The ABL Facility is structured to permit drawings in North America, Europe and Asia. Availability under the ABL Facility is determined by a Borrowing Base formula, based on eligible accounts receivable and inventory. As of January 31, 2016, approximately $8.4 million was outstanding on the ABL Facility. As discussed herein, the ABL Facility was assumed by the certain of the purchasers of the foreclosed upon assets in connection with consummation of the foreclosure proceeding for the Formerly Owned Operating Entities, was refinanced substantially contemporaneously with such assumption and, therefore, the ABL Facility does not hold any claims against the Debtors in these Chapter 11 Cases.

### 2.    The Prepetition $185 Million Facility

On May 24, 2011, TGII, as borrower, and Holdings, Targus, Inc., Targus USA, Inc. and Targus Group US LLC, as guarantors, entered into a $185 million secured term loan with Goldman Sachs Lending Partners LLC as agent and security trustee, which matures on May 24, 2016 (as amended on October 3, 2012, August 27, 2013, January 28, 2015 and May 21, 2015, the "**Prepetition $185 Million Facility**"). The Prepetition $185 Million Facility is secured by substantially all the assets of Holdings, TGII and its direct and indirect subsidiaries. The Prepetition $185 Million Facility has a second priority lien on all collateral that is not ABL Priority Collateral (the "**Prepetition $185 Million Facility Collateral**"), and a third priority lien on all ABL Priority Collateral. As of January 31, 2016, approximately $179 million is outstanding under the Prepetition $185 Million Facility. The Prepetition $185 Million Facility requires principal amortization of approximately $2.3 million per quarter with an excess cash flow sweep feature. Interest is charged at LIBOR + 9.5% + 1% PIK. In early 2015, Goldman Sachs resigned as agent under the Prepetition $185 Million Facility, and Wilmington Trust, N.A. was appointed as successor agent. As discussed below, as a result of the January Forbearances, default interest has been accruing on the Prepetition $185 Million Facility since January 1, 2015. As discussed above, pursuant to the Amendment, the Prepetition $185 Million Facility Lenders waived and released their claims against Holdings on account of the Prepetition $185 Million Facility, and therefore do not hold any claims against the Debtors in these Chapter 11 Cases.

### 3.    The Prepetition $20 Million Facility

On May 21, 2015, non-Debtor TGII as borrower and Holdings and each of TGII's domestic subsidiaries as guarantors, entered into the $20 million secured term loan with Wilmington Savings Fund Society, FSB as administrative and collateral agent and security trustee (the "**Prepetition $20 Million Facility Agent**"), which matures on February 29, 2016 (the "**Prepetition $20 Million Facility**"). The lenders under the Prepetition $20 Million Facility are the same as the Prepetition $185 Million Facility Requisite Majority Lenders. The Prepetition $20 Million Facility has a first priority lien on the Prepetition $185 Million Facility Collateral and a second priority lien on the ABL Priority Collateral. As of January 31, 2016, approximately $21 million is outstanding under the Prepetition $20 Million Facility. Interest is charged at an annual rate of 15%.

23

### 4.    The Parent PIK Notes

On December 14, 2009, Parent issued 10% Senior Unsecured Notes due June 14, 2019 ("**Parent PIK Notes**") in the aggregate amount of $26.15 million.  The notes were issued under a Note Purchase Agreement among Parent and the purchasers signatory thereto, and bear interest at a rate of 10% per annum payable in kind.  These Parent PIK Notes were issued, together with shares of common stock of Parent, as part of a restructuring of the Company's equity and debt capitalization in 2009, in exchange for the then-outstanding second lien debt issued by Parent.  The Note Purchase Agreement was amended on May 24, 2011.

On or about November 1, 2012, Parent issued approximately $5.3 million in Parent PIK Notes under a separate Note Purchase Agreement to the former equity holders of Oten, Inc., as part of the consideration for the acquisition of Oten, Inc.'s common stock by non-Debtor Targus, Inc.  As of January 31, 2016, approximately $52.7 million in Parent PIK Notes are outstanding.  Law Debenture Trust Company of New York ("**Law Debenture**") serves as administrative agent for the Parent PIK Notes.

### 5.    The Holdings PIK Notes

On October 26, 2012, Holdings issued $5 million in 16% Senior Unsecured Notes due October 26, 2018 ("**Holdings PIK Notes**") under a Note Purchase Agreement, among Holdings and the purchasers signatory thereto, in connection with the Company's acquisition of Sena Brands.  This issuance bears interest at a rate of 16% payable in kind.  The Holdings PIK Notes have seniority relative to the Parent PIK Notes due to the structural relationship between Holdings and Parent.  As of January 31, 2016, the outstanding amount on the Holdings PIK Notes is approximately $8.3 million.  The Holdings PIK Notes are held by the equity holders in the parent company and senior management.  Law Debenture serves as administrative agent for the Holdings PIK Notes.

### C.    Equity

As of the date hereof, there are 1,228,147 outstanding shares of privately-held common stock in Parent, the majority of which were issued in connection with the 2009 Restructuring.

### IV.  EVENTS LEADING TO THE
### COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    Changes in the Computer Carrying Case and Accessory Markets

The performance of the Formerly Owned Operating Businesses is tied to the underlying dynamics of the laptop computer and tablet markets.  The laptop computer market has shown year-over-year declines in sales since 2012.  This negative trend is largely driven by (i) consumers' migration from laptops to tablets and smartphones and (ii) slower re-fresh cycles within the laptop market.  Reduced laptop sales have negatively impacted the Formerly Owned Operating Companies' profitability, given their core capability is in the laptop bag, case, and accessory markets.  While the Formerly Owned Operating Businesses successfully pivoted into the tablet case and accessory market, that sector has also encountered strong headwinds in recent

24

years.  The market for tablets has quickly matured since the introduction of Apple's iPad in 2010.  Tablet users have demonstrated slower than expected re-fresh cycles and have shifted towards large- screen cell phones, often referred to as "phablets".  Further, the initial fast paced growth of the tablet and smartphone market led to a rapid influx of manufacturers and suppliers of accessories for those devices.  Now that growth in this market has slowed, the market for accessories is oversaturated and extremely competitive, reducing the Formerly Owned Operating Businesses' volumes and margins.  The rapid evolution of mobile device technology also complicates efforts to manufacture and sell cases and accessories for such products.  With every change or upgrade to tablets, smartphones, or phablets, older models of such products (and, importantly, the accessories and carrying cases for such products) become obsolete. This resulted in excess and obsolete inventory for the Formerly Owned Operating Businesses.

Consumer shopping patterns also changed in recent years.  Due to the increased use of smartphones for making retail purchases, consumers shifted more towards online shopping, a distribution channel in which the Formerly Owned Operating Businesses were less established.  Retail customers followed suit, with many retail chains moving away from brick and mortar retail stores in favor of an online presence.  To facilitate this move and to preserve their own revenues, many retail customers have recently undergone significant management changes, closed standalone stores, and became increasingly aggressive with trade terms.  These changes in the retail channel have further impacted the Formerly Owned Operating Businesses' profitability.  Other companies in this industry have likewise had to shift their focus to the development of their "Etail" (electronic retail) presence.

These changes in the marketplace significantly impacted results from the Formerly Owned Operating Businesses' operations, which endured a decline in consolidated revenues, profits, and income.  This financial performance directly impacted the ability of the Debtors, Holdings and Parent, to satisfy their secured and unsecured debt obligations. By the first half of 2014, declines in the Formerly Owned Operating Businesses' financial results jeopardized continued compliance with leverage, revenue, and profit covenants under the ABL Facility and the Prepetition $185 Million Facility.

## B.    December 2014 Covenant Defaults

As noted above, the decline in revenues as a result of an oversaturated and evolving market created difficulties for the Formerly Owned Operating Businesses to comply with their operating covenants under their secured credit facilities.  The inability of the Formerly Owned Operating Businesses to comply with their operating covenants impacted Holdings, which guaranteed the secured debt at TGII.  Notably, the ABL Facility and the Prepetition $185 Million Facility required the Debtors to deliver a business plan and clean-audited financials at the end of December 2014.  However, the Debtors did not believe that they would be able to deliver clean-audited financials and a business plan evidencing future compliance with such covenants.  A failure to deliver these reports would constitute (i) an immediate event of default under the ABL Facility and (ii) a default, subject to a 30-day grace period, under the Prepetition $185 Million Facility.

In anticipation of the impending covenant defaults, in December 2014, the Debtors and Formerly Owned Operating Businesses engaged Kramer Levin Naftalis & Frankel

LLP, as counsel, to assist in a restructuring process. Immediately thereafter, the Boards of Directors of the Debtors and the Formerly Owned Operating Businesses formed a four-member Restructuring Committee, which included one independent member.  Because there was no grace period under the ABL Facility, the Debtors and Formerly Owned Operating Businesses then engaged in negotiations with the Bank of America to enter into an amendment to the ABL Facility.  These negotiations resulted in an amendment extending the deadline for delivery of the required financial reporting until January 29, 2015 (to be concurrent with the expiration of the 30-day grace period under the Prepetition $185 Million Facility) and instituting certain other financial restrictions, including implementing a $7.5 million reserve on availability.  One of the conditions imposed by the Bank of America was the retention of a Chief Restructuring Officer. The Restructuring Committee, at the direction of the Boards, commenced the process of interviewing potential candidates to serve as the chief restructuring advisor for the Company. In mid-December, the Debtors and Formerly Owned Operating Businesses retained Alvarez & Marsal North America, LLC, to serve as restructuring advisors.

### C.    Prepetition Negotiations with the Prepetition $185 Million Facility Requisite Majority Lenders.

During January 2015, the Debtors and Formerly Owned Operating Businesses and their advisors engaged in discussions with the agent under the Prepetition $185 Million Facility and a group of lenders holding approximately 51% of the outstanding aggregate principal of that facility (the Prepetition $185 Million Facility Requisite Majority Lenders) to seek a waiver, amendment or forbearance agreement relating to the Prepetition $185 Million Facility.  While expressing a willingness to provide additional time, the Prepetition $185 Million Facility Requisite Majority Lenders were unwilling to provide a waiver or enter into a long term (multi-month) forbearance.  Instead, they were amenable to providing a two-week forbearance, which was subsequently entered into (through separate agreements) with the Prepetition $185 Million Facility Requisite Majority Lenders and Bank of America (the "**January Forbearances**").  The January Forbearances generally required that the Debtors and Formerly Owned Operating Businesses: (i) begin accruing default interest for both secured credit facilities; (ii) increase the reserve on availability under the ABL Facility from $7.5 million to $12.5 million; (iii) provide an updated financial presentation to the respective secured lenders; (iv) provide the respective secured lenders with a budget and other financial reporting; and (v) importantly, engage an investment banker to evaluate options for refinancing, sale(s) or other strategic alternatives.  In connection with January Forbearances, the Debtors and Formerly Owned Operating Businesses interviewed several investment bankers, before hiring Blackstone/PJT to advise on restructuring and strategic alternatives.

Before the expiration of the January Forbearances, the secured lenders agreed to further extend the forbearance period to February 26, 2015 ("**February Forbearances**"), during which time the Debtors and Formerly Owned Operating Businesses sought to negotiate the terms of a consensual restructuring with representatives of their secured lenders.  Subsequently, these secured lenders agreed to 17 additional short-term forbearance extensions through April 2, 2015 for the Prepetition $185 Million Facility and 25 additional short-term forbearance extensions through April 24, 2015 for the ABL Facility; often times in 24-hour increments. These short-term forbearances provided the parties with additional time to engage in out-of-court restructuring discussions on the same terms and conditions as the February Forbearances.

### D.    Prepetition $20 Million Facility

As noted, as a consequence of the covenant defaults, various reserves on availability were imposed under the ABL Facility.  This, in turn, impacted the ability of the Debtors and the Formerly Owned Operating Entities to pay certain obligations.  For example, the reduced availability impacted the ability to pay current interest under the Prepetition $185 Million Facility.  Because of the liquidity constraints imposed under the ABL Facility and the unwillingness of the Prepetition $185 Million Facility Requisite Majority Lenders to defer interest payments (other than on a short term basis as part of the interim forbearances), one of the key issues impacting the ability for the Debtors and Formerly Owned Operating Businesses to properly market the businesses was solving for additional liquidity.  It was believed that the most efficient, cost-effective and/or expedient manner to proceed was to obtain new funding from the Prepetition $185 Million Facility Requisite Majority Lenders who were willing to advance sufficient new monies to meet these objectives, and whose approvals likely would have been necessary had the Debtors and the Formerly Owned Operating Businesses sought to obtain alternative financing.  As such, the Debtors and the Formerly Owned Operating Businesses negotiated a $20 million new term loan facility that was used to improve liquidity and make the interest payments.  Importantly, this improved liquidity facilitated an orderly process to market the Formerly Owned Operating Businesses which, in turn, was the cornerstone of the purpose of the Forbearance and Marketing Period.  Proceeds of the new $20 million term loan were used to pay down the ABL Facility, thereby increasing cash availability, and to pay the accrued interest outstanding on the Prepetition $185 Million Facility as of May 21, 2015.  The terms of the Prepetition $20 Million Facility are described above in Section III.A.2.

### E.    ABL Facility Amendment and Forbearance Agreements

On April 24, 2015, the Formerly Owned Operating Businesses and Holdings entered into a forbearance agreement and seventh amendment for the ABL Facility.  This amendment provided, among other financial restrictions, that any long-term forbearance would be conditioned upon obtaining new liquidity (through the Prepetition $20 Million Facility) and receipt of final bids in the marketing process by August 31, 2015.  This process continued to be managed through short-term forbearances while the parties finalized negotiations on the definitive documentation of the Transaction Support Agreement, the Prepetition $20 Million Facility, and a separate long-term forbearance agreement with Bank of America for the ABL Facility which would also expire on October 20, 2015 ("**ABL Forbearance Agreement**").  The ABL Forbearance Agreement required weekly cash flow and borrowing base reporting, a cap on maximum revolver borrowing, and a restriction of principal payments on the Prepetition $185 Million Facility.  Payment of interest under the Prepetition $185 Million Facility was permitted so long as there was compliance with Net Sales and GTSA Adjusted EBITDA covenants.  Importantly, the ABL Forbearance Agreement reduced certain of the availability reserves imposed following the initial defaults under the ABL Facility, reducing the reserves from $12.5 million to $9 million.  This improved availability under the ABL Facility ensured that the Formerly Owned Operating Businesses would have a sufficient time frame to conduct the marketing process and operate.  If final bids were not submitted by the end of August 2015, the availability reserve would increase by $2 million.  (Because final bids were received within this deadline, the reserve was not increased).  Finally, the ABL Forbearance Agreement provided for an automatic forbearance extension for an equal duration to that provided by the Prepetition $185

Million Facility Requisite Majority Lenders upon termination of the Forbearance and Marketing Period.

### F.    Negotiation and Entry into the Transaction Support Agreement

Between February 13 and April 2, 2015, the Debtors and the Formerly Owned Operating Businesses and the Prepetition $185 Million Facility Requisite Majority Lenders arduously negotiated the salient terms of a long-term forbearance period memorialized in a term sheet annexed to the forbearance agreement dated April 2, 2015 for the Prepetition $185 Million Facility.  Thereafter, 11 additional short-term forbearance extensions were negotiated with the Prepetition $185 Million Facility Requisite Majority Lenders to negotiate definitive documentation, again often times for 24-48 hours.  Accordingly, the parties' negotiations culminated in the Transaction Support Agreement on May 21, 2015.[15]

The lynchpin of the Transaction Support Agreement was an agreement by Holdings to place the common stock of TGII into escrow in exchange for soliciting offers for a sale or refinancing transaction with a third-party (either transaction, an "**Escrow Release Transaction**") prior to the end of the Forbearance and Marketing Period (October 20, 2015).[16] Accordingly, the common stock of TGII was held in the legal title of the Supplemental Agent for the Prepetition $185 Million Facility from May 21, 2015 until the date of the Collateral Agent Stock Turnover.[17]  Importantly, pursuant to the terms of the Transaction Support Agreement, the beneficial ownership of the TGII common stock was retained by Holdings and a change in control did not occur when the TGII common stock was placed into escrow.

As noted above, the transfer of the TGII common stock to an escrow account was a condition precedent to Holdings (and the other entities) obtaining the benefit of the Forbearance and Marketing Period and, without such action, the Prepetition $185 Million Facility Requisite Majority Lenders and the ABL Facility Lender would not have agreed to a continued forbearance and would have been able to exercise remedies under their respective agreements, including foreclosing on their collateral.  Continued forbearance, however, would provide the Debtors and the Formerly Owned Operating Businesses with the requisite stability and liquidity to continue ordinary course operations and allow Blackstone/PJT to market thoroughly the businesses to pursue a third-party transaction that would provide all stakeholders, including the Debtors, with the best opportunity to identify a viable Escrow Release Transaction that would transfer the value of the TGII common stock back to Holdings.  All parties to the Transaction Support Agreement determined that a 9-month out of court process on these terms was the best way to maximize the value of the Debtors and the Formerly Owned Operating Businesses.

---

[15] The description of the Transaction Support Agreement and the other related agreements are for summary purposes only.  In the event of any inconsistency between the agreements and this summary, the agreements should govern. Capitalized terms not defined herein shall have the meaning ascribed to them in the Transaction Support Agreement.

[16] As described in further detail below, if either of these transactions were achieved, the common stock in TGII would be released from escrow back to Holdings.

[17] During this time, the TGII common stock was held in escrow by U.S. Bank National Association, as Escrow Agent.

In exchange for agreeing to transfer the TGII common stock into escrow, Holdings negotiated for a guaranteed recovery – in the form of the Transaction Consideration – to be paid even if the Debtors and the Formerly Owned Operating Businesses were unable to consummate an Escrow Release Transaction. The Prepetition $185 Million Facility Majority Lenders also agreed to provide funds in furtherance of the administration of the bankruptcy cases and the wind-down of the Debtors' estates, through the transfer of the "Funded Amount" consisting of $700,000, of which $200,000 would be used for post-bankruptcy wind-down expenses. Ultimately, the Holdings Board of Directors determined that, in the event a turnover of the stock was triggered, the value given in exchange for that stock turnover was the best available under the circumstances, and would maximize the value potentially available to Holdings.

The salient provisions of the Transaction Support Agreement are described below and a copy of the Transaction Support Agreement is annexed hereto as Exhibit B.

## 1.    **Forbearance and Marketing Period**

The foundation of the Transaction Support Agreement was the long-term forbearance under the Prepetition $185 Million Facility and the ABL Facility.  As part of the negotiations, the parties agreed to a mutually acceptable period within which the Formerly Owned Operating Businesses could be marketed.  The agreed-upon date – determined upon the advice of Blackstone/PJT as being a reasonable and adequate period to perform its services – was October 20, 2015.   Under the Transaction Support Agreement, the outcome of the Forbearance and Marketing Period would yield one of two results:

- The Formerly Owned Operating Businesses would achieve an Escrow Release Transaction – i.e., sale or refinancing transaction that would pay the Prepetition $185 Million Facility (and other secured debt) in full.  This would result in the release of the TGII common stock back to Holdings. To achieve such an Escrow Release Transaction, the third-party transaction would have needed to have resulted in net proceeds of at least $200 million.

- If no Escrow Release Transaction was consummated, then *either* (i) the TGII stock would be delivered to the Supplemental Agent ("**Collateral Agent Stock Turnover**") and, as such, beneficial (as well as legal) ownership of TGII would be transferred to the term lenders under the Prepetition $185 Million Facility ratably, or (ii) the Prepetition $185 Million Facility Requisite Majority Lenders could agree to an alternative transaction with a third-party (most likely a sale or refinancing for less than the secured obligations) ("**Acceptable Pre-Turnover Transaction**"). In either instance, Holdings would be entitled to receive the "Transaction Consideration."

The October 20th Outside Date could be accelerated if the Formerly Owned Operating Businesses failed to comply with certain financial and operational covenants under the Transaction Support Agreement.   If this happened, the Prepetition $185 Million Facility

Requisite Majority Lenders had the right to terminate the Forbearance and Marketing Period, triggering a Collateral Agent Stock Turnover. (While there was, in fact, non-compliance with one of the covenants required to be reported in September 2015, the Prepetition $185 Million Facility Requisite Majority Lenders did not exercise a right to terminate the forbearance period, thereby giving the Debtors the full benefit of the marketing process.) To minimize disruption to the Formerly Owned Operating Businesses in the event of an early termination of the Forbearance and Marketing Period, the Debtors and the Formerly Owned Operating Businesses negotiated an automatic 1-week extension from the date of any failure by the Formerly Owned Operating Businesses to meet a covenant. They also obtained an automatic 2-week forbearance extension if the forbearance period expired on the Outside Date. These post-turnover forbearances were designed to enable the Formerly Owned Operating Businesses to have go-forward liquidity and provide for an orderly transition of ownership and operations.

## 2.    <u>Transaction Consideration</u>

Key to these Chapter 11 Cases is the agreement for the payment of the Transaction Consideration to Holdings. As discussed above, a Collateral Agent Stock Turnover occurred on October 30, 2015, and, for ease sake, the description below focuses on Transaction Consideration that will be paid to Holdings and distributed to Holdings' creditors pursuant to the Transaction Support Agreement and Plan. As discussed more fully below in the section entitled "<u>Summary of the Prepackaged Plan</u>," the Post-Effective Date Debtors (or an agent thereof) will receive and distribute the Transaction Consideration to the Holdings' creditors.

Under the original Transaction Support Agreement, the Transaction Consideration to be paid to Holdings was to be calculated in accordance with a negotiated formula, and would have consisted of (i) an initial payment (either a specified percentage of any Transaction Value received by the Prepetition $185 Million Facility Lenders if a transaction closed within 6 months of the Stock Turnover Date or the lesser of the value of the Prepetition $185 Million Facility Lenders claim and their equity interests in TGII), and (ii) a Preferred Return (a percentage of excess consideration if the Prepetition $185 Million Facility Lenders sold the Formerly Owned Operating Businesses or had another liquidity event within 5 years of the Stock Turnover Date).

The calculation of the Transaction Consideration, however, was subject to a number of contingencies and future events, was speculative, and difficult to administer. Therefore, following the Stock Turnover Date, the parties to the Transaction Support Agreement began negotiations to settle and liquidate the amount of the Transaction Consideration prior to the commencement of the Chapter 11 Cases. Those negotiations proved fruitful, resulting in the parties entering into the Amendment and agreeing to a total Transaction Consideration of (i) $750,000 to be funded to Holdings after the consummation of a publicly-noticed asset foreclosure sale process for the Formerly Owned Operating Businesses, plus (ii) any portion of the Funded Amount remaining after the administration and wind-down of the bankruptcy cases. By liquidating the Transaction Consideration prior to the commencement of these cases, Holdings and its creditors obtained certainty in amount and timing of the distribution, reduced the costs that could have been associated with oversight of any future distributions, and is allowing for a more efficient wind down of Holdings and Parent.

To protect Holdings' right to receive the Transaction Consideration, the parties negotiated a subordination right that is set forth in section 5(f) of the Transaction Support Agreement and implemented through section IV.A of the Plan.[18]  This subordination provision – which provides for the Prepetition $185 Million Facility Lenders to turn over payments up to $3.5 million for the benefit of Holdings – survives termination of the Transaction Support Agreement, cannot be amended out of the relevant documents, and cannot be avoided or invalidated pursuant to the express agreement of the parties to the Transaction Support Agreement and the Prepetition $185 Million Facility.  This subordination provision will be deemed enforceable under section 510(a) of the Bankruptcy Code and provides for continued enforceability against the Prepetition $185 Million Facility Lenders.  Holdings, however, has agreed to release the Prepetition $185 Million Facility Lenders from the subordination obligation upon a definitive restructuring of the Formerly Owned Operating Businesses following a Stock Turnover *if* there is an express assumption of the obligated amount owed to the Debtors under the Transaction Support Agreement.

### 3.   Covenant Testing

The Prepetition $185 Million Facility Requisite Majority Lenders required certain financial and operational covenants to be met during the Forbearance and Marketing Period otherwise the forbearance period would terminate prior to the Outside Date.  Specifically, the two covenants that were tested each fiscal month are GTSA Adjusted EBITDA[19] and Net Sales.[20]  Ultimately, the Debtors believed that the covenants were set at a level that could be met in the months immediately following the execution of the Transaction Support Agreement and would not truncate the reasonable time required to market the businesses.

For the reporting periods through July 2015, the Formerly Owned Operating Businesses were in compliance with the monthly financial covenants in the Transaction Support Agreement.  The Net Sales covenant could not be met for the fiscal month ending August 29, 2015, which was tested at the end of September.  Despite noncompliance, the Prepetition $185 Million Facility Requisite Majority Lenders determined not to exercise remedies with respect to the covenant default under the Transaction Support Agreement and, as such, did not accelerate the Collateral Agent Stock Turnover prior to October 20, 2015.

---

[18] This subordination provision is also set forth in Section 1.23 of the Fourth Amendment to the Prepetition $185 Million Facility which provides for the addition of a new Section 11 to the Prepetition $185 Million Facility,

[19] Pursuant to the Transaction Support Agreement, GTSA Adjusted EBITDA means, for any period, Consolidated Adjusted EBITDA (as defined in the Term Loan Agreement), adjusted to: (i) exclude any limitation on addbacks as specified in (h) of the definition of Consolidated Adjusted EBITDA; (ii) exclude the impacts of foreign currency to the extent that actual rates for such period are different than those assumed in the draft budget of the Company Parties for Fiscal Year 2015; (iii) substitute the term GTSA Transaction Costs for the term "Transaction Costs" used in clause (f) of the definition of Consolidated Adjusted EBITDA; and (iv) for the avoidance of doubt, include within clause (h) any employee retention bonuses paid during such period.

[20] Pursuant to the Transaction Support Agreement, Net Sales means net sales calculated in accordance with GAAP and consistent with the Company's past practice. The calculation of Net Sales for any period shall exclude the impact of foreign currency to the extent that actual rates for such period are different than those assumed in the draft budget of the Company Parties for Fiscal Year 2015.

### 4.    Plan Support

The Transaction Support Agreement also provides that the Prepetition $20 Million Facility Lenders will support and vote in favor of the Plan in their capacity as lenders under the Prepetition $20 Million Facility. The Prepetition $20 Million Facility Lenders also agreed to allocate their entitlements to any distributions from Holdings on account of Holdings' guarantee of the secured facilities for the benefit of Holdings' general unsecured creditors.

In addition, certain of the Supporting PIK Noteholders were party to the prepetition negotiations over the terms of Transaction Support Agreement, the Plan, and this Disclosure Statement, and agreed to vote in favor of the Plan.

### 5.    Releases and Indemnification

Another integral component of the Transaction Support Agreement is the mutual releases between the parties and their respective agents, affiliates, principals, current and former officers, current and former directors, attorneys, financial advisors or other professionals or representatives for actions based upon actions taken or omissions solely in their respective capacities as parties to the Transaction Support Agreement and in any way related to the Transactions. These releases do not apply to actions that constitute gross negligence or willful misconduct.

The Transaction Support Agreement also provides that the Debtors and the Formerly Owned Operating Businesses will indemnify and insure their pre-turnover directors and officers following the Collateral Agent Stock Turnover. This obligation will be implemented only through the maintenance of a directors' and officers' insurance policy with an attendant tail policy for 6 years following the effective date of the Collateral Agent Stock Turnover to cover any claims arising prior thereto. The Plan provides for the assumption of directors' and officers' indemnification obligations of Holdings and Parent under the Transaction Support Agreement, which obligation will be satisfied solely through available insurance.[21]

### G.    Marketing Process

An adequate marketing period was the foundation for the Transaction Support Agreement. The Transaction Support Agreement and the attendant loan amendments and the Prepetition $20 Million Facility provided the Debtors and the Formerly Owned Operating Businesses with the ability to run a thorough and robust marketing process without the distraction and business disruption associated with a chapter 11 filing. In April 2015, Blackstone/PJT, working closely with A&M and the Formerly Owned Operating Businesses, developed a comprehensive, over 60-page confidential information memorandum and 120-page financial supplement to be delivered to potential interested parties that provided the history of the company, a detailed description of the global operations, financial data on each region,

---

[21]    Effective as of the Collateral Agent Stock Turnover Date, these employees resigned as officers of the Debtors pursuant to letter agreements entered into between the Debtors, the Formerly Owned Operating Businesses, the Requisite Prepetition $185 Million Facility Lenders and each former employee.

description of key product lines, description of certain initiatives and additional information that the Formerly Owned Operating Businesses believed would be relevant to potential interested parties.  In May and June 2015, Blackstone/PJT contacted approximately 80 parties – consisting of financial buyers, other companies competing in similar business lines, and banks – to solicit interest for a sale or refinancing. Approximately 40 of these parties executed nondisclosure agreements and those parties received the comprehensive confidential information memorandum and financial supplement.  Preliminary non-binding indications of interest were due in mid-June 2015, and five parties submitted such indications in the range of $120 million to $150 million. These initial bid indications were for values significantly below the combined ABL Facility, the Prepetition $20 Million Facility and the Prepetition $185 Million Facility outstanding debt. Further, the vast majority of parties – 35 to be exact – that executed nondisclosure agreements declined to participate further in the process after reviewing the diligence information provided to them.  This greatly narrowed the universe of remaining parties to conduct more detailed diligence.

        In June 2015, the five parties that submitted preliminary indications of interest were invited to conduct additional diligence, including access to the data room and participation in management meetings.  After this diligence process was completed, these parties were requested to submit second round bids.  However, between receipt of first and second round bids, the projections for TGII were revised downward to reflect the latest business performance. Projected EBITDA, for example, was reduced to $25.6 million based on year to date performance down from $30.2 million projected at the time of the initial indication of interest.[22] Three of the remaining five parties then declined to continue with the marketing process.

        In mid-August 2015, the two remaining interested parties submitted final bids, which were, once again, for values significantly below the combined ABL Facility, Prepetition $20 Million Facility and the Prepetition $185 Million Facility outstanding debt.  These bids – at a range of $100 to $120 million – were also below the initial indications of interest.  Given the low range of values, the Formerly Owned Operating Businesses were not able to pursue either an Escrow Release Transaction or an Acceptable Pre-Turnover Transaction pursuant to the terms of the Transaction Support Agreement.

## H.    Collateral Agent Stock Turnover

        The results of the marketing process established that the value of the Formerly Owned Operating Businesses fell well below the secured debt obligations – let alone all obligations – of those entities.  It also established that Holdings had no equity value in TGII (and, in turn, that Parent had no equity value in Holdings).  In order to facilitate a more orderly stock turnover, the Outside Date was extended from October 20, 2015 through October 30, 2015. Upon the eventual occurrence of the Outside Date, the Collateral Agent Stock Turnover occurred and the TGII common stock was released from the Escrow, thereby transferring beneficial control (as well as legal title) of the TGII common stock to TGII Holdco, LLC at the direction of the Requisite Prepetition $185 Million Facility Lenders.  At the direction of the Requisite Prepetition $185 Million Facility Lenders, the Supplemental Agent transferred the TGII common

---

[22] As of October 27, 2015, actual EBITDA for 2015 was $22.897 million.

stock to a newly-created entity TGII HoldCo, LLC, pursuant to a trust agreement between TGII HoldCo, LLC and the Supplemental Agent.  TGII HoldCo, LLC operates as a blind trust, with John Brecker appointed and acting as sole manager and member of the trust.  In addition, Mr. Brecker was also appointed as a director and officer of TGII.  In connection with the occurrence of the Outside Date, the existing members of the Boards of Directors for TGII and its subsidiaries (other than the Chief Executive Officer and Chief Financial Officer) were removed and resigned.[23]  While the Collateral Agent Stock Turnover has occurred, the Formerly Owned Operating Businesses have been continuing their business operations uninterrupted.

As discussed above, following the Stock Turnover Date, the parties to the Transaction Support Agreement continued their efforts to liquidate the Transaction Consideration, which resulted in the Amendment entered into on December 31, 2015, a copy of which is annexed hereto as Exhibit C.[24]  Among other things, the Amendment provided for: (i) the liquidation and settlement of the Transaction Consideration; (ii) the release of the Holdings' guarantee of the Prepetition $185 Million Facility; (iii) coordination of the public foreclosure process for the Formerly Owned Operating Businesses and these Chapter 11 Cases; and (iv) cooperation and wind down services including tax filing, reporting, and communication plans to be provided by the post-foreclosure owner of the businesses.  Contemporaneous with the Amendment, the Debtors also entered into letter agreements with former officers and directors whereby those officers and directors  resigned from the Debtors and Alvarez & Marsal resigned as restructuring advisors to the Debtors, all effective as of the Stock Turnover Date.  Christopher Layden serves as President, Secretary and Treasurer of the Debtors.[25]

Following the Amendment, the Requisite Prepetition $185 Million Facility Lenders directed the Collateral Agent to commence a publicly-noticed auction and foreclosure process for certain assets of the Formerly Owned Operating Businesses.  In connection with the consummation of such foreclosure proceeding, the purchaser entities are domestic and foreign entities whose ultimate equity owners are the Prepetition $185 Million Facility Lenders.  Certain of the purchaser entities have assumed the monetary and cooperation obligations owed to Holdings under the Transaction Support Agreement and the Amendment.  As discussed herein, the ABL Facility was assumed by the certain of the purchasers of the foreclosed upon assets in connection with consummation of the foreclosure proceeding for the Formerly Owned Operating Entities, was refinanced substantially contemporaneously with such assumption and, therefore, the ABL Facility does not hold any claims against the Debtors in these Chapter 11 Cases.

---

[23] Subsequently, the Chief Executive Officer and Chief Financial Officer also resigned from the Boards of Directors of TGII and its domestic subsidiaries effective as of the Collateral Agent Stock Turnover Date.

[24] A conformed copy of the Transaction Support Agreement which incorporates the Amendment is attached for informational purposes only.

[25] Mr. Layden has served as a member of the Board of Directors of Parent and Holdings since 2009 and is a managing director at York Street Capital Partners which is an equity holder of Parent, and a holder of the Parent PIK Notes and the Holdings PIK Notes.

Pursuant to the terms of the Transaction Support Agreement and the Amendment, Holdings received the Transaction Consideration contemporaneous with the consummation of the foreclosure sale proceeding. The amount of the Transaction Consideration is insufficient to satisfy the Allowed Claims against Holdings' estate in full. Thus, these Chapter 11 Cases contemplate the distribution of the Transaction Consideration pursuant to a waterfall of right to payment at Holdings with no distribution to Parent and thereafter the dissolution of Parent and Holdings.

## V.  THE ANTICIPATED CHAPTER 11 CASES

To effectuate the liquidation of the Debtors as contemplated by the Transaction Support Agreement, the Debtors anticipate filing voluntary petitions in the Bankruptcy Court for relief under Chapter 11 of the Bankruptcy Code. The filing of the petitions will commence the Chapter 11 Cases. At that time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors will be stayed under section 362 of the Bankruptcy Code. The Debtors will continue to operate and manage their property in the ordinary course of business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

### A.      First Day Motions and Retention of Professionals.

On the Petition Date, the Debtors intend to file certain motions requesting customary relief for holding companies and to implement the expeditious and cost-effective wind down of their operations (the "**First Day Motions**"). The following summary highlights certain of the First Day Motions that will be filed.

#### 1.      Scheduling Motion

The Debtors will be seeking confirmation of the Plan and emergence from chapter 11 as soon as possible. To that end, the Debtors intend to file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time for a hearing (the "**Combined Hearing**") to, among other things: (a) approve the adequacy of the Disclosure Statement, (b) approve retroactively the procedures for the solicitation of the votes on the Plan, and (c) confirm the Plan. The Debtors will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearing.

To facilitate and expedite the claims reconciliation and administration process, on the Petition Date, through this motion, the Debtors will also be seeking entry of an order establishing deadlines and procedures for filing proofs of claim and approving the Debtors' proposed forms and manner of notice of the proposed deadlines ("**Bar Date Procedures**"). The Plan Scheduling Order, once entered by the Court, will approve the Bar Date Procedures and establish the last date and time for all persons and entities, and all governmental agencies, to file proofs of claim based on prepetition claims against the Debtor.

#### 2.      Procedural Motions and Professional Retention Applications

The Debtors intend to file certain procedural motions that are standard in chapter 11 cases of similar size and nature, as well as applications to retain the certain professionals who will be assisting the Debtors during the Chapter 11 Cases.

## VI.  SUMMARY OF THE PREPACKAGED PLAN

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT.  ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THE PLAN.

### A.    Classification and Treatment of Administrative and Priority Claims, Claims and Equity Interests the Plan

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Fee Claims, as described below, have not been classified and thus are excluded from the classes of Claims and Equity Interests set forth in Article III of the Plan.

### 1.    Description and Treatment of Unclassified Claims.

(a)    Treatment of Administrative Claims (other than Fee Claims).

Administrative Claims means, at any given time, and regardless of whether such amounts are billed or unbilled, all accrued, contingent and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses by any Professional, except such fees and expenses that are reasonably incurred by the Prepetition Agents or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Court has not, as of the Effective Date, denied by Final Order (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying the remaining balance of any retainer that has been provided by the Debtors to such Professional.  To the extent the Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts will no longer constitute Accrued Professional Compensation.

Each holder of an Allowed Administrative Claim (other than an Administrative Claim that is a Fee Claim) as of the Effective Date will receive from the applicable Debtor (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as practicable after the later of (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date, (b) thirty (30) days after the date such Administrative Claim becomes an Allowed Administrative Claim if such Administrative Claim is Disputed as of or following the Effective Date, or (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is practicable or (ii) such other treatment as the Debtor and such holder agree upon in writing; provided, however, that Allowed Administrative Claims (other than Fee Claims) that arise in the ordinary course of the Debtors' business will be paid in

the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided in the Plan or in the Plan Scheduling Order or other order of the Bankruptcy Court, unless previously Filed or Allowed, each holder of an Administrative Claim (other than a Fee Claim) that arose (or, only in the case of unexpired leases of real or personal property, accrued) on or after the Petition Date through the Effective Date must File a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than thirty (30) days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, the Estates or their respective property, and such Administrative Claims will be deemed waived and released as of the Effective Date. Objections to requests for payment of Administrative Claims must be Filed and served on the requesting party by no later than 150 days after the Effective Date, subject to further order of the Bankruptcy Court. For the avoidance of doubt, nothing in the Plan modifies any requirement to File any Administrative Claim as set forth any other order of the Court including the Plan Scheduling Order, and any holder of such Administrative Claim that failed to comply with the requirements of such other order or the Plan Scheduling Order will be forever barred from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, the Estates or their respective property, and such Administrative Claims will be deemed waived and released.

(b)     Fee Claims.

Fee Claims are Administrative Claims under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date.

All requests for compensation or reimbursement of Fee Claims must be filed and served on the Debtors, counsel to the Debtors, the Post-Effective Date Debtors, the U.S. Trustee, and such other entities that are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than thirty (30) days after the Effective Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline will be forever barred from asserting such Claims against the Debtors or their respective properties, and such Fee Claims will be deemed released as of the Effective Date. Objections to any Fee Claims must be filed and served on the Debtors, counsel for the Debtors, and the requesting party no later than thirty (30) days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Fee Claim).

The amount of Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Post-Effective Date Debtors, or at the Post-Effective Date Debtors' direction, without interest or other earnings therefrom, when such Claims are approved by the Bankruptcy Court.

The Debtors will pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals on and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Court.

(c)      Priority Tax Claims.

Priority Tax Claims are any Claims entitled to a priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.  Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date will receive, at the option of the applicable Debtor, in full satisfaction, settlement, and release, of and in exchange for such Priority Tax Claim one of the following treatments: (i) payment in full in Cash as soon as practicable after the Effective Date in an amount equal to the amount of such Allowed Priority Tax Claim, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored non-priority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); (ii) payment in full in Cash payable in equal Cash installments made on a quarterly basis in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, over a period not to exceed five (5) years following the Petition Date, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored non-priority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); or (iii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon a Final Order of the Court.

(d)      U.S. Trustee Fees.

Notwithstanding anything to the contrary contained herein or in the Plan, on the Effective Date, the Debtors will pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, the Post-Effective Date Debtors will be responsible for filing required post-confirmation reports and paying quarterly fees due to the U.S. Trustee until the entry of a final decree in such Debtors' Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## 2.      Classification and Treatment of Claims and Equity Interests.

(a)      Classification of Claims and Equity Interests.

Except for those Claims addressed in Article II, all Claims and Equity Interests are placed in the Classes set forth below.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class,

and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled before the Effective Date.

(b)     Claims Record Date.

As of the close of business on the Claims Record Date, the claims register (for Claims) and transfer ledger (for Equity Interests) will be closed, and there will be no further changes in the record holders of any Claims or Equity Interests. The Debtors will have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the Claims Record Date. The Debtors will instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register (for Claims) and transfer ledgers (for Equity Interests) as of the close of business on the Claims Record Date.

(c)     Summary of Classification and Class Identification.

Although the Plan applies to both of the Debtors, the Plan constitutes two (2) distinct chapter 11 plans, one for each Debtor. The classification of Claims and Equity Interests set forth in the Plan will apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Subject to the following paragraph, for all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (i.e., there will be two (2) sub-Classes in each Class and many of such sub-Classes may be vacant). Notwithstanding the foregoing, the Debtors reserve the right to seek approval of the Bankruptcy Court to consolidate the Debtors for purposes of administrative convenience, provided that such consolidation does not materially and adversely impact the amount of distributions to any Person under the Plan.

Below is a chart identifying Classes of Claims and Equity Interests, a description of whether each Class is Impaired, and each Class's voting rights. Holdings is the only Debtor with a Class 3 because only Holdings is obligated under the Prepetition $20 Million Facility. Parent is the only Debtor that has a Class 4 with respect to General Unsecured Claims against Parent, and Holdings is the only Debtor that has a Class 5 with respect to General Unsecured Claims against Holdings. Holdings is the only Debtor that has a Class 8 with respect to Equity Interests in Holdings, and Parent is the only Debtor that has a Class 9 with respect to Equity Interests in Parent. If there are no creditors in one (1) or more Classes, then such Class will not apply to that Debtor.

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition $20 Million Facility Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims against Parent | Impaired | Deemed to Reject |
| 5 | General Unsecured Claims against Holdings | Impaired | Entitled to Vote |

| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests in Holdings | Impaired | Deemed to Reject |
| 8 | Equity Interests in Parent | Impaired | Deemed to Reject |

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific voting Class for a Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class (with respect to such Debtor) will be deemed to have accepted the Plan. The Debtors will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests. The Debtors reserve the right to modify the Plan in accordance with Article IX.F of the Plan, including the right to withdraw the Plan at any time before the Effective Date.

(d)     Treatment of Classified Claims and Equity Interests.

(i)     *Class 1 – Other Priority Claims.* Other Priority Claims are Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims).

Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement and release and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will receive payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

(ii)     *Class 2 – Other Secured Claims.* Other Secured Claims are Claims, other than the Prepetition $20 Million Facility Claims, to the extent reflected in the Schedules (to the extent the Debtors file Schedules in the Chapter 11 Cases or a proof of claim filed as a Secured Claim), which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors, in full and final satisfaction, settlement and release of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim will either: (i) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such

interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (ii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.

Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

(iii)    *Class 3 – Prepetition $20 Million Facility Claims*. Prepetition $20 Million Facility Claims are Claims evidenced by, derived from, based upon, relating to, or arising from the Prepetition $20 Million Facility.  In exchange for each Prepetition $20 Million Facility Claim, each holder of an Allowed Prepetition $20 Million Facility Claim will, on the Effective Date, allocate its right to receive a distribution of the Transaction Consideration and any Distributable Holdings Assets to the holders of Allowed Class 7 Unsecured Claims against Holdings, provided, however, that for the avoidance of doubt the treatment of the Prepetition $20 Million Facility Claims pursuant to the Plan will not constitute a release of any Prepetition $20 Million Facility Claims held by holders of Allowed Prepetition $20 Million Claims against any entity other than the Debtors.

Class 3 is Impaired.  Therefore, holders of Class 3 Prepetition $20 Million Facility Claims are entitled to vote to accept or reject the Plan.

(iv)    *Class 4 – General Unsecured Claims against Parent*. General Unsecured Claims against Parent are Claims against Parent that are not Secured or entitled to priority under the Bankruptcy Code or an order of the Court.  In full and final satisfaction, settlement and release of and in exchange for each Allowed General Unsecured Claim against Parent, each holder of an Allowed General Unsecured Claim against Parent will receive its pro rata share of any Distributable Parent Assets.

Class 4 is Impaired.  Because the Debtors believe there will be no Distributable Parent Assets to be distributed to holders of Class 4 General Unsecured Claims against Parent, holders of Claims in Class 4 are deemed to reject the Plan, and are not entitled to vote to accept or reject the Plan.

(v)    *Class 5 – General Unsecured Claims Against Holdings*. General Unsecured Claims against Holdings are Claims against Holdings that are not Secured or entitled to priority under the Bankruptcy Code or an order of the Court.  In full and final satisfaction, settlement and release of and in exchange for each Allowed General Unsecured Claim against Holdings, on or as soon as practicable after the Effective Date, (i) each holder of an Allowed Class 5 Claim that votes to accept the Plan by the Voting Deadline shall receive its pro rata share of: (ix) the Fixed Transaction Consideration Payment, (y) any Distributable Holdings Assets, and (z) the Residual Funded Amount; and (ii) alternatively, each holder of an Allowed Class 5 Claim that either votes to reject the Plan or does not vote on the Plan by the

41

Voting Deadline shall receive its pro rata share of (a) the Fixed Transaction Consideration Payment, and (b) any Distributable Holdings Assets.

Class 5 is Impaired. Therefore, holders of Class 5 General Unsecured Claims are entitled to vote to accept or reject the Plan.

(vi)     *Class 6 – Intercompany Claims*.  Intercompany Claims are any Claim held by a Debtor against another Debtor.  On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims will be deemed extinguished and released, and will not receive any distributions under the Plan.

Class 6 is Impaired.  Holders of Class 6 Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, as applicable.  Therefore, holders of Class 8 Intercompany Claims are not entitled to vote to accept or reject the Plan.

(vii)     *Class 7 – Equity Interests in Holdings*.  Equity Interests in Holdings means any equity security as such term is defined in section 101(16) of the Bankruptcy Code, or any other instrument evidencing an ownership interest in Holdings, whether or not transferable, and any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.  On the Effective Date, Equity Interests in Holdings will be cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Equity Interests will not receive or retain any property under the Plan on account of such Equity Interests in Holdings.

Class 7 is Impaired.  Holders of Class 7 Equity Interests in Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Class 7 Equity Interests in Holdings are not entitled to vote to accept or reject the Plan.

(viii)     *Class 8 – Equity Interests in Parent*.  Equity Interests in Parent means any equity security as such term is defined in section 101(16) of the Bankruptcy Code, or any other instrument evidencing an ownership interest in Parent, whether or not transferable, and any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

Class 8 is Impaired.  Holders of Class 8 Equity Interests in Parent are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Class 8 Equity Interests in Parent are not entitled to vote to accept or reject the Plan.

### B.     Means for Implementation of the Plan

### 1.     Effectuating Transaction Support Agreement and Subordination

Through the Effective Date, the Debtors will perform all respective obligations under the Transaction Support Agreement, and will be entitled to receive all benefits of the Transaction Support Agreement, including the receipt of the Transaction Consideration or other consideration provided therein in accordance with its terms.  The Transaction Support Agreement will be deemed and treated as an Executory Contract that will be assumed pursuant to the Plan.

For the avoidance of doubt, all terms of the Transaction Support Agreement will remain in full force and effect, including the subordination provisions set forth in paragraph 5(f) therein. Such subordination provisions are valid, binding and enforceable subordination provisions under Section 510(a) of the Bankruptcy Code.

### 2.    Dissolution of the Debtors

On the Effective Date, the Debtors will be deemed dissolved and will not be required to take any further steps with respect to such dissolution. The Post-Effective Date Debtors may, but will not be required, to take steps deemed desirable to wind up the Debtors' affairs and prepare appropriate dissolution filings, and file all appropriate tax returns. Effective automatically as of the Effective Date, and without the necessity of any other or further act, instrument or Bankruptcy Court order, the Chapter 11 Cases will be closed, except for Lead Case No. [ ].

### 3.    Liquidation of Assets

On and after the Effective Date, the Post-Effective Date Debtors may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Post-Effective Date Debtors may, without application to or approval of the Bankruptcy Court, pay the charges incurred after the Effective Date for Professional fees and expenses related to the winding up of the Debtors' affairs and administration and implementation of the Plan.

### 4.    Post-Confirmation Reports and Fees

Following the Confirmation Date, the Post-Effective Date Debtors will be responsible for the filing of post-Confirmation reports required during such periods with the U.S. Trustee and payment from the assets of the Post-Effective Date Debtors of all post-Confirmation fees charged or assessed against the estates under 28 U.S.C. 1930 during such periods.

### 5.    Funded Amount and Wind-Down Reserve

Prior to the Effective Date, the Funded Amount (together with any remaining retainers held by the professionals) will be used to pay reasonable fees and expenses, including the reasonable and documented professionals' fees and costs of administering the Debtors' Chapter 11 Cases, to oversee and facilitate the receipt and distribution of the Transaction Consideration and any other Distributions under the Plan. In the event that any portion of the Funded Amount, including the Wind-Down Reserve remains after the payment of all fees and expenses described herein or in the Plan, then the remainder will be distributed to holders of Allowed General Unsecured Claims against Holdings that vote to accept the Plan.

For the avoidance of doubt, no portion of the Funded Amount will be used to challenge the liens and/or claims under the Prepetition $20 Million Term Loan Facility or the validity and/or enforceability of the transactions contemplated by the Transaction Support Agreement or the Escrow Agreement.

    6.    **Release of Liens**

        Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of the Debtors' estate will be released, and all the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests will revert to the Post-Effective Date Debtors and its successors and assigns.

    7.    **Voting of Claims.**

        Each holder of an Allowed Claim as of the Voting Deadline in an Impaired Class of Claims or Equity Interests that is not deemed to have rejected the Plan and that held such Claim as of the Voting Record Date, will be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the instructions accompanying the Ballot. Approval for the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Plan Scheduling Motion. The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described in the Disclosure Statement.

    8.    **Treatment of Intercreditor Agreements**

        Nothing contained herein or in the Plan will affect the enforceability of any intercreditor agreement in accordance with, and subject to, the terms thereof and any applicable law, and all rights and obligations, if any, of the parties to any intercreditor agreements thereunder, or in connection therewith, are preserved.

    9.    **Nonconsensual Confirmation.**

        The Debtors intend to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed to have rejected the Plan pursuant to section 1126 of the Bankruptcy Code.

        In addition, although the Debtors believe that the Plan is confirmable as to each of Parent and Holdings, in the event that the Debtors are unable to confirm the Plan as to Parent, they reserve the right to convert Parent's Chapter 11 Case into a chapter 7 case or otherwise dismiss Parent's Chapter 11 Case.

    10.    **Indemnification of Directors, Officers and Employees.**

        Notwithstanding any other provisions of the Plan, from and after the Effective Date, indemnification obligations owed by the Debtors to directors and officers of a Debtor who continued to serve in such capacity on or after the date of the Transaction Support Agreement, to the extent provided in the applicable articles or certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement (including, for the avoidance of doubt, the indemnification obligations set forth in paragraph 10(e) of the Transaction Support Agreement), will be assumed pursuant to the Plan; provided however that such indemnification obligations will be paid and satisfied solely from the proceeds of available insurance policies

obtained by or on behalf of the Debtors.  Subject to the foregoing caveat with respect to available insurance policies, all such indemnification obligations will survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

Indemnification obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and by order of the Court, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

### C.    Effect of Confirmation of the Plan

#### 1.    Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions under the Plan and other benefits provided pursuant to the Plan and the Transaction Support Agreement, the provisions of the Plan, upon consummation, will constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and the Transaction Support Agreement and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distributions to be made on account of such an Allowed Claim or Equity Interest. In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Prepetition $20 Million Facility Lenders, the Supporting PIK Noteholders, and the PIK Administrative Agent reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and are within the range of reasonableness. Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

#### 2.    Injunction.

FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE V OF THE PLAN, THE RELEASING PARTIES WILL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, CAUSE OF ACTION

OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE V OF THE PLAN OR THE CONFIRMATION ORDER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE V OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE V ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH RELEASED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH RELEASED PARTIES OR THE PROPERTY OR ESTATES OF SUCH RELEASED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATIONS DUE FROM THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTORS ON ACCOUNT OF ANY SUCH CLAIM; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS THEREIN WILL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN AND THE EQUITY INTERESTS IN PARENT WILL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN THE PLAN, OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED, AND ALL EQUITY INTERESTS WILL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO WILL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WILL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THEIR ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF ITS ASSETS AND PROPERTIES, AND EACH OF THE RELEASED PARTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE RELATED TO THE DEBTORS, THE FORMERLY OWNED OPERATING BUSINESSES, AND THEIR RESPECTIVE BUSINESSES.

### 3.    Preservation of Causes of Action.

Section 1123(b)(3) of the Bankruptcy Code provides that a debtor's plan may provide for the debtor to retain and enforce any claim or interest on behalf of the debtor's estate for the benefit of its creditors.

In accordance with section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided herein or in the Plan (including, without limitation, as to released Claims) the Post-Effective Date Debtors will retain all Causes of Action, including, for the avoidance of doubt, all Causes of Action arising out of the Transaction Support Agreement and any related agreements or documents.  Nothing contained in the Plan, any exhibits thereto, or the Confirmation Order will be deemed a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtors that is not specifically waived or relinquished by the Plan.  The Post-Effective Date Debtors will have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately before the Petition Date as fully as if the Chapter 11 Case had not been commenced, and all of the Post-Effective Date Debtors' legal and equitable rights respecting any claim that is not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Case had not been commenced.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against such Person.  The Debtors or Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, in accordance with the Plan.  From and after the Effective Date, subject to the consent of the Oversight Committee, the Post-Effective Date Debtors will have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court.  In accordance with Article V of the Plan, the Post-Effective Date Debtors are deemed a representative of the Estates for the purpose of prosecuting any Claim or Cause of Action and any objections to Claims pursuant to 11 U.S.C. § 1123(b)(3)(B).  For the avoidance of doubt, the Claims and Causes of Action preserved pursuant to Article V.E of the Plan will not include (i) any Avoidance Actions released in accordance with Article V.F of the Plan, (ii) any Claims or Causes of Action released pursuant to Article V.KI of the Plan in accordance with the terms of the provisions set forth

therein, or (iii) any Claims or Causes of Action against the Debtors or their current or former directors and officers arising prior to the Effective Date.

### 4.    Release of Avoidance Actions

On the Effective Date, and except to the extent otherwise reserved in the Plan, the Debtors, on behalf of themselves and their estates, will release any and all Avoidance Actions and the Debtors and the Post-Effective Date Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Post-Effective Date Debtors will be deemed to have waived the right to pursue any and all Avoidance Actions.  No Avoidance Actions will revert to creditors of the Debtors.

### 5.    Votes Solicited in Good Faith.

The Debtors have, and upon entry of the Confirmation Order will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

### 6.    Payment of PIK Notes Administrative Agent

As of the Effective Date, any agreement regarding PIK Notes Administrative Agent fees between the Debtors and the PIK Notes Administrative Agent, as amended, will be deemed and treated as rejected pursuant to the Plan without giving rise to any Claims.  The PIK Notes Administrative Agent will apply the prepetition retainer it holds to satisfy any prepetition or postpetition fees it incurs without recourse against the Debtors.  Any unused portion of the prepetition retainer will promptly be returned to the Debtors.  If the Debtors or the Post-Effective Date Debtors dispute the reasonableness of the PIK Notes Administrative Agent Expenses, the Debtors, the Post-Effective Date Debtors, or the PIK Notes Administrative Agent, as applicable, may submit such dispute to the Court for a determination of the reasonableness of such fees or expenses and the disputed portion of the PIK Notes Administrative Agent Expenses will not be paid until the dispute is resolved.

### 7.    Cancellation of Certain Indebtedness and Existing Securities.

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in a Debtor giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan), and (ii) the obligations of a Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of such Debtor (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan or assumed by a Debtor) will be released; provided, however, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such agreement that governs the rights of the

48

holder of a Claim against the Debtors will continue in effect solely for purposes of (a) allowing holders of such Claims to receive distributions under the Plan as provided in the Plan, (b) allowing the Disbursing to make distributions under the Plan as provided in the Plan, and deduct therefrom such reasonable compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors and authorized under such agreement.

### 8.    Claims Incurred After the Effective Date.

Claims incurred by the Debtors after the Effective Date may be paid by the Post-Effective Date Debtors from the Funded Amount in the ordinary course of business and without application for or Court approval, subject to any agreements with such holders of a Claim and applicable law.

### 9.    Releases, Exculpations and Injunctions of Released Parties.

(a)    Releases by the Debtors.

**On the Effective Date, and notwithstanding any other provisions of the Plan, the Debtors and the Post-Effective Date Debtors, on behalf of themselves and their Estates, will be deemed to unconditionally release the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, assertable on behalf of or derivative from the Debtors, based in whole or in part upon actions taken _solely_ in their respective capacities described herein or in the Plan or any omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, their business and affairs the Formerly Owned Operating Businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, their businesses and affairs the Disclosure Statement, the Transaction Support Agreement, the Transactions (as defined the Transaction Support Agreement) including, without limitation actions taken during the Forbearance and Marketing Period and/or in connection with the Collateral Agent Stock Turnover, the Escrow Agreement, the PIK Notes Agency Agreement, the Plan or agreements, instruments, or other documents related to any of the foregoing, provided, however, that (a) no individual will be released from any act or omission that constitutes fraud, willful misconduct, gross negligence, or breach of fiduciary duty (if any), as determined by a Final Order, (b) the Post-Effective Date Debtors will not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such persons asserted against the Debtors, (c) nothing herein or in the Plan will operate as a waiver or release of any claims held by the Debtors against the Released Parties, including for the enforcement of the Transaction Support Agreement and any subordination provisions therein; _provided_, _however_, that any claims for actions or inactions taken by the Released Parties relating to the marketing of the Debtors, the Formerly Owned Operating Businesses and/or their respective assets during the Forbearance and Marketing Period and for the Collateral Agent Stock Turnover are released as set forth in this section, and (d) the foregoing release applies to the Released Parties solely in their respective capacities described in the Plan.**

The signatories to the extensively negotiated Transaction Support Agreement and Amendment, including the Debtors, and their respective professionals and advisors have, through their expertise, effort and collaboration, reached agreement on a Plan that provides for the distribution of the Transaction Consideration to the general unsecured creditors of Holdings and for the orderly and efficient wind down of Holdings and Parent.  The releases set forth in the Plan and described herein are the product of a compromise and settlement (through the Transaction Support Agreement or otherwise) with various parties in interest in these cases. The Debtors believe that the releases are reasonable, narrowly tailored and necessary for the success of the Plan.

The Debtors believe that the Released Parties have benefitted the Debtors' estates. The Released Parties have played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.   The Released Parties have supported the Plan by negotiating a settlement and compromise that permitted the Transactions (including, but not limited to, the marketing process) and forms the basis for the Plan.  In particular, under the Transaction Support Agreement and the Plan, the Prepetition $20 Million Facility Lenders have agreed to allocate their right to a distribution under the Plan to the Holders of General Unsecured Claims against Holdings, without which such Holders would not be entitled to any distribution under the Plan.  In addition to the specific holders of PIK Notes that participated in the Plan negotiation and settlement process, the PIK Notes Administrative Agent, represented the interests of all PIK Noteholders in such process.  The parties agreed to liquidate the Transaction Consideration, which forms the bulk of the distributions to be made to creditors under the Plan and allows for a consensual resolution of the Debtors' businesses.  The releases are similar in scope to those customarily approved by the courts in this District.  The Plan reflects a settlement and resolution of several complex issues, and the releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan.

(b)    Releases by Holders of Claims

**To the fullest extent permissible under applicable law, and except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, the Releasing Parties shall be deemed to unconditionally release the Released Parties and their respective property from any and all Claims, debts, obligations, rights, suits, judgments, damages, actions, causes of action, remedies, and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, at law, in equity, or otherwise, they hold that are in connection with any of the Debtors and their businesses and affairs, the Formerly Owned Operating Businesses and their businesses and affairs, the Debtors' respective Estates, Assets or properties, the Transactions (as defined in the Transaction Support Agreement), the Plan, or these Chapter 11 Cases; provided, however, that the foregoing releases by the Releasing Parties shall not operate to waive or release any Released Party on account of liability that is judicially determined pursuant to a Final Order to have resulted from such Released Party's fraud, willful misconduct, gross negligence, or breach of fiduciary duty, if any.**

Under the Plan, the "Released Parties" means each of: (a) the Debtors and the Post-Effective Date Debtors, (b) the Supporting PIK Noteholders, (c) the Prepetition $20 Million Facility Agent, (d) the Prepetition $20 Million Facility Lenders, (e) the PIK Administrative Agent, (f) the parties to the Transaction Support Agreement, including any joinder thereto, and (g) with respect to each of the foregoing in clauses (a) through (f), such entities' predecessors, Professionals, successors and assigns, subsidiaries, funds, portfolio companies, and each of their respective current and former officers, directors, employees, managers, attorneys, financial advisors, accountants, investment bankers, consultants, management companies or other professionals or representatives, in each case solely in their capacity as such.

The "Releasing Parties" are defined under the Plan as each of: (a) the Supporting PIK Noteholders, (b) the Prepetition $20 Million Facility Agent, (c) the Prepetition $20 Million Facility Lenders, (d) the PIK Administrative Agent, (e) the parties to the Transaction Support Agreement, including any joinder thereto, (f) any holder of a Claim that either is deemed to accept the Plan or votes to accept the Plan, and (g) with respect to each of the foregoing in clauses (a) through (f), such entities' predecessors, Professionals, successors and assigns, subsidiaries, funds, portfolio companies, and each of their respective current and former officers, directors, employees, managers, attorneys, financial advisors, accountants, investment bankers, consultants, management companies or other professionals or representatives, in each case solely in their capacity as such.

(c)    Exculpation and Injunction.

The Debtors and the other Released Parties (i) will have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission that occurred prior to, during and/or in connection with the Chapter 11 Cases and/or in connection with, or arising out of, the preparation and filing of the Chapter 11 Cases, the events and circumstances leading up to the Chapter 11 Cases, the Transaction Support Agreement (including, without limitation, negotiation and implementation thereof), the Transactions (as defined in the Transaction Support Agreement), including but not limited to, the prepetition marketing of the Debtors and the Formerly Owned Operating Businesses and/or the Collateral Agent Stock Turnover, and the Escrow Agreement, the PIK Notes Agency Agreements, preparation, negotiation, and filing of the Plan, the Disclosure Statement, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan, Disclosure Statement, the Transaction Support Agreement, or the Escrow Agreement, or any agreements, instruments, or other documents related to any of the foregoing, or in furtherance thereof, except for any act or omission that constitutes fraud, willful misconduct, gross negligence, or breach of fiduciary duty (if any) as determined by a Final Order, and (ii) in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  For the avoidance of doubt, nothing in the Plan will operate as a waiver or release of any claims held by the Debtors against the Released Parties relating to the Transaction Support Agreement, including for the enforcement of the Transaction Support Agreement and any subordination provisions

therein; **provided**, **however**, **that any claims for actions or inactions taken by the Released Parties relating to the marketing of the Debtors, the Formerly Owned Operating Businesses and/or their respective assets during the Forbearance and Marketing Period and for the Collateral Agent Stock Turnover are released as set forth in this section. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability. Without limiting the generality of the foregoing, the Released Parties will be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Equity Interest will be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or before the Effective Date and that has been released or waived pursuant to the Plan. Notwithstanding anything herein or in the Plan to the contrary, no Released Party shall be exculpated from any liability resulting from any act or omission that limits the liability of any Person pursuant to N.Y. Comp. Codes R. & Regs. Tit. 22 § 1200.8 Rule 1.8(h)(1) (2009) as determined by Final Order and any other statutes, rules or regulations dealing with professional conduct to which such professionals are subject; provided that each Released Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, however, that any party seeking to assert such a claim against any such attorney must first seek relief, on proper notice, from the Bankruptcy Court.**

(d)    <u>Satisfaction and Release of Claims and Equity Interests</u>

The rights afforded herein and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Post-Effective Date Debtors, or any of their respective assets or properties arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such Claim or Equity Interest will be precluded from asserting against the Debtors, the Post-Effective Date Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

(e)    <u>Preservation of Insurance</u>.

The Debtors' release from all Claims as provided herein will not, except as necessary to be consistent with this Plan, diminish or impair the enforceability of any insurance policy that may provide coverage for Claims against the Debtors, their current and former directors and officers, the Post-Effective Date Debtors, or any other Person. As set forth herein, the Transaction Support Agreement will be deemed and treated as an Executory Contract under the Plan, and the terms of the Transaction Support Agreement will remain in full force and effect, including the obligations to obtain and maintain insurance set forth therein. To the extent not obtained pursuant to the terms of the Transaction Support Agreement, prior to the Effective Date, the Debtors will obtain directors' and officers' liability insurance tail coverage for all of their

current and former directors and officers, which coverage will extend for a period of not less than six (6) years after the Effective Date and contain terms no less favorable to such directors and officers as the terms of the existing directors' and officers' liability insurance policies issued to the Debtors.

### D.    Distributions Under the Plan

#### 1.    Procedures for Treating Disputed Claims

On and after the Effective Date, only the Post-Effective Date Debtors will be entitled to object to, settle, compromise, withdraw or litigate objections to, or request the estimation of Claims against the Debtors, their respective Estates, Assets or properties. Objections and requests for estimation will be served on the respective Holder of the Claim and filed with the Bankruptcy Court on or before the Claims Objection Deadline. Any fees, costs or expenses incurred by the Post-Effective Date Debtors in objecting to Claims will be paid out of the Wind-Down Reserve. On the Effective Date, all outstanding objections to and requests for estimation of Claims will vest in the Post-Effective Date Debtors.

#### 2.    Allowed Claims.

(a)    Timing of Distributions.  Distributions under the Plan will be made by the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, as applicable.

(b)    Delivery of Distributions.  Distributions under the Plan will be made by the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, as applicable to the holders of Allowed Claims in all Classes for which a distribution is provided in the Plan at the addresses set forth on either (a) the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors have been notified in writing of a change in address, including, but not limited to, by the filing of a Proof of Claim by such Holder that contains an address for such Holder different from the address reflected on the Schedules for such Holder, (b) on the Proof of Claim filed such Holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such Holder giving details of a change of address; provided, however, that the initial distribution to Holders of PIK Notes Claims will be made to the PIK Notes Administrative Agent.

(c)    Distribution of Cash.  Any payment of Cash by the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, pursuant to the Plan will be made at the option and in the sole discretion of the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, as applicable by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Post-Effective Date Debtors.

(d)    Unclaimed Distributions of Cash.  Subject to Article VII.B.6 of the Plan, any distribution of Cash under the Plan that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) will, pursuant to section 347(b) of the Bankruptcy

53

Code, revert to the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date and thereafter will be distributed to holders of General Unsecured Claims against Holdings, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim will be extinguished and forever barred.

(e)     <u>Saturdays, Sundays, or Legal Holidays</u>.   If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and will be deemed to have been completed as of the required date.

(f)     <u>Disbursing Agent</u>. Pending the final distribution of all sums distributable under the terms of the Plan, the Disbursing Agent will have full authority to sign checks on any bank account of the Debtors to the extent necessary to make any payment or distribution contemplated by the Plan.

### 3.     <u>Distributions to Holders of Claims:</u>

(a)     <u>Distribution to Claims Allowed as of the Effective Date</u>.  Except as otherwise expressly set forth in the Plan, the Debtors, on the Effective Date, or the Post-Effective Date Debtors, after the effective Date, will distribute Cash or Collateral, as the case may be, to the holders of Allowed Claims as of the Effective Date as contemplated in the Plan.

(b)     <u>Claims Allowed after the Effective Date</u>.  Each holder of a Claim that becomes an Allowed Claim subsequent to the Effective Date will receive the distribution to which such holder of an Allowed Claim is entitled as set forth in Article III of the Plan, and distributions to such holder will be made in accordance with the provisions of the Plan.  As soon as practicable after the date that the Claim becomes an Allowed Claim, the Post-Effective Date Debtors or the Disbursing Agent will provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

(c)     <u>Interest on Claims</u>.  Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims), will be entitled, under any circumstances, to receive any interest on a Claim.

### 4.     <u>Allocation of Consideration.</u>

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan will be treated as first satisfying an amount equal to the principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid and interest, as applicable.

5.    **Estimation.**

The Debtors or the Post-Effective Date Debtors may, at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Post-Effective Date Debtors had previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement under the Plan or (iii) a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Post-Effective Date Debtors, as the case may be, may elect to object to ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

6.    **Claims Paid by Third Parties**

The Post-Effective Date Debtors will reduce in full a Claim, and such Claim will be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Post-Effective Date Debtors. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such holder will, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution will result in the holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

7.    **Insured Claims.**

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan will be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

E.    **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction: (i) to resolve any matters related

to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor or is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article VIII, any Executory Contracts or Unexpired Leases to the Assumption Schedule or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired; (ii) to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date; (iii) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan; (iv) to resolve disputes as to the ownership of any Claim or Equity Interest; (v) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests; (vi) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified or vacated; (vii) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (viii) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order; (ix) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (x) to hear and determine disputes arising in connection with the implementation, consummation, or enforcement of the Plan; (xii) to hear and determine any issue for which the Plan requires a Final Order of the Court; (xiii) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (xiv) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (xv) to hear and determine any Causes of Action preserved under the Plan; (xvi) to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions; (xvii) to enter a final decree closing the Chapter 11 Case; (xviii) to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan; (xix) to hear and determine disputes or issues arising under the Transaction Support Agreement; (xx) to adjudicate any and all disputes arising from or relating to distributions under the Plan; (xxi) to enforce all orders previously entered by the Court; and (xxii) to hear any other matter not inconsistent with the Bankruptcy Code.

### F.    <u>Executory Contracts and Unexpired Leases.</u>

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection.  In the case of the Debtors' rejection on of leases of real property, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

1.    **Assumption of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected will be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such executory contract or unexpired lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms in the Plan.

The Confirmation Order will constitute an order of the Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

2.    **Cure Claims.**

At the election of the Debtors or the Post-Effective Date Debtors, as applicable, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan will be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in one of the following ways (i) payment of the Cure Claim in Cash on or as soon as reasonably practicable to occur of (A) thirty (30) days after the determination of the Cure Claim, and (B) the Effective Date or such other date as may be set by the Court, or (ii) on such other terms as agreed to by the Debtors or the Post-Effective Date Debtors and the non-Debtor counterparty to such Executory Contract or Unexpired Lease. In the event of a dispute pertaining to assumption or assignment, the Cure Claim payments required by section 365(b)(1) of the Bankruptcy Code will be made following the resolution of the dispute in accordance with Article VII.A of the Plan.

The only adequate assurance of future performance will be the promise of the Post-Effective Date Debtors to perform all obligations under any executory contract or unexpired lease under the Plan.

ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE WILL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED WILL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE COURT.

Obligations arising under insurance policies assumed by the Debtors before the Effective Date will be adequately protected in accordance with any order authorizing such assumption.

3.    **Reservation of Rights.**

Neither the exclusion nor inclusion of any contract or lease in the Assumption Schedule, as applicable, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that Post-Effective Date Debtors has any liability thereunder.  In the event a written objection is filed with the Court as to whether a contract or lease is executory or unexpired, the right of the Debtors or the Post-Effective Date Debtors to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the entry of a Final Order by the Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan will not apply to such contract or lease.

4.    **Rejection of Executory Contracts and Unexpired Leases.**

(a)    **Rejection Damage Claims.**

If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Rejection Damage Claim, a Proof of Claim must be filed with the Court within (i) thirty (30) days after the date of entry of an order of the Court approving such rejection, or (ii) if the rejection is pursuant to the Plan, within thirty (30) days after the date of entry of the Confirmation Order.  For the avoidance of doubt, all Allowed Rejection Damage Claims will be treated as Unsecured Claims.  The Confirmation Order will constitute an order of the Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

(b)    **Requirement to File a Proof of Claim for Rejection Damage Claims.**

**ANY REJECTION DAMAGE CLAIMS THAT ARE NOT TIMELY FILED WILL BE DISALLOWED AUTOMATICALLY, FOREVER BARRED FROM ASSERTION, AND WILL NOT BE ENFORCEABLE AGAINST ANY DEBTOR WITHOUT THE NEED FOR ANY OBJECTION BY THE DEBTORS OR FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND ANY REJECTION DAMAGE CLAIM WILL BE DEEMED FULLY SATISFIED AND RELEASED, NOTWITHSTANDING ANYTHING IN THE SCHEDULES OR A PROOF OF CLAIM TO THE CONTRARY.**

5.    **Assignment.**

Any Executory Contract or Unexpired Lease held by any Debtor and assumed hereunder or otherwise in the Chapter 11 Case, if not expressly assigned to a third party previously in the Chapter 11 Case, will be deemed assigned to the Post-Effective Date Debtors pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption, assumption and assignment or Cure Claim is not resolved in favor of the Debtors before the Effective Date, the applicable Executory Contract or Unexpired Lease may be designated by the Debtor for rejection within five (5) Business Days of the entry of the order of the Court resolving the matter against the Debtor.  Such rejection will be deemed effective as of the Effective Date.

58

6. **Insurance Policies.**

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors will be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

7. **Benefit Plans and Indemnification Agreements**

Subject to Article IV.J of the Plan, on the Effective Date, all (i) indemnification agreements, and (ii) employee compensation and employee benefit plans of the Debtors, including employee benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code (if any) entered into before or after the Petition Date and not since terminated, will terminate as against the Debtors.

G. **Miscellaneous Provisions.**

1. **Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan will be immediately effective and enforceable and deemed binding upon the Debtors, the Post-Effective Date Debtors, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

2. **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of laws provisions thereof that would require or permit the application of the law of another jurisdiction) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

3. **Filing or Execution of Additional Documents.**

On or before the Effective Date, the Debtors or the Post-Effective Date Debtors will (on terms materially consistent with the Plan) file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

4.      **Term of Injunctions of Stays**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

5.      **Withholding and Reporting Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Post-Effective Date Debtors will comply with all withholding and reporting requirements imposed by any United States federal, state, local or non-U.S. taxing authority and all distributions hereunder will be subject to any such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Post-Effective Date Debtors will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distribution pending receipt of information necessary or appropriate to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

6.      **Conflicts.**

The terms of the Plan will govern in the event of any inconsistency between the Plan and the Disclosure Statement.  In the event of any inconsistency with the Plan and the Confirmation Order, the Confirmation Order will govern with respect to such inconsistency.

## VII.  CONFIRMATION AND EFFECTIVENESS OF THE PLAN

A.      **Conditions Precedent to Confirmation**

The Plan provides that the following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived in accordance with Article V.B of the Plan:

1.      The Court will have approved the Disclosure Statement.

2.      The Confirmation Order will have been entered by the Bankruptcy Court and is in form and substance reasonably satisfactory to the Debtors, in consultation with the Prepetition $20 Million Facility Lenders.

3.      The Plan will be in form and substance reasonably satisfactory to the Debtors and the Prepetition $20 Million Facility Lenders.

B.      **Waiver of Conditions Precedent to Confirmation.**

The Debtors, in consultation with the Prepetition $20 Million Facility Lenders, may waive the conditions set forth in Article V.A of the Plan at any time without leave of or order of the Court and without any formal action.

60

### C.    Conditions Precedent to Effectiveness.

Pursuant to the Plan, the Plan will not become effective unless and until the Confirmation Date has occurred and the following conditions have been satisfied in full or waived as described below and as more fully set forth in the Plan:

1.    the Confirmation Order will have been entered by the Court in form and substance acceptable to the Debtors in consultation with the Prepetition $20 Million Facility Lenders;

2.    the Confirmation Order will not have been stayed, modified, or vacated on appeal;

3.    the final version of the Plan and any supplemental documents and exhibits will have been filed and in a form and substance satisfactory to the Debtors and the Prepetition $20 Million Facility Lenders;

4.    all actions, documents, certificates and agreements necessary to implement the Plan will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws; and

5.    all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness will have been obtained and not revoked.

### D.    Waiver of Conditions Precedent to Effectiveness.

The Debtors may waive conditions set forth above and in Article IX.A of the Plan at any time without leave of or order of the Court and without any formal action.

### E.    Effect of Failure of Conditions.

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with the Plan, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an Order granting such motion.

### F.    Vacatur of Confirmation Order.

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (i) constitute a waiver or release of any Claims against or Equity Interests in the Debtor; (ii) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (iii) prejudice in any manner any right, remedy or claim of the Debtors; or (iv) be deemed an admission against interest by the Debtors.

### G.    Modification of the Plan.

Subject to the limitations contained in the Plan, (i) the Debtors, with the consent of the Prepetition $20 Million Facility Lenders, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors or the Post-Effective Date Debtors, as the case may be, with the consent of the Prepetition $20 Million Facility Lenders, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to remove Parent in the event that they are unable to confirm the Plan as to Parent.

### H.    Revocation, Withdrawal, or Non-Consummation.

#### 1.    Right to Revoke or Withdraw.

The Debtors, with the consent of the Prepetition $20 Million Facility Lenders, reserve the right to revoke or withdraw the Plan at any time before the Effective Date.

#### 2.    Effect of Withdrawal, Revocation, or Non-Consummation.

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of Executory Contracts, Unexpired Leases or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan will be null and void. In such event, nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan will be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## VIII.    CONFIRMATION PROCEDURES

### A.    Combined Disclosure Statement and Confirmation Hearing

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan and section 1129(b) provides that any party in interest may object to the confirmation of the chapter 11 plan. When the Debtors commence their Chapter 11 Cases, they will contemporaneously file a motion on the Petition Date to schedule the Combined Hearing on the adequacy of the Disclosure Statement, the sufficiency of the solicitation procedures, and confirmation of the Plan. Notice of the Combined Hearing will be provided to holders of Claims and Equity Interests or their agents or representatives as established in the order establishing the schedule for the Combined Hearing and related objections ("**Notice of Combined Hearing**"). Objections to the Disclosure Statement and confirmation of the Plan must be filed with the Bankruptcy Court by the date set forth in the Notice of Combined Hearing and will be governed by Bankruptcy Rules 3020(b) and

9014 and the local rules of the Bankruptcy Court.  UNLESS AN OBJECTION IS TIMELY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.**    **Confirmation of the Plan**.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired classes of Claims and Equity Interests or, if rejected by an Impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.

**1.**    **Acceptance**.

Under section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are conclusively deemed to have accepted a plan and their votes are not solicited. Holders of impaired claims and interests are entitled to vote on a plan (unless such claims or interests are in a class that is deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code, and therefore, must accept a plan for it to be confirmed without application of the "unfair discrimination" and "fair and equitable" tests to such classes.  A class of claims or interests is deemed to accept a plan if accepted by at least two-thirds (2/3) in amount of each such class (other than any interests designated under section 1126(e) of the Bankruptcy Code) and a majority in number of holders that has voted to accept or reject a plan.

Classes 1 and 2 of the Plan are Unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan.

Classes 3 through 8 of the Plan are Impaired under the Plan. Classes 4, 6, 7 and 8 are deemed to reject the Plan.  Thus, only Classes 3 and 5 are entitled to vote on the Plan.   The Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to Classes 4, 6, 7, and 8.  Finally, the Debtors reserve their right to amend the Plan in accordance with Article X.E. of the Plan with respect to any rejecting Class(es).

**2.**    **Standards for Confirmation**.

(a)    Requirements of Section 1129(a) of the Bankruptcy Code.

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a chapter 11 plan:

(i)    The plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

(iii)    The plan has been proposed in good faith and not by any means forbidden by law.

(iv)     Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(v)     The proponent of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

(vi)     The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(vii)     Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(viii)     With respect to each impaired class of claims or interests (x) each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or (y) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(ix)     With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not Impaired under the plan (subject to the "cramdown" provisions discussed below; see "Requirements of Section 1129(b) of the Bankruptcy Code").

(x)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a)     with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)     with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c)      with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim, regular installment payments in cash:

(i)      of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)      over a period ending not later than five (5) years after the date of the order for relief under sections 301, 302, or 303 of the Bankruptcy Code; and

(iii)      in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

(d)      with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in the bullet points above.

(xi)      If a class of claims is Impaired under the plan, at least one class of claims that is Impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

(xii)      Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(xiii)      All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(xiv)      The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code including those pertaining to voting as the Debtors obtained acceptance from Classes 3 and 5 prior to commencing the Chapter 11 Case.

(b)      <u>Requirements of Section 1129(b) of the Bankruptcy Code.</u>

If less than all Impaired Classes accept the Plan, but at least one Class of Claims Impaired under the Plan has accepted the Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders), the Debtors may seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code sets forth the so-called "cramdown" provisions for confirmation of a plan even if it is not accepted by all Impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one Impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any Impaired class that has not accepted the plan.

(i)     *Fair and Equitable*.

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting Impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

(e)     *Secured Creditors*.  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (i) that each of the holders of the secured claims included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (ii) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) hereof.

(f)     *Unsecured Creditors*.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

(g)     *Holders of Equity Interests*.  A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that: (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such holder is entitled, or (C) the value of the interest; or (ii) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

The Debtors believe the Plan is fair and equitable as to all creditors.

(ii)     *Unfair Discrimination*.

A plan does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more

than it is legally entitled to receive for its Claims or Equity Interests. The Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### 3. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization of the debtor. The Plan implements the liquidation and orderly wind-down of the Debtors' estates with any proceeds distributed to the Debtors' creditors. Since no further reorganization of the Debtors will be possible following their liquidation, the Debtors believe the Plan meets the financial feasibility requirement. The Debtors believe that, subject to the risk factors described in the Plan, there will be sufficient funds available to make the payments required by the Plan.

### 4. Best Interests Test.

With respect to each Impaired Class of Claims and Equity Interests, Confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties are compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan. To determine what holders of Claims and Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The value of any liquidated assets would then be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

Although the Plan effects a liquidation of the Debtors and a chapter 7 liquidation would have the same goal, the Debtors believe that the Plan provides the best and only source of recovery to all Holders of Allowed Claims. Holdings' only asset in the Chapter 11 Cases is the right to the Transaction Consideration and Parents' only asset is the equity in Holdings. Pursuant to section 5(h) of the Transaction Support Agreement, no Transaction Consideration is earned by or payable to Holdings in the event a non-consensual bankruptcy or other insolvency proceeding other than if the prepackaged Chapter 11 Case of Holdings is commenced. A chapter 7 liquidation of Holdings would constitute such a nonconsensual bankruptcy or insolvency proceeding. Under such circumstances, the Transaction Consideration – as Holdings' sole asset – would not be available for distribution to any holders of claims against Holdings. As a result, Holdings would have no assets to liquidate in a chapter 7 case and there would be no value in Holdings' equity, Parent's only asset. Thus, all holders of Claims against Holdings are either in

the same (in the case of the secured lenders) or better (in the case of unsecured creditors) position in the Chapter 11 Cases than in a chapter 7 liquidation. Moreover, by virtue of the secured lenders agreement to (i) allocate distributions to which they would otherwise be entitled to holders of Allowed General Unsecured Claims against Holdings, (ii) provide the Funded Amount to assist in funding the Chapter 11 Cases and Wind-Down Reserve, and (iii) allow for any Residual Funded Amount to be made available to holders of general unsecured claims that vote in favor of the Plan, holders of those Allowed General Unsecured Claims are receiving a substantially higher recovery than they would be entitled to in a chapter 7 case. Pursuant to the Transaction Support Agreement, the secured lenders' agreement to fund the Funded Amount and Wind-Down Reserve is solely to fund the administration of the consensual prepackaged Chapter 11 Cases. Thus, the Funded Amount and the Wind-Down Reserve would not be available for the administration of a chapter 7 liquidation, nor would it be available for holders of Allowed Claims in such chapter 7 liquidation.

Holders of Allowed General Unsecured Claims against Parent likewise have no entitlement to a recovery in a chapter 7 case due to (i) their structurally subordinated position to creditors of Holdings, and (ii) the fact that Holdings would have no value without its right to the Transaction Consideration. Because the holders of Allowed General Unsecured Claims at Parent would not receive a distribution in a chapter 7, the Plan leaves them in the same position as in a chapter 7 while facilitating an orderly wind-down of the Parent corporate entity.

Further, even if there were assets at Holdings and/or Parent to liquidate in a chapter 7, a chapter 7 liquidation would have increased costs relative to the contemplated chapter 11 liquidation. As noted above, the Funded Amount and Wind-Down Reserve would not be available to fund such costs of administration in a chapter 7 liquidation. The Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that a trustee might engage. Other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases include any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, including compensation for attorneys, financial advisors and accountants. These claims would be paid in full from the liquidation proceeds, if any, before the balance of those proceeds would be made available to pay prepetition Allowed General Unsecured Claims against Holdings and/or Parent, and, if applicable, Allowed Equity Interests in Parent.

Moreover, liquidating the Debtors' Estates under chapter 7 would not provide a timely distribution to Holders of such Claims because of potential added time and expense incurred by the Trustee and any retained professionals in familiarizing themselves with the Transaction Support Agreement and Chapter 11 Cases.

## IX. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS

CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Certain Bankruptcy Law Considerations.

#### 1.    Financial Information; Disclaimer

Although the Debtors have used their best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available to the Debtors at the time of the preparation of the Plan and Disclosure Statement.  While the Debtors expect that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

#### 2.    Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a debtor may place a claim or an equity interest in a particular class under a plan only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests in the Plan complies with the Bankruptcy Code requirements because the Debtors classified Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 3.    Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether or not the Bankruptcy Court enters an order subordinating certain Allowed Claims to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect the distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

#### 4.    The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of votes was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitation or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information" as defined in section 1125 of the Bankruptcy Code.

Additionally, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the Bankruptcy Court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for solicitation of creditors or equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors delivered the solicitation materials to all holders of Claims as of the Voting Record Date in the Classes entitled to vote. Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code. The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited. The Debtors cannot provide any assurances that such a re-solicitation would be successful. Re-solicitation could delay or jeopardize Confirmation of the Plan.

### 5.    Risk of Non-Confirmation.

Even if the impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, (1) that the confirmation of the Plan not be followed by liquidation or a need for further financial reorganization, unless, as is the case here, the Plan provides for such liquidation, (2) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, and (3) that the Plan and the Debtors, as proponents of the Plan, otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtors believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 6.    Delays of Confirmation or Effective Date.

Any delays of either confirmation or effectiveness of the Plan could result in, among other things, increased administrative costs, including professional fee claims. These negative effects of delays of either confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

### 7.    Estimation of Claims.

The Allowed amount of Claims in each Class could be greater than projected, which in turn, could cause the amount of distributions to creditors to be reduced substantially. Likewise, the amount of cash realized for the liquidation of the Debtors' assets could be less than projected, which could cause the amount of distributions to creditors to be reduced substantially.

### 8.    Withdrawal or Conversion of Parent Debtor Case

In the event a claim is filed against the Parent that is entitled to administrative or priority treatment in accordance with the Bankruptcy Code, the Debtors may need to withdraw the Plan for Parent and either dismiss Parent's Chapter 11 Case or convert Parent's Chapter 11 Case to a Chapter 7 liquidation.

### 9.    Insufficiency of the Funded Amount and the Wind-Down Reserve.

Pursuant to the terms of the Transaction Support Agreement, the parties negotiated a Funded Amount of $700,000 to assist in funding these chapter 11 cases for the Debtors.  The Debtors believe these amounts, together with remaining prepetition retainers, are sufficient to complete these chapter 11 cases.  The costs of administering the Chapter 11 Cases, however, remain unknown and the funds available to do so may be insufficient to fund the administrative expenses of the Chapter 11 Cases.  Moreover, any litigation or other delays of administration of the chapter 11 cases could result in increased administrative costs, and/or an inability to confirm the Plan.  If the Funded Amount and other available funds are ultimately insufficient to pay the administrative costs of the bankruptcy cases, the Debtors may be forced to use some or all of the Transaction Consideration, which would decrease recoveries to holders of General Unsecured Claims against Holdings.   A conversion to Chapter 7 could also occur if the Funded Amount and other available funds are insufficient.

## B.    Additional Factors to Be Considered.

### 1.    The Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2.    No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or related to the Debtors, the Operating Company, the Chapter 11 Case, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 3.    Forward-Looking Statements Are Not Assured, and Actual Results May Vary.

This Disclosure Statement contains forward-looking statements. These forward-looking statements are based on the current expectations and observations of the Debtors' management, and include factors that could cause actual results to differ materially such as: the

Debtors' ability to meet current operating needs; the Company's ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Cases, once commenced; the effects of the Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the case in general; the length of time the Debtors will operate under the Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of its interests in the Chapter 11 Cases; risks associated with third party motions in the Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the increased administrative and restructuring costs related to the Chapter 11 Cases; the Debtors' ability to arrange and consummate financing or sale transactions or to access capital; the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims; the occurrence of any event, change or other circumstance that could give rise to the termination of the Transaction Support Agreement; and the other factors described in this Section IX.

4.      **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**.

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of Claims against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such holder's Claims. This Disclosure Statement is not legal or tax advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of one or both of the Debtors under chapter 7 of the Bankruptcy Code, (ii) an alternative plan of liquidation, or (iii) the Debtors' Chapter 11 Cases may be dismissed.

A.      **Alternative Plan of Liquidation**.

If the Plan is not confirmed, the Debtors, or any party in interest (if, pursuant to section 1121 of the Bankruptcy Code, the Debtors have not filed a plan within the time period prescribed under the Bankruptcy Code) may propose a different plan. Such a plan might involve an alternative means for the liquidation of the Debtors' assets in a chapter 11 bankruptcy proceeding. However, the Debtors do not believe that any such alternative plans exist. The Debtors believe that the Plan, as described herein, enables Holders of Claims to realize the greatest possible value under the circumstances, and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

B.      **Liquidation Under Chapter 7**.

If no plan is confirmed for one or both of the Debtors, the Chapter 11 Case(s) may be converted to chapter 7 case(s), pursuant to which a trustee would be appointed or elected to liquidate such Debtor's assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would

have on the recoveries of holders of Claims and Equity Interests is set forth herein.  For the reasons above, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in smaller distributions being made to creditors than those provided for in the Plan.

### C.    Dismissal of Debtors' Chapter 11 Cases

Dismissal of all of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status *quo ante*. Upon dismissal of all of the Debtors' Chapter 11 Cases, the Debtors would lose the benefit of the agreements in the Transaction Support Agreement and related agreements supporting the Chapter 11 Cases and facilitating and funding the orderly liquidation of the estates.  This, in turn, reduces the amount available for other holders of Allowed Claims under the Plan. The Debtors believe that dismissal would lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Accordingly, therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a preferable alternative to the Plan.

## XI.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors, and holders of Claims and Equity Interests in Parent and Holdings.  The summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the Treasury Regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect.  This summary does not address all aspects of United States federal income taxation that may be relevant to a particular holder of a Claim or an Equity Interest in Parent or Holdings in light of its particular facts and circumstances or to particular types of holders of Claims or Equity Interests in Parent or Holdings subject to special treatment under the Tax Code (for example, persons that are not United States persons for federal income tax purposes, financial institutions, broker-dealers, insurance companies, tax-exempt organizations, retirement plans or other tax-deferred accounts, mutual funds, real estate investment trusts, traders in securities that elect mark-to-market treatment, holders of Claims or Equity Interests in Parent or Holdings subject to the alternative minimum tax, certain former United States citizens or long-term residents, persons who hold a Claim or an Equity Interest in Parent or Holdings as part of a hedge, straddle, constructive sale, conversion or other integrated transaction, persons that have a functional currency other than the United States dollar, investors in pass-through entities that hold Claims or Equity Interests in Parent or Holdings and, except as otherwise noted below, persons who received their Claim or Equity Interests in Parent or Holdings upon exercise of employee stock options or otherwise as compensation) and also does not discuss any aspects of United States federal non-income, state, local, and non-U.S. taxation.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan.  Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the United States federal income tax consequences of the Plan and the transactions contemplated

thereunder.  No ruling will be sought from the Internal Revenue Service (the "**IRS**") with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtors with respect thereto.

If a partnership (including any entity treated as a partnership for United States federal income tax purposes) is a beneficial owner of a Claim or an Equity Interest in Parent or Holdings , the treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership.  Partnerships and their partners should consult their tax advisors about the United States federal income tax consequences of participating in the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.     <u>Certain United States Federal Income Tax Consequences to the Debtors</u>.

The Debtors may not recognize income as a result of the cancellation of debt for federal income tax purposes pursuant to the Plan because Section 108(a)(1)(A) of the Tax Code provides that taxpayers do not recognize income from the cancellation of indebtedness that is cancelled in a bankruptcy case. However, a taxpayer is required to reduce its "tax attributes" by the amount of the debt cancellation. Tax attributes are reduced at the beginning of the taxable year following the taxable year in which the cancellation of indebtedness income was realized, in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryovers.

C.     <u>Certain United States Federal Income Tax Consequences to Holders of Claims</u>.

An unsecured creditor that receives cash in satisfaction of its Claim may recognize gain or loss, with respect to the principal amount of its Claim, equal to the difference between (i) the creditor's basis in the Claim (other than the portion of the Claim, if any, attributable to accrued interest), and (ii) the balance of the cash received after any allocation to accrued interest. The character of the gain or loss as capital gain or loss, or ordinary income or loss, will generally be determined by a number of factors, including the tax status of the creditor, applicability of the market discount provisions, and whether the Claim is a capital asset in the creditor's hands. A creditor may also recognize income or loss in respect of consideration received for accrued interest on the Claim. Such income or loss will generally be ordinary, regardless of whether the creditor's Claim is a capital asset in its hands.

## XII.  RECOMMENDATION AND CONCLUSION

The Debtors believe that confirmation of the Plan is in the best interests of all Creditors and Equity Interest holders and urge all creditors in the Voting Classes to <u>vote in favor of the Plan</u>.

Dated:  February 3, 2016


By: _____/s/ Christopher Layden_____
      Name: Christopher Layden
      Title: President, Parent THI, Inc. and TGHI, Inc.

<u>**EXHIBIT A TO THE DISCLOSURE STATEMENT**</u>

**PREPACKAGED PLAN OF LIQUIDATION OF THE DEBTORS UNDER CHAPTER 11
OF THE BANKRUPTCY CODE**

KLESTADT WINTERS JURELLER          KRAMER LEVIN NAFTALIS & FRANKEL LLP
SOUTHARD & STEVENS, LLP            Adam C. Rogoff
Tracy L. Klestadt                  Anupama Yerramalli
Joseph Corneau                     Rachael L. Ringer
200 West 41st Street, 17th Floor   1177 Avenue of the Americas
New York, New York 10036           New York, New York 10036
Telephone: (212) 972-3000          Telephone: (212) 715-9100
Facsimile: (212) 972-2245          Facsimile: (212) 715-8000

*Proposed Counsel for the Debtors*      *Proposed Special Counsel for the Debtors*
*and Debtors in Possession*             *and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
                                              :
In re:                                        :    Chapter 11
                                              :
TGHI, INC., et al.,                           :    Case No. 16-____ (   )
                                              :
                        Debtors.[1]           :    Joint Administration Pending
                                              :
------------------------------------------------------------------X

**PREPACKAGED PLAN OF LIQUIDATION OF THE DEBTORS**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

> **NO CHAPTER 11 CASES HAVE BEEN COMMENCED AT THIS TIME.  THE**
> **SOLICITATION MATERIALS ACCOMPANYING THIS PREPACKAGED**
> **PLAN OF LIQUIDATION HAVE NOT BEEN APPROVED BY THE COURT.**
> **FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE**
> **DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE COURT**
> **SCHEDULING A COMBINED HEARING ON THE ADEQUACY OF THE**
> **DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES AND**
> **CONFIRMATION OF THE PLAN.**

Dated:  February 3, 2016
        New York, New York

---

[1] The Debtors, and, if applicable, the last four digits of their taxpayer identification numbers are as follows: Parent THI, Inc. (5521), and TGHI, Inc. (3814).

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

Article I. DEFINITIONS AND CONSTRUCTION OF TERMS ..................................................1
    A.    Definitions...................................................................................1
    B.    Interpretation, Application of Definitions and Rules of Construction.................11
    C.    Computation of Time..........................................................................12

Article II. ADMINISTRATIVE AND PRIORITY CLAIMS .................................................12
    A.    Administrative Claims (Other Than Fee Claims). ....................................12
    B.    Fee Claims. ..................................................................................13
    C.    Priority Tax Claims...........................................................................13
    D.    U.S. Trustee Fees. ...........................................................................14

Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
              INTERESTS ...............................................................................14
    A.    Classification of Claims and Equity Interests.....................................14
    B.    Claims Record Date. ......................................................................14
    C.    Summary of Classification and Class Identification...............................15
    D.    Treatment of Classified Claims and Equity Interests. ..........................16
    E.    Special Provision Regarding Unimpaired Claims. ...............................18

Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................19
    A.    Effectuating Transaction Support Agreement and Subordination ........................19
    B.    Dissolution of the Debtors ...............................................................19
    C.    Liquidation of Assets .....................................................................19
    D.    Post-Confirmation Reports and Fees ....................................................19
    E.    Funded Amount and Wind-Down Reserve...............................................20
    F.    Release of Liens.............................................................................20
    G.    Voting of Claims...........................................................................20
    H.    Treatment of Intercreditor Agreements .................................................20
    I.    Nonconsensual Confirmation................................................................20
    J.    Indemnification of Directors, Officers and Employees. ......................21

Article V. CONFIRMATION OF THE PLAN....................................................................21
    A.    Conditions to Confirmation. ...............................................................21
    B.    Waiver of Conditions Precedent to Confirmation. ...............................22
    C.    Compromise and Settlement of Claims and Controversies ......................22
    D.    Injunction. ..................................................................................22
    E.    Preservation of Causes of Action......................................................24
    F.    Release of Avoidance Actions .............................................................24
    G.    Votes Solicited in Good Faith. ...........................................................25
    H.    Payment of PIK Notes Administrative Agent Fees ................................25
    I.    Cancellation of Certain Indebtedness and Existing Securities. ...........................25
    J.    Claims Incurred After the Effective Date. ..........................................25

K.    Releases, Exculpations and Injunctions of Released Parties. ................................26
L.    Satisfaction and Release of Claims and Equity Interests........................................28
M.    Preservation of Insurance.......................................................................................28

Article VI. DISTRIBUTIONS UNDER THE PLAN ......................................................................28
A.    Procedures for Treating Disputed Claims...............................................................28
B.    Allowed Claims. ......................................................................................................29
C.    Allocation of Consideration. ...................................................................................30
D.    Estimation. ...............................................................................................................30
E.    Claims Paid by Third Parties ..................................................................................30
F.    Insured Claims. ........................................................................................................31

Article VII. RETENTION OF JURISDICTION .........................................................................31

Article VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES................................33
A.    Assumption of Executory Contracts and Unexpired Leases...................................33
B.    Cure Claims. ............................................................................................................33
C.    Reservation of Rights...............................................................................................34
D.    Rejection of Executory Contracts and Unexpired Leases.......................................34
E.    Assignment. .............................................................................................................34
F.    Insurance Policies. ...................................................................................................35
G.    Benefit Plans and Indemnification Agreements .....................................................35

Article IX. EFFECTIVENESS OF THE PLAN ...........................................................................35
A.    Conditions Precedent to Effectiveness....................................................................35
B.    Waiver of Conditions Precedent to Effectiveness. .................................................36
C.    Effect of Failure of Conditions. ..............................................................................36
D.    Vacatur of Confirmation Order................................................................................36
E.    Modification of the Plan. .........................................................................................36
F.    Revocation, Withdrawal, or Non-Consummation. .................................................36

Article X. MISCELLANEOUS PROVISIONS.............................................................................37
A.    Immediate Binding Effect........................................................................................37
B.    Governing Law. .......................................................................................................37
C.    Filing or Execution of Additional Documents........................................................37
D.    Term of Injunctions of Stays...................................................................................37
E.    Withholding and Reporting Requirements. .............................................................38
F.    Notices. ....................................................................................................................38
G.    Conflicts...................................................................................................................39

## INTRODUCTION

The Debtors propose the following prepackaged plan of liquidation under section 1121(a) of chapter 11 of title 11 of the United States Code.  Capitalized terms used in the Plan and not otherwise defined shall have the meaning ascribed to such terms in Article I.

Claims against, and Equity Interests in, the Debtors will be treated as set forth herein.  Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, forbearance negotiations and agreements with lenders, a best interest analysis, and projections for future operations and risk factors, together with a summary and analysis of the Plan.

THIS PLAN SHOULD BE CONSIDERED ONLY IN CONJUNCTION WITH THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED HEREWITH. THE DISCLOSURE STATEMENT IS INTENDED TO PROVIDE YOU WITH THE INFORMATION THAT YOU NEED TO MAKE AN INFORMED JUDGMENT WHETHER TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions.

Unless otherwise defined herein the following terms shall have the respective meanings set forth below:

1.    "*Accrued Professional Compensation*" means, at any given time, and regardless of whether such amounts are billed or unbilled, all accrued, contingent and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses by any Professional, except such fees and expenses that are reasonably incurred by the Prepetition Agents, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Court has not, as of the Effective Date, denied by Final Order (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying the remaining balance of any retainer that has been provided by the Debtors to such Professional.   To the extent the Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.    "*Administrative Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including (i) any actual and necessary costs and expenses of preserving the Estate, (ii) any actual and necessary costs and expenses of operating the Debtors' businesses, (iii) any indebtedness or obligations assumed by the Debtors in connection with the conduct of its

businesses, (iv) all compensation and reimbursement of expenses of Professionals to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, (v) any fees or charges assessed against the Estate under section 1930 of title 28 of the United States Code, and (vi) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

3.    "*Allowed*" means, with reference to any Claim, (i) following the Claims Objection Deadline, any Claim as to which no objection or request for estimation has been Filed prior to the Claims Objection Deadline, (ii) a Claim that has been expressly allowed by Final Order, (iii) a Claim as to which the Debtors agree to the amount and/or priority thereof in writing, (iv) a Claim that is expressly allowed pursuant to the terms of this Plan, or (v) a Claim that is listed in the Schedules (to the extent the Debtors file Schedules in the Chapter 11 Cases) as liquidated, non-contingent, and undisputed.  If a Claim is Allowed only in part, any provisions hereunder with respect to Allowed Claims are applicable solely to the Allowed portion of such Claim.

4.    "*Assumption Schedule*"  means the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan and the effective date of such assumption, which shall be included as an exhibit to this Plan and shall be filed with the Bankruptcy Court on notice to parties-in-interest no later than five (5) Business Days before the deadline to object to confirmation of the Plan.

5.    "*Avoidance Actions*" means any cause of action assertable under sections 510, 542, 543,544, 545,547, 548, 549, 550, or 553 of the Bankruptcy Code, or any under any non-bankruptcy law, including any state law avoidance actions; *provided, however*, that Avoidance Actions shall not include any cause of action for subordination pursuant to paragraph 5(f) of the Transaction Support Agreement.

6.    "*Ballots*" means each of the ballots distributed with the Disclosure Statement to each holder of an Impaired Claim that is entitled to vote to accept or reject the Plan.

7.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect with respect to the Chapter 11 Cases.

8.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and local rules of the Court, as the context may require, as in effect with respect to the Chapter 11 Cases.

9.    "*Bar Date*" means the date fixed by the Bankruptcy Court as the last date by which all Creditors must have filed proofs of Claim against the Debtors, unless the Bankruptcy Court has set a different date by which a specific Creditor must file a proof of Claim, in which case it means, for the specific Creditor, such different date set by the Bankruptcy Court in the Plan Scheduling Order or otherwise.

10.    "*Business Day*" means any day on which commercial banks are open for business, and not authorized to close, in New York, New York, except any day designated as a legal holiday by Bankruptcy Rule 9006(a).

2

11.    "*Cash*"  means legal tender of the United States of America.

12.    "*Causes of Action*" means any and all claims, causes of actions, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims, defenses, demands, rights, actions, debts, damages, judgments, remedies, Liens, indemnities, guaranties, suits, obligations, liabilities, accounts, offsets, recoupments, powers, privileges, licenses, and franchises of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, whether arising before, on or after the Petition Date, including through the Effective Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.   For the avoidance of doubt, the term "Causes of Action" shall include: (i) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or in equity; (ii) the right to object to Claims; (iii) all claims pursuant to section 362 of the Bankruptcy Code; and (iv) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

13.    "*Chapter 11 Cases*"  means the chapter 11 cases commenced by the Debtors.

14.    "*Claim*" means a "claim" against a Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

15.    "*Claims Objection Deadline*"  means the first Business Day that is the later of (i) one-hundred eighty (180) days after the Effective Date, (ii) ninety (90) days from the date by which a holder of a Claim is required to file a Proof of Claim pursuant to an order of the Court, or (iii) such other later date the Court may establish upon a motion by the Debtors, which motion may be approved without a hearing and without notice to any party.

16.    "*Claims Record Date*" means, for purposes of making distributions under the Plan on account of Allowed Claims, the Effective Date.

17.    "*Class*" means a group of Claims or Equity Interests classified under the Plan.

18.    "*Collateral*" means any property or interest in property of an Estate subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or is otherwise invalid under the Bankruptcy Code or applicable law.

19.    "*Collateral Agent Stock Turnover*"  has the meaning ascribed to such term in the Transaction Support Agreement.

20.     "*Confirmation*"  means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

21.    "*Confirmation Date*"  means the date of Confirmation.

22.     "*Confirmation Hearing*"  means the confirmation hearing held by the Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Court will consider confirmation of the Plan.

23.     "*Confirmation Order*" means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

24.     "*Court*" means (i) the United States Bankruptcy Court for the Southern District of New York, (ii) to the extent there is no reference pursuant to section 157 of title 28 of the United States Code, the United States District Court for the Southern District of New York and (iii) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein.

25.     "*Cure Claim*" means a Claim in an amount equal to all unpaid monetary obligations under an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.  Any Cure Claim to which the holder thereof disagrees with the priority and/or amount thereof as determined by the Debtors shall be deemed a Disputed Claim under this Plan.

26.     "*Debtors*" means Holdings and Parent.

27.     "*Disbursing Agent*" means the Post-Effective Date Debtors or their claims agent, Kurtzman Carson Consultants LLC.

28.     "*Disclosure Statement*"  means the *Disclosure Statement for the Plan of Liquidation of the Debtors Under Chapter 11 of the Bankruptcy Code*, in furtherance of this Plan.

29.     "*Disputed*" means, with reference to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order, a Claim (i) that is listed in the Schedules (to the extent the Debtors file Schedules in the Chapter 11 Case) as unliquidated, contingent, or disputed, and as to which no request for payment or Proof of Claim has been filed, (ii) as to which a proper and timely request for payment or Proof of Claim has been filed, but with respect to which an objection or request for estimation has been filed and has not been withdrawn or determined by a Final Order, (iii) as to which a request for payment was required to be filed but as to which a request for payment was not properly filed, (iv) that is disputed in accordance with the provisions of the Plan, or (v) that is otherwise disputed by the Debtors upon notice to the holder of such Claim prior to the Claims Objection Deadline.

30.     "*Distributable Holdings Assets*" means all Assets of Holdings available for distribution to holders of Allowed Claims, including: (i) any Cash or Cash-equivalents held by Holdings, (ii) any receivables that are due and owing to Holdings, (iii) insurance proceeds (other than directors' and officers' insurance proceeds) relating to assets or property of Holdings, (iv) the portion of tax refunds allocable to Holdings relating to any taxable year during which Parent, Holdings, the TGII and its subsidiaries were part of a consolidated tax filing group, (v) any other amounts or assets of Holdings subject to turnover from TGII or its subsidiaries

pursuant to the Transaction Support Agreement, and (vi) proceeds of any Causes of Action belonging to Holdings.

31.    "*Distributable Parent Assets*" means all Assets of Parent available for distribution to holders of Allowed Claims, including: (i) any Cash or Cash-equivalents held by Parent, (ii) any receivables that are due and owing to Parent, (iii) insurance proceeds (other than directors' and officers' insurance proceeds) relating to assets or property of Parent, (iv) the portion of tax refunds allocable to Parent relating to any taxable year during which Parent, Holdings, the TGII and its subsidiaries were part of a consolidated tax filing group, if any, and (v) proceeds of any Causes of Action belonging to Parent.

32.    "*Distribution*" means any distribution provided for in this Plan to Holders of Allowed Claims in full or partial satisfaction of such Allowed Claims.

33.    "*Effective Date*" means the date which is the first Business Day selected by the Debtors on which (a) all of the conditions to the occurrence of the Effective Date specified in Article IX.A have been satisfied or waived in accordance with Article IX.B and (b) no stay of the Confirmation Order is in effect.

34.    "*Entity*" means an "entity" as such term is defined in section 101(15) of the Bankruptcy Code.

35.    "*Equity Interest*" means any "equity security" as such term is defined in section 101(16) of the Bankruptcy Code, or any other instrument evidencing an ownership interest in the Debtors, whether or not transferable.

36.    "*Escrow Agreement*" means the Escrow Agreement, dated May 21, 2015, between Holdings, TGII, the Supplemental Agent, and U.S. Bank, National Association, as escrow agent.

37.    "*Estates*"    means the estates of the Debtors created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

38.    "*Executory Contract*" means a contract to which one or more Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

39.    "*Fee Claim*"    means a Claim for Accrued Professional Compensation.

40.    "*Final Order*"    means an order or judgment of the Court which has not been modified, amended, reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have

5

become final in accordance with Bankruptcy Rule 8002; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

41.     "*Fixed Transaction Consideration Payment*" means the $750,000 in cash paid to Holdings as set forth in  section 5(c) of the Transaction Support Agreement.

42.     "*Forbearance and Marketing Period*" means the 210-day marketing period and the forbearance periods provided for under the Transaction Support Agreement.

43.     "*Formerly Owned Operating Businesses*" means the direct and indirect subsidiaries of TGII that were formerly indirect subsidiaries of Parent and Holdings.

44.     "*Funded Amount*" means the $700,000 deposited into a segregated account at Holdings, which shall include the $200,000 funded to the Wind-Down Reserve.

45.     "*General Unsecured Claims*" means the PIK Note Claims and the Other General Unsecured Claims.

46.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

47.     "*Holdings*" means TGHI, Inc., a Delaware corporation, and any successor thereto.

48.     "*Holdings PIK Note Agency Agreement*" that means that certain Agency Agreement dated March 27, 2015 among Holdings, Law Debenture Trust Company of New York and the Holdings PIK Note Holders.

49.     "*Holdings PIK Note Claims*"  means the Claims under or evidenced by the Holdings PIK Notes, which shall be Allowed in the principal amount of $8,323,000, plus interest that accrued but remains unpaid as of the Petition Date.

50.     "*Holdings PIK Noteholders*" means the holders of the Holdings PIK Note Claims.

51.     "*Holdings PIK Notes*"  means the 16% Senior Unsecured Notes due October 26, 2018, issued pursuant to the Holdings Note Purchase Agreement.

52.     "*Holdings PIK Note Purchase Agreement*" means that certain Note Purchase Agreement, dated as of October 16, 2012, among Holdings and the purchasers signatory thereto, pursuant to which the Holdings PIK Notes were issued.

53.     "*Impaired*"  means, when used with reference to Claims or Equity Interests, Claims or Equity Interests that are "impaired" within the meaning of section 1124 of the Bankruptcy Code.

54.    "*Insured Claim*" means any Claim or portion of a Claim that is or may be insured under any of the Debtor's insurance policies.

55.    "*Intercompany Claims*" means any Claim held by a Debtor against another Debtor.

56.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

57.    "*Note Purchase Agreements*" means, collectively, the Parent PIK Note Purchase Agreements and the Holdings Note Purchase Agreement.

58.    "*Other General Unsecured Claims*" means any Unsecured Claim that is not (i) a PIK Note Claim, or (ii) an Intercompany Claim.

59.    "*Other Priority Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim or (ii) a Priority Tax Claim.

60.    "*Other Secured Claim*" means any Claim that is Secured, other than a Prepetition $20 Million Facility Claim.

61.    "*Parent*" means Parent THI, Inc., a Delaware corporation, and any successor thereto.

62.    "*Parent PIK Note Agency Agreement*" means that certain Agency Agreement dated March 27, 2015, among Parent, Law Debenture Trust Company of New York and the holders of the Parent PIK Notes issued under the Parent Note Purchase Agreement dated as of May 24, 2011, and that certain Agency Agreement dated March 27, 2015, among Parent, Law Debenture Trust Company of New York and the holders of the Parent PIK Notes issued under the Parent Note Purchase Agreement dated as of October 26, 2014.

63.    "*Parent PIK Note Claims*" means the Claims under or evidenced by the Parent PIK Notes, which shall be Allowed in the principal amount of $52,733,000 plus interest that accrued but remains unpaid as of the Petition Date.

64.    "*Parent PIK Noteholders*" means the holders of the Parent PIK Note Claims.

65.    "*Parent PIK Notes*" means the two series of 10% Senior Unsecured Notes due January 14, 2019 issued pursuant to the Parent Note Purchase Agreements.

66.    "*Parent PIK Note Purchase Agreements*"  means, collectively: (i) that certain Amended and Restated Note Purchase Agreement, dated as of May 24, 2011, among Parent and the purchasers signatory thereto and (ii) that certain Note Purchase Agreement, dated as of October 26, 2014, by and among Parent and the purchasers signatory thereto, pursuant to which the Parent PIK Notes were issued.

67.     "*Person*" means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other Entity.

68.     "*Petition Date*" means the date on which each of the Debtors commenced the Chapter 11 Cases.

69.     "*PIK Notes*" means, collectively, the Parent PIK Notes and the Holdings PIK Notes.

70.     "*PIK Notes Administrative Agent*" means Law Debenture Trust Company of New York, as administrative agent for (i) the Parent PIK Note Holders pursuant to the Parent PIK Note Agency Agreement, and (ii) the Holdings PIK Note Holders pursuant to the Holdings PIK Note Agency Agreement.

71.     "*PIK Notes Administrative Agent Expenses*" means any reasonable and documented fees and out-of-pocket costs and expenses, incurred prior to or after the Petition Date by the PIK Notes Administrative Agent that are required to be paid under the PIK Notes Agency Agreements.  Such amounts shall include, without limitation: (i) any extraordinary expenses incurred by the PIK Notes Administrative Agent that are required to be paid under the PIK Notes Agency Agreements, and (ii) the reasonable, documented, out-of-pocket costs and expenses of, and reasonable, documented unpaid legal fees actually incurred by, counsel to the PIK Notes Administrative Agent in connection with the Chapter 11 Cases and the distributions to the PIK Noteholders.

72.     "*PIK Notes Agency Agreements*" means the Parent PIK Note Agency Agreement or the Holdings PIK Note Agency Agreement.

73.     "*Plan*" means this *Plan of Liquidation of the Debtor Under Chapter 11 of the Bankruptcy Code*, together with all addenda, exhibits, schedules or other attachments, if any, each of which is incorporated herein by reference, and as may be amended, modified, or supplemented from time to time in accordance with the terms herein.

74.     "*Plan Scheduling Motion*" means the motion filed by the Debtors, substantially contemporaneously with the filing of the Chapter 11 Cases, seeking entry of an order (a) scheduling an objection deadline and combined hearing on the Debtors' Disclosure Statement and Plan Confirmation, (b) approving the form and notice of the Confirmation Hearing, (c) establishing procedures for objections to the Disclosure Statement and the Plan, (d) approving Solicitation Procedures, (e) establishing the Bar Date, and (f) granting related relief.

75.     "*Plan Scheduling Order*" means the order granting the Plan Scheduling Motion, including establishing the Bar Dates.

76.     "*Post-Effective Date Debtors*" means the Debtors, from and after the Effective Date.

77.     "*Prepetition $20 Million Facility*" means the term loan facility under the Prepetition $20 Million Term Loan Agreement in an original principal amount of $20 million.

8

78.    "*Prepetition $20 Million Facility Agent*" means Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent under the Prepetition $20 Million Term Loan Agreement, and any successor administrative agent or collateral agent from time to time.

79.    "*Prepetition $20 Million Facility Claims*" means the Claims evidenced by, derived from, based upon, relating to, or arising from Holdings' guaranty of the obligations under the Prepetition $20 Million Facility.

80.    "*Prepetition $20 Million Facility Lenders*" means the lenders under the Prepetition $20 Million Term Loan Agreement.

81.    "*Prepetition $20 Million Term Loan Agreement*" means the term loan agreement entered into on May 21, 2015, with respect to the Prepetition $20 Million Facility among TGII and Holdings, as borrowers, certain subsidiaries of TGII, as guarantors, and the Prepetition $20 Million Facility Agent, and the Prepetition $20 Million Facility Lenders, as may be amended, restated, supplemented or otherwise modified from time to time.

82.    "*Priority Tax Claim*" means any Claim that is entitled to a priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

83.    "*Professional*" means any professional employed or retained in the Chapter 11 Cases pursuant to sections 327 or 328 of the Bankruptcy Code.

84.    "*Proof of Claim*" means a written proof of Claim filed in the Chapter 11 Case.

85.    "*Pro Rata*" means, with respect to any Claim, the proportion that the amount of such Claim bears to the aggregate amount of all Claims (including Disputed Claims) in the applicable Class or group of Classes, unless the Plan provides otherwise.

86.    "*Rejection Damage Claims*" means Claims for damages arising from the rejection of Executory Contracts or Unexpired Leases.  Unless otherwise agreed to in writing by the Debtors, all Rejection Damage Claims shall be deemed Disputed Claims.

87.    "*Rejection Notice*" means a notice of an Executory Contract or Unexpired Lease to be rejected under the Plan pursuant to section 365 of the Bankruptcy Code which notice shall include (i) the procedures for objecting to proposed rejection of Executory Contracts and Unexpired Leases, (ii) the procedures for filing Rejection Damage Claims, and (iii) the procedures for resolution by the Court of any related disputes.

88.    "*Released Parties*" means each of: (a) the Debtors and the Post-Effective Date Debtors, (b) the Supporting PIK Noteholders, (c) the Prepetition $20 Million Facility Agent, (d) the Prepetition $20 Million Facility Lenders, (e) the PIK Administrative Agent, (f) the parties to the Transaction Support Agreement, including any joinder thereto, and (g) with respect to each of the foregoing in clauses (a) through (f), such entities' predecessors, Professionals, successors and assigns, subsidiaries, funds, portfolio companies, and each of their respective current and former officers, directors, employees, managers, attorneys, financial advisors,

accountants, investment bankers, consultants, management companies or other professionals or representatives, in each case solely in their capacity as such.

89.    "*Releasing Parties*" means each of: (a) the Supporting PIK Noteholders, (b) the Prepetition $20 Million Facility Agent, (c) the Prepetition $20 Million Facility Lenders, (d) the PIK Administrative Agent, (e) the parties to the Transaction Support Agreement, including any joinder thereto, (f) any holder of a Claim that either is deemed to accept the Plan or votes to accept the Plan, and (g) with respect to each of the foregoing in clauses (a) through (f), such entities' predecessors, Professionals, successors and assigns, subsidiaries, funds, portfolio companies, and each of their respective current and former officers, directors, employees, managers, attorneys, financial advisors, accountants, investment bankers, consultants, management companies or other professionals or representatives, in each case solely in their capacity as such.

90.    "*Residual Funded Amount*" means any portion of the Funded Amount, including the Wind-Down Reserve, that remains after the payment of all fees, expenses, and other payments described in Article IV.E of this Plan.

91.    "*Schedules*"  means, to the extent the requirement to file the Schedules is not waived by the Court, the schedules of assets and liabilities, statements of financial affairs, and lists of holders of Claims and Equity Interests, filed with the Court by the Debtors, including any amendments or supplements thereto.

92.    "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, in each case, to the extent determined pursuant to section 506(a) of the Bankruptcy Code or (b) otherwise Allowed pursuant to the Plan as a Claim that is Secured.

93.    "*Securities Act*" means the Securities Act of 1933, as amended.

94.    "*Supporting Holdings PIK Noteholders*" has the meaning ascribed to such term in the Transaction Support Agreement.

95.    "*Supporting Parent PIK Noteholders*" has the meaning ascribed to such term in the Transaction Support Agreement.

96.    "*Supporting PIK Noteholders*" has the meaning ascribed to such term in the Transaction Support Agreement.

97.    "*TGII*" means Targus Group International, Inc., a Delaware corporation, and any successor thereto.

98.    "*Transaction Consideration*" means the Fixed Transaction Consideration Payment and the Residual Funded Amount.

99.    "*Transaction Support Agreement*" means the Global Forbearance and Transaction Support Agreement, dated as of May 21, 2015, and amended as of December 31, 2015, among the Debtors, TGII, and the additional parties signatory thereto, as it may be amended, modified or supplemented from time to time by the parties thereto in accordance with the terms of such agreement.

100.    "*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

101.    "*Unimpaired*" means any Class of Claims or Equity Interests that is not Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code.

102.    "*Unsecured Claim*" means any Claim that is not Secured or entitled to priority under the Bankruptcy Code or an order of the Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

103.    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

104.    "*Voting Deadline*" means February 5, 2016, which shall be the deadline for submitting Ballots to either accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

105.    "*Voting Record Date*" means February 1, 2016.

106.    "*Wind-Down Reserve*" means a reserve to be established, maintained, and withheld from the Distribution, to be used to fund (a) the effectuation and consummation of the Plan, (b) the investigation and prosecution of Causes of Action (including any Avoidance Actions) not otherwise released pursuant to the Plan, (c) the payment of court fees and the fees of the United States Trustee for the Southern District of New York under 28 U.S.C. §1930 and (d) the payment of the fees and expenses incurred in connection with the wind-down of the Debtors' businesses.

## B.    Interpretation, Application of Definitions and Rules of Construction.

Capitalized terms that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. Meanings of capitalized terms shall be equally applicable to both the singular and plural forms of such terms.  The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole (and, for the avoidance of doubt, all exhibits thereto) and not to any particular section or subsection in the Plan unless expressly provided otherwise.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.  Captions and headings to articles, sections and exhibits are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan.

**C.**     **Computation of Time.**

Except as otherwise specifically provided in the Plan, in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II.**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Fee Claims, as described below, have not been classified and thus are excluded from the classes of Claims and Equity Interests set forth in Article III.

**A.**     **Administrative Claims (Other Than Fee Claims).**

1.     *General*

Each holder of an Allowed Administrative Claim (other than an Administrative Claim that is a Fee Claim) as of the Effective Date shall receive from the applicable Debtor (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as practicable after the later of (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date, (b) thirty (30) days after the date such Administrative Claim becomes an Allowed Administrative Claim if such Administrative Claim is Disputed as of or following the Effective Date, or (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is practicable or (ii) such other treatment as the Debtor and such holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims (other than Fee Claims) that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.     *Bar Date for Administrative Claims*

Except as otherwise provided herein or in the Plan Scheduling Order or other order of the Bankruptcy Court, unless previously filed or Allowed, each holder of an Administrative Claim (other than a Fee Claim) that arose (or, only in the case of unexpired leases of real or personal property, accrued) on or after the Petition Date through the Effective Date must file a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than thirty (30) days after the Confirmation Hearing.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, the Estates or their respective property, and such Administrative Claims shall be deemed waived and released as of the Effective Date.  Objections to requests for payment of Administrative Claims must be filed and served on the requesting party by no later than 150 days after the Effective Date, subject to further order of the Bankruptcy Court.  For the avoidance of doubt, nothing herein modifies any requirement to file any Administrative Claim as set forth in any other order of the

Court including the Plan Scheduling Order, and any holder of such Administrative Claim that failed to comply with the requirements of such other order or the Plan Scheduling Order shall be forever barred from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, the Estates or their respective property, and such Administrative Claims shall be deemed waived and released.

## B.    Fee Claims.

### 1.    *Final Fee Applications.*

All requests for compensation or reimbursement of Fee Claims shall be filed and served on the Debtors, counsel to the Debtors, the Post-Effective Date Debtors, the U.S. Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than thirty (30) days after the Effective Date.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors or their respective properties, and such Fee Claims shall be deemed released as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Debtors, counsel for the Debtors, and the requesting party no later than thirty (30) days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Fee Claim).

The amount of Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Post-Effective Date Debtors, or at the Post-Effective Date Debtors' direction, without interest or other earnings therefrom, when such Claims are approved by the Bankruptcy Court.

### 2.    *Post-Effective Date Fees and Expenses.*

The Post-Effective Date Debtors shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals on and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Court.

## C.    Priority Tax Claims.

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the applicable Debtor, in full satisfaction, settlement and release of and in exchange for such Priority Tax Claim one of the following treatments: (i) payment in full in Cash as soon as practicable after the Effective Date in an amount equal to the amount of such Allowed Priority Tax Claim, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored non-priority Unsecured Claim provided for

by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); (ii) payment in full in Cash payable in equal Cash installments made on a quarterly basis in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, over a period not to exceed five (5) years following the Petition Date, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored non-priority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); or (iii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon a Final Order of the Court.

### D.    U.S. Trustee Fees.

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.   On and after the Effective Date, the Post-Effective Date Debtors shall be responsible for filing required post-confirmation reports and paying quarterly fees due to the U.S. Trustee until the entry of a final decree in such Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLAIMS AND EQUITY INTERESTS

### A.    Classification of Claims and Equity Interests.

Except for those Claims addressed in Article II, all Claims and Equity Interests are placed in the Classes set forth below.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled before the Effective Date.

### B.    Claims Record Date.

As of the close of business on the Claims Record Date, the claims register (for Claims) and transfer ledger (for Equity Interests) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests.  The Debtors shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the Claims Record Date.  The Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register (for Claims) and transfer ledgers (for Equity Interests) as of the close of business on the Claims Record Date.

14

C.    **Summary of Classification and Class Identification.**

Although the Plan applies to both Debtors, the Plan constitutes two (2) distinct chapter 11 plans, one for each Debtor.  The classification of Claims and Equity Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Subject to the following paragraph, for all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (i.e., there will be two (2) sub-Classes in each Class and many of such sub-Classes may be vacant).  Notwithstanding the foregoing, the Debtors reserve the right to seek approval of the Bankruptcy Court to consolidate the Debtors for purposes of administrative convenience, provided that such consolidation does not materially and adversely impact the amount of distributions to any Person under the Plan.

Below is a chart identifying Classes of Claims and Equity Interests, a description of whether each Class is Impaired, and each Class's voting rights.  Holdings is the only Debtor with Class 3 because only Holdings is obligated under the Prepetition $20 Million Facility.  Parent is the only Debtor that has a Class 4 with respect to General Unsecured Claims against Parent, and Holdings is the only Debtor that has a Class 5 with respect to General Unsecured Claims against Holdings.  Holdings is the only Debtor that has Class 7 with respect to Equity Interests and Parent is the only Debtor that has a Class 8 with respect to Equity Interests in Parent.  If there are no creditors in one (1) or more Classes, then such Class will not apply to that Debtor.

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition $20 Million Facility Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims against Parent | Impaired | Deemed to Reject |
| 5 | General Unsecured Claims against Holdings | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests in Holdings | Impaired | Deemed to Reject |
| 8 | Equity Interests in Parent | Impaired | Deemed to Reject |

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific voting Class for a Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class (with respect to such Debtor) will be deemed to have accepted the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Debtors reserve the right to modify the Plan in accordance with Article IX.F hereof, including the right to withdraw the Plan at any time before the Effective Date.

**D.**     **Treatment of Classified Claims and Equity Interests.**

   1.     *Class 1 – Other Priority Claims.*

      (a)     Classification:  Class 1 consists of Other Priority Claims.

      (b)     Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement and release and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

      (c)     Voting:  Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

   2.     *Class 2 – Other Secured Claims.*

      (a)     Classification:  Class 2 consists of Other Secured Claims.

      (b)     Treatment:  Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors, in full and final satisfaction, settlement and release of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim shall either: (i) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (ii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.

      (c)     Voting:  Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

   3.     *Class 3 – Prepetition $20 Million Facility Claims.*

      (a)     Classification:  Class 3 consists of Prepetition $20 Million Facility Claims.

      (b)     Allowance: The Prepetition $20 Million Facility Claims shall be Allowed on the Effective Date for all purposes in an amount of no less than $21 million, *plus* accrued and unpaid interest calculated in accordance with the Prepetition $20 Million Facility.

(c)    <u>Treatment</u>:  In exchange for each Prepetition $20 Million Facility Claim, each holder of an Allowed Prepetition $20 Million Facility Claim shall, on the Effective Date, allocate its right to receive a distribution of the Transaction Consideration and any Distributable Holdings Assets to the holders of Allowed Class 5 Unsecured Claims against Holdings, <u>provided</u>, however, that for the avoidance of doubt the treatment of the Prepetition $20 Million Facility Claims pursuant to this Plan shall not constitute a release of any Prepetition $20 Million Facility Claims held by holders of Allowed Prepetition $20 Million Claims against any entity other than the Debtors.

(d)    <u>Voting</u>:  Class 3 is Impaired.  Therefore, holders of Class 3 Prepetition $20 Million Facility Claims are entitled to vote to accept or reject the Plan.

4.    <u>*Class 4 – General Unsecured Claims against Parent*</u>

(a)    <u>Classification</u>:  Class 4 consists of General Unsecured Claims against Parent.

(b)    <u>Treatment</u>:  In full and final satisfaction, settlement and release of and in exchange for each Allowed General Unsecured Claim against Parent, each holder of an Allowed General Unsecured Claim against Parent shall receive its pro rata share of any Distributable Parent Assets.

(c)    <u>Voting</u>:  Class 4 is Impaired.  Because the Debtors believe there will be no Distributable Parent Assets to be distributed to holders of Class 4 General Unsecured Claims against Parent, holders of Claims in Class 4 are deemed to reject the Plan, and are not entitled to vote to accept or reject the Plan.

5.    <u>*Class 5 – General Unsecured Claims against Holdings*</u>

(a)    <u>Classification</u>:  Class 5 consists of General Unsecured Claims against Holdings.

(b)    <u>Treatment</u>:  In full and final satisfaction, settlement and release of and in exchange for each Allowed General Unsecured Claim against Holdings, on or as soon as practicable after the Effective Date, (i) each holder of an Allowed Class 6 Claim that votes to accept the Plan by the Voting Deadline shall receive its pro rata share of: (x) the Fixed Transaction Consideration Payment, (y) any Distributable Holdings Assets, and (z) the Residual Funded Amount; and (ii) alternatively, each holder of an Allowed Class 5 Claim that either votes to reject the Plan or does not vote on the Plan by the Voting Deadline shall receive its pro rata share of (a) the Fixed Transaction Consideration Payment, and (b) any Distributable Holdings Assets.

(c)    <u>Voting</u>:  Class 5 is Impaired.  Therefore, holders of Class 5 General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    <u>*Class 6 – Intercompany Claims*</u>.

(a)    <u>Classification</u>:  Class 6 consists of Intercompany Claims.

(a)     Treatment:   On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims shall be deemed extinguished and released, and shall not receive any distributions under the Plan.

(b)     Voting:   Class 6 is Impaired.  Holders of Class 6 Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, as applicable.  Therefore, holders of Class 6 Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.     *Class 7 – Equity Interests in Holdings*.

(a)     Classification:  Class 7 consists of Equity Interests in Holdings.

(b)     Treatment:   On the Effective Date, Equity Interests in Holdings shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Equity Interests shall not receive or retain any property under the Plan on account of such Equity Interests in Holdings.

(c)     Voting:  Class 7 is Impaired.  Holders of Class 7 Equity Interests in Holdings are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, holders of Class 7 Equity Interests in Holdings are not entitled to vote to accept or reject the Plan.

8.     *Class 8 – Equity Interests in Parent*.

(a)     Classification:  Class 8 consists of Equity Interests in Parent.

(b)     Treatment:   On the Effective Date, Equity Interests in Parent shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Equity Interests shall not receive or retain any property under the Plan on account of such Equity Interests in Parent.

(c)     Voting:  Class 8 is Impaired.  Holders of Class 8 Equity Interests in Parent are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Class 8 Equity Interests in Parent are not entitled to vote to accept or reject the Plan.

**E.     Special Provision Regarding Unimpaired Claims.**

Except as otherwise specifically provided in this Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Post-Effective Date Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Unimpaired Claims; and, except as otherwise specifically provided in this Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by this Plan.  Except as otherwise specifically provided in this Plan, the Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all

such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Post-Effective Date Debtors' legal and equitable rights with respect to any Claim left Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

# ARTICLE IV.
# MEANS FOR IMPLEMENTATION OF THE PLAN

## A.    Effectuating Transaction Support Agreement and Subordination

Through the Effective Date, the Debtors shall perform all respective obligations under the Transaction Support Agreement, and shall be entitled to receive all benefits of the Transaction Support Agreement, including the receipt of the Transaction Consideration or other consideration provided therein in accordance with its terms.    The Transaction Support Agreement shall be deemed and treated as an Executory Contract that shall be assumed pursuant to this Plan.

For the avoidance of doubt, all terms of the Transaction Support Agreement shall remain in full force and effect, including the subordination provisions set forth in paragraph 5(f) therein.    Such subordination provisions are valid, binding and enforceable subordination provisions under Section 510(a) of the Bankruptcy Code.

## B.    Dissolution of the Debtors

On the Effective Date, the Debtors shall be deemed dissolved and shall not be required to take any further steps with respect to such dissolution.    The Post-Effective Date Debtors may, but shall not be required, to take steps as deemed desirable to wind up the Debtors' affairs and prepare appropriate dissolution filings, and file all appropriate tax returns.

## C.    Liquidation of Assets

On and after the Effective Date, the Post-Effective Date Debtors may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Post-Effective Date Debtors may, without application to or approval of the Bankruptcy Court, pay the charges incurred after the Effective Date for Professional fees and expenses related to the winding up of the Debtors' affairs and administration and implementation of the Plan.

## D.    Post-Confirmation Reports and Fees

Following the Confirmation Date, the Post-Effective Date Debtors shall be responsible for the filing of post-Confirmation reports required during such periods with the U.S. Trustee and payment of all post-Confirmation fees charged or assessed against the estates under 28 U.S.C. § 1930 during such periods.

E.      **Funded Amount and Wind-Down Reserve**

Prior to the Effective Date, the Funded Amount (together with any retainers held by the professionals) shall be used to pay all reasonable fees and expenses, including the reasonable and documented professionals' fees and costs of administering the Debtors' Chapter 11 Cases, to oversee and facilitate the receipt and distribution of the Transaction Consideration and any other Distributions under this Plan.  In the event that any portion of the Funded Amount, including the Wind-Down Reserve, remains after the payment of all fees and expenses described herein, then the remainder shall be distributed to holders of Allowed General Unsecured Claims against Holdings that vote to accept the Plan.

For the avoidance of doubt, no portion of the Funded Amount shall be used to challenge the liens and/or claims under the Prepetition $20 Million Term Loan Facility or the validity and/or enforceability of the transactions contemplated by the Transaction Support Agreement or the Escrow Agreement.

F.      **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of the Debtors' estate shall be released, and all the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests shall revert to the Post-Effective Date Debtors and its successors and assigns.

G.      **Voting of Claims.**

Each holder of an Allowed Claim as of the Voting Deadline in an Impaired Class of Claims or Equity Interests that is not deemed to have rejected the Plan, and that held such Claim as of the Voting Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the instructions accompanying the Ballot. Approval for the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Plan Scheduling Motion. The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described in the Disclosure Statement.

H.      **Treatment of Intercreditor Agreements**

Nothing contained herein shall affect the enforceability of any intercreditor agreements in accordance with, and subject to, the terms thereof and any applicable law, and all rights and obligations, if any, of the parties to such intercreditor agreements thereunder, or in connection therewith, are preserved.

I.      **Nonconsensual Confirmation.**

The Debtors intend to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed to have rejected the Plan pursuant to section 1126 of the Bankruptcy Code.

In addition, although the Debtors believe that the Plan is confirmable as to each of Parent and Holdings, in the event that the Debtors are unable to confirm the Plan as to Parent, they reserve the right to convert Parent's Chapter 11 Case into a chapter 7 case or otherwise dismiss Parent's Chapter 11 Case.

**J.      Indemnification of Directors, Officers and Employees.**

Notwithstanding any other provisions of the Plan, from and after the Effective Date, indemnification obligations owed by the Debtors to directors, and officers of a Debtor who continued to serve in such capacity on or after the date of the Transaction Support Agreement, to the extent provided in the applicable articles or certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement (including, for the avoidance of doubt, the indemnification obligations set forth in paragraph 10(e) of the Transaction Support Agreement), will be assumed pursuant to this Plan; *provided, however* that such indemnification obligations shall be paid and satisfied solely from the proceeds of available insurance policies obtained by or on behalf of the Debtors.  Subject to the foregoing caveat with respect to available insurance policies, all such indemnification obligations shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

Indemnification obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and by order of the Court shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

## ARTICLE V.
## CONFIRMATION OF THE PLAN

**A.      Conditions to Confirmation.**

The following are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived in accordance with Article V.B:

1.      The Court shall have approved the Disclosure Statement.

2.      The Confirmation Order shall have been entered by the Bankruptcy Court and is in form and substance reasonably satisfactory to the Debtors, in consultation with the Prepetition $20 Million Facility Lenders.

3.      The Plan shall be in form and substance reasonably satisfactory to the Debtors and the Prepetition $20 Million Facility Lenders.

4.      The Assumption Schedule shall be in form and substance reasonably satisfactory to the Debtors, in consultation with the Prepetition $20 Million Facility Lenders.

**B.**     <u>**Waiver of Conditions Precedent to Confirmation.**</u>

The Debtors, with the consent of the Prepetition $20 Million Facility Lenders, may waive the conditions set forth in Article V.A above at any time without leave of or order of the Court and without any formal action.

**C.**     <u>**Compromise and Settlement of Claims and Controversies**</u>

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions under the Plan and other benefits provided pursuant to the Plan and the Transaction Support Agreement, the provisions of the Plan, upon consummation, shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and the Transaction Support Agreement and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distributions to be made on account of such an Allowed Claim or Equity Interest.  In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Prepetition $20 Million Facility Lenders, the Supporting PIK Noteholders, and the PIK Administrative Agent reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and are within the range of reasonableness. Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**D.**     <u>**Injunction.**</u>

FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS ARTICLE V, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, CAUSE OF ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS ARTICLE V OR THE CONFIRMATION ORDER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE V OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE V ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH RELEASED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH RELEASED PARTIES OR THE PROPERTY OR ESTATES OF SUCH RELEASED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATIONS DUE FROM THE DEBTORS OR THE POST -EFFECTIVE DATE DEBTORS OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTORS ON ACCOUNT OF ANY SUCH CLAIM; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, AND THE EQUITY INTERESTS IN PARENT SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL EQUITY INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THEIR  ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND

23

EACH OF ITS ASSETS AND PROPERTIES, AND EACH OF THE RELEASED PARTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE RELATED TO THE DEBTORS, THE FORMERLY OWNED OPERATING BUSINESSES AND THEIR RESPECTIVE BUSINESSES.

### E.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided herein (including, without limitation, as to released Claims) the Post-Effective Date Debtors shall retain all Causes of Action, including, for the avoidance of doubt, all Causes of Action arising out of the Transaction Support Agreement and any related agreements or documents. Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtors that is not specifically waived or relinquished by this Plan. The Post-Effective Date Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately before the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Post-Effective Date Debtors' legal and equitable rights respecting any claim that is not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against such Person. The Debtors or Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, in accordance with the Plan. From and after the Effective Date, the Post-Effective Date Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court. In accordance with Article V.E herein, the Post-Effective Date Debtors are deemed a representative of the Estates for the purpose of prosecuting any Claim or Cause of Action and any objections to Claims pursuant to 11 U.S.C. § 1123(b)(3)(B). For the avoidance of doubt, the Claims and Causes of Action preserved pursuant to this Article V.E shall not include (i) any Avoidance Actions released in accordance with Article V.F of this Plan, (ii) any Claims or Causes of Action released pursuant to Article V.K] of this Plan, or (iii) any Claims or Causes of Action against the Debtors or their current or former directors and officers arising prior to the Effective Date.

### F.    Release of Avoidance Actions

On the Effective Date, and except to the extent otherwise reserved in the Plan, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Post-Effective Date Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Post-Effective Date Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions. No Avoidance Actions shall revert to creditors of the Debtors.

**G.**     **Votes Solicited in Good Faith.**

The Debtors have, and upon entry of the Confirmation Order shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

**H.**     **Payment of PIK Notes Administrative Agent Fees**

As of the Effective Date, any agreement regarding payment of PIK Notes Administrative Agent fees between the Debtors and the PIK Notes Administrative Agent, as amended, shall be deemed and treated as rejected pursuant to this Plan without giving rise to any Claims.  The PIK Notes Administrative Agent shall apply the prepetition retainer it holds to satisfy any prepetition or postpetition fees it incurs, without any recourse against the Debtors. Any unused portion of the prepetition retainer shall promptly be returned to the Debtors.  If the Debtors or the Post-Effective Date Debtors dispute the reasonableness of the PIK Notes Administrative Agent Expenses, the Debtors, the Post-Effective Date Debtors, or the PIK Notes Administrative Agent, as applicable, may submit such dispute to the Court for a determination of the reasonableness of such fees or expenses and the disputed portion of the PIK Notes Administrative Agent Expenses shall not be paid until the dispute is resolved.

**I.**     **Cancellation of Certain Indebtedness and Existing Securities.**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in a Debtor giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan), and (ii) the obligations of a Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of such Debtor (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan or assumed by a Debtor) shall be released; provided, however, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such agreement that governs the rights of the holder of a Claim against the Debtors shall continue in effect solely for purposes of (a) allowing holders of such Claims to receive distributions under the Plan as provided herein, and (b) allowing the Disbursing Agent to make distributions under the Plan as provided herein, and deduct therefrom such reasonable compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors and authorized under such agreement.

**J.**     **Claims Incurred After the Effective Date.**

Claims incurred by the Debtors after the Effective Date may be paid by the Post-Effective Date Debtors from the Funded Amount in the ordinary course of business and without

application for or Court approval, subject to any agreements with such holders of a Claim and applicable law.

**K.    Releases, Exculpations and Injunctions of Released Parties.**

1.    ***Releases by the Debtors*.  On the Effective Date, and notwithstanding any other provisions of the Plan, the Debtors and the Post-Effective Date Debtors, on behalf of themselves and their Estates, shall be deemed to unconditionally release the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, assertable on behalf of or derivative from the Debtors, based in whole or in part upon actions taken <u>solely</u> in their respective capacities described herein or any omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating to the Debtors or their business and affairs, the Formerly Owned Operating Businesses or their businesses and affairs, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the Disclosure Statement, the Transaction Support Agreement, the Transactions (as defined in the Transaction Support Agreement), including, without limitation actions taken during the Forbearance and Marketing Period and/or in connection with the Collateral Agent Stock Turnover, the Escrow Agreement, the PIK Notes Agency Agreements, the Plan or agreements, instruments, or other documents related to any of the foregoing, <u>provided</u>, <u>however</u>, that (a) no individual shall be released from any act or omission that constitutes fraud, willful misconduct, gross negligence, or breach of fiduciary duty (if any) as determined by a Final Order, (b) the Post-Effective Date Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such persons asserted against the Debtors, (c) nothing herein shall operate as a waiver or release of any claims held by the Debtors against the Released Parties for the enforcement of the Transaction Support Agreement and any subordination provisions therein; <u>provided</u>, <u>however</u>, that any claims for actions or inactions taken by the Released Parties relating to the marketing of the Debtors, the Formerly Owned Operating Businesses and/or their respective assets during the Forbearance and Marketing Period and for the Collateral Agent Stock Turnover are released as set forth in this section; and (d) the foregoing release applies to the Released Parties solely in their respective capacities described herein.**

2.    *Releases by Holders of Claims*.  **To the fullest extent permissible under applicable law, and except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, the Releasing Parties shall be deemed to unconditionally release the Released Parties and their respective property from any and all Claims, debts, obligations, rights, suits, judgments, damages, actions, causes of action, remedies, and liabilities of any nature whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, at law, in equity, or otherwise, they hold that are in connection with any of the Debtors and their business and affairs, the Formerly Owned Operating Businesses and their business and affairs, the Debtors' respective Estates, Assets or properties, the Transactions (as defined in the Transaction Support Agreement), the Plan, or these Chapter 11 Cases; provided, however, that the foregoing releases by the Releasing Parties shall not operate to waive or release**

any Released Party on account of liability that is judicially determined pursuant to a Final Order to have resulted from such Released Party's fraud, willful misconduct, gross negligence, or breach of fiduciary duty (if any).

       3.     *Exculpation and Injunction.*   The Debtors and the other Released Parties (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission that occurred prior to, during and/or in connection with the Chapter 11 Cases and/or in connection with, or arising out of the preparation and filing of the Chapter 11 Cases, the events and circumstances leading up to the Chapter 11 Cases, the Transaction Support Agreement (including without limitation, negotiation and implementation thereof), the Transactions (as defined in the Transaction Support Agreement), including, but not limited to, the prepetition marketing of the Debtors and the Formerly Owned Operating Businesses and/or the Collateral Agent Stock Turnover, and the Escrow Agreement, the PIK Notes Agency Agreements, the preparation, negotiation, and filing of the Plan, the Disclosure Statement, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan, the Disclosure Statement, the Transaction Support Agreement, or the Escrow Agreement, and any agreements, instruments or other documents related to any of the foregoing, or in furtherance thereof, except for any act or omission that constitutes fraud, willful misconduct, gross negligence or breach of fiduciary duty (if any) as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. For the avoidance of doubt, nothing herein shall operate as a waiver or release of any claims held by the Debtors against the Released Parties for the enforcement of the Transaction Support Agreement and any subordination provisions therein; **provided, however**, that any claims for actions or inactions taken by the Released Parties relating to the marketing of the Debtors, the Formerly Owned Operating Businesses and/or their respective assets during the Forbearance and Marketing Period and for the Collateral Agent Stock Turnover are released as set forth in this section. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability. Without limiting the generality of the foregoing, the Released Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Equity Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or before the Effective Date and that has been released or waived pursuant to this Plan. Notwithstanding anything herein to the contrary, no Released Party shall be exculpated from any liability resulting from any act or omission that limits the liability of any Person pursuant to N.Y. Comp. Codes R. & Regs. Tit. 22 § 1200.8 Rule 1.8(h)(1) (2009) as determined by Final Order and any other statutes, rules or regulations dealing with professional conduct to which such professionals are subject; provided that each Released Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; **provided, however**, that any party seeking to

27

**assert such a claim against any such attorney must first seek relief, on proper notice, from the Bankruptcy Court.**

**L.**     **Satisfaction and Release of Claims and Equity Interests**

The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Post-Effective Date Debtors, or any of their respective assets or properties arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such Claim or Equity Interest shall be precluded from asserting against the Debtors, the Post-Effective Date Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

**M.**     **Preservation of Insurance.**

The Debtors' release from all Claims as provided herein shall not, except as necessary to be consistent with this Plan, diminish or impair the enforceability of any insurance policy that may provide coverage for Claims against the Debtors, their current and former directors and officers, the Post-Effective Date Debtors, or any other Person.  As set forth herein, the Transaction Support Agreement shall be deemed and treated as an Executory Contract under the Plan, and the terms of the Transaction Support Agreement shall remain in full force and effect, including the obligations to obtain and maintain insurance set forth therein. To the extent not obtained pursuant to the terms of the Transaction Support Agreement, prior to the Effective Date, the Debtors shall obtain directors' and officers' liability insurance tail coverage for all of their current and former directors and officers, which coverage shall extend for a period of not less than six (6) years after the Effective Date and contain terms no less favorable to such directors and officers as the terms of the existing directors' and officers' liability insurance policies issued to the Debtors.

**ARTICLE VI.**
**DISTRIBUTIONS UNDER THE PLAN**

**A.**     **Procedures for Treating Disputed Claims.**

On and after the Effective Date, only the Post-Effective Date Debtors shall be entitled to object to, settle, compromise, withdraw or litigate objections to, or request the estimation of Claims against the Debtors, their respective Estates, Assets or properties. Objections and requests for estimation shall be served on the respective Holder of the Claim and filed with the Bankruptcy Court on or before the Claims Objection Deadline.  Any fees, costs or expenses incurred by the Post-Effective Date Debtors in objecting to Claims shall be paid out of the Wind-Down Reserve. On the Effective Date, all outstanding objections to and requests for estimation of Claims will vest in the Post-Effective Date Debtors.

**B.**    **Allowed Claims.**

        1.    *Timing of Distributions*.  Distributions under the Plan shall be made by the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, as applicable.

        2.    *Delivery of Distributions*.  Distributions under the Plan shall be made by the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, to the holders of Allowed Claims in all Classes for which a distribution is provided in this Plan at the addresses set forth on either (a) the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors have been notified in writing of a change in address, including, but not limited to, by the filing of a Proof of Claim by such Holder that contains an address for such Holder different from the address reflected on the Schedules for such Holder, (b) on the Proof of Claim filed such Holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such Holder giving details of a change of address; *provided, however*, that the initial distribution to Holders of PIK Notes Claims shall be made to the PIK Notes Administrative Agent.

        3.    *Distribution of Cash*.  Any payment of Cash by the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, pursuant to the Plan shall be made at the option and in the sole discretion of the Debtors or the Post-Effective Date Debtors, as applicable, by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Post-Effective Date Debtors.

        4.    *Unclaimed Distributions of Cash*.  Subject to Article VII.B.6 herein, any distribution of Cash under the Plan that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) shall, pursuant to section 347(b) of the Bankruptcy Code, revert to the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date and thereafter shall be distributed to holders of General Unsecured Claims against Holdings, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

        5.    *Saturdays, Sundays, or Legal Holidays*.  If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

        6.    *Disbursing Agent*.  Pending the final distribution of all sums distributable under the terms of the Plan, the Disbursing Agent shall have full authority to sign checks on any bank account of the Debtors to the extent necessary to make any payment or distribution contemplated by the Plan.

7. *Distributions to Holders of Claims*:

(a) *Distribution to Claims Allowed as of the Effective Date.* Except as otherwise expressly set forth in the Plan, the Debtors, on the Effective Date, and the Post-Effective Date Debtors or the Disbursing Agent, after the Effective Date, shall distribute Cash or Collateral, as the case may be, to the holders of Allowed Claims as of the Effective Date as contemplated herein.

(b) *Claims Allowed after the Effective Date.* Each holder of a Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive the distribution to which such holder of an Allowed Claim is entitled as set forth in Article III, and distributions to such holder shall be made in accordance with the provisions of this Plan. As soon as practicable after the date that the Claim becomes an Allowed Claim, the Post-Effective Date Debtors or the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim.

8. *Interest on Claims.* Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims), shall be entitled, under any circumstances, to receive any interest on a Claim.

## C.    **Allocation of Consideration.**

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan shall be treated as first satisfying an amount equal to the principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid and interest, as applicable.

## D.    **Estimation.**

The Debtors or the Post-Effective Date Debtors may, at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Post-Effective Date Debtors had previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement under the Plan or (iii) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Post-Effective Date Debtors, as the case may be, may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

## E.    **Claims Paid by Third Parties**

The Debtors or the Post-Effective Date Debtors shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the

holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Post-Effective Date Debtors. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Post-Effective Date Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

F.     **Insured Claims**.

        If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

## ARTICLE VII.
## RETENTION OF JURISDICTION

        Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction:

        (i)    to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor or is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article VIII, any Executory Contracts or Unexpired Leases to the Assumption Schedule or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

        (ii)   to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date;

        (iii)  to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

        (iv)   to resolve disputes as to the ownership of any Claim or Equity Interest;

(v) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(vi) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified or vacated;

(vii) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(viii) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

(ix) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(x) to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan;

(xii) to hear and determine any issue for which the Plan requires a Final Order of the Court;

(xiii) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xiv) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date;

(xv) to hear and determine any Causes of Action preserved under the Plan;

(xvi) to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

(xviii) to enter a final decree closing the Chapter 11 Case;

(xix) to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(xx) to hear and determine disputes or issues arising under the Transaction Support Agreement;

(xx) to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(xxi) to enforce all orders previously entered by the Court; and

(xxii) to hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE VIII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption of Executory Contracts and Unexpired Leases.

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such executory contract or unexpired lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### B.     Cure Claims.

At the election of the Debtors or the Post-Effective Date Debtors, as applicable, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in one of the following ways (i) payment of the Cure Claim in Cash on or as soon as reasonably practicable to occur of (A) thirty (30) days after the determination of the Cure Claim, and (B) the Effective Date or such other date as may be set by the Court, or (ii) on such other terms as agreed to by the Debtors or the Post-Effective Date Debtors and the non-Debtor counterparty to such Executory Contract or  Unexpired Lease.  In the event of a dispute pertaining to assumption or assignment, the Cure Claim payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of the dispute in accordance with Article VII.A of this Plan.

The only adequate assurance of future performance shall be the promise of the Post-Effective Date Debtors to perform all obligations under any executory contract or unexpired lease under this Plan.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING**

**UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE COURT**.

Obligations arising under insurance policies assumed by the Debtors before the Effective Date shall be adequately protected in accordance with any order authorizing such assumption.

**C.**     **Reservation of Rights.**

Neither the exclusion nor inclusion of any contract or lease in the Assumption Schedule, as applicable, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that Post-Effective Date Debtors have any liability thereunder.  In the event a written objection is filed with the Court as to whether a contract or lease is executory or unexpired, the right of the Debtors or the Post-Effective Date Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

**D.**     **Rejection of Executory Contracts and Unexpired Leases.**

1.     *Rejection Damage Claims*. If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Rejection Damage Claim, a Proof of Claim must be filed with the Court within (i) thirty (30) days after the date of entry of an order of the Court approving such rejection, or (ii) if the rejection is pursuant to this Plan, within thirty (30) days after the date of entry of the Confirmation Order.  For the avoidance of doubt, all Allowed Rejection Damage Claims shall be treated as Unsecured Claims.

2.     ***REQUIREMENT TO FILE A PROOF OF CLAIM FOR REJECTION DAMAGE CLAIMS*. ANY REJECTION DAMAGE CLAIMS THAT ARE NOT TIMELY FILED SHALL BE DISALLOWED AUTOMATICALLY, FOREVER BARRED FROM ASSERTION, AND SHALL NOT BE ENFORCEABLE AGAINST ANY DEBTOR WITHOUT THE NEED FOR ANY OBJECTION BY THE DEBTORS OR FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND ANY REJECTION DAMAGE CLAIM SHALL BE DEEMED FULLY SATISFIED, RELEASED, NOTWITHSTANDING ANYTHING IN THE SCHEDULES OR A PROOF OF CLAIM TO THE CONTRARY.**

**E.**     **Assignment.**

Any Executory Contract or Unexpired Lease held by any Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases, will be deemed assigned to the Post-Effective Date Debtors pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption,

assumption and assignment or Cure Claim is not resolved in favor of the Debtors before the Effective Date, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors for rejection within five (5) Business Days of the entry of the order of the Court resolving the matter against the Debtor.  Such rejection shall be deemed effective as of the Effective Date.

**F.**     **Insurance Policies.**

Notwithstanding anything in this Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

**G.**     **Benefit Plans and Indemnification Agreements**

Subject to Section IV.J, on the Effective Date, all (i) indemnification agreements, and (ii) employee compensation and employee benefit plans of the Debtors, including employee benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code (if any) entered into before or after the Petition Date and not since terminated, shall terminate as against the Debtors.

## ARTICLE IX.
## EFFECTIVENESS OF THE PLAN

**A.**     **Conditions Precedent to Effectiveness.**

The Plan shall not become effective unless and until the Confirmation Date has occurred and the following conditions have been satisfied in full or waived in accordance with Article IX.B:

1.     the Confirmation Order shall have been entered by the Court in form and substance acceptable to the Debtors, in consultation with the Prepetition $20 Million Facility Lenders;

2.     the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

3.     the final version of the Plan and any supplemental documents and exhibits shall have been filed and in a form and substance satisfactory to the Debtors and the Prepetition $20 Million Facility Lenders;

4.     all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws; and

5.      all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained and not revoked.

## B.      Waiver of Conditions Precedent to Effectiveness.

The Debtors, in consultation with the Prepetition $20 Million Facility Lenders, may waive conditions set forth in Article IX.A above at any time without leave of or order of the Court and without any formal action.

## C.      Effect of Failure of Conditions.

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with the Plan, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an Order granting such motion.

## D.      Vacatur of Confirmation Order.

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims against or Equity Interests in the Debtor; (ii) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (iii) prejudice in any manner any right, remedy or claim of the Debtors; or (iv) be deemed an admission against interest by the Debtors.

## E.      Modification of the Plan.

Subject to the limitations contained in the Plan, (i) the Debtors, with the consent of the Prepetition $20 Million Facility Lenders, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors, with the consent of the Prepetition $20 Million Facility Lenders, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code.

## F.      Revocation, Withdrawal, or Non-Consummation.

1.      *Right to Revoke or Withdraw*.   The Debtors, with the consent of the Prepetition $20 Million Facility Lenders, reserve the right to revoke or withdraw the Plan at any time before the Effective Date.

2.      *Effect of Withdrawal, Revocation, or Non-Consummation*.   If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of

Claims or Equity Interests), the assumption or rejection of Executory Contracts, Unexpired Leases or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## ARTICLE X.
## MISCELLANEOUS PROVISIONS

### A.    **Immediate Binding Effect**.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Post-Effective Date Debtors, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

### B.    **Governing Law**.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of laws provisions thereof that would require or permit the application of the law of another jurisdiction) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

### C.    **Filing or Execution of Additional Documents**.

On or before the Effective Date, the Debtors shall (on terms materially consistent with the Plan) file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### D.    **Term of Injunctions of Stays**.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

E.    **Withholding and Reporting Requirements.**

        In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Post-Effective Date Debtors shall comply with all withholding and reporting requirements imposed by any United States federal, state, local or non-U.S. taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Post-Effective Date Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distribution pending receipt of information necessary or appropriate to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

F.    **Notices.**

        All notices, requests, and demands hereunder to be effective shall be made in writing or by e-mail, and unless otherwise expressly provided herein, shall be deemed to have been duly given when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed. Each of such notices shall be addressed as follows:

        1.    *To the Debtors at:*

                Parent THI, Inc. and TGHI, Inc.
                1211 North Miller Street
                Anaheim, California 92806
                Attn: Senior VP Restructuring
                layden@yorkstreetcapital.com

                *With a copy to:*

                Klestadt Winters Jureller Southard & Stevens, LLP
                200 West 41st Street, 17th Floor
                New York, New York 10036
                Attn: Tracy L. Klestadt and Joseph Corneau
                tklestadt@klestadt.com and JCorneau@Klestadt.com

                Kramer Levin Naftalis & Frankel LLP
                1177 Avenue of Americas
                New York, New York 10036
                Attn: Adam Rogoff and Anupama Yerramalli
                arogoff@kramerlevin.com, and ayerramalli@kramerlevin.com

        2.    *To the Prepetition $20 Million Facility Agent at:*

                Wilmington Savings Fund Society, FSB
                WSFS Bank Center
                500 Delaware Avenue, 11th Floor

P.O. Box 957
Wilmington, Delaware 19899
Attn: Patrick Healy
phealy@wsfsbank.com

*With a copy to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Daniel Ginsberg
blawrence@stroock.com, jgoldstein@stroock.com, and
dginsberg@stroock.com

3.     *To the PIK Note Administrative Agent:*

Law Debenture Trust Company of New York
400 Madison Avenue, Suite 4D
New York, NY 10017
Attn: Frank Godino and Thomas Musarra
frank.godino@lawdeb.com and thomas.musarra@lawdeb.com

*With a copy to*:

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061
Attn: Steven Reisman
sreisman@curtis.com

4.     *To the U.S. Trustee at*:

Office of the United States Trustee, Region 2
201 Varick Street
New York, NY 10014-4811
Attn:: Andy Velez-Rivera, Esq. and Susan Arbeit, Esq.
Andy.Velez-Rivera@usdoj.gov and  susan.arbeit@usdoj.gov.

**G.     Conflicts.**

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the Disclosure Statement.  In the event of any inconsistency with the Plan and the Confirmation Order, the Confirmation Order shall govern with respect to such inconsistency.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

39

Dated:  February 3, 2016

By: _____ /s/ Christopher Layden _____

**Christopher Layden**
**President, Parent THI, Inc. and TGHI, Inc.**

## <u>EXHIBIT B TO THE DISCLOSURE STATEMENT</u>

**GLOBAL FORBEARANCE AND TRANSACTION SUPPORT AGREEMENT**

*Execution Version*

# GLOBAL FORBEARANCE AND TRANSACTION SUPPORT AGREEMENT

**Dated as of May 21, 2015**

**among**

**Targus Group International, Inc.,**

**Targus Group Holdings, Inc.,**

**Targus Holdings, Inc.,**

**Certain Subsidiaries of Targus Group International, Inc., as Guarantors,**

**Supporting Term Lenders,**

**Wilmington Trust, National Association, as Administrative Agent,**

**Wilmington Trust, National Association, as the Collateral Agent,**

**Cortland Capital Market Services LLC, as Supplemental Agent,**

**New Term Loan Lenders,**

**Wilmington Savings Fund Society, FSB, as New Term Loan Administrative Agent,**

**Wilmington Savings Fund Society, FSB, as New Term Loan Collateral Agent,**

**Supporting PIK Noteholders,**

**and**

**Law Debenture of New York, as PIK Note Administrative Agent**

# TABLE OF CONTENTS

Page

1. *Definitions and Rules of Interpretation* ..................................................3

2. *Agreement Effective Date* ..................................................16

3. *The Escrow of the Common Stock* ..................................................17
   (a)    Delivery of Common Stock. ..................................................17
   (b)    Collateral Agent Stock Turnover ..................................................18
   (c)    Holdings Stock Turnover ..................................................18
   (d)    Agreements with Respect to Escrow and Stock Turnover ..................................................19

4. *Rights with Respect to Common Stock While in Escrow Account* ..................................................19

5. *Marketing Period; the Transactions* ..................................................20
   (a)    Escrow Release Transaction ..................................................20
   (b)    Acceptable Pre-Turnover Transaction ..................................................20
   (c)    Stock Turnover Transaction ..................................................21
   (d)    Form of Transaction Consideration for a Stock Turnover Transaction ..................................................22
   (e)    Terms of the Preferred Return ..................................................23
   (f)    Transaction Consideration Priority ..................................................24
   (g)    Means of Implementation ..................................................24
   (h)    Non-Consensual Bankruptcy Filing Prior to Stock Turnover ..................................................25

6. *Forbearance Period* ..................................................25
   (a)    Supporting Term Lender Forbearance ..................................................25
   (b)    Supporting PIK Noteholder Forbearance ..................................................25

7. *Term Lender Forbearance Termination Events* ..................................................25

8. *Effect of Term Loan Forbearance Termination* ..................................................26

9. *The Company Parties' Obligations* ..................................................26
   (a)    Support ..................................................27
   (b)    Payment of Interest ..................................................27
   (c)    Financial Covenants ..................................................28
   (d)    Information Rights ..................................................28
   (e)    Company Parties' Indemnification ..................................................29
   (f)    Fiduciary Duties ..................................................30
   (g)    No Interference ..................................................30
   (h)    Limitations on Indebtedness ..................................................30
   (i)    Limitations on Liens ..................................................31
   (j)    Limitations on Restricted Junior Payments ..................................................31
   (k)    Limitation on Amount Outstanding of Revolver Loans ..................................................31
   (l)    Payment of Trade Payables ..................................................32
   (m)    Release of Certain Security Interests in Intellectual Property ..................................................32
   (n)    Limitations on Equity Transactions ..................................................33
   (o)    Payment of Fees and Expenses ..................................................33
   (p)    Post-Turnover Sale Information ..................................................33

(q)    Turnover of Certain Amounts ..................................................................33

10.    ***The Supporting Term Lenders' Obligations*** ...............................34
(a)    Support.................................................................................................34
(b)    Support in Prepackaged Bankruptcy.................................................34
(c)    Forbearance.........................................................................................34
(d)    Direction to Collateral Agent, Supplemental Agent and Administrative Agent
..................................................................................................................34
(e)    No Interference ...................................................................................35
(f)    Compliance with this Agreement.......................................................35
(g)    Certain Rights Unaffected..................................................................35

11.    ***The New Term Lenders' Obligations*** ........................................35
(a)    Support.................................................................................................35
(b)    Support in Prepackaged Bankruptcy.................................................35
(c)    No Interference ...................................................................................36
(d)    Compliance with this Agreement.......................................................36
(e)    Direction to New Term Loan Administrative Agent and Collateral Agent...........36
(f)    Certain Rights Unaffected..................................................................36

12.    ***The Supporting PIK Noteholders' Obligations***..........................36
(a)    Support.................................................................................................36
(b)    Support in Prepackaged Bankruptcy.................................................37
(c)    No Enforcement of Remedies .............................................................37
(d)    No Interference ...................................................................................37
(e)    No Acceleration...................................................................................37
(f)    Compliance with this Agreement.......................................................37
(g)    Direction to PIK Note Administrative Agent ....................................37

13.    ***Trust for the Benefit of Holdings and Parent*** .........................38

14.    ***No Withdrawal of Support*** ........................................................39

15.    ***Acknowledgements*** ....................................................................39

16.    ***Limitations on Transfers*** ..........................................................39
(a)    Transfers..............................................................................................39
(b)    Qualified Marketmaker.....................................................................39
(c)    Additional Claims ..............................................................................40
(d)    Exceptions; Termination of Transfer Restriction .............................40

17.    ***Further Assurances*** .....................................................................40

18.    ***The Company Parties' Representations and Warranties*** .............40
(a)    Authority.............................................................................................40
(b)    Validity ...............................................................................................40
(c)    No Conflict..........................................................................................41
(d)    Authorization of Governmental Authorities and Creditors ..............41
(e)    No Reliance.........................................................................................41
(f)    Integrated Agreement.........................................................................41
(g)    No Other Agreements, etc...................................................................41

KL2 2888005.30

(h)    Ratifications of Term Loan Obligations under the Term Loan Credit
       Agreement by the Company Parties ..................................................41
(i)    Ratifications of Obligations under the PIK Notes by the Company Parties ..........42
(j)    No Defaults ..................................................................................43
(k)    Corporate Structure; Common Stock ...............................................43

19.    *The Creditor Parties' Representations and Warranties* ...............43
(a)    Authority ....................................................................................43
(b)    Validity ......................................................................................43
(c)    No Conflict..................................................................................43
(d)    Authorization of Governmental Authorities and Creditors ..................43
(e)    No Reliance..................................................................................44
(f)    Title...........................................................................................44
(g)    Integrated Agreement....................................................................44
(h)    No Other Agreements, etc...............................................................44

20.    *Releases* ...........................................................................................44

21.    *Governing Law; Jurisdiction* ...............................................................45

22.    *Entire Agreement* ...............................................................................45

23.    *Amendment or Waiver* ........................................................................46

24.    *Specific Performance; Remedies Cumulative* ........................................46

25.    *Construction* ......................................................................................46

26.    *Receipt of Information; Representation by Counsel* .................................46

27.    *Binding Effect; Successors and Assigns* .................................................47

28.    *Counterparts* ......................................................................................47

29.    *Headings; Schedules and Exhibits* .........................................................47

30.    *Severability and Construction* ...............................................................47

31.    *Waiver of Jury Trial* ............................................................................47

32.    *Notices* ...............................................................................................47

33.    *Consideration* .....................................................................................50

34.    *No Third-Party Beneficiaries* ...............................................................51

35.    *Confidentiality* ...................................................................................51

36.    *No Public Announcement* .....................................................................51

37.    *Reservation of Rights* ..........................................................................51

38.    *No Admissions* ....................................................................................51

39.    *Termination; Survival* ..........................................................................52

This Global Forbearance and Transaction Support Agreement (this "<u>Agreement</u>") is entered into effective as of the Agreement Effective Date (defined below) by and among Targus Group International, Inc., a Delaware corporation (the "<u>Company</u>"), Targus Group Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), Targus Holdings, Inc., a Delaware corporation ("<u>Parent</u>"), the Guarantors (defined below and together with the Company, Holdings and Parent, individually a "<u>Company Party</u>" and, collectively, the "<u>Company Parties</u>"), the Term Lenders (defined below) party hereto (in their capacities as such, the "<u>Supporting Term Lenders</u>"), the Administrative Agent (defined below), the Collateral Agent (defined below), the Supplemental Agent (defined below), the New Term Loan Secured Parties (defined below), the holders of Parent PIK Notes (defined below) party hereto (the "<u>Supporting Parent PIK Noteholders</u>"), the holders of Holdings PIK Notes (defined below) party hereto (the "<u>Supporting Holdings PIK Noteholders</u>" and together with the Supporting Parent PIK Noteholders, the "<u>Supporting PIK Noteholders</u>"), and the PIK Note Administrative Agent (defined below and together with the Supporting Term Lenders, the Administrative Agent, the Collateral Agent, the New Term Loan Secured Parties, and the Supporting PIK Noteholders, and each Term Lender, holder of PIK Notes or New Term Lender (defined below) that is or becomes a party to this Agreement after the Agreement Effective Date, individually a "<u>Creditor Party</u>" and collectively, the "<u>Creditor Parties</u>").  Each of the Company Parties and each of the Creditor Parties, and any other Person (defined below) that is or becomes a party to this Agreement after the Agreement Effective Date, is individually a "<u>Party</u>" and are collectively the "<u>Parties</u>."

## <u>RECITALS</u>

WHEREAS:

A.    The Company entered into that certain Credit and Guaranty Agreement, dated as of May 24, 2011, by and among the Company, Holdings, certain subsidiaries of the Company, as Guarantors, the Term Lenders, the Agents (as such terms are defined therein) party thereto from time to time and the other entities party thereto from time to time (as amended, supplemented or otherwise modified from time to time, the "<u>Term Loan Credit Agreement</u>");

B.    The Company entered into that certain Loan, Guaranty and Security Agreement, dated as of May 24, 2011, by and among the Company, as borrower, Holdings and certain subsidiaries of the Company, as guarantors, and Bank of America, N.A., as lender and agent (the "<u>ABL Parties</u>") (as amended, supplemented or otherwise modified from time to time, the "<u>ABL Facility</u>");

C.    Parent issued two series of 10% Senior Unsecured Notes due June 14, 2019 (as amended, supplemented or otherwise modified from time to time, the "<u>Parent PIK Notes</u>") pursuant to (i) that certain Amended and Restated Note Purchase Agreement, dated as of May 24, 2011, among Parent and the purchasers signatory thereto and (ii) that certain Note Purchase Agreement (together, the "<u>Parent Note Purchase Agreements</u>"), dated as of October 26, 2014, by and among Parent and the purchasers signatory thereto (the holders of both such series of Parent PIK Notes, the "<u>Parent PIK Note Holders</u>");

D.    Holdings issued 16% Senior Unsecured Notes due October 26, 2018 (as amended, supplemented or otherwise modified from time to time, the "<u>Holdings PIK Notes</u>" and together

with the "Parent PIK Notes", collectively, the "PIK Notes") pursuant to that certain Note Purchase Agreement (the "Holdings Note Purchase Agreement" and together with the Parent Note Purchase Agreements, the "Note Purchase Agreements" and each a "Note Purchase Agreement"), dated as of October 16, 2012, among Holdings and the purchasers signatory thereto (the "Holdings PIK Note Holders" and together with the Parent PIK Note Holders, collectively, the "PIK Note Holders");

E.      Law Debenture Trust Company of New York serves as administrative agent (in such capacity, the "PIK Note Administrative Agent") for (i) the Parent PIK Note Holders pursuant to that certain Agency Agreement dated March 27, 2015, among Parent, Law Debenture Trust Company of New York and the holders of the Parent PIK Notes issued under the Parent Note Purchase Agreement dated as of May 24, 2011, and that certain Agency Agreement dated March 27, 2015, among Parent, Law Debenture Trust Company of New York and the holders of the Parent PIK Notes issued under the Parent Note Purchase Agreement dated as of October 26, 2014 (collectively, the "Parent PIK Note Agency Agreement") and (ii) the Holdings PIK Note Holders pursuant to that certain Agency Agreement dated March 27, 2015 among Holdings, Law Debenture Trust Company of New York and the Holdings PIK Note Holders (the "Holdings PIK Note Agency Agreement");

F.      Substantially contemporaneously herewith, the Company Parties (other than Parent) and the New Term Loan Secured Parties will be entering into the New Term Loan Agreement (defined below);

G.      One or more Events of Default (as defined in the ABL Facility) set forth on Schedule 3 (the "ABL Specified Defaults") have occurred under the ABL Facility or are likely to occur under the ABL Facility during the Forbearance Period (defined below);

H.      One or more Events of Default (as defined in the Term Loan Credit Agreement) set forth on Schedule 4 (the "Term Loan Specified Defaults") have occurred under the Term Loan Credit Agreement or are likely to occur under the Term Loan Credit Agreement during the Forbearance Period;

I.      One or more Events of Default (as defined in the Note Purchase Agreements) set forth on Schedule 5 (the "PIK Notes Specified Defaults") have occurred under the Note Purchase Agreements or are likely to occur under the Note Purchase Agreements during the Forbearance Period;

J.      The Company Parties and Term Lenders constituting the Requisite Lenders entered into (i) that certain Forbearance and Third Amendment Agreement, dated as of January 28, 2015; (ii) that certain Second Forbearance Agreement, dated as of February 13, 2015 (as amended and extended); and (iii) that certain Third Forbearance Agreement, dated as of April 2, 2015, as extended from time to time, whereby such Term Lenders agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to certain of the Term Loan Specified Defaults, subject to the terms and conditions of such agreements (the "Term Loan Forbearance Agreements");

KL2 2888005.30

K.      The Company Parties and the ABL Parties entered into (i) that certain Forbearance Agreement and Amendment Number Six to Loan, Guaranty and Security Agreement, dated as of January 28, 2015; (ii) that certain Forbearance Agreement, dated as of February 13, 2015 (as amended and extended); (iii) that certain Forbearance Agreement and Amendment Number Seven to Loan, Guaranty and Security Agreement, dated as of April 24, 2015; and (iv) that certain Forbearance Agreement and Amendment Number Eight to Loan Guaranty and Security Agreement dated as of May 21, 2015 (the "<u>ABL Fourth Forbearance Agreement</u>"), whereby the ABL Parties agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to the ABL Specified Defaults, subject to the terms and conditions of such agreements (the "<u>ABL Forbearance Agreements</u>");

L.      The Supporting Term Lenders wish to further forbear from exercising rights and remedies against the Company Parties with respect to the Term Loan Specified Defaults in connection with this Agreement, subject to the terms and conditions set forth herein;

M.      The Parties have negotiated in good faith at arm's-length and agreed to a further forbearance period to support (x) the Company Parties' efforts to effect a sale of all or substantially all of their assets or a refinancing of their debt obligations that results in an Escrow Release Transaction (defined below) prior to a Collateral Agent Stock Turnover (defined below), (y) the transfer of the Common Stock (defined below) to the Collateral Agent pursuant to a Collateral Agent Stock Turnover and/or (z) the payment of the Transaction Consideration (defined below), as applicable (collectively, the "<u>Transactions</u>"), subject to and consistent with the terms and conditions set forth in this Agreement;

N.      Absent the deposit of the Common Stock and the New Stock Certificate (defined below) into the Escrow Account (defined below) as provided herein, the Supporting Term Lenders would not agree to continue to forbear on the terms provided herein from the exercise of rights and remedies otherwise available to them, the exercise of which would result in material disruption of the Company's operations and deterioration of the value of the Company Parties, including the Company; and

O.      The Transactions and the transactions contemplated in the Escrow Agreement and in the New Term Loan Agreement are part of a single negotiated and integrated transaction by and among the Parties to each such agreement without which (x) the Supporting Term Lenders would not agree to continue to forbear on the terms provided herein from the exercise of rights and remedies otherwise available to them; (y) the Company Parties would be subject to the exercise of such rights and remedies; and (z) the Company Parties would need to seek alternatives in order to preserve their value.

NOW, THEREFORE, in consideration of the recitals stated above and the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties agrees as follows:

1.      ***Definitions and Rules of Interpretation***.  For purposes of this Agreement, the defined terms used herein shall have the respective meanings set forth below:

KL2 2888005.30

"ABL Parties" has the meaning set forth in Recital B of this Agreement.

"ABL Facility" has the meaning set forth in Recital B of this Agreement.

"ABL Forbearance Agreements" has the meaning set forth in Recital K of this Agreement.

"ABL Fourth Forbearance Agreement" has the meaning set forth in Recital K of this Agreement.

"ABL Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement, dated as of May __, 2015, by and among the Company Parties (other than Parent), the ABL Parties, the Collateral Agent, the Supplemental Agent and the New Term Loan Collateral Agent, as amended, supplemented or otherwise modified from time to time.

"ABL Obligations" means the outstanding Obligations (as such term is defined in the ABL Facility).

"ABL Specified Defaults" has the meaning set forth in Recital G of this Agreement.

"ABL Testing Period" has the meaning set forth in Section 9(k) of this Agreement.

"Acceptable Pre-Turnover Transaction" has the meaning set forth in Section 5(b) of this Agreement.

"Acceptable Pre-Turnover Transaction Consideration" has the meaning set forth in Section 5(b) of this Agreement.

"Administrative Agent" has the meaning set forth in the Term Loan Credit Agreement.

"Agreement" has the meaning set forth in the preamble hereto.

"Agreement Effective Date" has the meaning set forth in Section 2 of this Agreement.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"Blackstone" means Blackstone Advisory Partners, L.P. before the date of the establishment of the new advisory practice, and thereafter PJT Partners.

"Blackstone Consultation" means consultation with Blackstone by the Restructured Board in connection with the valuation of the components of the Transaction Consideration; provided, that, any such valuation shall not require a fairness opinion.

"Business Day" has the meaning set forth in the Term Loan Credit Agreement.

"Carlyle Group Entities" means Carlyle Mezzanine Partners, L.P.

"Chosen Courts" has the meaning set forth in Section 21(b) of this Agreement.

"Collateral" has the meaning set forth in the Term Loan Credit Agreement.

"Collateral Agent" has the meaning set forth in the Term Loan Credit Agreement.

"Collateral Agent Stock Turnover" has the meaning set forth in Section 3(b) of this Agreement.

"Collateral Agent Stock Turnover Date" has the meaning set forth in Section 3(b) of this Agreement.

"Collateral Documents" has the meaning set forth in the Term Loan Credit Agreement.

"Common Stock" means the common stock, par value $0.01 of the Company.

"Common Stock Liens" has the meaning set forth in Section 3(b) of this Agreement.

"Company" has the meaning set forth in the preamble hereto. For the avoidance of doubt, the Company shall include the Restructured Company from and after the Collateral Agent Stock Turnover.

"Company Parties" has the meaning set forth in the preamble hereto.

"Compliance Certificate" has the meaning set forth in Section 9(c) of this Agreement.

"Consideration" means cash, equity (including preferred equity), debt (including new debt or rolled-over debt), tangible assets or other tangible property received on account of an Equity Interest in any of the Company Parties or a debt claim against any of the Company Parties.

"Contingent Amounts" means, with respect to any Relevant Transaction, Net Proceeds of such Relevant Transaction that are receivable after the closing thereof.

"Covenant Testing Date" has the meaning set forth in Section 9(c) of this Agreement.

"Creditor Party" has the meaning set forth in the preamble hereto.

"Debt Instruments" means, collectively, the Term Loan Credit Agreement, the New Term Loan Agreement and the PIK Notes.

"Equity Interest" has the meaning set forth in the Term Loan Credit Agreement (and the correlative meaning with respect to the Restructured Company).

"Escrow Account" means the escrow account established pursuant to the Escrow Agreement and governed by the terms of such Escrow Agreement.

"Escrow Agent" means U.S. Bank National Association, the escrow agent under the Escrow Agreement, together with its successors and assigns under the Escrow Agreement.

5

"Escrow Agreement" means that certain Escrow Agreement, to be entered into substantially contemporaneously with the Agreement Effective Date, in the form attached hereto as Exhibit A.

"Escrow Release Transaction" means either (x) a Term Lender Payoff or (y) an Acceptable Pre-Turnover Transaction.

"Excess Availability Condition" has the meaning ascribed to such term in Section 9(b) of this Agreement.

"Forbearance Period" means the period beginning on the Agreement Effective Date and ending on the earliest to occur of (i) 5:00 p.m. New York City time on the date that is two weeks following the Outside Time, (ii) with respect to a Termination Notice delivered by the Requisite Supporting Term Lenders upon the occurrence of a Forbearance Termination Event under Section 7(a) hereof as a result of the Company Parties' breach of the GTSA Financial Covenants, 5:00 p.m. New York City time on the date that is one week following the Termination Notice Expiration Time, (iii) with respect to any other Termination Notice delivered by the Requisite Supporting Term Lenders, the Termination Notice Expiration Time, (iv) the termination of any forbearance under the ABL Facility (including, without limitation, pursuant to the ABL Fourth Forbearance Agreement) by any of the ABL Parties, and (v) the commencement of a Non-Consensual Bankruptcy Filing.

"Forbearance Termination Event" has the meaning set forth in Section 7 of this Agreement.

"Fourth Amendment Agreement" means that certain Fourth Amendment Agreement, dated on or about the Agreement Effective Date, by and among the Company, Holdings, the Guarantors, the Administrative Agent, the Collateral Agent and the Supplemental Agent, substantially in the form attached hereto as Exhibit D.

"Funded Amount" means $700,000 to be deposited into a segregated account at Holdings on or before the earlier of (i) the commencement of a Prepackaged Bankruptcy or (ii) the earlier of (a) the date on which an Acceptable Pre-Turnover Transaction is consummated and (b) the Collateral Agent Stock Turnover Date, which funds shall be available  solely for the benefit of Holdings and Parent to be used, solely in the event of an Acceptable Pre-Turnover Transaction or a Collateral Agent Stock Turnover, to pay all reasonable fees and expenses, including the reasonable and documented professionals' fees and costs, of Holdings and Parent necessary to facilitate the wind down of Holdings and Parent whether through a Prepackaged Bankruptcy or otherwise, and to oversee and facilitate the receipt and distribution of the Transaction Consideration, including, without limitation, fees and expenses of Holdings and Parent necessary to establish a liquidating trust and to appoint a liquidating trustee; provided, that $200,000 of the Funded Amount shall be available solely for the fees and expenses of such liquidating trustee or any other fiduciary overseeing the winddown of Parent and/or Holdings.  In the event that any portion of the Funded Amount remains after the payment of all fees and expenses described herein, then the remainder shall be released from such account to the Restructured Company.  For the avoidance of doubt, no portion of the Funded Amount shall be (i) used to challenge (x) the liens and/or claims under the Term Loan Credit Documents or New Term Loan Agreement or (y) the validity and/or

enforceability of the Transactions or the transactions contemplated by the Escrow Agreement; or (ii) distributed to creditors or equity holders of Parent or Holdings on account of their claims or interests in such Prepackaged Bankruptcy.

"Future Transaction" means the consummation, within five (5) years after the Collateral Agent Stock Turnover Date, of any of the following: (i) a sale or other disposition (in one transaction or a series of transactions) of all or substantially all of the assets (including Equity Interests in its Subsidiaries) of the Restructured Company and its Subsidiaries, taken as a whole, (ii) a sale or other disposition (in one transaction or a series of transactions) of Equity Interests in the Restructured Company representing in the aggregate more than 50% of the total voting power of all Equity Interests in the Restructured Company that are entitled to vote for the election of directors (after giving effect to such sale or other disposition) to any Person or "group" (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) of Persons, (iii) a merger, share exchange or consolidation of the Restructured Company or any of its Subsidiaries with or into any other entity in which the Restructured Company's stockholders immediately prior to such transaction own immediately after such transaction less than 50% of the total voting power of all Equity Interests in the Restructured Company or its applicable Subsidiary that are entitled to vote for the election of directors or, if the Restructured Company or its applicable Subsidiary is not the acquiring or surviving entity in such transaction, such other entity or (iv) (a) an initial public offering of Equity Interests of the Restructured Company (other than any such offering that is registered on Form S-4 or Form S-8 under the Securities Act of 1933, as amended), or (b) the listing on a national securities exchange registered with the Securities Exchange Commission under Section 6(a) of the Securities Exchange Act of 1934, as amended, of Equity Interests of the Restructured Company other than in a transaction included in clauses (i) through (iii) above (e.g., in connection with a merger with a third party that has listed shares but in which the Restructured Company's stockholders continue to own 50% or more of the total voting power in the merged entity).

"GTSA Adjusted EBITDA" means, for any period, Consolidated Adjusted EBITDA (as defined in the Term Loan Agreement), adjusted to: (i) exclude any limitation on addbacks as specified in (h) of the definition of Consolidated Adjusted EBITDA; (ii) exclude the impacts of foreign currency to the extent that actual rates for such period are different than those assumed in the draft budget of the Company Parties for Fiscal Year 2015; (iii) substitute the term GTSA Transaction Costs for the term "Transaction Costs" used in clause (f) of the definition of Consolidated Adjusted EBITDA; and (iv) for the avoidance of doubt, include within clause (h) any employee retention bonuses paid during such period.

"GTSA Transaction Costs" means the fees, costs and expenses payable by Holdings, the Company or any of the Company's Subsidiaries in connection with the negotiation, execution and delivery of this Agreement and the potential restructuring or workout of the obligations under the Debt Instruments, including, without limitation, the fees and costs of all professional advisors engaged by the Company Parties in connection therewith.

"Guarantors" has the meaning set forth in the Term Loan Credit Agreement.

"Holdings" means Targus Group Holdings, Inc., a Delaware corporation, and any successor thereto.

"Holdings Note Purchase Agreement" has the meaning set forth in Recital D of this Agreement.

"Holdings Obligations" means the obligation of the Company or the Restructured Company, as applicable, to pay the Transaction Consideration and the Funded Amount to Holdings in accordance with and subject to the terms and conditions of this Agreement.

"Holdings PIK Note Agency Agreement" has the meaning set forth in Recital E of this Agreement.

"Holdings PIK Notes" has the meaning set forth in Recital D of this Agreement.

"Holdings PIK Note Holders" has the meaning set forth in Recital D of this Agreement.

"Holdings Stock Release Direction" has the meaning set forth in section 3(c) of this Agreement.

"Holdings Stock Turnover" has the meaning set forth in Section 3(b) of this Agreement.

"Holdings Stock Turnover Date" has the meaning set forth in Section 3(b) of this Agreement.

"Independent Valuation" means a valuation conducted by Duff & Phelps, Mesirow Financial Consulting or another valuation firm mutually agreed to by the Requisite Supporting PIK Noteholders and the Requisite Supporting Term Lenders; provided, that any such valuation shall not require a fairness opinion. The fees of any valuation firm for any Independent Valuation shall be paid by, and shall be the sole and exclusive responsibility of, the Restructured Company; provided that such fees shall not exceed $200,000 in the aggregate for all Independent Valuations.

In connection with any event or transaction that would permit Holdings (or any liquidating trustee or similar agent for Holdings) to request an Independent Valuation in accordance with the terms of this Agreement (any such event or transaction, a "Valuation Event"), the Requisite Supporting Term Lenders or the Restructured Company, as applicable, shall provide written notice (a "Valuation Notice") via overnight certified mail and electronic copy to Holdings and its counsel of the value determined by the Requisite Supporting Term Lenders or the Restructured Board, as applicable, in connection with such Valuation Event as soon as reasonably practicable after the Requisite Supporting Term Lenders or the Restructured Board, as applicable, makes such determination or, if the Requisite Supporting Term Lenders or the Restructured Board are not required to make a value determination in connection with such Valuation Event, the occurrence of such Valuation Event. Subject to further extension of time as agreed to by the Requisite Supporting Term Lenders or the Restructured Board, as applicable, in their sole discretion, Holdings shall have seven (7) days after receipt of the Valuation Notice (the "Valuation Request Deadline") to deliver a request for an Independent Valuation with respect to the applicable Valuation Event; provided, that in the event of a Collateral Agent Stock Turnover, with respect to any Valuation Notice delivered in connection with a Valuation Event occurring after the Calculation Date, the Valuation Request Deadline shall be thirty (30) days after the receipt of the Valuation Notice. If Holdings fails to deliver a request for an Independent Valuation within such

three-Business Day period, Holdings shall be deemed to have irrevocably waived its right to request an Independent Valuation with respect to the applicable Valuation Event and the valuation set forth in the Valuation Notice shall be dispositive.

"Instruments of Transfer" has the meaning set forth in Section 3(a)(iii) of this Agreement.

"Interim Transaction Value" has the meaning set forth in the definition of Transaction Value, subsection (ii).

"Interim Transaction Value Payment Date" has the meaning set forth in Section 5(d) of this Agreement.

"Intercreditor Agreements" means, together, the ABL Intercreditor Agreement and the Term Intercreditor Agreement.

"Joint Venture" has the meaning set forth in the Term Loan Credit Agreement.

"Net Proceeds" means, with respect to any Relevant Transaction, an amount equal to: (i) the Proceeds from such Relevant Transaction, minus (ii) any bona fide direct fees, costs or expenses incurred in connection with such Relevant Transaction and payable to non-affiliated third parties, including, without limitation, (a) income or gains taxes paid or reasonably estimated to be payable by the seller as a result of any gain recognized in connection with such Relevant Transaction, (b) sale, use, stock transfer, real property transfer, transfer, stamp, registration, documentary, recording or similar taxes paid or reasonably estimated to be payable by the seller in connection with such Relevant Transaction, (c) reasonable and customary discounts, commissions and similar amounts payable to non-affiliated third parties, (d) all payments made, and installment payments required to be made on any indebtedness that is secured by any assets subject to such Relevant Transaction (including, without limitation, the ABL Obligations and the New Term Loan Obligations), in accordance with the terms of any lien upon such assets, or that must by its terms, or in order to obtain a necessary non-affiliated third party consent to such Relevant Transaction, or by applicable law, be repaid out of the proceeds from such Relevant Transaction, in each case, other than amounts payable to any Creditor Party on account of the Term Loan Obligations or the PIK Notes, as applicable, and (e) a reasonable reserve for any indemnification payments (fixed or contingent) or purchase price adjustments in respect of such Relevant Transaction, in each case, to the extent not funded with the Funded Amount.

"Net Sales" means net sales calculated in accordance with GAAP and consistent with the Company's past practice. The calculation of Net Sales for any period shall exclude the impact of foreign currency to the extent that actual rates for such period are different than those assumed in the draft budget of the Company Parties for Fiscal Year 2015.

"New Stock Certificate" has the meaning set forth in Section 3(a)(i) of this Agreement.

"New Term Lenders" means the lenders under the New Term Loan Agreement, in their capacities as such; provided, that following an equitization or other conversion of the New Term Loan Obligations or any portion thereof, "New Term Lenders" shall include holders of such Equity Interests or other securities or debt into which the Term Loan or such portion was

9

converted, and their transferees; <u>provided</u>, that the term "New Term Lenders" shall not include the transferee of any such debt claims or Equity Interests pursuant to a Relevant Transaction.

"<u>New Term Loan Agreement</u>" means a term loan agreement to be entered into substantially contemporaneously with the Agreement Effective Date in the form attached hereto as Exhibit C, which will provide for term loans to be made to the Company in an aggregate principal amount of $20 million, and the other agreements related thereto, including, but not limited to, the Term Intercreditor Agreement.

"<u>New Term Loan Administrative Agent</u>" has the meaning ascribed to the term "Administrative Agent" set forth in the New Term Loan Documents.

"<u>New Term Loan Collateral Agent</u>" has the meaning ascribed to the term "Collateral Agent" set forth in the New Term Loan Documents.

"<u>New Term Loan Documents</u>" has the meaning ascribed to the term "Credit Documents" set forth in the New Term Loan Agreement.

"<u>New Term Loan Obligations</u>" has the meaning ascribed to the term "Obligations" set forth in the New Term Loan Agreement.

"<u>New Term Loan Secured Parties</u>" has the meaning ascribed to the term "Secured Parties" set forth in the New Term Loan Agreement.

"<u>Non-Consensual Bankruptcy Filing</u>" has the meaning ascribed to such term in Section 5(h).

"<u>Note Purchase Agreements</u>" has the meaning set forth in Recital D of this Agreement.

"<u>Original Stock Certificate</u>" means any certificate evidencing the Common Stock and Holdings as the record owner thereof.

"<u>Other Sale</u>" means any sale of Common Stock or other Equity Interests in or assets of the Restructured Company or its Subsidiaries that (a) is consummated after the Collateral Agent Stock Turnover Date and (b) does not constitute a Post-Turnover Sale.

"<u>Outside Time</u>" means October 20, 2015, at 5:00 p.m. (New York City time).

"<u>Parent</u>" means Targus Holdings, Inc., a Delaware corporation, and any successor thereto.

"<u>Parent PIK Note Agency Agreement</u>" has the meaning set forth in Recital E of this Agreement.

"<u>Parent PIK Notes</u>" has the meaning set forth in Recital C of this Agreement.

"<u>Parent PIK Note Holders</u>" has the meaning set forth in Recital C of this Agreement.

"Parent Note Purchase Agreements" has the meaning set forth in Recital C of this Agreement.

"Party" has the meaning set forth in the preamble hereto.

"Person" has the meaning set forth in the Term Loan Credit Agreement.

"PIK Note Administrative Agent" has the meaning set forth in Recital E of this Agreement and evidenced by the signature page for the specific issuance of Parent PIK Notes and Holdings PIK Notes.

"PIK Notes" means the Holdings PIK Notes and the Parent PIK Notes.

"PIK Note Specified Defaults" are listed on Schedule 5 hereto.

"Post-Turnover Sale" means either (x) a sale or other disposition (in one transaction or a series of transactions) of all or substantially all of the assets of the Restructured Company (including Equity Interests in the Subsidiaries of the Restructured Company), taken as a whole, or (y) a sale or other disposition (in one transaction or a series of transactions) of 90% or more of the Common Stock of the Restructured Company, in either case, that is consummated within six (6) months after the Collateral Agent Stock Turnover Date.

"Pre-Turnover Transaction" has the meaning set forth in Section 5(a) of this Agreement

"Preferred Hurdle" means an amount that shall be initially equal to the sum of (a) the aggregate outstanding principal amount of the Term Loans as of the Collateral Agent Stock Turnover Date, plus (b) all accrued and unpaid interest on the Term Loans as of the Collateral Agent Stock Turnover Date, calculated at the default interest rate (where applicable) under the Term Loan Credit Agreement. On the last day of each calendar quarter following the Collateral Agent Stock Turnover Date and on the date of the consummation of any Future Transaction (any such date, a "Hurdle Adjustment Date"), the Preferred Hurdle shall increase by an amount equal to the product of (x) the then existing Preferred Hurdle, multiplied by (y) a rate equal to the default rate of interest applicable to the Term Loans under the Term Loan Credit Agreement as of the Collateral Agent Stock Turnover Date, calculated on a 30/360 basis. On each such Hurdle Adjustment Date, the Preferred Hurdle shall also (i) increase by the portion of the Funded Amount that has been used during the period since the last Hurdle Adjustment Date (or if there is no prior Hurdle Adjustment Date, since the date following the Collateral Agent Stock Turnover) (a "Hurdle Adjustment Period") and (ii) decrease by the amount of Consideration, including, but not limited to, interest, return of principal, Net Proceeds from an Other Sale and dividends (but excluding (x) any Consideration solely to the extent such Consideration is received in exchange for, or in respect of, new value, (y) any Consideration received by a Term Lender on account of a Transfer of its Term Lenders' Claims and Interests to a third party, that does not result in a payment to the Term Lenders as a class and (z) any Consideration consisting of Term Lenders' Claims and Interests received in exchange for or on account of other Term Lenders' Claims and Interests), actually received by the Term Lenders during such Hurdle Adjustment Period solely on account of the Term Lenders' Claims and Interests, provided, that if the Hurdle Adjustment Date is the date of a Future Transaction, the decrease described in this clause (ii) that occurs on such Hurdle Adjustment Date shall not take into account any Proceeds of such Future Transaction. The value

11

of any non-cash Proceeds or Consideration (excluding any Contingent Amounts) used to calculate an adjustment to the Preferred Hurdle shall be determined by the Restructured Board (after a Blackstone Consultation), and, if requested in writing by Holdings (or any liquidating trustee or similar agent for Holdings) prior to the Valuation Request Deadline, by an Independent Valuation, which shall be dispositive.

"Preferred Return" has the meaning set forth in Section 5(e)(i) of this Agreement.

"Preferred Return Expiration Date" has the meaning set forth in Section 5(e)(iii) of this Agreement.

"Prepack Documents" means the prepackaged chapter 11 plan (the "Prepackaged Plan") and disclosure statement, in substantially the form to be annexed hereto as a supplemental exhibit in accordance with Section 5(f) of this Agreement, which shall be acceptable in form and substance to the Company Parties and the Requisite Supporting Term Lenders.

"Prepackaged Bankruptcy" means prepackaged cases of Holdings and/or Parent under chapter 11 of the Bankruptcy Code, to be implemented pursuant to the Prepack Documents.

"Proceeds" means proceeds received from a Relevant Transaction, including, but not limited to, cash, equity, preferred equity and/or debt (including new debt or rolled-over debt).

"Qualified Marketmaker" has the meaning set forth in Section 16(b) of this Agreement.

"Qualified Transfer" has the meaning set forth in Section 16(b) of this Agreement.

"Release Effective Date" has the meaning set forth in Section 20 of this Agreement.

"Relevant Transaction" means an Acceptable Pre-Turnover Transaction, a Post-Turnover Sale, a Future Transaction or an Other Sale.

"Requisite Lenders" has the meaning set forth in the Term Loan Credit Agreement.

"Requisite Supporting PIK Noteholders" means Supporting PIK Noteholders constituting the Required Holders (as defined in the PIK Notes).

"Requisite Supporting Term Lenders" means Supporting Term Lenders constituting the Requisite Lenders.

"Restructured Board" means the board of directors of the Restructured Company.

"Restructured Company" means the Company or any successor entity after a Collateral Agent Stock Turnover.

"Sale Transaction" has the meaning set forth in Section 5(a) of this Agreement.

"Specified Defaults" means, collectively, the Term Loan Specified Defaults, the ABL Specified Defaults and the PIK Note Specified Defaults.

KL2 2888005.30

"Stock Turnover Transaction Consideration" has the meaning set forth in Section 5(c).

"Stock Turnover Date" means the Collateral Agent Stock Turnover Date or the Holdings Stock Turnover Date, as applicable.

"Stub Payment Month" has the meaning set forth in Section 9(b) of this Agreement.

"Subsidiary" has the meaning set forth in the Term Loan Credit Agreement.

"Supplemental Agent" has the meaning ascribed to the term "Supplemental Agent" in the Term Loan Credit Agreement.

"Supporting Holdings PIK Noteholders" has the meaning set forth in the preamble to this Agreement.

"Supporting Parent PIK Noteholders" has the meaning set forth in the preamble to this Agreement.

"Supporting PIK Noteholders" has the meaning set forth in the preamble to this Agreement.

"Supporting Term Lenders" has the meaning set forth in the preamble to this Agreement.

"Term Intercreditor Agreement" has the meaning set forth in the Term Loan Credit Agreement.

"Term Lender Payoff" means the repayment in full, in cash, with immediately available funds, of (i) all outstanding Term Loan Obligations and (ii) all outstanding New Term Loan Obligations, each as estimated on Schedule 2 to this Agreement which shall be subject to a reconciliation prior to the payoff, which for the avoidance of doubt shall consist only of the aggregate principal amount of the Loans (as defined in the Term Loan Credit Agreement or the New Term Loan Documents, as applicable) plus any accrued and unpaid interest (including default interest), fees, expenses and any accrued and unpaid principal prepayments (and for the avoidance of doubt, no such prepayment shall include a prepayment premium notwithstanding any provision of the Term Loan Credit Agreement or the New Term Loan Documents to the contrary) and/or undisputed penalties due thereon.

"Term Lenders" means the lenders under the Term Loan Credit Agreement in their capacities as such and, following a Collateral Agent Stock Turnover, in their capacity as holders of Equity Interests in the Restructured Company; provided, that following an equitization or other conversion of the Term Loan or any portion thereof, "Term Lenders" shall include holders of such Equity Interests or other securities or debt into which the Term Loan or such portion was converted and their assignees and transferees; provided, that the term "Term Lenders" shall not include the transferee of any such debt claims or Equity Interests pursuant to a Relevant Transaction.

"Term Lenders' Claims and Interests" means the debt claims against or Equity Interests in the Restructured Company held by the Term Lenders (excluding the New Term Loan

Obligations and any other debt claims or Equity Interests solely to the extent such debt claims or Equity Interests are received in exchange for, or in respect of, new value).

"Term Loan" has the meaning set forth in the Term Loan Credit Agreement.

"Term Loan Credit Agreement" has the meaning set forth in Recital A of this Agreement.

"Term Loan Credit Documents" has the meaning ascribed to the term "Credit Documents" set forth in the Term Loan Credit Agreement.

"Term Loan Forbearance Agreements" has the meaning set forth in Recital J of this Agreement.

"Term Loan Obligations" means the Obligations as defined in the Term Loan Credit Agreement.

"Term Loan Secured Parties" has the meaning ascribed to the term "Secured Parties" set forth in the Term Loan Credit Agreement.

"Term Loan Specified Defaults" has the meaning set forth in Recital G of this Agreement.

"Termination Notice" has the meaning set forth in Section 7 of this Agreement.

"Termination Notice Expiration Time" means (x) with respect to any Forbearance Termination Event described in clauses (a), (b), (c), or (g) of Section 7, 5:00 p.m. (New York City time) on the date that is five (5) calendar days following the date of receipt by the Company Parties of a Termination Notice from the Requisite Supporting Term Lenders with respect to such Forbearance Termination Event, and (y) with respect to any Forbearance Termination Event described in clauses (d), (e), or (f) of Section 7, the date and time that the Company Parties receive a Termination Notice from the Requisite Supporting Term Lenders with respect to such Forbearance Termination Event.

"Transaction Consideration" means either the Acceptable Pre-Turnover Transaction Consideration or the Stock Turnover Transaction Consideration, as applicable.

"Transaction Value" means:

(i) with respect to an Acceptable Pre-Turnover Transaction, (x) the total value of the Consideration actually received by the Term Lenders on account of the Term Loan Obligations, before any payment owed as Transaction Consideration, from the Net Proceeds of such Acceptable Pre-Turnover Transaction less (y) the aggregate amount of the accrued and unpaid scheduled interest payments under the Term Loans as of the date of receipt of such Consideration by the Term Lenders;

(ii) in connection with a Collateral Agent Stock Turnover, the Transaction Value shall be equal to either: (a) in the event a Post-Turnover Sale occurs, the total value of the

Consideration actually received by the Term Lenders, solely on account of the Term Lenders' Claims and Interests, from the Net Proceeds of such Post-Turnover Sale or (b) in the event no Post-Turnover Sale is consummated, the Transaction Value shall be calculated as of the date that is six (6) months after the Collateral Agent Stock Turnover Date (the "Calculation Date") and shall be equal to the lesser of (1) without duplication of any of the items set forth in the following clauses (x) and (y), (x) the total value of the Term Lenders' Claims and Interests, as determined as of the Calculation Date in good faith by the Restructured Board (after a Blackstone Consultation); provided, however, that, if requested in writing by Holdings (or any liquidating trustee or similar agent for Holdings) prior to the Valuation Request Deadline, the value of such Term Lenders' Claims and Interests shall be finally determined by an Independent Valuation, plus (y) the total value of the Consideration actually received by the Term Lenders, solely on account of the Term Lenders' Claims and Interests, from the period after the Collateral Agent Stock Turnover Date through the Calculation Date, including, but not limited to, the Net Proceeds of any Other Sale, interest payments on such indebtedness, principal repayments and dividends (but excluding any such Consideration on account of a Transfer of any Term Lenders Claims and Interests), less (z) the aggregate amount of the accrued and unpaid scheduled interest payments under the Term Loans as of the Collateral Agent Stock Turnover Date; and (2) the aggregate outstanding amount of the Term Loan Obligations as of the Collateral Agent Stock Turnover Date; provided, that the Transaction Value set forth in this Section 5(b)(ii) is the "Interim Transaction Value") and

(iii) with respect to a Future Transaction, the total value of the Consideration actually received by the Term Lenders (prior to any distribution to Holdings on account of the Preferred Return) solely on account of the Term Lenders' Claims and Interests from the Net Proceeds of such Future Transaction.

Any Contingent Amounts paid in connection with any Relevant Transaction shall not be included in the calculation of Transaction Value in connection with such Relevant Transaction; provided, however, that if and when the Term Lenders actually receive Consideration, solely on account of the Term Lenders' Claims and Interests, from such Contingent Amounts, the value of such Consideration shall be added to the Transaction Value in connection with such Relevant Transaction, and the incremental increase in the Transaction Consideration or Preferred Return, as applicable, resulting therefrom shall be paid by the Company to Holdings promptly following the determination of such additional Transaction Value and incremental increase, if any, in the Transaction Consideration or Preferred Return, as applicable.

(A) Non-cash Consideration or Proceeds (excluding any Contingent Amounts) as used in this definition shall be valued (i) in the case of an Acceptable Pre-Turnover Transaction, by the Requisite Supporting Term Lenders, and (ii) in connection with a Collateral Agent Stock Turnover, by the Restructured Board, in each case after (x) a Blackstone Consultation, and (y) if requested in writing by Holdings (or any liquidating trustee or similar agent for Holdings) prior to the Valuation Request Deadline, an Independent Valuation, which shall be dispositive; and (B) in the event of any Post-Turnover Sale, Other Sale or Future Transaction between the Restructured Company, on the one hand, and any affiliate (as defined in Rule 405 under the Securities Act of 1933, as amended) of the Restructured Company, on the other hand (an "Affiliate Transaction"), Holdings (or any liquidating trustee or similar agent for Holdings) may request in writing, prior to the Valuation Request Deadline, that the fair value of the assets and/or Equity Interests acquired by such affiliate in such Affiliate Transaction be determined by an Independent Valuation, and in

15

such case, the fair value thereof as determined by the Independent Valuation shall be used (in lieu of the Consideration actually received by the Term Lenders) for purposes of calculating the Transaction Value applicable to such Affiliate Transaction; provided, however, that the foregoing clauses (A) and (B) shall not apply in the case of a Relevant Transaction that is (w) approved by, or under the supervision of, any court (including, without limitation, any bankruptcy court), (x) consummated after the Restructured Company or its representatives or advisors have undertaken good faith marketing efforts consistent with market practice to sell the assets or Equity Interests subject to such Relevant Transaction, to Persons that are not affiliates of the Restructured Company (unless such marketing or other efforts do not produce or result in any proposals, bids or offers by any Persons other than affiliates of the Restructured Company), (y) subject to any good faith auction or other competitive process consistent with market practice (even if such auction or other competitive process does not produce or result in any proposals, bids or offers by any Persons other than affiliates of the Restructured Company), or (z) consummated through the exercise of any rights or remedies as a creditor of the Restructured Company (including, without limitation, any "credit bid" under section 363(k) or section 1129(b)(2)(a)(ii) of the Bankruptcy Code or the acceptance of collateral in full or partial satisfaction of obligations pursuant to Section 9-620 of the UCC).

"Transactions" has the meaning set forth in Recital M, as more fully described herein.

"Transfer" has the meaning set forth in Section 16(a) of this Agreement.

"Transferee Acknowledgment" has the meaning set forth in Section 16(a) of this Agreement and attached as Exhibit B hereto.

"York Street Capital Entities" means (i) York Street Mezzanine Partners, L.P. and (ii) York Street Mezzanine Partners II, L.P.

Unless otherwise specified, references in this Agreement to any Section, Recital, Schedule, Exhibit or clause refer to such Section, Recital, Schedule, Exhibit or clause in or to this Agreement.  The words "herein," "hereof," and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement, except as otherwise specified.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including," "includes," and "include" shall be deemed to be followed by the words "without limitation."

2.    ***Agreement Effective Date.*** This Agreement shall become effective as of the date upon which each of the following conditions has been satisfied (such date, the "Agreement Effective Date"):

(a)    (i) the Company Parties; (ii) Term Lenders constituting the Requisite Lenders, (iii) the Administrative Agent; (iv) the Collateral Agent; (v) the Supplemental Agent; (vi) the New Term Lenders; (vii) the New Term Loan Collateral Agent; (viii) the New Term Loan Administrative Agent; (ix) the PIK Note Administrative Agent on behalf of the Holdings PIK Notes; (x) the PIK Note Administrative Agent on behalf of the Parent PIK Notes (solely to the

16

extent that the Supporting Parent PIK Noteholders constitute the Required Holders of the Parent PIK Notes as of the Agreement Effective Date); and (xii) (x) the Carlyle Group Entities, (y) the York Street Capital Entities, and (z) the employees of the Company Parties that are holders of the Holdings PIK Notes; shall have executed and delivered counterpart signature pages of this Agreement to each of the other Parties.  Signature pages to this Agreement that are included in any copy of this Agreement delivered to (x) other Creditor Parties shall be in a redacted form that removes the Creditor Parties' holdings of debt outstanding under the Debt Instruments, and (y) the Company Parties shall be in an unredacted form;

(b)    The Escrow Agreement shall have (i) been executed and delivered by Holdings, the Company, the Supplemental Agent and the Escrow Agent and (ii) become effective;

(c)    The ABL Fourth Forbearance Agreement shall (i)(x) provide that the ABL Parties shall have agreed that the Controlling Term Secured Parties (as defined in the ABL Intercreditor Agreement) shall have the right to purchase all of the ABL Obligations at any time following the Agreement Effective Date on the terms set forth in Sections 7.1, 7.2 and 7.3 of the ABL Intercreditor Agreement notwithstanding the existence or continuation of any forbearance by the ABL Lenders and the Company Parties shall agree that no Company Party shall have any consent or approval rights over any such purchase by any Creditor Party, and (y) otherwise be in form and substance reasonably acceptable to the Requisite Supporting Term Lenders, and (ii) have become effective;

(d)    The Fourth Amendment Agreement shall have been executed and delivered by the parties thereto and shall have become effective;

(e)    The New Term Loan Agreement shall have been executed and delivered by the parties thereto and shall have become effective; and

(f)    The Intercreditor Agreements shall have been executed and delivered by the parties thereto and shall have become effective.

3.    ***The Escrow of the Common Stock***.

(a)    <u>Delivery of Common Stock.</u>:  (i) On or before the Agreement Effective Date, the Collateral Agent shall deliver the Original Stock Certificate to the Company and the Company shall (and Holdings shall cause the Company to) (w) cancel the Original Stock Certificate, (x) reissue the Common Stock represented by a new stock certificate (the "<u>New Stock Certificate</u>") in the name of the Supplemental Agent, as agent for the Term Loan Secured Parties, as the record owner thereof, (y) register the Supplemental Agent, as agent for the Term Loan Secured Parties, as the record owner of the Common Stock on the Company's books and records, and (z) deliver the New Stock Certificate to the Supplemental Agent and (ii) within one (1) Business Day of the Agreement Effective Date, the Supplemental Agent shall deliver the New Stock Certificate, accompanied by instruments of transfer or assignments duly executed by the Supplemental Agent in blank reasonably satisfactory to Holdings (the "<u>Instruments of Transfer</u>") to be held in escrow by the Escrow Agent and released and distributed in accordance with Section 3(b) or 3(c) below upon either a Collateral Agent Stock Turnover or a Holdings Stock Turnover, as applicable, and on the terms and conditions set forth in the Escrow Agreement.

17

(b)    Collateral Agent Stock Turnover.  At the earliest to occur of (i) the Outside Time, (ii) the Termination Notice Expiration Time and (iii) the expiration of the Forbearance Period (the earliest such date and time, the "Collateral Agent Stock Turnover Date"), and pursuant to the terms of the Escrow Agreement, the Escrow Agent shall deliver the entire Escrow Estate (as defined in the Escrow Agreement) to the Supplemental Agent or its designee for the benefit of the Term Loan Secured Parties without the necessity of further instruction (other than, if the Collateral Agent Stock Turnover Date is the Termination Notice Expiration Time or the expiration of the Forbearance Period, notice of the Collateral Agent Stock Turnover, which notice shall be provided by the Supplemental Agent if directed in writing by the Requisite Supporting Term Lenders) (such delivery, the "Collateral Agent Stock Turnover"); provided, that prior to the Collateral Agent Stock Turnover Date, the Company Parties shall be in receipt of the identity of the new members of the Board of the Restructured Company and any necessary documentation to effect the appointment of such new members and such appointment shall be effective upon the termination of the Forbearance Period following the Collateral Agent Stock Turnover Date; provided, further, however, that a Collateral Agent Stock Turnover shall not take place if an Escrow Release Transaction has been consummated before the Collateral Agent Stock Turnover Date.  On the Collateral Agent Stock Turnover Date (if the Escrow Release Transaction has not been consummated), without any further action on the part of or notice to any Person, Holdings shall no longer have any right, title or interest (including any beneficial ownership interest) in or to the Common Stock, including, without limitation, the right to receive and retain dividends, cash payments in respect of the Common Stock or to exercise the voting or other rights and powers that Holdings would otherwise be entitled to exercise in respect of the Common Stock, and all such rights shall immediately become vested in the Supplemental Agent for the benefit of the Term Loan Secured Parties. Promptly following the Collateral Agent Stock Turnover, the Supplemental Agent shall ratably distribute the Common Stock to the Term Lenders (other than, at the discretion of the Supplemental Agent, to any Term Lender that has failed to make any payment required to be made by such Term Lender to the Supplemental Agent under the Term Loan Credit Agreement) (and the Company hereby agrees that, promptly (and in any event with one (1) Business Day) following any request of the Supplemental Agent occurring on or after the Collateral Agent Stock Turnover, to issue new stock certificates to replace the New Stock Certificate in the names of the Term Lenders, with each Term Lender receiving its Pro Rata Share (as defined in the Term Loan Agreement) of the common stock evidenced by the New Stock Certificate, or in such other name(s) as may be directed by the Supplemental Agent at the direction of the Requisite Supporting Term Lenders)..

(c)    Holdings Stock Turnover.  Upon written notice from Holdings to the Supporting Term Lenders (with a copy simultaneously delivered to the Supplemental Agent) that an Escrow Release Transaction has been consummated before the Collateral Agent Stock Turnover Date, (1) the Requisite Supporting Term Lenders shall promptly notify the Supplemental Agent in writing that such an Escrow Release Transaction has been consummated and shall direct the Supplemental Agent in writing to take the actions specified in clause (ii) below (such direction, the "Holdings Stock Release Direction") and (2) upon receipt of such notification and written direction from the Requisite Supporting Term Lenders, the Supplemental Agent shall promptly (and in any event within one Business Day) notify the Escrow Agent in writing that such an Escrow Release Transaction has been consummated.  On the date set forth for such distribution in the Escrow Agreement (such date, the "Holdings Stock Turnover Date"), the Escrow Agent shall distribute the Common Stock and the New Stock Certificate and the Instruments of Transfer to

18

Holdings without the necessity of any further instruction and otherwise in accordance with the terms of the Escrow Agreement (the "Holdings Stock Turnover").  Upon the Holdings Stock Turnover, Holdings shall have sole legal and beneficial ownership of the Common Stock and the New Stock Certificate.  If the Holdings Stock Turnover occurs: (i) the liens in favor of the Supplemental Agent, for the benefit of the Term Loan Secured Parties, and in favor of the New Term Loan Collateral Agent, for the benefit of the New Term Lenders, on the Common Stock and the New Stock Certificate created under the Collateral Documents and the New Term Loan Documents (the "Common Stock Liens") shall be automatically released on the Holdings Stock Turnover Date; (ii) the Supplemental Agent, following its receipt of the Holdings Stock Release Direction, and the New Term Loan Collateral Agent shall deliver to Holdings (and the Supplemental Agent is hereby directed by the Requisite Supporting Term Lenders), at the sole expense of the Company, all documentation reasonably requested in writing by Holdings evidencing such release of liens within five (5) Business Days after the date of the Supplemental Agent's or the New Term Loan Collateral Agent's, as applicable, receipt of such written request; and (iii) Holdings and its designees shall be automatically, without further action, authorized to file all such UCC termination statements and other releases, discharges and terminations of mortgages and other liens and security interests that are required to terminate the Common Stock Liens (without any further action on the part of the Supplemental Agent, Term Lenders, New Term Loan Collateral Agent, and the New Term Lenders).

(d)    Agreements with Respect to Escrow and Stock Turnover.

(i)    The Parties agree that the transactions described in this Section 3 do not constitute, and shall not be deemed to be, a partial or full foreclosure on the Common Stock or any of the other Collateral, or any other exercise of rights or remedies with respect to the Common Stock or any of the other Collateral, and such transactions shall not discharge the Term Loan Obligations in any respect (it being understood and agreed by the Parties that Holdings is receiving valuable consideration and the Company is giving valuable consideration in exchange for the transactions contemplated by this Agreement including, without limitation, the Transaction Consideration and the agreement by the Supporting Term Lenders to forbear from the exercise of their rights and remedies during the Forbearance Period which agreement is being facilitated by, among other things, Holdings' transfer of the Common Stock into the Escrow Account).  The Parties further agree that the Transactions described in Section 3(a) shall not be deemed to be a disposition of the Common Stock by Holdings for federal or state income tax purposes.

(ii)    The Supporting Term Lenders and the Supporting PIK Noteholders agree that the transactions described in this Section 3, including the delivery of the Escrow Estate (as defined in the Escrow Agreement) to the Escrow Agent pursuant to the terms of this Agreement, shall not constitute a Change of Control under the Term Loan Agreement or the Note Purchase Agreements, respectively.

4.    **_Rights with Respect to Common Stock While in Escrow Account._**  While the Common Stock and the New Stock Certificate are held in the Escrow Account pursuant to the Escrow Agreement, Holdings shall have and retain all rights with respect to, and beneficial ownership of and control over, the Common Stock; provided that Holdings agrees that it shall not transfer or dispose of the Common Stock and/or the New Stock Certificate or enter into an agreement to do so that is inconsistent with the terms of this Agreement without the consent of the

19

Requisite Supporting Term Lenders. For the avoidance of doubt, while the New Stock Certificate is held in the Escrow Account: (a) Holdings shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Common Stock for any purpose not inconsistent with the terms of this Agreement, the Escrow Agreement or the Term Loan Credit Agreement; and (b) Holdings shall be entitled to receive and retain any and all cash payments, including, but not limited to, cash dividends and other cash distributions payable in respect of the Common Stock to the extent payment of such amounts is permitted under the Term Loan Credit Agreement and this Agreement. To the extent the exercise by Holdings of the voting and other consensual rights with respect to the Common Stock as provided for herein is adversely affected by the arrangements contemplated by the Escrow Agreement, then, at the reasonable request of Holdings (and as and to the extent directed in writing by the Requisite Supporting Term Lenders), the Supplemental Agent shall promptly execute and deliver (or cause to be executed and delivered) to Holdings, all proxies and other necessary instruments reasonably requested by Holdings for the purpose of enabling Holdings to exercise such voting or other consensual rights.

5.    *Marketing Period; the Transactions*.

(a)    Escrow Release Transaction. Until the Collateral Agent Stock Turnover Date, the Company Parties, with the assistance of Blackstone and the Company Parties' other advisors, shall undertake a marketing process and use commercially reasonable efforts to consummate: (1) a sale or other disposition of all of the Common Stock of the Company or substantially all of the Company's and its Subsidiaries' assets, including through a merger or similar transaction (a "Sale Transaction") or (2) a refinancing of all of the Term Loan Obligations and the New Term Loan Obligations (a "Refinancing Transaction") (each of a Sale Transaction and a Refinancing Transaction, a "Pre-Turnover Transaction") in a transaction that qualifies as an Escrow Release Transaction. As set forth in Section 3(c) of this Agreement, in the event of an Escrow Release Transaction before the Collateral Agent Stock Turnover Date, the Holdings Stock Turnover shall occur.

(b)    Acceptable Pre-Turnover Transaction.

(i)    If the Company Parties consummate a Pre-Turnover Transaction prior to the Collateral Agent Stock Turnover Date that does not result in a Term Lender Payoff, but is otherwise acceptable to both the Requisite Supporting Term Lenders and (only if the New Term Loan Obligations remain outstanding) the New Term Lenders in their respective sole discretion (an "Acceptable Pre-Turnover Transaction"), Holdings shall receive the following amount in cash from the Net Proceeds of such Acceptable Pre-Turnover Transaction without any offset or deduction, which shall be earned upon the closing of such Acceptable Pre-Turnover Transaction and shall be payable promptly following a final determination of the Transaction Value in connection with such Acceptable Pre-Turnover Transaction (including any Independent Valuation): (A) one percent (1%) of the amount of any Transaction Value up to and including $150 million plus (B) ten percent (10%) of the amount of any Transaction Value in excess of (and solely to the extent in excess of) $150 million (collectively, the "Acceptable Pre-Turnover Transaction Consideration"), subject to clause (h) below. To the extent the Company (rather than Holdings or Parent) receives the Proceeds of an Acceptable Pre-Turnover Transaction, the Company shall pay or cause to be paid to Holdings the Acceptable Pre-Turnover Transaction Consideration promptly following the determination of the Transaction Value with respect to such Acceptable

Pre-Turnover Transaction.  To the extent that Holdings or Parent (rather than the Company) receives the Proceeds of an Acceptable Pre-Turnover Transaction, Holdings or Parent, as applicable, shall promptly turn over such Proceeds to the Administrative Agent, for the benefit of the Term Loan Secured Parties, net of the Acceptable Pre-Turnover Transaction Consideration which balance shall be applied in accordance with the Term Loan Credit Agreement.

(ii)    The Supporting Term Lenders and the New Term Loan Secured Parties agree (x) that any such Acceptable Pre-Turnover Transaction Consideration paid to or received by Holdings and Holdings' rights thereto under this Agreement shall be free and clear of any and all liens, claims and interests of the Term Loan Secured Parties under the Term Loan Credit Documents and the New Term Loan Secured Parties under the New Term Loan Documents, (y) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on or promptly after the Agreement Effective Date any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on Holdings' right to receive the Acceptable Pre-Turnover Transaction Consideration under Section 5(b)(i) hereof, and (z) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on the date that the Company pays or causes to be paid to Holdings the Acceptable Pre-Turnover Transaction Consideration, any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on the Acceptable Pre-Turnover Transaction Consideration.

(c)    Stock Turnover Transaction.

(i)    In the event of a Collateral Agent Stock Turnover, the Company shall pay, or cause to be paid, to Holdings the following consideration without any offset or deduction: (A) one percent (1%) of the amount of any Transaction Value up to and including $150 million; plus (B) ten percent (10%) of the amount of any Transaction Value in excess (and solely to the extent in excess) of $150 million; plus (C) the Preferred Return (collectively, the "Stock Turnover Transaction Consideration") which shall be paid or delivered to Holdings or, if applicable, any liquidating trustee or other agent designated in writing by Holdings  as and when further provided in clauses (d) and (e) below and subject to clause (h) below. For the avoidance of doubt, in the event of an Acceptable Pre-Turnover Transaction, no Stock Turnover Transaction Consideration shall be paid.

(ii)    The Supporting Term Lenders and the New Term Loan Secured Parties agree (x) that the Stock Turnover Transaction Consideration paid to or received by Holdings and Holdings' rights thereto under this Agreement shall be free and clear of any and all liens, claims and interests of the Term Loan Secured Parties and the New Term Loan Secured Parties under the applicable Term Loan Credit Documents and New Term Loan Documents, respectively, and (y) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on or promptly after the

KL2 2888005.30

Agreement Effective Date any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on Holdings' right to receive the Stock Turnover Transaction Consideration under Section 5(c)(i) hereof, and (z) to execute (or to instruct in writing the Collateral Agent the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on the date that the Company shall pay or cause to be paid to Holdings the Stock Turnover Transaction Consideration, any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on the Stock Turnover Transaction Consideration, provided, however that any delay until such documentation has been filed shall not in any manner limit, hinder, impair or otherwise affect the rights in favor of Holdings provided herein.  Effective as of the later of (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the Collateral Agent Stock Turnover Date and (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan, Holdings shall not have any further indebtedness, liabilities or obligations owing to the Term Loan Secured Parties under the Term Loan Credit Documents or the New Term Loan Secured Parties under the New Term Loan Documents, its respective Term Loan Obligations and New Term Loan Obligations shall be deemed satisfied, and each security interest, lien and pledge granted thereunder or in connection therewith in favor of the Collateral Agent in any assets of Holdings shall automatically be released, discharged and terminated, in each case automatically with no further action on the part of the Term Loan Secured Parties or the New Term Loan Secured Parties; and the Term Loan Secured Parties and the New Term Loan Secured Parties expressly authorize Holdings and its designees to release and terminate all UCC financing statements, security interests, mortgages and liens in favor of the Collateral Agent and the New Term Loan Collateral Agent which were filed with respect to Holdings pursuant to, or under the applicable Term Loan Credit Documents and New Term Loan Documents, respectively, and at any time and from time to time after such later date, the Term Lenders (and the Collateral Agent and/or the Supplemental Agent, as applicable, at the written direction of the Requisite Lenders) and the New Term Loan Secured Parties shall, promptly execute and deliver such other termination statements, lien releases, discharges of security interests, and any other similar discharge or release documents as Holdings (or its assigns) may from time to time reasonably request and prepare to effectuate, or reflect of public record, the release and discharge of such security interests and liens, as applicable.

(d)    Form of Transaction Consideration for a Stock Turnover Transaction.  If the Stock Turnover Transaction Consideration is based upon Transaction Value set forth in clause (ii)(a) of the definition of Transaction Value, then the Stock Turnover Transaction Consideration, if any, specified in clauses (A) and (B) in the definition of Stock Turnover Transaction Consideration shall be earned upon the consummation of a Post-Turnover Sale and shall be paid by the Company in cash promptly following the final determination of the Transaction Value (including any Independent Valuation) in connection with such Post-Turnover Sale.  If the Stock Turnover Transaction Consideration is based upon Transaction Value set forth in clause (ii)(b) of the definition of Transaction Value, then the Stock Turnover Transaction Consideration, if any,

22

specified in clauses (A) and (B) in the definition of Stock Turnover Transaction Consideration shall be earned upon the Calculation Date and shall be paid by the Company within one (1) week following the final determination of the Interim Transaction Value (including any Independent Valuation) (the date that is one (1) week following the date of the final determination of such Transaction Value, the "Interim Transaction Value Payment Date") in either cash or equity in the Restructured Company at the election of, and at a valuation (solely with respect to any consideration paid in equity) determined by the Restructured Board following a Blackstone Consultation and, if requested in writing by Holdings (or any liquidating trustee or similar agent for Holdings) prior to the Valuation Request Deadline, by an Independent Valuation, which shall be dispositive.  If any Stock Turnover Transaction Consideration is paid in the form of equity in the Restructured Company, then Holdings shall promptly become a party to any stockholders agreement and/or other document or agreement providing for rights and obligations of stockholders in the Restructured Company, to the extent any such agreement has been entered into, and shall have the same rights as any other stockholder in the Restructured Company (other than rights to vote on the members of the Restructured Board and drag-along rights), including pre-emptive rights, anti-dilution rights, tag-along rights and amendments.

(e)    Terms of the Preferred Return.

(i)    *Preferred Return*.  If the Collateral Agent Stock Turnover occurs, Holdings shall have the right to receive 10% of the Transaction Value of a Future Transaction in excess of the Preferred Hurdle (and such 10% calculation shall be made only with respect to the amount of such excess) (the "Preferred Return").  The Preferred Return, if any, shall be earned upon the consummation of a Future Transaction and shall be paid by the Company promptly following the final determination of the Transaction Value (including any Independent Valuation) in connection with such Future Transaction.

(ii)    *Form of Payment*.  The Preferred Return shall be payable, at the option of the Restructured Company, in either (x) cash, (y) equity of the Restructured Company (solely in the case of a Future Transaction referred to in clause (iv) of the definition thereof) or (z) in the form of Consideration received by the Term Lenders (solely on account of the Term Lenders' Claims and Interests) in a Future Transaction.

(iii)    *Expiration of the Preferred Return*.  The Preferred Return shall expire on the earlier of (a) five (5) years after the Collateral Agent Stock Turnover Date and (b) the consummation of a Future Transaction (such earlier date, the "Preferred Return Expiration Date").

(iv)    *Rights of a Holder of the Preferred Return*.  The Preferred Return shall not entitle Holdings (or any liquidating trustee or similar agent for Holdings), to vote or receive dividends or to be deemed the holder of Common Stock or any other Equity Interest or securities of the Restructured Company, nor shall the Preferred Return confer upon the holder thereof any of the rights of a stockholder of the Restructured Company (including appraisal rights, any right to vote for the election of directors or to vote upon any matter submitted to stockholders of the Restructured Company at any meeting thereof or by written consent, or to receive notice of meetings, or to receive dividends or subscription rights or otherwise).  Any solicitation, negotiation or closing of a Future Transaction shall be subject to the sole and absolute discretion of the Restructured Company and its stockholders and there will be no liability to Holdings or the

KL2 2888005.30

holders of PIK Notes on the part of the Restructured Company or any other Person if a Future Transaction is not consummated for any reason or the Net Proceeds of a Future Transaction do not exceed the Preferred Hurdle.  The Restructured Company and its stockholders will determine in their sole discretion whether to effect or consummate a Future Transaction and neither Holdings, any liquidating trustee or similar agent for Holdings, nor any holder of PIK Notes shall have any rights to (x) require the Restructured Company or its stockholders to enter into a Future Transaction, (y) question the price, timing or form of Consideration in connection with a Future Transaction or otherwise object to any Future Transaction or (z) object to any third party to a Future Transaction.

(f)        Transaction Consideration Priority.  Each of the Supporting Term Lenders agrees that the payment of the Term Loan Obligations (including payment of any claim or security or instrument into which the Term Loan Obligations are subsequently converted) shall be subordinated to the Holdings Obligations in the maximum amount of $3.5 million, solely upon the terms and subject to the conditions set forth in the Fourth Amendment Agreement and such subordination is a valid, binding and enforceable subordination provision under Section 510(a) of the Bankruptcy Code.  The subordination provisions set forth in the Fourth Amendment Agreement constitute a continuing agreement of subordination on the terms set forth in the Fourth Amendment Agreement, notwithstanding any modifications or renewals of the Term Loan Credit Documents; provided that any additional advances of monies under the Term Loan Credit Agreement after the Agreement Effective Date shall not be subject to such subordination.

(g)        Means of Implementation.  If a Term Lender Payoff does not occur as a result of a Pre-Turnover Transaction, then the applicable Company Parties may effect the receipt of the Transaction Consideration by Holdings, and the further distribution of such Transaction Consideration to the PIK Noteholders  in either of the following manners:

(i)        Out-of-Court Implementation.  Notwithstanding anything to the contrary contained in this Agreement and subject to the execution of this Agreement by the applicable and necessary Creditor Parties, the receipt and distribution of the Transaction Consideration shall be consummated in accordance with the terms of this Agreement through out-of-court transactions and without the need for judicial approval or process.

(ii)        In-Court Implementation.  In the event that 100% of the Holdings PIK Note Holders and 100% of the Parent PIK Note Holders do not execute this Agreement prior to the Collateral Agent Stock Turnover Date, then, following the Collateral Agent Stock Turnover, Holdings and Parent may commence a Prepackaged Bankruptcy for Holdings and Parent to effect the receipt and distribution of the Transaction Consideration and any such Prepackaged Bankruptcy shall be paid for through the Funded Amount.

A        Timing of Filing.  If a Prepackaged Bankruptcy is required for Holdings and Parent, then the Prepackaged Bankruptcy shall be commenced no later than forty-five (45) days after the later of the (1) Collateral Agent Stock Turnover Date and (2) final determination by the Company, Holdings and the ABL Parties as to the restructuring or satisfaction of the ABL Facility following a Collateral Agent Stock Turnover.

KL2 2888005.30

B        Definitive Documents.  The applicable Prepack Documents shall be consistent with this Agreement, negotiated in good faith by the Parties and acceptable to the Company Parties, the Requisite Supporting Term Lenders and the Requisite Supporting PIK Noteholders and annexed as a supplemental exhibit hereto prior to the commencement of a Prepackaged Bankruptcy.

(h)        Non-Consensual Bankruptcy Filing Prior to Stock Turnover. Notwithstanding anything herein to the contrary, no Transaction Consideration shall be earned by, or payable or paid to Holdings if Holdings, the Company or any other Subsidiary of the Company, without the consent of the Requisite Supporting Term Lenders, either (i) voluntarily commences a bankruptcy or other insolvency proceeding (other than a Prepackaged Bankruptcy of Holdings) or (ii) is subject to an involuntary bankruptcy proceeding that is commenced and for so long as it has not been dismissed (a "Non-Consensual Bankruptcy Filing"); provided, that the foregoing shall not apply to any such bankruptcy or other insolvency proceeding that is commenced with respect to the Company and any Subsidiary of the Company after the Collateral Agent Stock Turnover Date.

6.        *Forbearance Period*.  During the Forbearance Period:

(a)        Supporting Term Lender Forbearance.  The Supporting Term Lenders shall, and hereby direct the Administrative Agent and the Collateral Agent to, forbear from the exercise of any rights and remedies against the Company and all of the Company Parties to which they are or may become entitled under the Term Loan Credit Agreement as a direct consequence of the occurrence and continuation of the Term Loan Specified Defaults, subject to the terms and conditions set forth in this Agreement; provided that such forbearance shall not affect any rights of the Supporting Term Lenders with respect to the Collateral Agent Stock Turnover.

(b)        Supporting PIK Noteholder Forbearance.  The Supporting PIK Noteholders shall, and hereby direct the PIK Note Administrative Agent to, forbear from the exercise of any rights and remedies against the Parent and Holdings, as applicable, and any other Company Parties to which the Supporting PIK Noteholders are or may become entitled as a direct consequence of the occurrence and continuation of the PIK Notes Specified Defaults, subject to the terms and conditions set forth in this Agreement.  For the avoidance of doubt, the Supporting PIK Noteholders shall not have the right to terminate such forbearance during the term of this Agreement so long as any other Creditor Parties remain bound by this Agreement.

7.        *Term Lender Forbearance Termination Events*.  Following the occurrence of any of the events set forth below (each a "Forbearance Termination Event"), and in the event that the Requisite Supporting Term Lenders determine to terminate the Forbearance Period, the Requisite Supporting Term Lenders may provide written notice (a "Termination Notice") to the Company Parties and the other Parties hereto, delivered in accordance with this Agreement, setting forth such Forbearance Termination Event.

(a)        the Company Parties have failed to perform or comply with any of their covenants and obligations set forth in Section 9 hereof and such failure has continued beyond any applicable cure period set forth in this Agreement;

(b)     the Company Parties have failed to perform or comply in any material respect (without giving effect to any "materiality" qualifiers set forth herein) with any of their other respective covenants or obligations set forth herein and such failure has continued beyond any applicable cure periods set forth in this Agreement;

(c)     any representation or warranty made by any Company Party in this Agreement or in any certificate, report, statement or other document delivered at any time to the Supporting Term Lenders and/or the Administrative Agent under this Agreement shall prove to have been untrue or incorrect in any material respect as of the date as of which made or deemed to have been made or reaffirmed;

(d)     the issuance by any required governmental, regulatory, or licensing authority, or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Transactions;

(e)     the Company publicly announces its express intention not to pursue the Transactions or to consummate a Pre-Turnover Transaction that is not an Acceptable Pre-Turnover Transaction;

(f)     the consummation of a Pre-Turnover Transaction that does not result in a Term Lender Payoff or an Acceptable Pre-Turnover Transaction; and

(g)     any Event of Default (as defined in each of the Term Loan Credit Agreement and the New Term Loan Agreement, as applicable, other than any Specified Defaults, shall have occurred and be continuing.

8.     ***Effect of Term Loan Forbearance Termination***.  Immediately upon the expiration of the Forbearance Period, all forbearance obligations of the Supporting Term Lenders, the Administrative Agent, the Collateral Agent and the Supplemental Agent shall automatically terminate, without any requirement of notice or declaration of any kind.  Thereafter, the Supporting Term Lenders, the Administrative Agent, the Collateral Agent, and the Supplemental Agent shall be entitled to exercise and to enforce any and all rights and remedies available to them under the Term Loan Credit Agreement or any other agreements with the Company Parties, as applicable, or with respect to the Collateral, including, without limitation, any and all rights and remedies to which the Supporting Term Lenders, the Administrative Agent, the Collateral Agent and/or the Supplemental Agent are or may become entitled as a consequence of any of the Term Loan Specified Defaults or any other Events of Default (as such term is defined in the Term Loan Credit Agreement) that have occurred prior to, during or after the Forbearance Period, in each case subject to the Intercreditor Agreements.  For the avoidance of doubt, any Stock Turnover Transaction Consideration that may be payable following a Collateral Agent Stock Turnover, as set forth in Section 5(c) hereof, shall be payable notwithstanding the expiration of the Forbearance Period (except as otherwise set forth in Section 5(h) hereof).

9.     ***The Company Parties' Obligations***.  For so long as this Agreement has not been terminated in accordance with its terms, the Company and each other Company Party, where applicable, covenants and agrees to the following:

(a)    <u>Support</u>.    To support and use commercially reasonable efforts and cooperate in good faith with the other Parties to (A) complete the Transactions and all transactions contemplated under this Agreement, and (B) take any and all reasonably necessary actions in furtherance of the Transactions and the transactions contemplated under this Agreement.  From the Agreement Effective Date until the earlier of (i) the date on which (x) Term Lenders holding Term Loans of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding Term Loans and (y) PIK Noteholders holding Holdings PIK Notes of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding Holdings PIK Notes, execute and deliver this Agreement or (ii) the voting deadlines established as part of a Prepackaged Bankruptcy, the Company Parties shall use commercially reasonable efforts to cooperate with the Creditor Parties to procure the execution and delivery of this Agreement by additional Term Lenders and additional holders of Holdings PIK Notes.

(b)    <u>Payment of Interest</u>.    Promptly following the Agreement Effective Date, and subject to the Company's entry into the New Term Loan Agreement, the Company shall pay the Administrative Agent (for the account of itself and of the Term Lenders) all accrued and unpaid cash interest (at the default rate commencing January 1, 2015), due and payable under the Term Loan Credit Agreement as of the Agreement Effective Date.  During the Forbearance Period, within three (3) Business Days after the last day of each month, the Company shall pay the Administrative Agent (for the account of the Term Lenders) current cash interest on the Term Loans accrued through the last day of such month at the default rate, monthly in arrears, subject only to the conditions that (i) Global Availability (as defined in the ABL Facility) as calculated under Section 2.1.11 of the ABL Facility (including, without limitation, any other caps, reserves, blocks or borrowing limitations under the ABL Facility) for each day during the thirty (30) day period ending on the last day of such month (or, solely with respect to the month ended May 31, 2015, the period commencing on the Agreement Effective Date and ending on May 31, 2015) would exceed $4 million, pro forma for such interest payment and any interest payment then due and payable under New Term Loan Agreement; and (ii) the making of such interest payment, after the payment in full of any interest on the New Term Loan Agreement then due and payable, would not result in the Maximum ABL Balance exceeding the amount under the column entitled "Maximum ABL Balance (Cap)" in section 9(k) hereof for the applicable fiscal period (the foregoing clauses (i) and (ii), the "<u>Excess Availability Condition</u>"); <u>provided</u>, that the Excess Availability Condition shall not apply to the payment of accrued interest under the Term Loan Credit Agreement on the Agreement Effective Date).  If the payment of the full amount of accrued and unpaid cash interest as of any monthly interest payment date would cause the Excess Availability Condition not to be satisfied, cash interest shall be paid in the maximum amount payable without causing the Excess Availability Condition not to be satisfied (a "<u>Stub Payment Month</u>").  To the extent that any amount of monthly cash interest is not paid as a result of the Excess Availability Condition not being satisfied, (i) such interest shall continue to accrue and shall be paid on the next monthly interest payment date when the Excess Availability Condition can be satisfied, (ii) to the extent such failure to timely pay monthly interest constitutes an Event of Default (as defined in the Term Loan Credit Agreement) it shall be a Term Loan Specified Default hereunder and (iii) the Company shall promptly (and in any event within five (5) Business Days of the beginning of the month following a Stub Payment Month) deliver to the Administrative Agent and the Term Lenders a certificate setting forth the total amount of unpaid cash interest otherwise due in such Stub Payment Month.  For the avoidance of doubt, PIK Interest (as defined in the Term

Loan Credit Agreement) shall accrue and be payable in kind on each monthly interest payment date regardless of whether the Excess Availability Condition has been satisfied.

(c)    Financial Covenants.  The Company hereby covenants and agrees that, during the Forbearance Period, it shall maintain GTSA Adjusted EBITDA and Net Sales (the "GTSA Financial Covenants") of at least the applicable minimum levels set forth in Schedule 6 hereto, tested as of the last day of each fiscal period set forth therein (each a "Covenant Testing Date").  The Company Parties shall deliver to the Administrative Agent and the Supporting Term Lenders a certificate (a "Compliance Certificate"), certified by an officer of the Company, certifying the Company's compliance or non-compliance with the GTSA Financial Covenants and setting forth reasonable detail (including, without limitation, appropriate calculations in connection therewith) with respect to such compliance or non-compliance.  Each Compliance Certificate shall be delivered no later than thirty (30) days after the end of each fiscal period set forth in Schedule 6 annexed hereto; provided that such Compliance Certificate shall be permitted to be delivered no later than forty-five (45) days after the Covenant Testing Date on each month that is a fiscal quarterly reporting period (March, June, September and December).   If a GTSA Financial Covenant is not met as of any Covenant Testing Date, the Requisite Supporting Term Lenders may (but shall have no obligation to) waive compliance with such GTSA Financial Covenant for such testing period.

(d)    Information Rights.  The Company Parties shall provide the information listed in (i) through (iv) below to the Supporting Term Lenders and the New Term Lenders, subject to that certain Confidentiality and Nondisclosure Agreement dated as of January 30, 2015, as amended, or another comparable non-disclosure agreement; provided, that in the event that the Company Parties fail to deliver any such information to a required recipient on a specified date, the Company Parties shall have five (5) days to cure any such failure:

(i)    Thirteen-Week Cash Flow Projections.  On the last Friday before each fiscal month commencing with the first full week following the Agreement Effective Date, the Company Parties shall provide a 13-week cash flow and liquidity forecast and on Friday of each week, a weekly and cumulative variance report in the form provided under the Term Loan Forbearance Agreements;

(ii)    Status Update Call.  Commencing with the week in which the Agreement Effective Date occurs, if requested, the Company Parties shall provide a weekly (or more frequently as may be reasonably requested by the Requisite Supporting Term Lenders) update call with members of the Company Parties' senior management, outside turnaround advisor, and/or financial advisor to provide a status update on the Company Parties' process to effectuate a Pre-Turnover Transaction;

(iii)    ABL Facility Information.  During the Forbearance Period, copies of all financial statements, reports, notices and other information that are delivered to the ABL Parties under the ABL Facility at any time after the Agreement Effective Date, with such delivery to be made to the Administrative Agent reasonably contemporaneous with the delivery of such financial statements, reports, notices or other information to any agent or lender under the ABL Facility.

28

(iv)     Transaction Process Information.  Each of the following:

A     on Friday of each week, commencing with the first full week following the Agreement Effective Date, a log of all significant communications and interactions by or on behalf of the Company with (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective refinancing lenders and investors in connection with a potential Refinancing Transaction, which log shall be consistent with a transaction matrix customarily maintained by an investment bank in connection with a sell-side mergers and acquisitions or refinancing engagement;

B     copies of all executed confidentiality and nondisclosure agreements from (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective lenders and investors in connection with a potential Refinancing Transaction;

C     access to an electronic data repository for use in due diligence investigations with (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective lenders and investors in connection with a potential Refinancing Transaction;

D     copies of any teasers, confidential information memoranda, presentations and/or other marketing materials provided to (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective lenders and investors in connection with a potential Refinancing Transaction;

E     copies of (1) all term sheets, indications of interest and bids (including informal bids) delivered by prospective buyers to the Company or its advisors in connection with a potential Sale Transaction and (2) all term sheets, letters of intent and informal proposals delivered by prospective lenders and investors to the Company or its advisors in connection with a potential Refinancing Transaction; and

F     copies of (1) all final bids (including supporting documentation, such as transaction documents and financing commitments) delivered by prospective buyers to the Company or its advisors in connection with a potential Sale Transaction and (2) all final proposals (including supporting documentation, such as transaction documents and financing commitments) delivered by prospective lenders and investors to the Company or its advisors in connection with a potential Refinancing Transaction.

(e)     Company Parties' Indemnification.  The Company Parties shall indemnify and insure the directors and officers of the Company Parties following the consummation of any of the Transactions (or make satisfactory arrangements therefor), including, without limitation, maintaining the directors' and officers' insurance policies and tail insurance providing coverage substantially similar to, and no less favorable than, the coverage provided prior to the consummation of such Transaction for a six-year period following the effective date of such

KL2 2888005.30

Transaction to cover any claims arising prior to the effective date of such Transaction regardless of whether the claim is asserted before or after the effective date of such Transaction.  In the event of a Prepackaged Bankruptcy, Holdings and/or Parent, as applicable, shall assume all indemnification provisions and agreements currently in place for current and former directors, officers, employees, and agents of Holdings and/or Parent, as applicable.    In the event that Holdings and/or Parent brings an action for breach of this Agreement against the Company or the Supporting Term Lenders, the Company shall reimburse the reasonable and documented legal fees and expenses of Holdings and/or Parent, as applicable, incurred in connection therewith, solely to the extent that Holdings and/or Parent is the prevailing party in such action.  The Company shall be responsible (either directly or shall promptly reimburse Holdings and/or Parent, as applicable) for the reasonable and documented legal fees and expenses incurred by Holdings and/or Parent, in an aggregate amount not to exceed $1,000,000, in connection with an action by a Person that is not a Party to this Agreement or any person or entity acting on behalf of such Party seeking to challenge or otherwise invalidate this Agreement.

(f)    Fiduciary Duties.  Notwithstanding anything to the contrary set forth in this Agreement, nothing in this Agreement shall require any directors or officers of the Company Parties (in such Person's capacity as such) to take, or cause any party to take any future action, or to refrain, or cause any party to refrain, from taking any future action (including terminating this Agreement), to the extent that any such Person believes on the advice of counsel that such action or inaction is inconsistent with or required or advisable, as applicable, to comply with such Person's fiduciary obligations under applicable law.  In addition, notwithstanding anything to the contrary set forth in this Agreement, in the event the Transactions are implemented pursuant to a Prepackaged Bankruptcy, the Company Parties shall at all times and in all respects after the petition date of such Prepackaged Bankruptcy act in accordance with applicable law to exercise fiduciary duties as a debtor in possession in the applicable chapter 11 case(s).

(g)    No Interference.  None of the Company Parties shall take, nor shall any of the Company Parties encourage any other Person to take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(h)    Limitations on Indebtedness.  During the Forbearance Period, none of Holdings or the Company shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness (as defined in the Term Loan Credit Agreement), except for Indebtedness (i) existing as of the Agreement Effective Date; (ii) described in (and subject to the terms, conditions and limitations set forth in) clauses (b), (c), (d), (e), (f), (g), (h), (i) (in an amount not to exceed $250,000 during the Forbearance Period), (k), (l), (m), (n), (o), (p), (r), (s), (t) and (u) (in an amount not to exceed $250,000)) of Section 6.1 of the Term Loan Credit Agreement; and (iii) described in (and subject to the terms, conditions and limitations set forth in) Section 6.1(q) of the Term Loan Credit Agreement and Section 10(k) hereof, but solely to the extent each Borrowing (as defined in the ABL Facility) shall be incurred in the ordinary course of business; provided, however that any such Borrowing that is not incurred in the ordinary course of business shall require the prior written consent of the Requisite Supporting Term Lenders.  Nothing in the Term Loan Credit Agreement or this Agreement to the contrary shall prohibit the

Company Parties from entering into the New Term Loan Agreement or incurring Indebtedness thereunder.

(i)    <u>Limitations on Liens</u>.  During the Forbearance Period, none of Holdings or the Company shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien (as defined in the Term Loan Credit Agreement) on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien (as defined in the Term Loan Credit Agreement) with respect to any such property, asset, income or profits under the Uniform Commercial Code of any State or under any similar recording or notice statute, except for Liens (as such term is defined in the Term Loan Credit Agreement) (1) existing as of the Agreement Effective Date, (2) described in (and subject to the terms, conditions and limitations set forth in) clauses (b), (c), (d), (e) (f), (h), (i), (j) (k)(i), (m) (securing Indebtedness under Section 6.1(i) of the Term Loan Credit Agreement in an amount not to exceed $250,000 during the Forbearance Period), (n), (o), (p), (q), (r), (s), (u) and (v) (securing Indebtedness in an amount not to exceed $250,000 during the Forbearance Period) of Section 6.2 of the Term Loan Credit Agreement, and (3) described in Section 6.2(t) of the Term Loan Credit Agreement but solely to the extent Liens existing as of the Agreement Effective Date thereafter extend to after-acquired property.  Nothing in the Term Loan Credit Agreement or this Agreement to the contrary shall prohibit the Company Parties from entering into the New Term Loan Agreement or granting Liens thereunder.

(j)    <u>Limitations on Restricted Junior Payments</u>.  During the Forbearance Period, none of Holdings or the Company shall, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment (as defined in the Term Loan Credit Agreement), except for Restricted Junior Payments described (and subject to the terms, conditions and limitations set forth in) in Section 6.5(a)(i) of the Term Loan Credit Agreement (other than the absence of any Event of Default), solely with respect to indemnification obligations and expenses.

(k)    <u>Limitation on Amount Outstanding of Revolver Loans</u>.  During the Forbearance Period, the Company Parties shall not permit the aggregate amount of the outstanding Revolver Loans (as defined in the ABL Credit Agreement), at any time during each fiscal period set forth below (each an "<u>ABL Testing Period</u>"), to exceed the amounts (the "<u>Maximum ABL Balance</u>") set forth below for such ABL Testing Period:

Following the Company's entry into the New Term Loan Agreement, the Maximum ABL Balance during each fiscal period set forth below shall not exceed the amount under the column entitled "Maximum ABL Balance (Base)" for such monthly period; <u>provided</u>, that the amounts set forth below for each monthly period under the column entitled "Maximum ABL Balance (Base)" shall be increased on a dollar-for-dollar basis by the aggregate amount of cash interest payments made on the Term Loans and under the New Term Loan Agreement during the period from the Agreement Effective Date through the last calendar day of the prior fiscal period; <u>provided</u>, <u>further</u>, that in no event shall the Maximum ABL Balance during any fiscal period exceed the amount under the column entitled "Maximum ABL Balance (Cap)" for such

31

period. For the avoidance of doubt, the borrowing limits set forth in this Section 9(k) do not constitute reductions to the Revolver Commitments (as defined in the ABL Facility). No later than two (2) Business Days following the end of each ABL Testing Period, the Company Parties shall deliver to the Administrative Agent and the Supporting Term Lenders a certificate describing in reasonable detail their compliance or non-compliance with the covenant set forth in this Section 9(j) for such ABL Testing Period.

| Monthly Period | Maximum ABL Balance (Base) | Maximum ABL Balance (Cap) |
|---|---|---|
| May 1, 2015 through May 31, 2015 | $16,000,000 | $27,000,000 |
| June 1, 2015 through June 30, 2015 | $16,000,000 | $27,000,000 |
| July 1, 2015 through July 31, 2015 | $12,000,000 | $26,000,000 |
| August 1, 2015 through August 31, 2015 | $8,000,000 | $24,000,000 |
| September 1, 2015 through September 30, 2015 | $4,000,000 | $22,000,000 |
| October 1, 2015 through October 31, 2015 | $2,000,000 | $21,000,000 |

(l)    Payment of Trade Payables. During the Forbearance Period, the Company shall, and shall cause its Subsidiaries to, pay its and their trade payables in the ordinary course and in a manner consistent with the Company's customary past practice; provided, however, that the Company shall pay each trade payable no earlier than the last five Business Days prior to the date that such payment is due (without the imposition of any interest or penalty), as required by the standard, written payment terms of each of the Company's trade vendors; provided, further, that, the Company may, in the exercise of its reasonable business judgment, seek the consent of the Requisite Supporting Term Lenders (not to be unreasonably withheld, delayed or conditioned) to accelerate the payment of a trade payable.

(m)    Release of Certain Security Interests in Intellectual Property. The Company and Holdings shall use reasonable best efforts during the Forbearance Period to deliver to the Collateral Agent adequate documentation reflecting the release of the following security interests in certain of the Company Parties' intellectual property: (A) Security Interest (as defined in the Term Loan Credit Agreement) in favor of BHF-BANK AKTIENGESELLSCHAFT dated June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (B) Security Interest (as

KL2 2888005.30

defined in the Term Loan Credit Agreement) in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(n)    Limitations on Equity Transactions.    Except with the consent of the Requisite Supporting Term Lenders, during the Forbearance Period, neither Holdings, the Company nor any Subsidiary of the Company shall, nor shall permit any of their Subsidiaries to, (i) form any Subsidiary or enter into any Joint Venture; (ii) directly or indirectly sell, assign, transfer, hypothecate, pledge or otherwise encumber or dispose of, or create or issue, any Equity Interests of such entity; (iii) directly or indirectly sell, assign, transfer, hypothecate, pledge or otherwise encumber or dispose of, or create or issue, any Equity Interests of any Subsidiary of such entity; or (iv) materially amend or modify their organizational documents in any manner.

(o)    Payment of Fees and Expenses.    The Company hereby agrees that promptly following delivery of an invoice to the Company, it shall pay the reasonable and documented fees and expenses of (i) Stroock & Stroock & Lavan LLP, counsel to the New Term Lenders and Supporting Term Lenders and (ii) Kaye Scholer LLP, counsel to the Collateral Agent, the Administrative Agent and the Supplemental Agent.

The obligations of the Company under this clause (o) shall survive the termination of this Agreement with respect to such fees and expenses incurred and payable pursuant to this clause (o) prior to such termination.For the avoidance of doubt, the covenants and agreements in clauses (b), (c), (d) and (h) through (o) of this Section 9 shall be only for the benefit of the Supporting Term Lenders, the Collateral Agent, the Supplemental Agent and the Administrative Agent and only the Supporting Term Lenders, the Collateral Agent, the Supplemental Agent and/or the Administrative Agent shall be entitled to enforce a breach of, or amend or waive compliance with, such covenants under this Agreement.

(p)    Post-Turnover Sale Information.    The Restructured Company shall provide, and shall not interfere with nor impede the provision of, information as reasonably requested by Holdings and Parent on (i) the process to seek and implement a Post-Turnover Sale and (ii) any payment of Stock Turnover Transaction Consideration payable to Holdings in connection with a Post-Turnover Sale.

(q)    Turnover of Certain Amounts.    Following the Collateral Agent Stock Turnover Date, to the extent that (i) Parent or Holdings receives (x) payment on account of any receivable that is due and owing to the Company or any of its Subsidiaries; (y) insurance proceeds (other than directors' and officers' insurance proceeds) relating to assets or property of the Company and its Subsidiaries or (z) a tax refund relating to any taxable year during which Parent, Holdings, the Company and its Subsidiaries were part of a consolidated tax filing group, Parent or Holdings, as applicable, shall promptly turn over to the Company the payment on account of such receivable, such insurance proceeds or the portion determined by Parent, Holdings and the Company in good faith of such tax refund that is reasonably allocable to the Company and its Subsidiaries, as applicable; and (ii) the Company and its Subsidiaries receive (x) payment on account of any receivable that is due and owing to Parent or Holdings, (y) insurance proceeds (other than directors' and officers' insurance proceeds) relating to assets or property of the Holdings and/or Parent, or (z) a tax refund relating to any taxable year during which Parent,

Holdings, the Company and its Subsidiaries were part of a consolidated tax filing group, Company and its Subsidiaries shall promptly turn over to Holdings and/or Parent, as applicable, the payment on account of such receivable, such insurance proceeds or the portion as determined by Parent, Holdings and the Company in good faith of such tax refund reasonably allocable to Holdings and/or Parent, as applicable.

10.    ***The Supporting Term Lenders' Obligations***.  For so long as a Supporting Term Lender holds or otherwise controls an interest in the Term Loans and as long as this Agreement has not been terminated in accordance with its terms with respect to the Term Loans held by such Supporting Term Lender, each Supporting Term Lender, severally and not jointly. covenants and agrees to perform and comply with the following obligations (only in its capacity as an owner, manager, or holder of any interest in the Term Loans):

(a)    <u>Support</u>.  Such Supporting Term Lender shall use commercially reasonable efforts and shall cooperate in good faith with the Company Parties, to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by any Company Party to support, facilitate, implement, or consummate or otherwise give effect to the Transactions in an out-of-court or in-court proceeding with respect to Holdings and/or Parent that is consistent with the terms of this Agreement.  From the Agreement Effective Date until the earlier of (i) the date on which Term Lenders holding Term Loans of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding Term Loans execute and deliver this Agreement or (ii) the voting deadlines established as part of a Prepackaged Bankruptcy, such Supporting Term Lender shall use commercially reasonable efforts to cooperate with the Company Parties to procure the execution and delivery of this Agreement by additional Term Lenders; provided, however, that none of the Supporting Term Lenders shall be required to make any payments to other Term Lenders or assume any liabilities or incur any expenses that are not otherwise reimbursed or reimbursable by the Company Parties.

(b)    <u>Support in Prepackaged Bankruptcy</u>.  In the event the receipt and distribution of the Transaction Consideration is implemented through a Prepackaged Bankruptcy of Parent and Holdings, and provided that such Supporting Term Lender has been solicited in accordance with Sections 1125 and 1126 of the Bankruptcy Code (to the extent applicable) and other applicable law, such Supporting Term Lender shall (a) vote all of its Term Loan claims in favor of the Prepackaged Plan by timely delivering its duly executed and completed ballot accepting the Prepackaged Plan and (b) not withdraw or revoke (or causing not to be withdrawn or revoked) such vote.

(c)    <u>Forbearance</u>.  Such Supporting Term Lender agrees to forbear from the exercise of any rights or remedies, including the taking of any enforcement actions, against the Company Parties or any collateral of the Company Parties in connection with the Term Loan Specified Defaults, during the Forbearance Period on the terms set forth in this Agreement.

(d)    <u>Direction to Collateral Agent, Supplemental Agent and Administrative Agent</u>.  Such Supporting Term Lender hereby directs each of the Administrative Agent, the Collateral Agent and the Supplemental Agent to (i) execute and deliver this Agreement, and (ii) take the actions requested of it or them pursuant to and in compliance with this Agreement and the Escrow Agreement, including without limitation, the actions of the Collateral Agent to deliver (or

34

cause to be delivered) the Original Stock Certificate and the actions of the Supplemental Agent to deliver (or cause to be delivered) the New Stock Certificate and Instruments of Transfer in the manner set forth in Sections 3(a) of this Agreement.

(e)    No Interference.    Such Supporting Term Lender shall not, and shall not encourage any other Person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(f)    Compliance with this Agreement.    Such Supporting Term Lender shall support and not interfere with or hinder the Restructured Company's performance of its obligations under this Agreement following a Collateral Agent Stock Turnover, including, without limitation, with respect to payment of the Transaction Consideration, as and when due.

(g)    Certain Rights Unaffected.    Except as otherwise may be expressly set forth in this Agreement, nothing contained herein shall limit: (i) the ability of any Supporting Term Lender to confer with the Company Parties, the Administrative Agent, the Collateral Agent, the Supplemental Agent or any other Term Lender or creditor of the Company Parties and their respective advisors, (ii) the right of any Supporting Term Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including without limitation, the right to participate in a Prepackaged Bankruptcy, in each case, in a manner not inconsistent with its obligations under this Agreement, including, without limitation, appearing as a party in interest in any matter to be adjudicated in such Prepackaged Bankruptcy, (iii) the ability of a Supporting Term Lender to sell or enter into any transaction in connection with the Term Loans or any other claims against or equity interests in the Company (subject to the provisions of Section 16 hereof), or (iv) the rights of any Supporting Term Lender under the Term Loan Credit Agreement or any of the other Term Loan Credit Documents.

11.    *The New Term Lenders' Obligations*.    For so long as a New Term Lender holds or otherwise controls an interest in any New Term Loan and this Agreement has not been terminated in accordance with its terms with respect to the New Term Loan that such New Term Lender holds, each such New Term Lender, severally and not jointly, covenants and agrees to perform and comply with the following obligations (only in its capacity as owner, manager or holder of any interest in the New Term Loan):

(a)    Support.    Such New Term Lender shall use commercially reasonable efforts and shall cooperate in good faith with the Company Parties, to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Company to support, facilitate, implement, or consummate or otherwise give effect to the Transactions in an out-of-court or in-court proceeding with respect to Holdings and/or Parent that is consistent with the terms of this Agreement.

(b)    Support in Prepackaged Bankruptcy.    In the event the receipt and distribution of the Transaction Consideration is implemented through a Prepackaged Bankruptcy of Parent and Holdings, and provided that such New Term Lender has been solicited in accordance with Sections 1125 and 1126 of the Bankruptcy Code (to the extent applicable) and other

35

applicable law, such New Term Lender shall (a) vote all of its holdings of their respective New Term Loan in favor of the Prepackaged Plan by timely delivering its duly executed and completed ballot accepting the Prepackaged Plan and (b) not withdraw or revoke (or causing not to be withdrawn or revoked) such vote.

(c)    No Interference.  Such New Term Lender shall not, nor encourage any other Person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(d)    Compliance with this Agreement.  Such New Term Lender shall support and not interfere with or hinder the Company Parties' performance of their obligations under this Agreement following a Collateral Agent Stock Turnover, including, without limitation, with respect to payment of the Transaction Consideration, as and when due.

(e)    Direction to New Term Loan Administrative Agent and Collateral Agent. Such New Term Lender hereby directs each of the New Term Loan Administrative Agent and the New Term Loan Collateral Agent to (i) execute and deliver this Agreement, and (ii) take the actions requested of it or them pursuant to and in compliance with this Agreement.

(f)    Certain Rights Unaffected.  Except as otherwise may be expressly set forth in this Agreement, nothing contained herein shall limit: (i) the ability of any New Term Lender to confer with the Company Parties, the New Term Loan Administrative Agent, the New Term Loan Collateral Agent or any other New Term Lender or creditor of the Company Parties and their respective advisors, (ii) the right of any New Term Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including without limitation, the right to participate in a Prepackaged Bankruptcy, in each case, in a manner not inconsistent with its obligations under this Agreement, including, without limitation, appearing as a party in interest in any matter to be adjudicated in such Prepackaged Bankruptcy, (iii) the ability of a New Term Lender to sell or enter into any transaction in connection with the New Term Loans or any other claims against or equity interests in the Company (subject to the provisions of Section 16 hereof), or (iv) the rights of any New Term Lender under the New Term Loan Credit Documents.

12.    ***The Supporting PIK Noteholders' Obligations***.  For so long as a Supporting PIK Noteholder holds or otherwise controls an interest in any PIK Notes and this Agreement has not been terminated in accordance with its terms with respect to the PIK Notes that such Supporting PIK Noteholder holds, each such Supporting PIK Noteholder, severally and not jointly, covenants and agrees to perform and comply with the following obligations (only in its capacity as owner, manager or holder of any interest in the PIK Notes or as a holder of Equity Interests in any of the Company Parties):

(a)    Support.  Each Supporting PIK Noteholder shall use commercially reasonable efforts, and shall cooperate in good faith with the Company Parties, to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Company Parties to support, facilitate, implement, or consummate or otherwise give effect to the Transactions in an out-of-court or in-court proceeding with respect to Holdings and/or Parent that is consistent with the terms of this Agreement.  From the Agreement Effective Date

36

until the earlier of (i) the date on which PIK Noteholders holding Holdings PIK Notes of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding PIK Notes execute and deliver this Agreement or (ii) the voting deadlines established as part of a Prepackaged Bankruptcy, such Supporting PIK Noteholder shall use commercially reasonable efforts to cooperate with the Company Parties to procure the execution and delivery of this Agreement by additional holders of Holdings PIK Notes; provided, however, that none of the Supporting PIK Noteholders shall be required to make any payments to other PIK Noteholders or assume any liabilities or incur any expenses that are not otherwise reimbursed or reimbursable by the Company Parties.  To the extent that the Supporting Parent PIK Noteholders do not constitute the Required Holders of the Parent PIK Notes as of the Agreement Effective Date, promptly upon the Supporting Parent PIK Noteholders constituting the Required Holders of the Parent PIK Notes, such Supporting Parent PIK Noteholders shall direct the PIK Note Administrative Agent to execute this Agreement in its capacity as such on behalf of the Parent PIK Notes.

(b)    <u>Support in Prepackaged Bankruptcy</u>.    In the event the receipt and distribution of the Transaction Consideration is implemented through a Prepackaged Bankruptcy of Parent and Holdings, and provided that such Supporting PIK Note Holder has been solicited in accordance with Sections 1125 and 1126 of the Bankruptcy Code (to the extent applicable) and other applicable law, each Supporting PIK Noteholder shall (a) vote all of its holdings of their respective PIK Notes in favor of the Prepackaged Plan by timely delivering its duly executed and completed ballot accepting the Prepackaged Plan and (b) not withdraw or revoke (or causing not to be withdrawn or revoked) such vote.

(c)    <u>No Enforcement of Remedies</u>.    Such Supporting PIK Noteholder shall not take or instruct the taking of, under or relating to the PIK Notes or otherwise, any action against or in respect of Company Parties that constitutes or would constitute an enforcement action or remedy.

(d)    <u>No Interference</u>.  Each Supporting PIK Noteholder shall not, nor encourage any other Person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(e)    <u>No Acceleration</u>.  Unless a chapter 11 filing has occurred, each Supporting PIK Noteholder shall not accelerate or support the acceleration of the PIK Notes under the terms of the applicable Note Purchase Agreement for any default or event of default that has occurred or may occur thereunder.

(f)    <u>Compliance with this Agreement</u>.  Such Supporting PIK Noteholder shall support and not interfere with or hinder the Company Parties' performance of their obligations under this Agreement prior to a Collateral Agent Stock Turnover.

(g)    <u>Direction to PIK Note Administrative Agent</u>.  The Supporting Holdings PIK Noteholders represent and warrant to the PIK Note Administrative Agent that the Supporting Holdings PIK Noteholders constitute Required Holders (as such term is defined in the Holdings Note Purchase Agreement) and the Supporting Holdings PIK Noteholders have all requisite power and authority to direct the PIK Note Administrative Agent pursuant to and in accordance with the

37

Holdings Note Purchase Agreement and the Holdings PIK Note Agency Agreement. The Supporting Parent PIK Noteholders represent and warrant to the PIK Note Administrative Agent that the Supporting Parent PIK Noteholders constitute Required Holders (as such term is defined in the Parent Note Purchase Agreements) and the Supporting Parent PIK Noteholders have all requisite power and authority to direct the PIK Note Administrative Agent pursuant to and in accordance with the Parent Note Purchase Agreements and the Parent PIK Note Agency Agreements. In their respective capacities as Required Holders under the Holdings Note Purchase Agreement and the Parent Note Purchase Agreements, as applicable, the Supporting Holdings PIK Noteholders and Supporting Parent PIK Noteholders hereby (i) direct the PIK Note Administrative Agent to (A) execute and deliver this Agreement and (B) take the actions requested of it pursuant to and in compliance with this Agreement and (ii) agree to provide direction to the PIK Note Administrative Agent, to the extent necessary, to take actions pursuant to and in compliance with this Agreement.

13.    ***Trust for the Benefit of Holdings and Parent***.  The board of directors of each of Holdings and Parent shall have the right at their sole discretion to establish one or more liquidating trusts for the benefit of their respective stakeholders and subsequently dissolve notwithstanding anything to the contrary in the Term Loan Credit Agreement or the Note Purchase Agreements and no such actions shall constitute an Event of Default (as defined in the Term Loan Credit Agreement and the Note Purchase Agreements). Upon the assignment to the liquidating trust by Holdings and Parent of all of its rights hereunder, including the right to receive the Stock Turnover Transaction Consideration, the liquidating trustee(s) appointed to administer such liquidating trust(s) shall be responsible for: (a) receiving, accounting for and distributing the Stock Turnover Transaction Consideration to the creditors of Holdings; (b) electing to have the Independent Valuation conducted and overseeing such Independent Valuation process; (c) monitoring the process to seek and implement a Post-Turnover Sale; (d) receiving reasonable updates and information related to the process to seek and implement a Post-Turnover Sale and payment of Stock Turnover Transaction Consideration to Holdings in connection with a Post-Turnover Sale; and (e) administering the liquidating trust. The Transaction Consideration received by Holdings (or any liquidating trustee(s) or agent designated in writing by Holdings) shall be used to satisfy the obligations owed to the creditors of Holdings prior to any subsequent distribution to the Parent, as the holder of equity of Holdings. In the absence of the appointment of any liquidating trustee(s) under this Section 13, Holdings and Parent, as applicable, shall have the rights set forth in clauses (a) through (d) above. All fees and expenses incurred by Parent and Holdings in connection with establishing any liquidating trust and subsequently dissolving, including, without limitation, any compensation payable to any liquidating trustee and any reserve established to fund the ongoing administration of any liquidating trust, shall be funded from the Funded Amount. The Creditor Parties hereby consent to the establishment of any liquidating trust hereunder to facilitate the wind down of Holdings and Parent and agree to execute any and all documents reasonably requested by Holdings or Parent to effectuate the same. The Term Lenders further agree (i) that all assets of any liquidating trust established under this Section 13 shall be free and clear of any and all liens, claims and interests of the Term Lenders under the applicable Term Loan Credit Documents, and (ii) to execute any and all releases, terminations and other documents reasonably requested by Holdings or Parent that are required to effect a release or termination of such liens, claims and interests upon establishment of such liquidating trust(s).

KL2 2888005.30

14.    *No Withdrawal of Support*.  No Party to this Agreement shall withdraw or revoke its support of this Agreement unless this Agreement has been terminated in accordance with its terms, or if such Party is no longer subject to this Agreement solely by reason of assignment permitted hereby.

15.    *Acknowledgements*.  Each Party acknowledges that no securities of the Company are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of the Company Parties.

16.    *Limitations on Transfers*.

(a)    <u>Transfers</u>.  No Creditor Party shall, to the extent such Creditor Party is a holder of a Debt Instrument or any other claim or lien against or Equity Interest in the Company, (i) sell, transfer, assign, pledge (other than ordinary course pledges and rehypothecation agreements), grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Creditor Party's interest in a Debt Instrument, or any other claim against or Equity Interest in the Company, in whole or in part, or (ii) grant any proxies, deposit any of such Creditor Party's interests in a Debt Instrument, or any other claim against or Equity Interest in the Company, into a voting trust, or enter into a voting agreement with respect to any such interest (other than stockholders agreements and other organizational documents with respect to the Restructured Company) (collectively, the actions described in clauses (i) and (ii), a "<u>Transfer</u>"), unless such Transfer is to another Creditor Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Company a transferee acknowledgment substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Transferee Acknowledgment</u>") in accordance with the notice provisions hereof. With respect to such transferred Debt Instrument (or interest therein), and any other claim against the Company, held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Creditor Party set forth in this Agreement.  Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement solely to the extent of such transferred rights and obligations but shall otherwise remain party to this Agreement as a Creditor Party with respect to any interest in a Debt Instrument or other claim not so transferred.  Any Transfer made in violation of this section 16(a) shall be deemed null and void and of no force or effect, regardless of any prior notice provided to the Company, and shall not create any obligation or liability of any Company Party to the purported transferee (it being understood that the putative transferor shall continue to be bound by the terms and conditions set forth in this Agreement).

(b)    <u>Qualified Marketmaker</u>.  Notwithstanding anything to the contrary herein, (i) a Creditor Party may Transfer any claim to an entity that is acting in its capacity as a Qualified Marketmaker (defined below) (a "<u>Qualified Transfer</u>") without the requirement that the Qualified Marketmaker be or become a Creditor Party, provided that such Qualified Transfer shall only be valid if the Qualified Marketmaker subsequently Transfers such claim to a transferee that is a Creditor Party (or becomes a Creditor Party at the time of the Transfer pursuant to a Transferee Acknowledgment) within five (5) Business Days of its acquisition thereof and (ii) if a Creditor Party, acting solely in its capacity as a Qualified Marketmaker, acquires a claim from a holder of claims that is not a Creditor Party, it may Transfer such claim without the requirement that the transferee be or become a Creditor Party with respect to such claim.  For purposes hereof, a

KL2 2888005.30

"Qualified Marketmaker" shall mean an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company Parties (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company Parties (including debt securities or other debt), in its capacity as a dealer or market maker in such claims and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)    Additional Claims.  To the extent a Creditor Party acquires additional Debt Instruments (including an increase in the amount of Debt Instruments held by it when it became a Party to this Agreement) or other claims against a Company Party, other than solely in its capacity as a Qualified Marketmaker as provided in Section 16(b) above, such Creditor Party agrees that all such additional Debt Instruments or other claims shall automatically and immediately be deemed to be subject to this Agreement, including the obligation to support the Transactions.

(d)    Exceptions; Termination of Transfer Restriction.  The provisions of Section 16(a) shall not apply to any Transfer of a Debt Instrument, or any other claim against or Equity Interest in the Company to a purchaser pursuant to a Relevant Transaction.  In addition, the Administrative Agent, the Collateral Agent and the Supplemental Agent may each resign from the respective capacities as such in accordance with the Term Loan Credit Agreement.  The provisions of this Section 16 shall terminate on the Release Effective Date.

17.    ***Further Assurances***.  From and after the Agreement Effective Date, each of the Parties agrees to promptly execute and deliver all such agreements, instruments, and documents and to take all such further actions as any of the Parties may reasonably deem necessary from time to time to carry out the intent and purpose of this Agreement, and to consummate the transactions contemplated hereby, including, without limitation, the timely transfer of the Transaction Consideration to Holdings.

18.    ***The Company Parties' Representations and Warranties.***  In order to induce the Creditor Parties to enter into and perform their obligations under this Agreement, the Company Parties hereby represent, warrant, and acknowledge, severally and jointly, as follows:

(a)    Authority.  (i) Each Company Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all of the requisite corporate, partnership, or other power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery, and performance by it of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action (corporate, partnership, or otherwise) on the part of it and no other proceedings on the part of it is necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    Validity.  This Agreement has been duly executed and delivered by each Company Party and constitutes the legal, valid, and binding agreement of it, enforceable against it in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally

40

affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(c)     No Conflict.  The execution, delivery, and performance by each Company Party of this Agreement (when such performance is due) does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its or their certificates of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party other than a breach that constitutes a Specified Default.

(d)     Authorization of Governmental Authorities and Creditors.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by any Company Party of this Agreement.

(e)     No Reliance.  Each Company Party (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Creditor Parties, and based on such information as such Company Party has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon the Creditor Parties' express representations, warranties, and covenants in this Agreement, and it acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)     Integrated Agreement.  Each Company Party acknowledges that this Agreement, the Escrow Agreement, the New Term Loan Agreement and the Transactions contemplated in such agreements have been negotiated by the relevant Parties and are part of a single integrated transaction.

(g)     No Other Agreements, etc.  No Company Party has entered into, or agreed to enter into, any agreement, side letter or other arrangement relating to the Transactions other than as set forth herein, the New Term Loan Agreement, the Escrow Agreement and the Term Loan Credit Documents.

(h)     Ratifications of Term Loan Obligations under the Term Loan Credit Agreement by the Company Parties.

(i)     As of the Agreement Effective Date, the aggregate principal balance of all of the outstanding Term Loan Obligations under the Term Loan Credit Agreement is approximately $169.7 million (which amount does not include interest, fees, expenses or other amounts which are chargeable or otherwise reimbursable under the Term Loan Credit Agreement and the other Term Loan Credit Documents).

(ii)     All of the Term Loan Obligations are secured by a legal, valid and enforceable first priority security interest in and Lien (as defined in the Term Loan Credit Agreement) on the Collateral in favor of the Collateral Agent or the Supplemental Agent, as

41

applicable, on behalf of the Term Lenders, as described in the Collateral Documents, subject to the terms of the ABL Intercreditor Agreement.  All of the Term Loan Obligations are hereby ratified and confirmed in all respects.

(iii)    Other than as provided herein, there are no understandings or agreements relating to the Term Loan Obligations other than the Term Loan Credit Documents and each applicable Company Party reaffirms, confirms and ratifies the effectiveness and continuing validity of the Term Loan Credit Agreement and each of the other Term Loan Credit Documents to which it is a party.

(iv)    None of the Administrative Agent, the Collateral Agent, the Supplemental Agent nor any of the Term Lenders is in default under any of the Term Loan Credit Documents or has otherwise breached any obligations to the applicable Company Parties.

(v)    There are no offsets, counterclaims or defenses to the Term Loan Obligations, or to the rights, remedies or powers of the Administrative Agent or any of the Term Lenders in respect of any of the Term Loan Obligations or any of the Term Loan Credit Documents.

(vi)    The execution and delivery of the Term Loan Forbearance Agreements and/or this Agreement have not established any course of dealing between the parties hereto or created any obligation, commitment or agreement of the Administrative Agent, the Collateral Agent, the Supplemental Agent or any of the Term Lenders with respect to this Agreement.

(i)    <u>Ratifications of Obligations under the PIK Notes by the Company Parties</u>.

(i)    As of the Agreement Effective Date, the aggregate principal balance of all of the outstanding Parent PIK Notes is approximately $51.1 million and the Holdings PIK Notes is approximately $5.6 million (which amount does not include interest, fees, expenses or other amounts which are chargeable or otherwise reimbursable under the respective Note Purchase Agreements or Parent PIK Note Agency Agreement or Holdings PIK Note Agency Agreement, as applicable).

(ii)    Other than as provided herein, there are no understandings or agreements relating to the PIK Obligations other than the respective Note Purchase Agreements and each Company Party reaffirms, confirms and ratifies the effectiveness and continuing validity of the Note Purchase Agreements to which it is a party.

(iii)    Neither the PIK Note Administrative Agent nor any of the holders of the PIK Notes is in default under any of the respective Note Purchase Agreements or has otherwise breached any obligations to the Company Parties.

(iv)    There are no offsets, counterclaims or defenses to the PIK Obligations, or to the rights, remedies or powers of the PIK Note Administrative Agent or any of the holders of the PIK Notes in respect of any of the PIK Obligations or any of the Note Purchase Agreements.

KL2 2888005.30

(j)    No Defaults.  Except for the Specified Defaults, no Defaults or Events of Default, as defined in the Debt Instruments, exist on the date hereof.

(k)    Corporate Structure; Common Stock.  The corporate and organizational structure of the Company Parties as of the Agreement Effective Date is as set forth on Schedule [1] hereto.  The Common Stock evidenced by the Original Stock Certificate represents all of the issued and outstanding Equity Interests of the Company.  Holdings (i) is the legal and beneficial owner of the Common Stock evidenced by the Original Stock Certificate, and (ii) has good and valid title to the Common Stock evidenced by the Original Stock Certificate, free and clear of all liens, claims and encumbrances (other than those under the Collateral Documents and the Escrow Agreement).

19.    ***The Creditor Parties' Representations and Warranties***.  To induce the Company Parties to enter into and perform their obligations under this Agreement, each Creditor Party (other than, except in the case of clauses (a) and (b) below, the Administrative Agent, the Collateral Agent, the Supplemental Agent, the New Term Loan Administrative Agent, the New Term Loan Collateral Agent and the PIK Note Administrative Agent), severally but not jointly, represents, warrants, and acknowledges, as to itself only, as follows:

(a)    Authority.  (i) Such Creditor Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all the requisite corporate, partnership, or other power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery, and performance by such Creditor Party of this Agreement and the consummation by such Creditor Party of the transactions to be consummated by such Creditor Party contemplated herein have been duly authorized by all necessary action (corporate, partnership, or otherwise) on the part of such Creditor Party.

(b)    Validity.  This Agreement has been duly executed and delivered by such Creditor Party and constitutes the legal, valid, and binding agreement of such Creditor Party, enforceable against such Creditor Party in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(c)    No Conflict.  The execution, delivery, and performance by such Creditor Party (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or, in the case of an entity, any of its subsidiaries or its or their certificates of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it, or, as applicable, any of its subsidiaries is a party.

(d)    Authorization of Governmental Authorities and Creditors.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by such Creditor Party of this Agreement.

KL2 2888005.30

(e)    No Reliance.  Such Creditor Party (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Company or any officer, employee, agent, or representative thereof, and based on such information as such Creditor Party has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that such Creditor Party has relied upon the Company's express representations, warranties, and covenants in this Agreement, and such Creditor Party acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)    Title.  With respect to each Supporting Term Lender, Supporting PIK Noteholder and New Term Lender, such Creditor Party is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to the debt outstanding under the Debt Instruments in the aggregate principal amount set forth on its signature page hereto (and in the case of a nominee, it has due and proper authorization to act on behalf of, and to bind, the beneficial owner of such Debt Instruments).  Such Creditor Party's interest in the Debt Instruments held by it is free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrances of any kind that would adversely affect in any way such Creditor Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

(g)    Integrated Agreement.  Each Creditor Party acknowledges that this Agreement, the Escrow Agreement, the New Term Loan Agreement and the Transactions contemplated in such agreements have been negotiated by the relevant Parties and are part of a single integrated transaction.

(h)    No Other Agreements, etc.  Each Creditor Party has not entered into, or agreed to enter into, any agreement, side letter or other arrangement relating to the Transactions other than as set forth herein, the New Term Loan Agreement, the Escrow Agreement, and the Term Loan Credit Documents.

20.    **Releases.**  On the Release Effective Date, (a) the Parties shall be deemed to unconditionally release the other Parties from any and all claims, intercompany claims, obligations, suits, judgments, damages, rights, causes of action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, assertable on behalf of or derivative of the Parties, based in whole or in part upon actions taken solely in their respective capacities described herein or any omission, transaction, agreement, event or other occurrence taking place on or before the Release Effective Date in any way relating to the Transactions and any related instruments, documents or agreements and (b) the Parties will each be deemed to have forever released and covenanted with the other Parties not to sue or otherwise seek recovery from the other Parties on account of any claim, including any claim or cause of action based upon tort, breach of contract, or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the consummation of the Transactions in any way related to the Company Parties or their businesses and affairs, provided, however, that in the instance of either (a) or (b), no Party shall be released from

any act or omission that constitutes gross negligence or willful misconduct as determined by final order by a court of competent jurisdiction; provided, further, however, that the releases set forth in this paragraph shall not release any Party's performance or obligations under this Agreement or under any of the Debt Instruments except as expressly set forth herein.  For the purposes of this Section 20 and the releases set forth herein, "Parties" shall also include all of the assets and property of each of the Parties, and each Party's current and/or former members, officers, directors, employees, counsel, advisors, professionals, or agents.  The "Release Effective Date" shall be (1) in the case of a Term Lender Payoff, the date of the occurrence of the Term Lender Payoff, (2) in the case of an Acceptable Pre-Turnover Transaction, (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the date upon which the Acceptable Pre-Turnover Transaction Consideration has been paid to or received by Holdings, or (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan and (3) in the case of a Collateral Agent Stock Turnover, (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the Collateral Agent Stock Turnover, or (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan.

21.    *Governing Law; Jurisdiction*.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)    By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement, shall be brought, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City or, if applicable, following the commencement of a bankruptcy case, the applicable bankruptcy court (the "Chosen Courts").  By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

22.    *Entire Agreement.*  This Agreement and the Escrow Agreement (including, for the avoidance of doubt, the Exhibits hereto and thereto) constitute the entire agreement with respect to the Transactions and supersede all prior and contemporaneous agreements, representations, warranties, term sheets, proposals, and understandings of the Parties, whether oral, written, or implied, as to the subject matter hereof; provided, however, that any confidentiality agreement executed by any Creditor Party and any Company Party shall survive this Agreement and shall remain in full force and effect in accordance with its terms.

45

23.    ***Amendment or Waiver***.    Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by the Company Parties, the Requisite Supporting Term Lenders, and the Requisite Supporting PIK Noteholders, and the New Term Lenders; <u>provided</u>, that any amendment of this Agreement affecting the rights or obligations under this Agreement of the Administrative Agent, the Collateral Agent, the Supplemental Agent, the New Term Loan Administrative Agent, the New Term Loan Collateral Agent or the PIK Note Administrative Agent shall require the written consent of each such Party.  No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

24.    ***Specific Performance; Remedies Cumulative***.    This Agreement is intended as a binding commitment enforceable in accordance with its terms.  Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach of this Agreement would result in damages that would be difficult to determine with certainty.  It is understood and agreed that money damages would not be a sufficient remedy for any such breach of this Agreement, and that any non-breaching Party shall be entitled to obtain specific performance and injunctive relief as remedies for any such breach, and each Party further agrees to waive, and to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with requesting such remedy.  In furtherance of the foregoing, the Supporting Term Lenders and the Collateral Agent consent to the entry of injunctive relief, and such other rights and remedies as described in the foregoing sentence, in the event the Requisite Supporting Term Lenders fail to direct the Supplemental Agent or the Supplemental Agent fails to (i) notify the Escrow Agent of the consummation of an Escrow Release Transaction pursuant to this Agreement, or (ii) permit Holdings to exercise the rights provided for in Section 4 of this Agreement (Rights with Respect to Common Stock in Escrow Account) pursuant to the terms of this Agreement.  Such remedies shall not be deemed to be the exclusive remedies for the breach of this Agreement by any Party or its representatives.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy by any Party hereto shall not preclude the simultaneous or later exercise of any other such right, power, or remedy hereunder.

25.    ***Construction***.    This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

26.    ***Receipt of Information; Representation by Counsel***.    Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

46

27.    ***Binding Effect; Successors and Assigns***.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors, assigns, heirs, transferees, executors, administrators, and representatives, in each case solely as such parties are permitted under this Agreement.

28.    ***Counterparts***.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  The signatures of all of the Parties need not appear on the same counterpart.  Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed signature page of this Agreement.

29.    ***Headings; Schedules and Exhibits***.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.  References to sections, unless otherwise indicated, are references to sections of this Agreement.

30.    ***Severability and Construction***.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

31.    ***Waiver of Jury Trial***.  EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY, AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM, OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN), OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF THE PARTIES HERETO HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 31 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.  THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

32.    ***Notices***.  All notices and other communications given, provided or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, provided, made or received: (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail, and if not so confirmed, then on the next Business Day, (c) three (3) days after

having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

To the Company Parties at:

Targus Group International, Inc.
1211 North Miller Street
Anaheim, California 92806
Attn:  Robert Davis, General Counsel
rdavis@targus.com

*With a copy (which shall not constitute notice) to:*

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of Americas
New York, New York 10036
Attn:  Adam Rogoff and Anupama Yerramalli
arogoff@kramerlevin.com and ayerramalli@kramerlevin.com

O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Attn: Jennifer Taylor
jtaylor@omm.com

To the Administrative Agent or the Collateral Agent at:

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attn: Jeffery Rose
jrose@wilmingtontrust.com

*With a copy (which shall not constitute notice) to:*

Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attn: Michael Messersmith and Alan Glantz
michael.messersmith@kayescholer.com and alan.glantz@kayescholer.com

To the Supplemental Agent at:

Cortland Capital Market Services LLC

KL2 2888005.30

225 W. Washington Street, 21st Floor
Chicago, Illinois 60606
Attn: Joanna Anderson, Christopher Capezuti and Legal Department
joanna.anderson@cortlandglobal.com, chris.capezuti@cortlandglobal.com
and legal@cortlandglobal.com

*With a copy (which shall not constitute notice) to*:

Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attn: Michael Messersmith and Alan Glantz
michael.messersmith@kayescholer.com and alan.glantz@kayescholer.com

To a Supporting Term Lender at the notice information provided on its signature page hereto:

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Sayan Bhattacharyya
blawrence@stroock.com, jgoldstein@stroock.com,
and sbhattacharyya@stroock.com

To the New Term Loan Administrative Agent or New Term Loan Collateral Agent at:

Wilmington Savings Fund Society, FSB
WSFS Bank Center
500 Delaware Avenue, 11th Floor
P.O. Box 957
Wilmington, Delaware 19899
Attn: Patrick Healy
phealy@wsfsbank.com

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982

49

Attn: Brett Lawrence, Jayme Goldstein and Sayan Bhattacharyya
blawrence@stroock.com, jgoldstein@stroock.com,
and sbhattacharyya@stroock.com


To a New Term Lender at the notice information provided on its signature page hereto.

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Sayan Bhattacharyya
blawrence@stroock.com, jgoldstein@stroock.com,
and sbhattacharyya@stroock.com


To the PIK Note Administrative Agent:

Law Debenture Trust Company of New York
400 Madison Avenue, Suite 4D
New York, NY 10017
Attn: Frank Godino and Thomas Musarra
frank.godino@lawdeb.com and thomas.musarra@lawdeb.com

*With a copy (which shall not constitute notice)* to:

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178-0061
Attn: Steven Reisman
sreisman@curtis.com


To a Supporting PIK Noteholder at the notice information provided on its signature page hereto.

or to such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

33.   ***Consideration***.  The Company and each other Party hereby acknowledge that no consideration, other than that specifically described in this Agreement, shall be due or paid to any Party for its agreement to support the Transactions in accordance with the terms and conditions of this Agreement.

KL2 2888005.30

34.  **No Third-Party Beneficiaries**.  This Agreement shall bind and inure to the benefit of the Parties hereto (or any other Person that may become a Party to this Agreement in accordance with the terms of this Agreement) and no other Person shall be a third-party beneficiary hereof; <u>provided</u> that any Person that is released pursuant to Section 20 shall be deemed to be an intended third party beneficiary of Section 20 as of the Release Effective Date; provided further, than any liquidating trustee or similar agent on behalf of Holdings and/or Parent shall have all the rights and obligations of Holdings and/or Parent hereunder.

35.  **Confidentiality**.  The Parties agree that any applicable confidentiality agreement entered into in connection with the Debt Instruments applies to this Agreement.

36.  **No Public Announcement**.  Except as may be required in connection with a Prepackaged Bankruptcy, other bankruptcy or legal proceeding, or to obtain the support of additional Creditor Parties to execute this Agreement, each Party agrees that it shall not make any announcement or disclosure regarding the Company Parties, the Agreement, the Escrow Agreement or the transactions contemplated without the prior written consent of the other Parties hereto, which shall not be unreasonably withheld.  The Company Parties shall not (a) use the name of any Creditor Party in any public manner without such Creditor Party's prior written consent or (b) disclose to any Person (including, for the avoidance of doubt, any other Creditor Party) other than counsel and advisors to the Company Parties and the Supporting Term Lenders, the principal amount, or percentage of, Debt Instruments or any other equity or debt securities or interests of the Company Parties held by any Creditor Party; provided, however, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of each series of Debt Instrument held by the Creditor Parties as a group and to make any and all such disclosures as are required by law.

37.  **Reservation of Rights**.  Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries).  If the transactions contemplated by this Agreement are not consummated, or if this Agreement is terminated with respect to a Party for any reason, the Parties (or if less than all Parties, the Parties with respect to which this Agreement is terminated) fully reserve any and all of their rights, remedies, or interests.

38.  **No Admissions**.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any Person, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Agreement except as expressly set forth herein.  This Agreement and the Transactions are part of a proposed settlement of a dispute among the Parties.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this Agreement.

KL2 2888005.30

39.    ***Termination; Survival***.  This Agreement shall terminate following the earliest to occur of (the "Termination Date"): (i) the consummation of a Term Lender Payoff, (ii) if an Acceptable Pre-Turnover Transaction is consummated, (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the payment to, or receipt by, Holdings of the Acceptable Pre-Turnover Transaction Consideration and, (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan, and (iii) in the event of a Collateral Agent Stock Turnover, the Preferred Return Expiration Date and, if any Preferred Return is due to Holdings, the payment of such Preferred Return.  Upon the Termination Date, no Party shall have any continuing liability or obligation to any other Party hereunder except as otherwise provided herein; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the Termination Date. Notwithstanding the foregoing, the following provisions of this Agreement shall survive the Termination Date: (i) the last paragraph of Section 1, and (ii) sections 5(f), 9(e), 9(f), 9(o), and 20-39, together with any defined terms used in such Sections.

*[Signature pages follow]*

KL2 2888005.30

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

**Company Parties**

**TARGUS GROUP INTERNATIONAL, INC. (the "Company") (as Obligor under the Term Loan)**

By: _Victor C. Streufert_
    Name: Victor C. Streufert
    Title: Executive Vice President and
    Chief Financial Officer

**TARGUS GROUP HOLDINGS, INC. ("Holdings") (as Obligor under the Term Loan)**

By: _Victor C. Streufert_
    Name: Victor C. Streufert
    Title: Executive Vice President and
    Chief Financial Officer

**TARGUS HOLDINGS, INC. ("Parent")**

By: _Victor C. Streufert_
    Name: Victor C. Streufert
    Title: Executive Vice President and
    Chief Financial Officer

**TARGUS USA, INC. (as Guarantor under the Term Loan)**

By: _Victor C. Streufert_
    Name: Victor C. Streufert
    Title: Executive Vice President and
    Chief Financial Officer

**TARGUS, INC. (as Guarantor under the Term Loan)**

By: _Victor C. Streufert_
    Name: Victor C. Streufert
    Title: Executive Vice President and
    Chief Financial Officer

**TARGUS GROUP US LLC (as Guarantor under the Term Loan)**

By: _Victor C. Streufert_
    Name: Victor C. Streufert
    Title: Executive Vice President and
    Chief Financial Officer

**OTEN INC. (as Guarantor under the Term Loan)**

By: _Victor C. Streufert_
    Name: Victor C. Streufert
    Title: Executive Vice President and
    Chief Financial Officer

**Administrative Agent and Collateral Agent**

**WILMINGTON       TRUST,       NATIONAL
ASSOCIATION        (as          successor
Administrative Agent and Collateral Agent)**

By: _____

    Name:

    Title:

            Jeffery Rose
            Vice President

*Signature Page to Global Forbearance and Transaction Support Agreement*

**New Term Loan Administrative Agent and New Term Loan Collateral Agent**

**WILMINGTON SAVINGS FUND
SOCIETY, FSB (as New Term Loan
Administrative Agent and New Term Loan
Collateral Agent)**

By: _____
    Name: Kristin L. Moore
    Title: Vice President

*Signature Page to Global Forbearance and Transaction Support Agreement*

**PIK Note Administrative Agent**

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**, as Administrative Agent to the holders of 10% Parent PIK Notes issued under that certain Amended and Restated Note Purchase Agreement, dated as of May 24, 2011

By: _____
     Name:
     Title:

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**, as Administrative Agent to the holders of 10% Parent PIK Notes issued under that certain Note Purchase Agreement, dated as of October 26, 2014

By: _____
     Name:
     Title:

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**, as Administrative Agent to the holders of 16% Holdings PIK Notes

By: _____
     Name: Frank Godino
     Title: V.P.

<u>**Supplemental Agent**</u>

**CORTLAND CAPITAL MARKET
SERVICES LLC**, as Supplemental Agent


By: _Jessica J Mead_____
Name:
Title:
       Jessica J. Mead
       General Counsel

**Requisite Lenders**

**5180 CLO LP**
By: Guggenheim Partners Investment
Management, LLC, as Sub-Adviser

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact

**WILSHIRE INSTITUTIONAL MASTER
FUND SPC – GUGGENHEIM ALPHA
SEGREGATED PORTFOLIO**
By: Guggenheim Partners Investment
Management, LLC, as Sub-Advisor

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact

**CLC LEVERAGED LOAN TRUST**
By: Challenger Life Nominees PTY Limited
as Trustee
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact

**COPPER RIVER CLO LTD.**
By: Guggenheim Partners Investment
Management, LLC, as Collateral Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact

**GENERAL DYNAMICS CORPORATION
GROUP TRUST**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact

**GUGGENHEIM LIFE AND ANNUITY
COMPANY**
By: Guggenheim Partners Investment
Management, LLC, as Advisor

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact

*Signature Page to Global Forbearance and Transaction Support Agreement*

**GUGGENHEIM LOAN MASTER FUND, LTD.**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

**GUGGENHEIM HIGH-YIELD PLUS MASTER FUND SPC, on behalf of and for the account of the HIGH-YIELD LOAN PLUS MASTER SEGREGATED PORTFOLIO**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

**HEMPSTEAD CLO LP**
By: Guggenheim Partners Investment
Management, LLC, as Collateral Manager

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

**I.A.M. NATIONAL PENSION FUND**
By: Guggenheim Partners Investment
Management, LLC, as Adviser

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

**INTEL CORPORATION RETIREMENT PLANS MASTER TRUST**
By: Guggenheim Partners Investment
Management, LLC, as Advisor

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

**INDIANA UNIVERSITY HEALTH,  INC.**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

**KENNECOTT FUNDING LTD.**
By: Guggenheim Partners Investment
Management, LLC, as Collateral Manager

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

**MERCER FIELD CLO LP**
By: Guggenheim Partners Investment
Management, LLC, as Collateral Manager

By: _____
      Name:  William R. Hagner
      Title:  Attorney-in-Fact

*Signature Page to Global Forbearance and Transaction Support Agreement*

**MIDLAND NATIONAL LIFE
INSURANCE COMPANY**
By: Guggenheim Partners Investment
Management, LLC, as Investment Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


**NZC GUGGENHEIM MASTER FUND
LIMITED**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


**PRINCIPAL FUND, INC. – GLOBAL
DIVERSIFIED INCOME FUND**
By: Guggenheim Partners Investment
Management, LLC, as Sub-Adviser

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


**SHRINERS HOSPITALS FOR
CHILDREN**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


**NEW YORK LIFE INSURANCE AND
ANNUITY CORPORATION PRIVATE
PLACEMENT VARIABLE UNIVERSAL
LIFE SEPARATE ACCOUNT 70**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


**ORPHEUS FUNDING LLC**
By: Guggenheim Partners Investment
Management, LLC, as Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


**SANDS POINT FUNDING LTD.**
By: Guggenheim Partners Investment
Management, LLC, as Collateral Manager

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


**VERGER CAPITAL FUND LLC**
By: Guggenheim Partners Investment
Management, LLC, as Sub-Advisor

By: _____
    Name:  William R. Hagner
    Title:  Attorney-in-Fact


*Signature Page to Global Forbearance and Transaction Support Agreement*

**GUGGENHEIM STRATEGIC
OPPORTUNITIES FUND**
By: Guggenheim Partners Investment
Management, LLC, as Investment Manager

By: _____
     Name:  William R. Hagner
     Title:  Attorney-in-Fact

**GUGGENHEIM FUNDS TRUST –
GUGGENHEIM MACRO
OPPORTUNITIES FUND**
By: Guggenheim Partners Investment
Management, as Investment Adviser

By: _____
     Name:  William R. Hagner
     Title:  Attorney-in-Fact

*Signature Page to Global Forbearance and Transaction Support Agreement*

**GUGGENHEIM BUILD AMERICA
BONDS MANAGED DURATION TRUST**
By: Guggenheim Partners Investment
Management, LLC, as Investment Manager

By: _____
       Name:   William R. Hagner
       Title:  Attorney-in-Fact

**GUGGENHEIM CREDIT ALLOCATION
FUND**
By: Guggenheim Partners Investment
Management, LLC, as Sub-Adviser

By: _____
       Name:   William R. Hagner
       Title:  Attorney-in-Fact

**GUGGENHEIM FUNDS TRUST –
GUGGENHEIM FLOATING RATE
STRATEGIES FUND**
By: Guggenheim Partners Investment
Management, LLC, as Investment Adviser

By: _____
       Name:   William R. Hagner
       Title:  Attorney-in-Fact

**GUGGENHEIM FUNDS TRUST
– GUGGENHEIM HIGH YIELD FUND**
By: Security Investors, LLC, as Investment
Adviser

By: _____
       Name:   Amy J. Lee
       Title:  Senior Vice President and Secretary

*Signature Page to Global Forbearance and Transaction Support Agreement*

**GUGGENHEIM U.S. LOAN FUND, a sub fund of GUGGENHEIM QUALIFYING INVESTOR FUND PLC**
By: For and on behalf of BNY Mellon Trust Company (Ireland) Limited under Power of Attorney

By: _____
     Name:
     Title:

Eileen McCarroll  21/5/15
Assistant Manager
For and on behalf of
BNY Mellon Trust Company (Ireland) Limited
Under Power of Attorney

**GUGGENHEIM U.S. LOAN FUND II, a sub fund of GUGGENHEIM QUALIFYING INVESTOR FUND PLC**
By: For and on behalf of BNY Mellon Trust Company (Ireland) Limited under Power of Attorney

By: _____
     Name:
     Title:

Eileen McCarroll  21/5/15
Assistant Manager
For and on behalf of
BNY Mellon Trust Company (Ireland) Limited
Under Power of Attorney

*Signature Page to Global Forbearance and Transaction Support Agreement*

**Requisite Lenders**

**MUDRICK DISTRESSED OPORTUNITY FUND GLOBAL, LP**

By: **MUDRICK CAPITAL MANAGEMENT, LP**, its investment manger

By: _____
Name:  Glenn Springer
Title:  Chief Financial Officer

**BLACKWELL PARTNERS LLC**

By: **MUDRICK CAPITAL MANAGEMENT, LP**, its investment manger

By: _____
Name  Glenn Springer
Title:  Chief Financial Officer

*Signature Page to Global Forbearance and Transaction Support Agreement*

**THE 2011 MICHAEL PETER HOOPIS**
**REVOCABLE TRUST**, as Holdings PIK Note
Holder

By: _____
Name: Michael P. Hoopis
Title: Trustee

**Notice Information:**

_____

_____

_____

**THE STREUFERT REVOCABLE LIVING
TRUST, U/D/T MA 16, 1997,** as Holdings PIK
Note Holder

By: _Victor Streufert_
Name: Victor C. Streufert
Title: Trustee

**Notice Information:**

_____

_____

_____

Signature Page to Global Forbearance and Transaction Support Agreement

**CARLYLE MEZZANINE PARTNERS,**
**L.P.**, as Parent PIK Note Holder

**Notice Information:**

By: CMP General Partner, L.P., its General
Partner
By: TC Group CMP, L.L.C., its General
Partner

By: _____
Name: Grishma Parekh
Title: Managing Director

**CARLYLE MEZZANINE PARTNERS,**
**L.P.**, as Holdings PIK Note Holder

**Notice Information:**

By: CMP General Partner, L.P., its General
Partner
By: TC Group CMP, L.L.C., its General
Partner

By: _____
Name: Grishma Parekh
Title: Managing Director

Signature Page to Global Forbearance and Transaction Support Agreement

**YORK STREET MEZZANINE PARTNERS,**
L.P., as Parent PIK Note Holder

By: York Street Capital Partners, L.L.C., its
General Partner

By: _Christopher A. Layden_

Name: _Christopher A. Layden_
Title: _Managing Director_

**Notice Information:**

_364 Main St._
_Suite 200_
_Bedminster, NJ 07921_

**YORK STREET MEZZANINE**
**PARTNERS II, L.P.,** as Parent PIK Note
Holder

By: York Street Capital Partners II, L.L.C., its
General Partner

By: _Christopher A. Layden_

Name: _Christopher A. Layden_
Title: _Managing Director_

**Notice Information:**

_364 Main St._
_Suite 200_
_Bedminster, NJ 07921_

**YORK STREET MEZZANINE**
**PARTNERS, L.P.,** as Holdings PIK Note
Holder

By: York Street Capital Partners, L.L.C., its
General Partner

By: _Christopher A. Layden_

Name: _Christopher A. Layden_
Title: _Managing Director_

**Notice Information:**

_364 Main St._
_Suite 200_
_Bedminster, NJ 07921_

Signature Page to Global Forbearance and Transaction Support Agreement

**YORK STREET MEZZANINE**
**PARTNERS II, L.P.**, as Holdings PIK
Note Holder

By: York Street Capital Partners II, L.L.C., its
General Partner

By: _Christopher A. Layden_
Name: Christopher A. Layden
Title: Managing Director

**Notice Information:**

364 Main St.
Suite 200
Bedminster, NJ  07921

Signature Page to Global Forbearance and Transaction Support Agreement

**"HOLDINGS PIK NOTE HOLDER"**

By: _____
Name: Theresa M. Hope-Reese

**Notice Information:**

_____

_____

_____

**"HOLDINGS PIK NOTE HOLDER"**

By: _____
Name: Robert L. Davis

**Notice Information:**

2 Vermilion Cliffs
Aliso Viejo, CA. 92656
mobile (949) 295-1270

Signature Page to Global Forbearance and Transaction Support Agreement

## EXHIBIT C TO THE DISCLOSURE STATEMENT

**FIRST AMENDMENT TO GLOBAL FORBEARANCE AND TRANSACTION
SUPPORT AGREEMENT AND WIND DOWN COOPERATION AGREEMENT**

EXECUTION VERSION

## FIRST AMENDMENT TO GLOBAL
## FORBEARANCE AND TRANSACTION SUPPORT
## AGREEMENT AND WIND DOWN COOPERATION AGREEMENT

This **FIRST AMENDMENT TO GLOBAL FORBEARANCE AND TRANSACTION SUPPORT AGREEMENT AND WIND DOWN COOPERATION AGREEMENT** (this "Agreement"), dated as of December 31, 2015, is entered into by and among Targus Group International, Inc., a Delaware corporation (the "Company"), Targus Group Holdings, Inc., a Delaware corporation ("Holdings"), Targus Holdings, Inc., a Delaware corporation ("Parent"), the Guarantors, the Term Lenders party to the GFTSA (as defined in this Amendment), the Administrative Agent, the Collateral Agent, the Supplemental Agent, the New Term Loan Secured Parties, the holders of Parent PIK Notes party to the GFTSA, the holders of Holdings PIK Notes party to the GFTSA, the PIK Note Administrative Agent and each other Person that is a party to the GFTSA (each, a "Party", and collectively, the "Parties"). Each capitalized term used in this Agreement and not otherwise defined herein shall have the meaning assigned to such term in the GFTSA.

## RECITALS

**WHEREAS**, the Parties have entered into that certain Global Forbearance and Transaction Support Agreement, dated as of May 21, 2015 (as may be amended from time to time, the "GFTSA");

**WHEREAS**, the Parties, among others, entered into the GFTSA in an attempt to effectuate a sale of all or substantially all of the assets of the Company or a refinancing of the Company's debt obligations;

**WHEREAS**, the GFTSA provided for certain payments of Transaction Consideration to Holdings in the event of either an Acceptable Pre-Turnover Transaction or a Stock Turnover Transaction;

**WHEREAS**, in accordance with Section 5 of the GFTSA, the Company Parties, with the assistance of Blackstone (as financial advisor to the Company Parties), marketed the Company for sale or refinancing;

**WHEREAS**, during the marketing period, over eighty parties were contacted regarding their interest in the Company Parties, approximately forty parties signed non-disclosure agreements to undertake diligence on the Company Parties and five parties submitted bids for the assets or equity of the Company Parties;

**WHEREAS**, the parties to the GFTSA agreed that the marketing period, which concluded after over 210 days on October 20, 2015, did not result in either a Term Lender Payoff or an otherwise Acceptable Pre-Turnover Transaction;

**WHEREAS**, as a result of the failure to consummate either a Term Lender Payoff or an otherwise Acceptable Pre-Turnover Transaction by the Outside Time, in accordance with the terms of the GFTSA, a Collateral Agent Stock Turnover occurred on October 30, 2015;

**WHEREAS**, the Company Parties and the Term Lenders that are signatories to the GFTSA entered into that certain Fifth Forbearance Agreement, dated as of December 11, 2015, to agree, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to certain of the Term Loan Specified Defaults, subject to the terms and conditions of such agreements;

**WHEREAS**, the Company Parties and the New Term Lenders that are signatories to the GFTSA entered into that certain Second Forbearance and Amendment Agreement, dated as of December 11, 2015, to agree, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to certain events of defaults under the New Term Loan Agreement, subject to the terms and conditions of such agreements;

**WHEREAS**, the Company Parties and the ABL Parties entered into that certain Forbearance Agreement and Amendment Number Ten to the Loan, Guaranty and Security Agreement, dated as of December 11, 2015, whereby the ABL Parties agreed to, among other things, forbear from exercising rights and remedies against the Company Parties with respect to certain defaults and events of default under the ABL Facility, subject to the terms and conditions of such agreement; and

**WHEREAS**, as a result of the consummation of the Collateral Agent Stock Turnover and in order to facilitate the wind downs of Parent and Holdings, on the one hand, and the Company and its subsidiaries, on the other hand, the Parties desire to enter into this Agreement to amend certain of the terms of the GFTSA and to settle or otherwise resolve certain claims between certain Parties to the GFTSA and to set forth certain additional cooperation agreements among the Parties.

<u>**AGREEMENT**</u>

**NOW, THEREFORE**, in consideration of the premises and mutual agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**ARTICLE I**
<u>**AMENDMENT**</u>

As of the date hereof, the GFTSA is amended in the manner provided in this <u>Article I</u>:

**1.1**     The Recitals to the GFTSA are hereby amended by adding the following Whereas clauses:

"J.     One or more Events of Default (as defined in the New Term Loan Agreement) set forth on Schedule 6 (the "New Term Loan Specified Defaults") have occurred under the New Term Loan Agreement or are likely to occur under the New Term Loan Agreement during the Forbearance Period;"

"M.     The Company Parties and the New Term Lenders entered into (i) that certain First Forbearance Agreement, dated as of November 13, 2015; and (ii) that certain Second Forbearance and Amendment Agreement, dated as of December 11, 2015,

-2-

whereby the New Term Lenders agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to the New Term Loan Specified Defaults, subject to the terms and conditions of such agreements (the "New Term Loan Forbearance Agreements");"

**1.2**     The Recitals to the GFTSA are hereby amended by amending and restating each of the following Whereas clauses in their entirety:

"K.     The Company Parties and Term Lenders constituting the Requisite Lenders entered into (i) that certain Forbearance and Third Amendment Agreement, dated as of January 28, 2015; (ii) that certain Second Forbearance Agreement, dated as of February 13, 2015 (as amended and extended); (iii) that certain Third Forbearance Agreement, dated as of April 2, 2015; (iv) that certain Fourth Forbearance Agreement, dated as of November 13, 2015; and (v) that certain Fifth Forbearance Agreement, dated as of December 11, 2015, as extended from time to time, whereby such Term Lenders agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to certain of the Term Loan Specified Defaults, subject to the terms and conditions of such agreements (the "Term Loan Forbearance Agreements");"

"L.     The Company Parties and the ABL Parties entered into (i) that certain Forbearance Agreement and Amendment Number Six to Loan, Guaranty and Security Agreement, dated as of January 28, 2015; (ii) that certain Forbearance Agreement, dated as of February 13, 2015 (as amended and extended); (iii) that certain Forbearance Agreement and Amendment Number Seven to Loan, Guaranty and Security Agreement, dated as of April 24, 2015; (iv) that certain Forbearance Agreement and Amendment Number Eight to Loan Guaranty and Security Agreement dated as of May 21, 2015 (the "ABL Fourth Forbearance Agreement"); (v) that certain Forbearance Agreement and Amendment Number Nine to Loan Guaranty and Security Agreement dated as of November 11, 2015; and (vi) that certain Forbearance Agreement and Amendment Number Ten to Loan Guaranty and Security Agreement dated as of December 11, 2015, whereby the ABL Parties agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to the ABL Specified Defaults, subject to the terms and conditions of such agreements (the "ABL Forbearance Agreements");"

**1.3**     Section 1 of the GFTSA is hereby amended by adding the following definitions in the appropriate alphabetical order therein:

""Challenge Claim" has the meaning set forth in Section 9(e) of this Agreement."

""Designated Entity" means, the newly-formed entity designated by the Purchaser to assume the monetary obligations due and payable to Holdings and Parent set forth in Sections 5(c) and 9(e) of this Agreement and the obligations set forth in Sections 2.3, 2.5 and 2.6 of the First Amendment."

-3-

""Estate Representative" has the meaning set forth in Section 9(e) of this Agreement."

""First Amendment" means the First Amendment to this Agreement, dated as of December 31, 2015, by and among the Company Parties and the Creditor Parties."

""Foreclosure Transaction" has the meaning set forth in Section 5(c) of this Agreement."

""New Term Loan Forbearance Agreements" has the meaning set forth in Recital M of this Agreement."

""Prepackaged Plan" has the meaning set forth in the definition of Prepack Documents."

""Purchaser" has the meaning set forth in Section 5(c) of this Agreement."

""Transaction Consideration Funding Date" has the meaning set forth in Section 5(c) of this Agreement."

**1.4**     Section 1 of the GFTSA is hereby amended by amending and restating each of the following definitions in their entirety:

""Forbearance Period" means the period beginning on the Agreement Effective Date and ending on the respective date of the termination of the forbearance period set forth in each of the Term Loan Forbearance Agreements, the ABL Forbearance Agreements and the New Term Loan Forbearance Agreements."

""Funded Amount" means $700,000 to be deposited into a segregated account at Holdings on or before the earlier of (i) the commencement of a Prepackaged Bankruptcy or (ii) the earlier of (a) the date on which an Acceptable Pre-Turnover Transaction is consummated and (b) the Collateral Agent Stock Turnover Date, which funds shall be available solely for the benefit of Holdings and Parent to be used, solely in the event of an Acceptable Pre-Turnover Transaction or a Collateral Agent Stock Turnover, to pay all reasonable fees and expenses, including the reasonable and documented professionals' fees and costs, of Holdings and Parent necessary to facilitate the wind down of Holdings and Parent whether through a Prepackaged Bankruptcy or otherwise, and to oversee and facilitate the receipt and distribution of the Transaction Consideration, including, without limitation, fees and expenses of Holdings and Parent necessary to appoint a disbursement agent or to establish a liquidating trust and to appoint a liquidating trustee; provided, that $200,000 of the Funded Amount shall be available solely for the fees and expenses of such fiduciary overseeing the winddown of Parent and/or Holdings.  In the event that any portion of the Funded Amount remains after the payment of all fees and expenses described herein, then the remainder shall constitute a portion of the Stock Turnover Transaction Consideration.  For the avoidance of doubt, no portion of the Funded Amount shall be used to challenge (x) the liens and/or claims under the Term Loan Credit Documents or New Term Loan Agreement or (y) the validity and/or enforceability of the Transactions or the transactions contemplated by the Escrow Agreement."

-4-

"Prepack Documents" means the prepackaged chapter 11 plan (the "Prepackaged Plan"), the related disclosure statement, all material pleadings to be filed in the Prepackaged Bankruptcy and all other related material documents for the Prepackaged Bankruptcy, all of which shall be reasonably acceptable in form and substance to the Company Parties and the Requisite Supporting Term Lenders."

""Transaction Value" means:

(i) with respect to an Acceptable Pre-Turnover Transaction, (x) the total value of the Consideration actually received by the Term Lenders on account of the Term Loan Obligations, before any payment owed as Transaction Consideration, from the Net Proceeds of such Acceptable Pre-Turnover Transaction less (y) the aggregate amount of the accrued and unpaid scheduled interest payments under the Term Loans as of the date of receipt of such Consideration by the Term Lenders; and

(ii) in connection with a Collateral Agent Stock Turnover, the Transaction Value shall be equal to the Transaction Consideration.

(A) Non-cash Consideration or Proceeds (excluding any Contingent Amounts) as used in this definition shall be valued in the case of an Acceptable Pre-Turnover Transaction, by the Requisite Supporting Term Lenders after (x) a Blackstone Consultation, and (y) if requested in writing by Holdings (or any liquidating trustee or similar agent for Holdings) prior to the Valuation Request Deadline, an Independent Valuation, which shall be dispositive; provided, however, that the foregoing clause (A) shall not apply in the case of a Relevant Transaction that is (w) approved by, or under the supervision of, any court (including, without limitation, any bankruptcy court), (x) consummated after the Restructured Company or its representatives or advisors have undertaken good faith marketing efforts consistent with market practice to sell the assets or Equity Interests subject to such Relevant Transaction, to Persons that are not affiliates of the Restructured Company (unless such marketing or other efforts do not produce or result in any proposals, bids or offers by any Persons other than affiliates of the Restructured Company), (y) subject to any good faith auction or other competitive process consistent with market practice (even if such auction or other competitive process does not produce or result in any proposals, bids or offers by any Persons other than affiliates of the Restructured Company), or (z) consummated through the exercise of any rights or remedies as a creditor of the Restructured Company (including, without limitation, any "credit bid" under section 363(k) or section 1129(b)(2)(a)(ii) of the Bankruptcy Code or the acceptance of collateral in full or partial satisfaction of obligations pursuant to Section 9-620 of the UCC)."

**1.5**    Section 1 of the GFTSA is hereby amended by deleting each of the following defined terms in their entirety: "Forbearance Termination Event", "Future Transaction", "Interim Transaction Value", "Interim Transaction Value Payment Date", "Other Sale"", "Post-Turnover Sale", "Preferred Hurdle", "Preferred Return", "Preferred Return Expiration Date", "Term Lenders Claims and Interests", "Termination Notice" and "Termination Notice Expiration Time".

-5-

**1.6**     The definition of "ABL Forbearance Agreements" in Section 1 of the GFTSA is hereby amended by replacing the letter "K" set forth therein with "L".

**1.7**     The definition of "ABL Fourth Forbearance Agreement" in Section 1 of the GFTSA is hereby amended by replacing the letter "K" set forth therein with "L".

**1.8**     The definition of "Holdings Obligation" in Section 1 of the GFTSA is hereby amended by adding the following parenthetical immediately after the words "the Restructured Company":

"(including a Purchaser pursuant to a Foreclosure Transaction or otherwise)".

**1.9**     The definition of "Independent Valuation" in Section 1 of the GFTSA is hereby amended by deleting the following language in the second to last sentence thereof: " ;provided, that in the event of a Collateral Agent Stock Turnover, with respect to any Valuation Notice delivered in connection with a Valuation Event occurring after the Calculation Date, the Valuation Request Deadline shall be thirty (30) days after the receipt of the Valuation Notice."

**1.10**     The definition of "Outside Time" in Section 1 of the GFTSA is hereby amended by replacing the number "20" set forth therein with "30".

**1.11**     The definition of "Relevant Transaction" in Section 1 of the GFTSA is hereby amended by deleting the following words at the end thereof:

", a Post-Turnover Sale, a Future Transaction or an Other Sale".

**1.12**     The definition of "Restructured Company" in Section 1 of the GFTSA is hereby amended by adding the clause ", but does not include any purchaser of the equity or assets of the Company and its U.S. Subsidiaries pursuant to a Foreclosure Transaction or otherwise" at the end thereof.

**1.13**     The definition of "Term Lenders" in Section 1 of the GFTSA is hereby amended by (a) replacing the apostrophe after the first instance of "Term Lenders" with a closed quotation mark and (b) replacing the phrase "and, following a Collateral Agent Stock Turnover, in their capacity as holders of Equity Interests in the Restructured Company" with "and, following a Foreclosure Transaction, in their capacity as holders of Equity Interests in the Purchaser (if applicable)".

**1.14**     The definition of "Term Loan Forbearance Agreements" in Section 1 of the GFTSA is hereby amended by replacing the letter "J" set forth therein with "K".

**1.15**     The definition of "Term Loan Secured Parties" in Section 1 of the GFTSA is hereby amended by replacing the closed quotation mark prior to the term "Secured Parties" with an open quotation mark.

**1.16**     Section 3(a) of the GFTSA is hereby amended by replacing the colon in the heading thereof with a period.

-6-

**1.17** Section 3(b) of the GFTSA is hereby amended by amending and restating it in its entirety with the following:

"(b)   Collateral Agent Stock Turnover.   At the earliest to occur of (i) the Outside Time and (ii) the expiration of the Forbearance Period (the earliest such date and time, the "Collateral Agent Stock Turnover Date"), and pursuant to the terms of the Escrow Agreement, the Escrow Agent shall deliver the entire Escrow Estate (as defined in the Escrow Agreement) to the Supplemental Agent or its designee without the necessity of further instruction (other than, if the Collateral Agent Stock Turnover Date is the expiration of the Forbearance Period, notice of the Collateral Agent Stock Turnover, which notice shall be provided by the Supplemental Agent if directed in writing by the Requisite Supporting Term Lenders) (such delivery, the "Collateral Agent Stock Turnover"); provided, that prior to the Collateral Agent Stock Turnover Date, the Company Parties shall be in receipt of the identity of the new members of the Board of the Restructured Company and any necessary documentation to effect the appointment of such new members and such appointment shall be effective upon the Collateral Agent Stock Turnover Date; provided, further, however, that a Collateral Agent Stock Turnover shall not take place if an Escrow Release Transaction has been consummated before the Collateral Agent Stock Turnover Date.  On the Collateral Agent Stock Turnover Date (if the Escrow Release Transaction has not been consummated), without any further action on the part of or notice to any Person, Holdings shall no longer have any right, title or interest (including any beneficial ownership interest) in or to the Common Stock, including, without limitation, the right to receive and retain dividends, cash payments in respect of the Common Stock or to exercise the voting or other rights and powers that Holdings would otherwise be entitled to exercise in respect of the Common Stock, and all such rights shall immediately become vested in the Supplemental Agent.   Promptly following the Collateral Agent Stock Turnover, the Supplemental Agent shall distribute the Common Stock solely in accordance with directions received by the Supplemental Agent from the Requisite Lenders (and the Company hereby agrees, promptly (and in any event within one (1) Business Day) following any request of the Supplemental Agent occurring on or after the Collateral Agent Stock Turnover, to issue new stock certificates to replace the New Stock Certificate in such names(s) as may be directed by the Supplemental Agent at the direction of the Requisite Lenders)."

**1.18** Section 5(c) of the GFTSA is hereby amended by amending and restating it in its entirety with the following:

"(c)   Stock Turnover Transaction.

(i) In the event of a Collateral Agent Stock Turnover, (A) the Restructured Company shall, on a date (the "Transaction Consideration Funding Date") which is promptly, but no later than four (4) Business Days, after the consummation of a foreclosure transaction by the Term Loan Secured Parties on the assets or stock of the Company (the "Foreclosure Transaction"), pay, or cause the purchaser(s), if any, of the equity or a substantial portion of the assets of the Company and its U.S. Subsidiaries (the "Purchaser") to pay, $750,000 in cash to Holdings without any offset or deduction and (B) Holdings shall be entitled to retain, for distribution to its

-7-

creditors, any remaining portion of the Funded Amount (collectively, the "Stock Turnover Transaction Consideration") which, in the case of both clauses (A) and (B), shall be paid or delivered to Holdings or, if applicable, any liquidating trustee or other agent designated in writing by Holdings to be distributed pursuant to the Prepackaged Bankruptcy.   Parent and Holdings acknowledge that the Funded Amount was delivered to Holdings on or about October 30, 2015 and that portion of the Holdings Obligations has been satisfied.

(ii) The Supporting Term Lenders and the New Term Loan Secured Parties agree (x) that the Stock Turnover Transaction Consideration paid to or received by Holdings and Holdings' rights thereto under this Agreement shall be free and clear of any and all liens, claims and interests of the Term Loan Secured Parties and the New Term Loan Secured Parties under the applicable Term Loan Credit Documents and New Term Loan Documents, respectively, and (y) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on or promptly after the Agreement Effective Date any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on Holdings' right to receive the Stock Turnover Transaction Consideration under Section 5(c)(i) hereof, and (z) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on the date that the Restructured Company shall pay or cause to be paid to Holdings the Stock Turnover Transaction Consideration, any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on the Stock Turnover Transaction Consideration, provided, however that any delay until such documentation has been filed shall not in any manner limit, hinder, impair or otherwise affect the rights in favor of Holdings provided for herein.  Effective as of the later of (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the Collateral Agent Stock Turnover Date and (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan, Holdings shall not have any further indebtedness, liabilities or obligations owing to the  New Term Loan Secured Parties under the New Term Loan Documents, the New Term Loan Obligations shall be deemed satisfied with respect to Holdings, and each security interest, lien and pledge granted thereunder or in connection therewith in favor of the Collateral Agent in any assets of Holdings shall automatically be released, discharged and terminated, in each case automatically with no further action on the part of the New Term Loan Secured Parties and any distribution payable to the New Term Loan Secured Parties by Holdings under the Prepackaged Plan shall be allocated to holders of general unsecured claims at Holdings; and the New Term Loan Secured Parties

-8-

expressly authorize Holdings and its designees to release and terminate all UCC financing statements, security interests, mortgages and liens in favor of the New Term Loan Collateral Agent which were filed with respect to Holdings pursuant to, or under the New Term Loan Documents, and at any time and from time to time after such later date, the New Term Loan Secured Parties shall, promptly execute and deliver such other termination statements, lien releases, discharges of security interests, and any other similar discharge or release documents as Holdings (or its assigns) may from time to time reasonably request and prepare to effectuate, or reflect of public record, the release and discharge of such security interests and liens, as applicable."

1.19    Each of Section 5(d), Section 5(e), Section 7, Section 9(b) and Section 9(p) of the GFTSA is hereby amended by deleting the text therein in its entirety and replacing it with the phrase "[Intentionally Deleted]."

1.20    Section 5(f) of the GFTSA is hereby amended by adding the following words at the end thereof:

"For the avoidance of doubt, the Holdings Obligations shall not be subordinated to the New Term Loan Obligations."

1.21    Section 5(g)(ii) of the GFTSA is hereby amended by deleting the following words at the beginning thereof and replacing such works with "Following":

"In the event that 100% of the Holdings PIK Note Holders and 100% of the Parent PIK Note Holders do not execute this Agreement prior to the Collateral Agent Stock Turnover Date, then following".

1.22    Section 5(g)(ii)(A) of the GFTSA is hereby amended by deleting the language following the word "commenced" and replacing it with the following:

"on a date to be mutually agreed between Parent, Holdings and the Requisite Supporting Term Lenders, provided that the Prepackaged Bankruptcy shall not be commenced on or prior to the date that the Foreclosure Transaction is consummated; provided, further, that, the Prepackaged Bankruptcy shall be commenced no later than February 1, 2016 (or such later date as may be agreed to in writing by Holdings, the Restructured Company and the Requisite Lenders)."

1.23    Section 5(g)(ii)(B) of the GFTSA is hereby amended by adding the phrase ", as applicable" prior to the word "annexed" and deleting the word "applicable" immediately prior to the words "Prepack Documents".

1.24    Section 5(h) of the GFTSA is hereby amended by deleting the words "Prior to Stock Turnover" in the heading thereof.

1.25    Section 9(c) of the GFTSA is hereby amended by replacing the references to "Schedule 6" therein with references to "Schedule 7".

-9-

**1.26**     Section 9(e) of the GFTSA is hereby amended by amending and restating it in its entirety with the following:

"(e)     <u>Company Parties' Indemnification</u>.  Following the Collateral Agent Stock Turnover, each Company Party shall indemnify its respective directors and officers for claims or losses arising from and after the Collateral Agent Stock Turnover; <u>provided</u>, <u>however</u>, that nothing herein shall impact or impair the Company Parties' obligations to indemnify the directors and officers of the Company Parties for claims or losses arising, or related to acts or omissions taken or not taken, prior to the Collateral Agent Stock Turnover.  In addition, the Company Parties shall insure the directors and officers of the Company Parties following the consummation of any of the Transactions or the Foreclosure Transaction (or make satisfactory arrangements therefor, including coordination with the Purchaser, if any, including the Designated Entity), including, without limitation, maintaining the directors' and officers' insurance policies and tail insurance providing coverage substantially similar to, and no less favorable than, the coverage provided prior to the consummation of such Transaction for a six-year period following the effective date of the conclusion of the final dissolution of all of the Company Parties in connection with the Transactions and the Foreclosure Transaction to cover any claims arising prior to the effective date of such Transaction and Foreclosure Transaction regardless of whether the claim is asserted before or after the effective date of such Transaction and Foreclosure Transaction.  In the event that Holdings and/or Parent brings an action for breach of this Agreement against the Company or the Supporting Term Lenders, the Restructured Company and the Designated Entity shall reimburse the reasonable and documented legal fees and expenses of Holdings and/or Parent, as applicable, incurred in connection therewith, solely to the extent that Holdings and/or Parent is the prevailing party in such action.  The Restructured Company shall be, or shall cause the Purchaser, if any, (including the Designated Entity) to be, responsible (either directly or shall promptly reimburse Holdings and/or Parent, as applicable) for the reasonable and documented legal fees and expenses incurred by Holdings and/or Parent, in an aggregate amount not to exceed $1,000,000, in connection with an action by a Person that is not a Party to this Agreement or any person or entity acting on behalf of such Party seeking to challenge or otherwise invalidate this Agreement (each, a "<u>Challenge Claim</u>").  For the avoidance of doubt, the Parties hereto agree that a receiver, monitor, trustee, custodian, sequestrator, conservator or person functioning in a similar capacity for any Party or for a substantial part of the property or assets of any Party, whether in a proceeding brought under the Bankruptcy Code, similar state law or otherwise (each, an "<u>Estate Representative</u>"), shall be deemed a Party to this Agreement for purposes of a Challenge Claim and, as such, the indemnification for a Challenge Claim set forth in the immediately preceding sentence shall not apply or be available in connection with any action by an Estate Representative seeking to challenge or otherwise invalidate this Agreement.  In addition, a Challenge Claim indemnity shall not be applicable to a Challenge Claim brought by a party holding funded debt issued by Holdings or a party acting on behalf of any party holding funded debt issued by Holdings, including, without limitation, an Indenture Trustee for such funded debt."

**1.27**     Section 9(k) of the GFTSA is hereby amended by amending and restating the chart set forth therein in its entirety with the following:

-10-

| Monthly Period | Maximum ABL Balance (Base) | Maximum ABL Balance (Cap) |
|---|---|---|
| May 1, 2015 through May 31, 2015 | $16,000,000 | $27,000,000 |
| June 1, 2015 through June 30, 2015 | $16,000,000 | $27,000,000 |
| July 1, 2015 through July 31, 2015 | $12,000,000 | $26,000,000 |
| August 1, 2015 through August 31, 2015 | $8,000,000 | $24,000,000 |
| September 1, 2015 through September 30, 2015 | $4,000,000 | $22,000,000 |
| October 1, 2015 through October 31, 2015 | $2,000,000 | $21,000,000 |
| November 1, 2015, through November 30, 2015 | | $21,000,000 |
| December 1, 2015, through December 31, 2015 | | $21,000,000 |
| January 1, 2016 through January 31, 2016 | | $21,000,000 |

**1.28**    Section 13 of the GFTSA is hereby amended by:

(a)    replacing sub-clauses (a) through (e) in the second sentence set forth therein in their entirety with "(a) receiving, accounting for and distributing the Stock Turnover Transaction Consideration to the creditors of Holdings; and (b) administering the liquidating trust."; and

(b)    replacing the words "clauses (a) through (d) above" with the following: "clauses (a) and (b) above".

**1.29**    Section 18(h)(i) of the GFTSA is hereby amended by replacing the number to "$169.7 million" set forth therein with "$170.7 million".

**1.30**    Section 32 of the GFTSA is hereby amended by deleting the notice information of all the Parties set forth therein in its entirety and replacing it with the following:

-11-

"To the Company and its Subsidiaries at:

Targus Group International, Inc.
1211 North Miller Street
Anaheim, California 92806
Attn:  Sherry Abbott, General Counsel
sabbott@targus.com

*With a copy (which shall not constitute notice) to:*

O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Attn: Jennifer Taylor
jtaylor@omm.com

To Parent and Holdings (by email only):

Targus Holdings, Inc. and Targus Group Holdings, Inc.
1211 North Miller Street
Anaheim, California 92806
Attn:  Christopher Layden
layden@yorkstreetcapital.com

*With a copy (which shall not constitute notice) to:*

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of Americas
New York, New York 10036
Attn:  Adam Rogoff and Anupama Yerramalli
arogoff@kramerlevin.com and ayerramalli@kramerlevin.com

To the Administrative Agent or the Collateral Agent at:

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attn: Jeffery Rose
jrose@wilmingtontrust.com

*With a copy (which shall not constitute notice) to:*
Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attn: Michael Messersmith and Alan Glantz

-12-

michael.messersmith@kayescholer.com and alan.glantz@kayescholer.com

To the Supplemental Agent at:

Cortland Capital Market Services LLC
225 W. Washington Street, 21st Floor
Chicago, Illinois 60606
Attn: Joanna Anderson, Christopher Capezuti and Legal Department
joanna.anderson@cortlandglobal.com, chris.capezuti@cortlandglobal.com and
legal@cortlandglobal.com

*With a copy (which shall not constitute notice) to:*

Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attn: Michael Messersmith and Alan Glantz
michael.messersmith@kayescholer.com and alan.glantz@kayescholer.com

To a Supporting Term Lender at the notice information provided on its signature page hereto:

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Daniel Ginsberg
blawrence@stroock.com, jgoldstein@stroock.com, and dginsberg@stroock.com

To the New Term Loan Administrative Agent or New Term Loan Collateral Agent at:

Wilmington Savings Fund Society, FSB
WSFS Bank Center
500 Delaware Avenue, 11th Floor
P.O. Box 957
Wilmington, Delaware 19899
Attn: Patrick Healy
phealy@wsfsbank.com

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Daniel Ginsberg

-13-

blawrence@stroock.com, jgoldstein@stroock.com, and dginsberg@stroock.com

To a New Term Lender at the notice information provided on its signature page hereto.

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Daniel Ginsberg
blawrence@stroock.com, jgoldstein@stroock.com, and dginsberg@stroock.com

To the PIK Note Administrative Agent:

Law Debenture Trust Company of New York
400 Madison Avenue, Suite 4D
New York, NY 10017
Attn: Frank Godino and Thomas Musarra
frank.godino@lawdeb.com and thomas.musarra@lawdeb.com

*With a copy (which shall not constitute notice) to:*

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178-0061
Attn: Steven Reisman
sreisman@curtis.com

To a Supporting PIK Noteholder at the notice information provided on its signature page hereto.

**1.31**    Section 39 of the GFTSA is hereby amended by amending and restating sub-clause (iii) in the first sentence set forth therein in its entirety with the following:

"(iii) in the event of a Collateral Agent Stock Turnover, the first Business Day on which both the Prepackaged Bankruptcy and any voluntary proceeding under chapter 7 of the Bankruptcy Code or other wind-down process for the Company and its U.S. subsidiaries have been consummated."

**1.32**    Schedule 3 to the GFTSA is hereby amended by amending and restating it in its entirety with Exhibit A attached hereto.

**1.33**    Schedule 4 to the GFTSA is hereby amended by amending and restating it in its entirety with Exhibit B attached hereto.

**1.34**    Schedule 6 to the GFTSA is hereby amended by the replacing the heading "Schedule 6" therein with "Schedule 7" and by replacing the word "Convenants" therein with "Covenants".

-14-

**1.35**    Exhibit C attached to this Agreement is hereby added as a new Schedule 6 to the GFTSA.

**ARTICLE II**
**COVENANTS**

The applicable Parties hereby covenant and agree as follows:

**2.1    Release of Holdings Guaranty and Security Interest**.  The Term Lenders party to the GFTSA agree to release, and to cause the Administrative Agent and Collateral Agent to release, the guaranty and security interests granted by Holdings, such release to be effective as of the date of this Agreement pursuant to the Release of Guaranty and Security Interest attached hereto as Exhibit D contemporaneously with the full execution of this Agreement.

**2.2    Wind-Down of TGII**.  Any voluntary proceeding under chapter 11 or chapter 7 of the Bankruptcy Code or other process for the wind-down of the Company and its U.S. subsidiaries (any of the foregoing, a "Company Wind Down Proceeding") will be commenced on a date that is mutually agreed to by Parent, Holdings, the Company and the Term Lenders party to the GFTSA; provided that such Company Wind Down Proceeding shall not be commenced prior to the consummation of the Foreclosure Transaction and confirmation of the Prepackaged Bankruptcy.  Notwithstanding the foregoing, the Company and its U.S. subsidiaries may commence voluntary chapter 11 proceedings prior to confirmation of the Prepackaged Bankruptcy if determined to be necessary in the exercise of their reasonable business judgment.

**2.3    Communications Plan**.  Parent, Holdings and the Company (the "Targus Entities") and their respective advisors shall work together to develop a mutually agreeable communications plan concerning the Company Wind Down Proceedings, the Foreclosure Transaction and the Prepackaged Bankruptcy, as applicable, for the Targus Entities.  Each of Parent and Holdings, on the one hand, and the Company, on the other hand, agree to reasonably consult with the other party regarding the substance and timing of any public announcement to be made by it prior to the release of such public announcement.

**2.4    Additional Supporting Parties**.  Parent and Holdings shall use commercially reasonable efforts to procure the written agreement of certain PIK Noteholders, currently identified as Saratoga Investment Corp. and Farallon Capital Management, L.L.C. (together with any of their investment managers or advisors, affiliates or managed funds and/or accounts which are the record or beneficial holders of PIK Notes) or their assignees, to (a) support, and vote in favor of, the Prepackaged Bankruptcy, including but not limited to the Prepackaged Plan and other Prepack Documents and (b) grant the third party releases contained in the Prepackaged Plan (which releases shall be consistent with Section 20 of the GFTSA) to the Parties to the GFTSA.

**2.5    Cooperation**.

(a)    Parent and Holdings, on the one hand, and the Restructured Company, Subsidiaries of the Restructured Company, or the Purchaser, if any, on the other hand, shall, subject to the availability of personnel and the possession of relevant data, cooperate, and act

-15-

reasonably and in good faith, with one another regarding (i) the preparation and filing of all necessary tax returns and other documents relating to each of their and their respective direct and indirect subsidiary's or affiliate's wind-downs, (ii) the preparation and filing of all necessary tax returns and other documents of Parent, Holdings and the Company or the Restructured Company with respect to any taxable period that ends on or includes the Stock Turnover Date ("Pre-Turnover Period"), and (iii) any inquiries, claims, assessments, audits or similar events (including, where appropriate or necessary, providing a power of attorney) regarding a Pre-Turnover Period (collectively, the "Cooperation Services").  Parent and Holdings, on the one hand, and the Restructured Company, Subsidiaries of the Restructured Company or the Purchaser, if any, on the other hand, shall (i) allow each other and their respective employees, agents and subcontractors access to the other's facilities, records, documents, accounting data and other information as reasonably necessary for the performance of the Cooperation Services and (ii) have no, nor shall any of their respective officers, employees, directors or agents have any, liability for any failure to provide or delay in providing the Cooperation Services to the extent such failure or delay results from the failure of the other party's compliance with this Section 2.5.

(b)    The party providing the Cooperation Services pursuant to this Section 2.5 (the "CS Provider") shall not seek reimbursement for any costs or expenses (including, without limitation, administrative, overhead, or personnel costs and expenses) from the party for whose benefit the Cooperation Services are being provided (the "CS Receiver"); provided, however, that the CS Provider may seek reimbursement for out-of-pocket costs incurred and payable directly to a third party with the consent of the CS Recipient; provided that the CS Provider shall have no obligation to incur any out-of-pocket costs and expenses in connection with the provision of Cooperation Services if the CS Receiver does not consent to reimburse the CS Provider for such out-of-pocket costs or expenses.

(c)    The Parties acknowledge and agree that this Section 2.5 does not create a fiduciary relationship, partnership, joint venture or relationships of agency or trust between the parties and that all Cooperation Services are provided on an independent contractor basis.  Any potential conflicts that arise from the provision of the Cooperation Services are hereby waived by Parent, Holdings and the Restructured Company or the Purchaser, if any,.  Though the scope of the Cooperation Services is to be mutually agreed upon by the Chief Executive Officer, Chief Financial Officer or General Counsel (each, an "Executive") of the Restructured Company (or of the Purchaser, if any) and the board of directors of THI and/or TGHI, respectively, such services shall be reasonably related to Executive's previous areas of responsibility at, or on behalf of, THI and TGHI.  The Cooperation Services provided by an Executive shall not materially interfere with or materially hinder his or her performance of services on behalf of the Restructured Company or the Purchaser, if any, and such Executive may rely upon the services of other individuals or advisors employed by the Restructured Company, its subsidiaries and the Purchaser, if any, that are not party to this Agreement to fulfill such Cooperation Services.

## 2.6    Tax Returns and Elections.

(a)    The Company shall have the right to review all tax returns (or drafts of such tax returns) filed after the date hereof by or on behalf of Parent or Holdings with respect to or including any Pre-Turnover Period, at least 20 business days prior to the expected filing date

-16-

of such returns (or such shorter period as the Parties agree).  The Company shall have the right to consent to, and to cause Parent or Holdings to make, consent to or report any tax elections or positions on such returns that are reasonably expected to affect the tax liability of the Company or any of its subsidiaries, provided that any such elections or positions do not have a material adverse impact upon the amount of taxes payable by Parent or Holdings, with respect to the Pre-Turnover Period or any future taxable period involving the orderly wind down of Parent or Holdings.   For the avoidance of doubt, nothing herein shall prevent Parent or Holdings from making an election to accelerate or report any discharge of indebtedness deferred under Section 108(i) of the Internal Revenue Code.  Parent or Holdings shall have the right to control any tax audits relating to tax returns filed by or on behalf of Parent or Holdings with respect to or including any Pre-Turnover Period, except that Parent or Holdings shall notify the Company of, and keep the Company reasonably informed with respect to, any matters or issues raised in any such audits that could reasonably affect the tax liability of the Company, and the Company shall have the right to consent, with such consent not to be unreasonably withheld, delayed or conditioned, to the resolution or settlement of any such matter or issues to the extent that such resolution or settlement would have a material adverse impact on the amount of taxes payable by the Company or any of its subsidiaries.

(b)     Parent or Holdings shall have the right to review all tax returns (or drafts of such tax returns) filed after the date hereof by or on behalf of the Company and its U.S subsidiaries, but not including tax returns that include Parent or Holdings (which for the avoidance of doubt are governed by the immediately preceding paragraph), with respect to or including any Pre-Turnover Period, at least 20 business days prior to the expected filing date of such returns (or such shorter period as the Parties agree).  Parent or Holdings shall have the right to consent to, and to cause the Company or its U.S. subsidiaries to make, consent to or report any tax elections or positions on such returns that are reasonably expected to affect the tax liability of Parent or Holdings with respect to the Pre-Turnover Period or any future taxable period involving the orderly wind down of Parent or Holdings, provided that any such elections or positions do not have a material adverse impact upon the amount of taxes payable by the Company or any of its subsidiaries with respect to the Pre-Turnover Period or any future taxable period and such elections or positions are not inconsistent with any elections or positions required to be made by Parent under subsection (a) above.  The Company shall have the right to control any tax audits relating to tax returns filed by or on behalf of the Company or any of its subsidiaries with respect to any Pre-Turnover Period, except that the Company shall notify Parent or Holdings of, and keep Parent or Holdings, as applicable, reasonably informed with respect to, any matters or issues raised in any such audits that could reasonably affect the tax liability of Parent or Holdings, and Parent or Holdings shall have the right to consent, with such consent not to be unreasonably withheld, delayed or conditioned, to the resolution or settlement of any such matter or issues to the extent that such resolution or settlement would have a material adverse impact on the amount of taxes payable by Parent or Holdings with respect to the Pre-Turnover Period or any future taxable period involving the orderly wind down of Parent or Holdings.

**2.7    Return of Retainer**.  Holdings shall (a) cause Kramer Levin Naftalis & Frankel LLP to return to TGII, or as otherwise directed by or on behalf of TGII, prior to the petition date for the Prepackaged Bankruptcy, all but $60,000 of any unused portion of its retainer as of the

-17-

petition date for the Prepackaged Bankruptcy and (b) take all actions necessary to effectuate the return of such retainer amount.

2.8    **Designated Entity Obligations.**    Prior to the consummation of the Foreclosure Transaction, the Supporting Term Lenders shall identify to Parent, Holdings and the Restructured Company, the Designated Entity, and, upon consummation of the Foreclosure Transaction, the Designated Entity shall assume (a) the monetary obligations of the Restructured Company under Sections 5(c) and 9(e) of the GFTSA and (b) the obligations of the Restructured Company under Sections 2.3, 2.5 and 2.6 of this Agreement pursuant to documentation reasonably satisfactory to Holdings and Parent, such documentation to include (i) provisions requiring the Designated Entity to have and maintain access to liquid assets at all times in excess of the amount of the obligations set forth in Sections 5(c) and 9(e) of the GFTSA and to perform the obligations set forth in Sections 2.3, 2.5 and 2.6 of this Agreement and (ii) a consent to jurisdiction provision substantially similar to those set forth in the GFTSA.

**ARTICLE III**
**ADDITIONAL COMPANY PARTIES'**
**REPRESENTATIONS AND WARRANTIES**

The Company Parties hereby represent, warrant, acknowledge and agree, severally and jointly, as follows:

3.1    **Ratifications of New Term Loan Obligations under the New Term Loan Agreement by the Company Parties.**

(a)    As of the effective date of this Agreement, the aggregate principal balance of all of the outstanding New Term Loan Obligations under the New Term Loan Agreement is approximately $20.0 million (which amount does not include interest, fees, expenses or other amounts which are chargeable, due or otherwise reimbursable under the New Term Loan Agreement and the other New Term Loan Documents).

(b)    All of the New Term Loan Obligations are secured by a legal, valid and enforceable first priority security interest in and Lien (as defined in the New Term Loan Agreement) on the Collateral in favor of the New Term Loan Collateral Agent, on behalf of the New Term Lenders, as described in the New Term Loan Documents, subject to the terms of the ABL Intercreditor Agreement.  All of the New Term Loan Obligations and the Liens granted to secure the New Term Loan Obligations are hereby ratified and confirmed in all respects.

(c)    Other than as provided in the GFTSA (as amended by this Agreement) and this Agreement, there are no understandings or agreements relating to the New Term Loan Obligations other than the New Term Loan Documents and each applicable Company Party reaffirms, confirms and ratifies the effectiveness and continuing validity of the New Term Loan Agreement and each of the other New Term Loan Documents to which it is a party.

(d)    None of the New Term Loan Administrative Agent, the New Term Loan Collateral Agent nor any of the New Term Lenders is in default under any of the New Term Loan Documents or has otherwise breached any obligations to the applicable Company Parties.

-18-

(e)     There are no offsets, counterclaims or defenses to the New Term Loan Obligations, or to the rights, remedies or powers of the New Term Loan Administrative Agent or any of the New Term Lenders in respect of any of the New Term Loan Obligations or any of the New Term Loan Documents.

(f)     The execution and delivery of this Agreement have not established any course of dealing between the parties hereto or created any obligation, commitment or agreement of the New Term Loan Administrative Agent, the New Term Loan Collateral Agent or any of the New Term Lenders with respect to this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Each Party hereby represents and warrants, solely with respect to itself, that:

**4.1     Due Authorization**.  It has all of the requisite corporate, partnership or other applicable power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein, and the execution and delivery of this Agreement has been duly authorized by all necessary action (corporate, partnership or otherwise) on the part of it and no other proceeding on the part of it is necessary to authorize and approve this Agreement.

**4.2     Validity**.  This Agreement has been duly executed and delivered, and constitutes the legal, valid and binding agreement of it.

## ARTICLE V
## DIRECTIONS

**5.1**     Direction to Administrative Agent, Collateral Agent and Supplemental Agent. The Term Lenders signatory hereto which constitute the Requisite Lenders (under and as defined in the Term Loan Credit Agreement) (the "Term Loan Directing Lenders") hereby direct the Administrative Agent, the Collateral Agent and the Supplemental Agent to execute and deliver this Agreement.  In addition, the Term Loan Directing Lenders, in their capacity as the Requisite Lenders (as defined in the Term Loan Credit Agreement), hereby acknowledge and agree that (x) all of the directions in this Section 5.1 constitute a direction from the Requisite Lenders (as defined in the Term Loan Credit Agreement) under the provisions of Section 9 of the Term Loan Credit Agreement and all subsections thereof and (y) Sections 9.6, 10.2 and 10.3 of the Term Loan Credit Agreement shall apply to any and all actions taken or not taken by the Administrative Agent, the Collateral Agent and the Supplemental Agent in accordance with such directions.

**5.2**     Direction to New Term Loan Administrative Agent and New Term Loan Collateral Agent.  The New Term Lenders signatory hereto which constitute the Requisite Lenders (under and as defined in the New Term Loan Agreement) (the "New Term Directing Lenders") hereby direct the New Term Loan Administrative Agent and the New Term Loan Collateral Agent to execute and deliver this Agreement.  In addition, the New Term Directing Lenders, in their capacity as the Requisite Lenders (as defined in the New Term Loan

-19-

Agreement), hereby acknowledge and agree that (x) all of the directions in this Section 5.2 constitute a direction from the Requisite Lenders (as defined in the New Term Loan Agreement) under the provisions of Section 9 of the New Term Loan Agreement and all subsections thereof and (y) Sections 9.6, 10.2 and 10.3 of the New Term Loan Agreement shall apply to any and all actions taken or not taken by the New Term Loan Administrative Agent and the New Term Loan Collateral Agent in accordance with such directions.

**5.3**    Direction to PIK Note Administrative Agent.  The Supporting Holdings PIK Noteholders represent and warrant to the PIK Note Administrative Agent that the Supporting Holdings PIK Noteholders constitute Required Holders (as such term is defined in the Holdings Note Purchase Agreement) and the Supporting Holdings PIK Noteholders have all requisite power and authority to direct the PIK Note Administrative Agent pursuant to and in accordance with the Holdings Note Purchase Agreement and the Holdings PIK Note Agency Agreement.   The Supporting Parent PIK Noteholders represent and warrant to the PIK Note Administrative Agent that the Supporting Parent PIK Noteholders constitute Required Holders (as such term is defined in the Parent Note Purchase Agreements) and the Supporting Parent PIK Noteholders have all requisite power and authority to direct the PIK Note Administrative Agent pursuant to and in accordance with the Parent Note Purchase Agreements and the Parent PIK Note Agency Agreements.  In their respective capacities as Required Holders under the Holdings Note Purchase Agreement and the Parent Note Purchase Agreements, as applicable, the Supporting Holdings PIK Noteholders and Supporting Parent PIK Noteholders hereby (i) direct the PIK Note Administrative Agent to (A) execute and deliver this Agreement and (B) take the actions requested of it pursuant to and in compliance with this Agreement and (ii) agree to provide direction to the PIK Note Administrative Agent, to the extent necessary, to take actions pursuant to and in compliance with this Agreement.

## ARTICLE VI
## MISCELLANEOUS

**6.1**    **Condition Precedent.**  This Agreement shall not be effective unless and until the Parties shall have duly executed and delivered this Agreement.

**6.2**    **Entire Agreement; No Other Modifications to GFTSA**.   This Agreement constitutes the entire agreement with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, warranties, proposals and understandings of the Parties, if any, whether oral, written or implied, as to the subject matter hereof.  Except as expressly amended and modified in Section 1.1 of this Agreement, all other terms of the GFTSA remain in full force and effect, and the Parties hereby ratify and confirm the same.

**6.3**    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.   The signatures of all of the Parties need not appear on the same counterpart. Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed signature page of this Agreement.

*[The remainder of this page has been intentionally left blank.]*

-20-

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date written above.

<u>Company Parties</u>

**TARGUS GROUP INTERNATIONAL, INC. (the "Company") (as Obligor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS, INC. (as Guarantor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS GROUP HOLDINGS, INC. ("Holdings") (as Obligor under the Term Loan)**

By: _____
    Name: Christopher A. Layden
    Title: SVP

**TARGUS GROUP US LLC (as Guarantor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS HOLDINGS, INC. ("Parent")**

By: _____
    Name: Chistopher A. Layden
    Title: SVP

**OTEN INC. (as Guarantor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS USA, INC. (as Guarantor under the Term Loan)**

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date written above.

<u>**Company Parties**</u>

**TARGUS GROUP INTERNATIONAL, INC. (the "Company") (as Obligor under the Term Loan)**

By: _____
      Name:
      Title:

**TARGUS, INC. (as Guarantor under the Term Loan)**

By: _____
      Name:
      Title:

**TARGUS GROUP HOLDINGS, INC. ("Holdings") (as Obligor under the Term Loan)**

By: _____
      Name:
      Title:

**TARGUS GROUP US LLC (as Guarantor under the Term Loan)**

By: _____
      Name:
      Title:

**TARGUS HOLDINGS, INC. ("Parent")**

By: _____
      Name:
      Title:

**OTEN INC. (as Guarantor under the Term Loan)**

By: _____
      Name:
      Title:

**TARGUS USA, INC. (as Guarantor under the Term Loan)**

By: _____
      Name:
      Title:

**Administrative Agent and Collateral Agent**

**WILMINGTON    TRUST    NATIONAL
ASSOCIATION    (as    successor
Administrative Agent and Collateral Agent)**

By: _____
    Name:  Jeffery Rose
    Title:   Vice President

**New Term Loan Administrative Agent and New Term Loan Collateral Agent**

**WILMINGTON SAVINGS FUND
SOCIETY, FSB,** as New Term Loan
Administrative Agent and New Term Loan
Collateral Agent

By: _____
   Name:  Kristin L. Moore
   Title:   Vice President

**PIK Note Administrative Agent**

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**, as Administrative Agent to the holders of 10% Parent PIK Notes issued under that certain Amended and Restated Note Purchase Agreement, dated as of May 24, 2011

By: _____
  Name:
  Title:

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**, as Administrative Agent to the holders of 10% Parent PIK Notes issued under that certain Amended and Restated Note Purchase Agreement, dated as of October 26, 2014

By: _____
  Name:
  Title:

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**, as Administrative Agent to the holders of 16% Holdings PIK Notes

By: _____
  Name:          Frank Godino
  Title:          Vice President
        Law Debenture Trust Company of New York

**Supplemental Agent**

**CORTLAND CAPITAL MARKET SERVICES LLC**, as Supplemental Agent

By: _____

    Name:       **Polina Arsentyeva**
    Title:        **Associate Counsel**

**REQUISITE LENDERS:**

**5180-2 CLO LP**
By: Guggenheim Partners Investment
Management, LLC, as Collateral Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**WILSHIRE INSTITUTIONAL MASTER
FUND SPC – GUGGENHEIM ALPHA
SEGREGATED PORTFOLIO**
By: Guggenheim Partners Investment
Management, LLC, as Sub-Advisor

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**CLC LEVERAGED LOAN TRUST**
By: Challenger Life Nominees PTY Limited as Trustee
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**COPPER RIVER CLO LTD.**
By: Guggenheim Partners Investment Management,
LLC, as Collateral Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

*Signature Page to First Amendment to Global Forbearance and
Transaction Support Agreement and Wind Down Cooperation Agreement*

**GENERAL DYNAMICS CORPORATION
GROUP TRUST**
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:   Kevin Robinson
Title:   Attorney-in-Fact


**GUGGENHEIM LIFE AND ANNUITY
COMPANY**
By: Guggenheim Partners Investment Management,
LLC, as Advisor

By: _____
Name:   Kevin Robinson
Title:   Attorney-in-Fact


**GUGGENHEIM LOAN MASTER FUND, LTD.**
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:   Kevin Robinson
Title:   Attorney-in-Fact


**GUGGENHEIM HIGH-YIELD PLUS MASTER
FUND SPC, on behalf of and for the account of the
HIGH-YIELD LOAN PLUS MASTER
SEGREGATED PORTFOLIO**
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:   Kevin Robinson
Title:   Attorney-in-Fact


*Signature Page to First Amendment to Global Forbearance and
Transaction Support Agreement and Wind Down Cooperation Agreement*

**HEMPSTEAD CLO LP**
By: Guggenheim Partners Investment Management,
LLC, as Collateral Manager

By: _____
Name:     Kevin Robinson
Title:     Attorney-in-Fact

**I.A.M. NATIONAL PENSION FUND**
By: Guggenheim Partners Investment Management,
LLC, as Adviser

By: _____
Name:     Kevin Robinson
Title:     Attorney-in-Fact

**INTEL CORPORATION RETIREMENT PLANS
MASTER TRUST**
By: Guggenheim Partners Investment Management,
LLC, as Advisor

By: _____
Name:     Kevin Robinson
Title:     Attorney-in-Fact

**INDIANA UNIVERSITY HEALTH, INC.**
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:     Kevin Robinson
Title:     Attorney-in-Fact

**KENNECOTT FUNDING LTD.**
By: Guggenheim Partners Investment Management,
LLC, as Collateral Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact


**MERCER FIELD CLO LP**
By: Guggenheim Partners Investment Management,
LLC, as Collateral Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact


**MIDLAND NATIONAL LIFE INSURANCE
COMPANY**
By: Guggenheim Partners Investment Management,
LLC, as Investment Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact


**NEW YORK LIFE INSURANCE AND ANNUITY
CORPORATION PRIVATE PLACEMENT
VARIABLE UNIVERSAL LIFE SEPARATE
ACCOUNT 70**
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact


*Signature Page to First Amendment to Global Forbearance and
Transaction Support Agreement and Wind Down Cooperation Agreement*

**NZC GUGGENHEIM MASTER FUND LIMITED**
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**ORPHEUS FUNDING LLC**
By: Guggenheim Partners Investment Management,
LLC, as Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**PRINCIPAL FUND, INC. – GLOBAL
DIVERSIFIED INCOME FUND**
By: Guggenheim Partners Investment Management,
LLC, as Sub-Adviser

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**SANDS POINT FUNDING LTD.**
By: Guggenheim Partners Investment Management,
LLC, as Collateral Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**SHRINERS HOSPITALS FOR CHILDREN**
By: Guggenheim Partners Investment Management,
LLC, as Manager

*Signature Page to First Amendment to Global Forbearance and
Transaction Support Agreement and Wind Down Cooperation Agreement*

By: _____

Name:    **Kevin Robinson**

Title:    Attorney-in-Fact


**VERGER CAPITAL FUND LLC**

By: Guggenheim Partners Investment Management, LLC, as Sub-Advisor

By: _____

Name:    **Kevin Robinson**

Title:    Attorney-in-Fact

**GUGGENHEIM BUILD AMERICA BONDS
MANAGED DURATION TRUST**
By: Guggenheim Partners Investment Management,
LLC, as Investment Manager

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**GUGGENHEIM CREDIT ALLOCATION FUND**
By: Guggenheim Partners Investment Management,
LLC, as Sub-Advisor

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**GUGGENHEIM FUNDS TRUST -
GUGGENHEIM FLOATING RATE
STRATEGIES FUND**
By: Guggenheim Partners Investment Management,
LLC, as Investment Advisor

By: _____
Name:    Kevin Robinson
Title:    Attorney-in-Fact

**GUGGENHEIM FUNDS TRUST –
GUGGENHEIM HIGH YIELD FUND**
By: Security Investors, LLC, as Investment Adviser

By: _____
Name:    Amy Lee
Title:    Vice President and Secretary

**GUGGENHEIM U.S. LOAN FUND, a sub fund of GUGGENHEIM QUALIFYING INVESTOR FUND PLC**
By: Guggenheim Partners Investment Management, LLC, as Investment Manager

By: _____

Name: Kevin Robinson
Title: Attorney-in-Fact


**GUGGENHEIM U.S. LOAN FUND II, a sub fund of GUGGENHEIM QUALIFYING INVESTOR FUND PLC**
By: Guggenheim Partners Investment Management, LLC, as Investment Manager

By: _____

Name: Kevin Robinson
Title: Attorney-in-Fact

**GUGGENHEIM STRATEGIC OPPORTUNITIES FUND**
By: Guggenheim Partners Investment Management, LLC, as Investment Advisor

By: _____

Name: Kevin Robinson

Title: Attorney-in-Fact


**GUGGENHEIM FUNDS TRUST - GUGGENHEIM MACRO OPPORTUNITIES FUND**
By: Guggenheim Partners Investment Management, LLC, as Investment Advisor

By: _____

Name: Kevin Robinson

Title: Attorney-in-Fact

**REQUISITE LENDERS:**

**MUDRICK DISTRESSED OPPORTUNITY FUND GLOBAL, LP**

By:  **MUDRICK CAPITAL MANAGEMENT, LP**, its investment manager

By: _____
Name:  Jason Mudrick
Title:  President

**BLACKWELL PARTNERS LLC**

By:  **MUDRICK CAPITAL MANAGEMENT, LP**, its investment manager

By: _____
Name:  Jason Mudrick
Title:  President

**THE 2011 MICHAEL PETER HOOPIS
REVOCABLE TRUST,** as Holdings PIK
Note Holder

By: _____
    Name: Michael P. Hoopis
    Title: Trustee

**Notice Information:**

_____

_____

_____

*Signature Page to First Amendment to Global Forbearance and
Transaction Support Agreement and Wind Down Cooperation Agreement*

THE STREUFERT REVOCABLE LIVING
TRUST, U/D/T MA 16, 1997, as Holdings
PIK Note Holder

By: _____
    Name: Victor C. Streufert
    Title: Trustee

Notice Information:

Targus Group International, Inc.
1211 North Miller Street
Anaheim, California 92806
Attn: Victor C. Streufert

**CARLYLE MEZZANINE PARTNERS, L.P.**, as Parent PIK Note Holder

By: CMP General Partner, L.P., its General Partner

By: TC Group CMP, L.L.C., its General Partner

By:

_____
    Name: Grishma Parekh
    Title: Managing Director

**Notice Information:**

The Carlyle Group

520 Madison Avenue

NY, NY 10022


**CARLYLE MEZZANINE PARTNERS, L.P.**, as Holdings PIK Note Holder

By: CMP General Partner, L.P., its General Partner

By: TC Group CMP, L.L.C., its General Partner

By:

_____
    Name: Grishma Parekh
    Title: Managing Director

**Notice Information:**

The Carlyle Group

520 Madison Avenue

NY, NY 10022


*Signature Page to First Amendment to Global Forbearance and*
*Transaction Support Agreement and Wind Down Cooperation Agreement*

**YORK STREET MEZZANINE
PARTNERS II, L.P.,** as Holdings PIK Note
Holder

By: York Street Capital Partners II, L.L.C., its
General Partner

By: _____

     Name:  Christopher A. Layden
     Title: Managing Director

**Notice Information:**

364 Main Street

Suite 200

Bedminster, NJ 07921

**YORK STREET MEZZANINE
PARTNERS, L.P.,** as Parent PIK Note Holder

By: York Street Capital Partners, L.L.C., its
General Partner

By: _____
    Name: Christopher A. Layden
    Title: Managing Director

**Notice Information:**

_____364 Main Street_____

_____Suite 200_____

_____Bedminster, NJ 07921_____


**YORK STREET MEZZANINE
PARTNERS II, L.P.,** as Parent PIK Note
Holder

By: York Street Capital Partners II, L.L.C., its
General Partner

By: _____
    Name: Christopher A. Layden
    Title: Managing Director

**Notice Information:**

_____364 Main Street_____

_____Suite 200_____

_____Bedminster, NJ 07921_____


**YORK STREET MEZZANINE
PARTNERS, L.P.,** as Holdings PIK Note
Holder

By: York Street Capital Partners, L.L.C., its
General Partner

By: _____
    Name: Christopher A. Layden
    Title: Managing Director

**Notice Information:**

_____364 Main Street_____

_____Suite 200_____

_____Bedminster, NJ 07921_____

**"HOLDINGS PIK NOTE HOLDER"**

By: _____
      Name: Theresa M. Hope-Reese

**Notice Information:**

Targus

1211 N. Miller St.

Anaheim, CA 92806

**"HOLDINGS PIK NOTE HOLDER"**

By: _____
Name: Robert L. Davis

**Notice Information:**

Robert Davis
2 Vermilion Cliffs
Aliso Viejo, CA 92656

**EXHIBIT A**

**SCHEDULE 3**

*ABL Specified Defaults*

The term "ABL Specified Defaults" means the Defaults or Events of Default (each as defined in the ABL Facility) arising as a result of any of the following:

(i)      The Parent and each other Obligor's failure to deliver to the Agent no later than December 31, 2014, the information required to be delivered under Sections 10.1.2(a), (d), and (e) of the ABL Facility for the Fiscal Year ended September 30, 2014, which failures constitute Events of Default under Section 12.1(c) of the ABL Facility.

(ii)      The Company's failure to comply with Section 10.1.3 of the ABL Facility with respect to the delivery of notice of any Specified Default and the effects thereof, any exercise of remedies by the Collateral Agent with respect to the Common Stock and the Stock Certificate, the entry into this Agreement, and the occurrence of the Stock Turnover Date or any Material Adverse Effect resulting from the foregoing or the transactions contemplated hereby, which failure constitutes an Event of Default under Section 12.1(c) of the ABL Facility.

(iii)      The occurrence of an Event of Default under Section 12.1(c) of ABL Facility, with respect to the disposition of Common Stock and Stock Certificate in connection with the transactions contemplated by this Agreement and by the Escrow Agreement to the extent such transactions constitute a failure to comply with Section 10.2.6 of the ABL Facility.

(iv)      The breach or inaccuracy of any representation, warranty or other written statement of an Obligor (as defined in the ABL Facility) made in connection with any Loan Documents (as defined in the ABL Facility) or transactions contemplated thereby when given solely as a result of  the existence of the Specified Defaults and the effects thereof, any exercise of remedies by the Collateral Agent with respect to the Common Stock and the Stock Certificate, the entry into this Agreement, and the occurrence of the Stock Turnover Date, which breach or inaccuracy constitutes an Event of Default under Section 12.1(b) of the ABL Facility.

(v)      The occurrence of an Event of Default under Section 12.2(c) of the ABL Facility with respect to the Company's failure to comply with Section 10.2.2 of the ABL Facility as a result of the existence of: (i) Security Interest in favor of Enhanced Capital Connecticut Fund I, LLC dated November 15, 2011 which was recorded at Reel/Frame No. 4663/0854 of the United States Trademark Office; (ii) Security Interest in favor of First Union National Bank dated August 31, 2000 which was recorded at Reel/Frame No. 2148/0647 at the United States Trademark Office and at Reel Frame No. 11103/0163 at the United States Patent Office; (iii) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (iv) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(vi)    The failure to comply with Section 10.2.14, 10.2.17 of the ABL Facility and a Default or an Event of Default under Section 12.1(c), 12.1(i) and Section 12.1(m) of the ABL Facility arising on account of the effectiveness of the GTSA, including the consummation of the transactions contemplated by Section 3.1(a) and Section 3.1(b) of the GTSA.

(vii)    Any Default or Event of Default under Section 12.1(i) or Section 12.1(m) of the Loan Agreement on account of the Collateral Agent Stock Turnover and any Material Adverse Effect in respect of actions taken in connection therewith.

(viii)    The occurrence and continuance of the Term Loan Specified Defaults and the PIK Notes Specified Defaults which each constitute an Event of Default under Section 12.1(f) of the ABL Facility.

(ix)    The failure to deliver a Financial Plan not later than sixty (60) days after the beginning of the Fiscal Year commencing October 1, 2015, as required under Section 10.1.2(f) of the Loan Agreement, constitutes an Event of Default under Sections 12.1(c) and 12.1(f) of the Loan Agreement.

(x)    The failure to comply with the GFTSA Financial Covenants (as defined in the GTSA) and to deliver a compliance certificate in respect thereof as required under Section 9(c) of the GTSA, which constitutes a default under the Term Loan Documents and an Event of Default under Section 12.1(f) of the Loan Agreement.

(xi)    The failure to deliver a certificate setting forth the total amount of unpaid cash interest due under the Term Loan Documents for November 2015, and thereafter as required under Section 9(b) of the GTSA, which constitutes a default under the Term Loan Documents and an Event of Default under Section 12.1(f) of the Loan Agreement.

(xii)    The failure to deliver a certificate describing in reasonable detail compliance with the covenant set forth in Section 9(k) for the ABL Testing Period (as defined in the GTSA) ending October 31, 2015, which constitutes a default under the Term Loan Documents and an Event of Default under Section 12.1(f) of the Loan Agreement.

-23-

**EXHIBIT B**

**SCHEDULE 4**

*Term Loan Specified Defaults*

The term "Term Loan Specified Defaults" means the following Defaults or Events of Default:

(i)    The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make a scheduled payment of the Term Loans in the amount of $475,000 each on the last day of each of the second, third and fourth Fiscal Quarters of 2015 and the last day of the first Fiscal Quarter of 2016 in accordance with Section 2.9 of the Term Loan Credit Agreement.

(ii)    The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make a prepayment of the Term Loans in the amount of $1,800,000 (plus any interest due and payable in connection with such prepayment) no later than two (2) Business Days after the date on which the Compliance Certificate for each of the first, second, and third Fiscal Quarters of 2015 was required to be delivered in accordance with Section 2.11(c) of the Term Loan Credit Agreement.

(iii)    The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make any additional prepayment of the Term Loans under Section 2.11(g) of the Term Loan Credit Agreement in the event that the Company determines that the actual Consolidated Excess Cash Flow required to be prepaid under Section 2.11(e)(ii) of the Term Loan Credit Agreement for the Fiscal Year ending on September 30, 2014 exceeds the actual amount prepaid under Section 2.11(e)(ii) of the Term Loan Credit Agreement for such Fiscal Year.

(iv)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 2.11(g) of the Term Loan Credit Agreement with respect to the delivery of the prepayment certificate required to accompany the prepayment of the Term Loans under Section 2.11(c) for each of the first, second, and third Fiscal Quarters of 2015 and any additional prepayment of Consolidated Excess Cash Flow under Section 2.11(e) of the Term Loan Credit Agreement for the Fiscal Year ending on September 30, 2014.

(v)    The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make interest payments due on the Term Loans at any time prior to and during the Forbearance Period, other than as specifically contemplated by Section 9(b) of this Agreement (except as a result of the failure of the Excess Availability Condition to be satisfied).

(vi)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(c) of the Term Loan Credit Agreement with respect to the Fiscal Year ending on September 30, 2014 and September 30, 2015.

(vii)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(d) of the Term Loan Credit Agreement with respect to the delivery of the Compliance Certificate required to accompany the financial statements of the Company and its Subsidiaries for the Fiscal Year ending on September 30, 2014 and September 30, 2015.

(viii)    The occurrence of a Default or an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(f) of the Term Loan Credit Agreement with respect to the delivery of notice of any Term Loan Specified Default and the effects thereof, the entry into this Agreement, the occurrence of the Stock Turnover Date or any effect thereof, or any Material Adverse Effect resulting from the foregoing or the transactions contemplated hereby.

(ix)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(o) of the Term Loan Credit Agreement with respect to the delivery of the certificate referred to therein that is required to accompany the financial statements of the Company and its Subsidiaries for the Fiscal Year ending on September 30, 2014 and September 30, 2015.

(x)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement, if any, with respect to the Company's failure to obtain a private rating issued by S&P with respect to its senior secured debt during the Forbearance Period in accordance with Section 5.15 of the Term Loan Credit Agreement.

(xi)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 6.8(a) of the Term Loan Credit Agreement with respect to the last Fiscal Quarter of 2014 and the first, second, third and fourth Fiscal Quarters of 2015, and the first Fiscal Quarter of 2016.

(xii)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 6.8(b) of the Term Loan Credit Agreement with respect to the last Fiscal Quarter of 2014 and the first, second, third and fourth Fiscal Quarters of 2015, and the first Fiscal Quarter of 2016.

(xiii)    The occurrence of an Event of Default under Section 8.1(c) of the Term Loan Credit Agreement with respect to the disposition of Common Stock and Old Stock Certificate in connection with the transactions contemplated this Agreement and by the Escrow Agreement, including the occurrence of the Collateral Agent Stock Turnover, to the extent such transactions constitute a failure to comply with Section 6.9 or Section 6.10 of the Term Loan Credit Agreement.

(xiv)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 6.2 of the Term Loan Credit Agreement as a result of the existence of: (i) Security Interest in favor of Enhanced Capital Connecticut Fund I, LLC dated November 15, 2011 which was recorded at Reel/Frame No. 4663/0854 of the United States Trademark Office; (ii) Security Interest in favor of First Union National Bank dated August 31, 2000 which was recorded at Reel/Frame No. 2148/0647

-25-

at the United States Trademark Office and at Reel Frame No. 11103/0163 at the United States Patent Office; (iii) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (iv) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(xv)    The occurrence of an Event of Default under Section 8.1(d) of the Term Loan Credit Agreement with respect to the breach of any representation, warranty, certification or other statement made or deemed made in any Term Loan Credit Document or in any statement or certificate at any time given by any Company Party or any of its Subsidiaries in writing pursuant to the Term Loan Credit Agreement solely as a result of the existence of the Term Loan Specified Defaults, the entry into this Agreement, and the occurrence of the Stock Turnover Date.

(xvi)    The occurrence of an Event of Default under Section 8.1(k) of the Term Loan Credit Agreement with respect to the disposition of Common Stock and the New Stock Certificate in connection with the transactions contemplated by the Escrow Agreement and as a result of the Collateral Stock Turnover to the extent such transaction constitutes a Change of Control.

(xvii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Term Loan Credit Agreement with respect to the ABL Specified Defaults, provided that the ABL Parties have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived such ABL Specified Defaults.

(xviii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Term Loan Credit Agreement with respect to the PIK Notes Specified Defaults, provided that the Supporting PIK Noteholders have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived, PIK Notes Specified Defaults.

(xix)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Term Loan Credit Agreement with respect to the "Specified Defaults" set forth in that certain Second Forbearance Agreement, dated as of December 11, 2015, by and among the Company Parties and the New Term Loan Secured Parties.

(xx)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement as a result of the failure to deliver a Financial Plan required under Section 5.1(i) for the Fiscal Year commencing October 1, 2015.

(xxi)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement as a result of the failure to deliver the certificate required to be delivered under section 9(b) of the GTSA for each of November 2015 and December 2015, the failure to comply with the GTSA Financial Covenants (as defined in the GTSA) set forth in section 9(c) of the GTSA and to deliver a compliance certificate in respect thereof, and the failure to deliver the

-26-

certificate required to be delivered under section 9(k) of the GTSA for the ABL Testing Period
ending October 31, 2015.

NY 75946693

## EXHIBIT C

## SCHEDULE 6

*New Term Loan Specified Defaults*

The term "New Term Loan Specified Defaults" means the following Defaults or Events of Default:

(i)    The occurrence of a Default or an Event of Default under Section 8.1(k) as a result of the Collateral Agent Stock Turnover (as defined in the GTSA).

(ii)    The occurrence of a Default or an Event of Default under Section 8.1(a) arising from any non-payment of interest amounts on the Loans from the Forbearance Effective Date through and including January 4, 2016.

(iii)    The occurrence of a Default or an Event of Default under Section 8.1(e) of the Credit Agreement with respect to the Company's failure to comply with Section 5.1(f) of the Credit Agreement with respect to the delivery of notice of any Specified Default and the effects thereof, the entry into this Agreement, the occurrence of the Stock Turnover Date or any effect thereof, or any Material Adverse Effect resulting from the foregoing or the transactions contemplated hereby.

(iv)    The occurrence of an Event of Default under Section 8.1(c) of the Credit Agreement with respect to the disposition of Common Stock and Old Stock Certificate in connection with the transactions contemplated this Agreement and by the Escrow Agreement to the extent such transactions constitute a failure to comply with Section 6.9 or Section 6.10 of the Credit Agreement.

(v)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Credit Agreement with respect to the Company's failure to comply with Section 6.2 of the Credit Agreement as a result of the existence of: (i) Security Interest in favor of Enhanced Capital Connecticut Fund I, LLC dated November 15, 2011 which was recorded at Reel/Frame No. 4663/0854 of the United States Trademark Office; (ii) Security Interest in favor of First Union National Bank dated August 31, 2000 which was recorded at Reel/Frame No. 2148/0647 at the United States Trademark Office and at Reel Frame No. 11103/0163 at the United States Patent Office; (iii) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (iv) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(vi)    The occurrence of an Event of Default under Section 8.1(d) of the Credit Agreement with respect to the breach of any representation, warranty, certification or other statement made or deemed made in any Credit Document or in any statement or certificate at any time given by any Company Party or any of its Subsidiaries in writing pursuant to the Credit

Agreement solely as a result of the existence of the Specified Defaults, the entry into this Agreement, and the occurrence of the Stock Turnover Date.

(vii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Credit Agreement with respect to the ABL Specified Defaults, provided that the ABL Parties have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived such ABL Specified Defaults.

(viii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Credit Agreement with respect to the PIK Notes Specified Defaults, provided that the Supporting PIK Noteholders have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived, PIK Notes Specified Defaults.

(ix)    The occurrence of Events of Default arising under (u) Section 8.1(k) as a result of the Collateral Agent Stock Turnover (as defined in the GTSA), (v) Section 8.1(a) arising from any non-payment of interest amounts on the Loans from the Forbearance Effective Date through and including January 4, 2016, (w) Section 8.1(e) as a result of the failure to deliver a Financial Plan required under Section 5.1(i) for the Fiscal Year commencing October 1, 2015, (x) Section 8.1(e) as a result of the failure to deliver the certificate required to be delivered under section 9(b) of the GTSA for each of November 2015 and December 2015, the failure to comply with the GTSA Financial Covenants (as defined in the GTSA) set forth in section 9(c) of the GTSA and to deliver a compliance certificate in respect thereof, and the failure to deliver the certificate required to be delivered under section 9(k) of the GTSA for the ABL Testing Period (as defined in the GTSA) ending October 31, 2015, (y) Section 8.1(b)(iii) with respect to the "Specified Defaults" as defined in that certain Fifth Forbearance Agreement dated as of December 11, 2015, by and among Company, Holdings, certain subsidiaries of Company party thereto, Wilmington Savings Fund Society, FSB, and the lenders party thereto, and (z) Section 8.1(b)(iii) with respect to the "Existing Events of Default" as defined in that certain Forbearance Agreement and Amendment Number Ten to Loan, Guaranty and Security Agreement dated as of December 11, 2015 by and among Company, Holdings, certain subsidiaries of Company party thereto, Bank of America, N.A., as agent, and the lenders party thereto.

## EXHIBIT D

**FORM OF RELEASE OF GUARANTY AND SECURITY INTEREST**

[Attached]

*Execution Version*

## RELEASE OF GUARANTY AND SECURITY INTEREST

This **RELEASE OF GUARANTY AND SECURITY INTEREST** (this "**Guaranty and Lien Release**") is dated as of December 31, 2015 and is by and among **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent (together with its permitted successors and assigns in such capacity, "**Administrative Agent**") and Collateral Agent (together with its permitted successors and assigns in such capacity, "**Collateral Agent**"), **TARGUS GROUP HOLDINGS, INC.,** a Delaware corporation ("**Holdings**") and the Lenders signatory hereto. Capitalized terms used herein without definition shall have the same meanings herein as set forth in the Credit Agreement (as defined below).

## RECITALS

**WHEREAS,** Holdings has entered into that certain Credit and Guaranty Agreement, dated as of May 24, 2011, among Targus Group International, Inc. (the "**Company**"), as borrower, Holdings and certain subsidiaries of the Company, as Guarantors, the Lenders party thereto from time to time, Administrative Agent and Collateral Agent, as amended by that certain First Amendment Agreement, dated as of October 3, 2012, Second Amendment Agreement, dated as of August 27, 2013, Forbearance and Third Amendment Agreement, dated as of January 28, 2015, and Fourth Amendment Agreement, in each case, among the Company, Holdings and the various Persons party thereto (as amended, restated, supplemented or otherwise modified immediately prior to the date hereof, the "**Credit Agreement**");

**WHEREAS**, pursuant to (i) Article VII of the Credit Agreement, Holdings has guaranteed payment of all of the Obligations of the Company thereunder and incurred the Guaranteed Obligations in connection therewith (collectively, the "**Holdings Guaranty**") and (ii) the Pledge and Security Agreement, Holdings has granted the Collateral Agent (for the benefit of the Secured Parties) a security interest in and Liens on certain of its assets to secure the Obligations (the "**Holdings Lien**");

**WHEREAS**, the Lenders signatory hereto (the "**Requisite Lenders**") constitute the Requisite Lenders under and as defined in the Credit Agreement;

**WHEREAS**, Holdings has requested that (i) the Administrative Agent release Holdings from the Guaranty, (ii) the Collateral Agent release the Holdings Lien, and (iii) the Requisite Lenders consent to such releases, in each case, as provided for herein; and

**WHEREAS**, subject to the terms and conditions set forth below, the Requisite Lenders are willing to consent to, and based on such consent and at the direction of the Requisite Lenders as provided herein, the Administrative Agent and the Collateral Agent are willing to agree to, such release of Holdings from the Holdings Guaranty and such release of the Holdings Lien, in each case, as more fully set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.  RELEASE OF HOLDINGS GUARANTY AND LIEN

1.1    **Release**.

1.1.1    The (A) Administrative Agent hereby unconditionally and irrevocably (i) terminates the Holdings Guaranty and (ii) unconditionally and irrevocably releases and discharges Holdings of and from all obligations, liabilities, duties and covenants Holdings has or may have under the Holdings Guaranty, including, without limitation, the Guaranteed Obligations and (B) Collateral Agent hereby unconditionally and irrevocably releases and discharges the Holdings Lien against Holdings.

1.1.2    The Administrative Agent, the Collateral Agent and the Requisite Lenders hereby acknowledge and agree that as of the date hereof Holdings shall no longer constitute a "Guarantor" or "Loan Party" (in each case under and as defined in the Credit Agreement) or a "Grantor" (as defined in the Pledge and Security Agreement) for any and all intents and purposes of the Credit Documents.

1.2    **Consent to Release**.

The Requisite Lenders hereby consent to the release and discharge of (x) Holdings from the Holdings Guaranty and (y) the Holdings Lien, in each case, as set forth in Section 1.1.1 hereof.

## SECTION 2.  CONDITIONS PRECEDENT TO EFFECTIVENESS OF GUARANTY AND LIEN RELEASE

2.1    **Effectiveness of Guaranty and Lien Release**.

This Guaranty and Lien Release shall become effective as of the date first written above upon the satisfaction or waiver in writing by the Requisite Lenders of all of the following conditions precedent:

A.    **Documentation**.  The Administrative Agent, the Requisite Lenders and Holdings shall have duly executed and delivered this Guaranty and Lien Release .

B.    **GFTSA Amendment**.  The Administrative Agent and the Requisite Lenders shall have received a fully executed and effective copy of that certain First Amendment to Global Forbearance and Transaction Support Agreement and Wind Down Cooperation Agreement, dated as of the date hereof, by and among Holdings, the Company, the Administrative Agent and the other Persons party thereto.

## SECTION 3.  EXECUTION OF CERTAIN DOCUMENTS

Each of the Administrative Agent, Collateral Agent and the Requisite Lenders hereby authorizes Holdings (or any person or entity designated by Holdings as its delegate for this purpose) to file or record all Uniform Commercial Code termination statements with respect to all Uniform Commercial Code financing statements previously filed by the Administrative Agent or the Collateral Agent in connection with the Credit Documents with respect to the release and

2

discharge of the Holdings Lien pursuant to Section 1.1 hereof.  The Requisite Lenders further agree (at the sole cost and expense of Holdings) to direct the Administrative Agent and the Collateral Agent to execute, deliver or record such other termination statements, lien releases, discharges of security interests, and any other similar discharge or release documents, as Holdings may from time to time reasonably request, that are required by applicable law to effectuate, or reflect of public record, the release and discharge of the Holdings Lien pursuant to Section 1.1 hereof.

## SECTION 4.  REQUISITE LENDER DIRECTION

The Requisite Lenders (the "<u>Directing Lenders</u>") hereby direct the Administrative Agent and the Collateral Agent, to execute and deliver this Guaranty and Lien Release.  In addition, the Directing Lenders, in their capacity as the Requisite Lenders, hereby acknowledge and agree that (x) all of the directions in this Section 4 constitute a direction from the Requisite Lenders under the provisions of Section 9 of the Credit Agreement and all subsections thereof and (y) Sections 9.6, 10.2 and 10.3 of the Credit Agreement shall apply to any and all actions taken or not taken by the Administrative Agent and the Collateral Agent in accordance with such directions.

## SECTION 5.  MISCELLANEOUS

**A.**     **Reference to and Effect on the Credit Agreement**.

(i)     Except as specifically modified by this Guaranty and Lien Release, the Credit Agreement shall remain in full force and effect and is hereby ratified and confirmed.

**B.**     **Headings**.  Section and subsection headings in this Guaranty and Lien Release are included herein for convenience of reference only and shall not constitute a part of this Guaranty and Lien Release for any other purpose or be given any substantive effect.

**C.**     **Counterparts**.  This Guaranty and Lien Release may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.  Delivery of an executed counterpart of a signature page of this Guaranty and Lien Release by facsimile transmission or electronic transmission (in pdf or other viewing format) will be effective as delivery of a manually executed counterpart hereof.

**D.**     **GOVERNING LAW. THIS GUARANTY AND LIEN RELEASE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401).**

**E.**     **Release and Waiver.**  Holdings hereby (i) releases, acquits, and forever discharges each of the Agents (as defined in the Credit Agreement) and each of the Lenders, and

each and every past and present subsidiary, affiliate, stockholder, officer, director, agent, servant, employee, representative, and attorney of any of the Agents and/or Lenders, from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including reasonable attorneys' fees) of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, which Holdings may have or claim to have now or which may hereafter arise out of or connected with any act of commission or omission of any of the Agents or the Lenders existing or occurring prior to the date of this Guaranty and Lien Release, in each case, arising with respect to this Guaranty and Lien Release, the Credit Agreement, the other Credit Documents or the transactions consummated in connection herewith and therewith and (ii) waives any and all claims, counterclaims, causes of action, offsets, rights of recoupment, defenses and demands, whether known or unknown, arising on or before the date of this Guaranty and Lien Release, in each case, under or with respect to any of the Loans or Obligations or under any of the Credit Documents or the transactions entered into in connection therewith ; <u>provided</u>, that, such releases and waivers described in (i) and (ii) above shall not be applicable with respect to any claims, counterclaims, causes of action, offsets, suits, debts, liens, obligations, liabilities, losses, costs, expenses, demands, defenses or rights of recoupment resulting primarily from the gross negligence or willful misconduct of the Agents or the Lenders as determined by a court of competent jurisdiction pursuant to a final and nonappealable judgment.  The provisions of this Section 5.E. shall be binding upon Holdings and shall inure to the benefit of Agents and the Lenders and their respective subsidiaries, affiliates, stockholders, officers, directors, agents, employees, representatives, attorneys, executors, administrators, successors and assigns.

   **F. Covenant Not to Sue**.  Holdings, on behalf of itself and its affiliates, successors, assigns, and other legal representatives, hereby unconditionally and irrevocably agrees that it will not sue any Agent or any Lender in any capacity or any of their respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing (collectively, the "**Releasees**") on the basis of any and all liens, claims, interests, debts, controversies, damages, judgments, executions, demands, actions and causes of action of any kind or nature, known or unknown, suspected or unsuspected, both at law and in equity that such Credit Party now has or hereafter may have, which have been released, remised and discharged by the Credit Parties pursuant to Section 5.E. hereof. If any of Holdings or any of their respective affiliates, successors, assigns or other legal representatives violates the foregoing covenant, Holdings, for itself and its affiliates, successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

**SECTION 6.  EFFECT OF GUARANTY AND LIEN RELEASE.**

   **A.** Except as expressly set forth herein, this Guaranty and Lien Release shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders, the Administrative Agent, the Supplemental Agent or the Collateral Agent under the Credit Agreement or any other Credit Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of the Credit Agreement or of any

4

other Credit Documents, all of which are ratified, confirmed, and affirmed in all respects and shall continue in full force and effect.  This Guaranty and Lien Release shall in no manner affect (other than expressly provided herein) or impair the Obligations or the Liens which have been granted to secure the payment and performance thereof.  Nothing herein shall be deemed to entitle any person to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Credit Document in similar or different circumstances.  Except as expressly set forth herein, the execution, delivery and effectiveness of this Guaranty and Lien Release shall not operate as a waiver of any right, power or remedy of the Administrative Agent, Collateral Agent, Supplemental Agent or Lenders, nor constitute a waiver of any provision of the Credit Agreement or the other Credit Documents or be deemed or construed to constitute a course of dealing or any other basis for altering the Obligations of any Credit Party.

**B.**    This Guaranty and Lien Release shall constitute a Credit Document for all purposes of the Credit Agreement and shall be administered and construed pursuant to the terms of the Credit Agreement (including, without limitation, Section 10 of the Credit Agreement).

*[Remainder of page intentionally left blank.]*

5

**IN WITNESS WHEREOF**, the parties hereto have caused this Guaranty and Lien Release to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**HOLDINGS:**

**TARGUS GROUP HOLDINGS, INC.**

By: _____

Name:

Title:

**AGENT:**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent

By: _____
Name:
Title:

**REQUISITE LENDERS:**

[_____]

By: _____
Name:
Title:

## EXHIBIT D TO THE DISCLOSURE STATEMENT

**CONFORMED COPY OF THE GLOBAL FORBEARANCE AND TRANSACTION SUPPORT AGREEMENT PROVIDED FOR INFORMATIONAL PURPOSES ONLY**

<u>*Conformed Version*</u>
<u>*(including First Amendment Dated as of December 31, 2015)*</u>

**GLOBAL FORBEARANCE AND TRANSACTION SUPPORT AGREEMENT**

**Dated as of May 21, 2015**

**among**

**Targus Group International, Inc.,**

**Targus Group Holdings, Inc.,**

**Targus Holdings, Inc.,**

**Certain Subsidiaries of Targus Group International, Inc., as Guarantors,**

**Supporting Term Lenders,**

**Wilmington Trust, National Association, as Administrative Agent,**

**Wilmington Trust, National Association, as the Collateral Agent,**

**Cortland Capital Market Services LLC, as Supplemental Agent,**

**New Term Loan Lenders,**

**Wilmington Savings Fund Society, FSB, as New Term Loan Administrative Agent,**

**Wilmington Savings Fund Society, FSB, as New Term Loan Collateral Agent,**

**Supporting PIK Noteholders,**

**and**

**Law Debenture of New York, as PIK Note Administrative Agent**

# TABLE OF CONTENTS

| | | Page |
|---|---|---|

1.        Definitions and Rules of Interpretation .................................................................4

2.        Agreement Effective Date ...........................................................................................14

3.        The Escrow of the Common Stock ............................................................................15

    (a)        Delivery of Common Stock .................................................................................15
    (b)        Collateral Agent Stock Turnover ........................................................................15
    (c)        Holdings Stock Turnover ....................................................................................16
    (d)        Agreements with Respect to Escrow and Stock Turnover ................................17

4.        Rights with Respect to Common Stock While in Escrow Account .......................17

5.        Marketing Period; the Transactions ........................................................................18

    (a)        Escrow Release Transaction ...............................................................................18
    (b)        Acceptable Pre-Turnover Transaction ................................................................18
    (c)        Stock Turnover Transaction ................................................................................19
    (d)        [Intentionally Deleted] .......................................................................................20
    (e)        [Intentionally Deleted] .......................................................................................20
    (f)        [Intentionally Deleted] .......................................................................................20
    (g)        Means of Implementation ...................................................................................20
    (h)        Non-Consensual Bankruptcy Filing Prior to Stock Turnover ..........................21

6.        Forbearance Period ....................................................................................................21

    (a)        Supporting Term Lender Forbearance ...............................................................21
    (b)        Supporting PIK Noteholder Forbearance ..........................................................22

7.        [Intentionally Deleted] ...............................................................................................22

8.        Effect of Term Loan Forbearance Termination .....................................................22

9.        The Company Parties' Obligations ...........................................................................22

    (a)        Support .................................................................................................................22
    (b)        Payment of Interest ............................................................................................23
    (c)        Financial Covenants ...........................................................................................23
    (d)        Information Rights ..............................................................................................23
    (e)        Company Parties' Indemnification ....................................................................24
    (f)        Fiduciary Duties ..................................................................................................25
    (g)        No Interference ....................................................................................................26
    (h)        Limitations on Indebtedness ...............................................................................26
    (i)        Limitations on Liens ...........................................................................................26
    (j)        Limitations on Restricted Junior Payments .......................................................27
    (k)        Limitation on Amount Outstanding of Revolver Loans .....................................27
    (l)        Payment of Trade Payables ................................................................................28
    (m)        Release of Certain Security Interests in Intellectual Property ..........................28

-i-

| | | | |
|---|---|---|---|
| (n) | | Limitations on Equity Transactions | 28 |
| (o) | | Payment of Fees and Expenses | 29 |
| (p) | | [Intentionally Deleted] | 29 |
| (q) | | Turnover of Certain Amounts | 29 |
| 10. | | The Supporting Term Lenders' Obligations | 29 |
| (a) | | Support | 29 |
| (b) | | Support in Prepackaged Bankruptcy | 30 |
| (c) | | Forbearance | 30 |
| (d) | | Direction to Collateral Agent, Supplemental Agent and Administrative Agent | 30 |
| (e) | | No Interference | 30 |
| (f) | | Compliance with this Agreement | 30 |
| (g) | | Certain Rights Unaffected | 30 |
| 11. | | The New Term Lenders' Obligations | 31 |
| (a) | | Support | 31 |
| (b) | | Support in Prepackaged Bankruptcy | 31 |
| (c) | | No Interference | 31 |
| (d) | | Compliance with this Agreement | 31 |
| (e) | | Direction to New Term Loan Administrative Agent and Collateral Agent | 31 |
| (f) | | Certain Rights Unaffected | 32 |
| 12. | | The Supporting PIK Noteholders' Obligations | 32 |
| (a) | | Support | 32 |
| (b) | | Support in Prepackaged Bankruptcy | 32 |
| (c) | | No Enforcement of Remedies | 33 |
| (d) | | No Interference | 33 |
| (e) | | No Acceleration | 33 |
| (f) | | Compliance with this Agreement | 33 |
| (g) | | Direction to PIK Note Administrative Agent | 33 |
| 13. | | Trust for the Benefit of Holdings and Parent | 34 |
| 14. | | No Withdrawal of Support | 34 |
| 15. | | Acknowledgements | 34 |
| 16. | | Limitations on Transfers | 34 |
| (a) | | Transfers | 34 |
| (b) | | Qualified Marketmaker | 35 |
| (c) | | Additional Claims | 35 |
| (d) | | Exceptions; Termination of Transfer Restriction | 36 |
| 17. | | Further Assurances | 36 |
| 18. | | The Company Parties' Representations and Warranties | 36 |

-ii-

(a)         Authority ..................................................................................36
(b)         Validity ....................................................................................36
(c)         No Conflict ...............................................................................36
(d)         Authorization of Governmental Authorities and Creditors ...............................36
(e)          No Reliance .............................................................................37
(f)         Integrated Agreement ................................................................37
(g)         No Other Agreements, etc ..........................................................37
(h)         Ratifications of Term Loan Obligations under the Term Loan Credit
            Agreement by the Company Parties ...........................................37
(i)         Ratifications of Obligations under the PIK Notes by the Company
            Parties.....................................................................................38
(j)         No Defaults ..............................................................................38
(k)         Corporate Structure; Common Stock..........................................38

19.         The Creditor Parties' Representations and Warranties ...........................38
(a)         Authority ..................................................................................39
(b)         Validity ....................................................................................39
(c)         No Conflict ...............................................................................39
(d)         Authorization of Governmental Authorities and Creditors .......................39
(e)          No Reliance .............................................................................39
(f)         Title .........................................................................................39
(g)         Integrated Agreement ................................................................40
(h)          No Other Agreements, etc .........................................................40

20.         Releases....................................................................................40

21.         Governing Law; Jurisdiction........................................................41

22.         Entire Agreement .......................................................................41

23.         Amendment or Waiver ................................................................41

24.         Specific Performance; Remedies Cumulative ................................41

25.         Construction ..............................................................................42

26.         Receipt of Information; Representation by Counsel.............................42

27.         Binding Effect; Successors and Assigns.........................................42

28.         Counterparts ..............................................................................42

29.         Headings; Schedules and Exhibits ...............................................42

30.         Severability and Construction......................................................43

31.         Waiver of Jury Trial....................................................................43

32.         Notices .....................................................................................43

33.         Consideration ............................................................................46

34.         No Third-Party Beneficiaries.......................................................46

35.         Confidentiality ...........................................................................46

36.         No Public Announcement ............................................................46

37.      Reservation of Rights..................................................................................47

38.      No Admissions..........................................................................................47

39.      Termination; Survival ..............................................................................47

NY 75934768v10

This Global Forbearance and Transaction Support Agreement (this "Agreement") is entered into effective as of the Agreement Effective Date (defined below) by and among Targus Group International, Inc., a Delaware corporation (the "Company"), Targus Group Holdings, Inc., a Delaware corporation ("Holdings"), Targus Holdings, Inc., a Delaware corporation ("Parent"), the Guarantors (defined below and together with the Company, Holdings and Parent, individually a "Company Party" and, collectively, the "Company Parties"), the Term Lenders (defined below) party hereto (in their capacities as such, the "Supporting Term Lenders"), the Administrative Agent (defined below), the Collateral Agent (defined below), the Supplemental Agent (defined below), the New Term Loan Secured Parties (defined below), the holders of Parent PIK Notes (defined below) party hereto (the "Supporting Parent PIK Noteholders"), the holders of Holdings PIK Notes (defined below) party hereto (the "Supporting Holdings PIK Noteholders" and together with the Supporting Parent PIK Noteholders, the "Supporting PIK Noteholders"), and the PIK Note Administrative Agent (defined below and together with the Supporting Term Lenders, the Administrative Agent, the Collateral Agent, the New Term Loan Secured Parties, and the Supporting PIK Noteholders, and each Term Lender, holder of PIK Notes or New Term Lender (defined below) that is or becomes a party to this Agreement after the Agreement Effective Date, individually a "Creditor Party" and collectively, the "Creditor Parties"). Each of the Company Parties and each of the Creditor Parties, and any other Person (defined below) that is or becomes a party to this Agreement after the Agreement Effective Date, is individually a "Party" and are collectively the "Parties."

## RECITALS

WHEREAS:

A.    The Company entered into that certain Credit and Guaranty Agreement, dated as of May 24, 2011, by and among the Company, Holdings, certain subsidiaries of the Company, as Guarantors, the Term Lenders, the Agents (as such terms are defined therein) party thereto from time to time and the other entities party thereto from time to time (as amended, supplemented or otherwise modified from time to time, the "Term Loan Credit Agreement");

B.    The Company entered into that certain Loan, Guaranty and Security Agreement, dated as of May 24, 2011, by and among the Company, as borrower, Holdings and certain subsidiaries of the Company, as guarantors, and Bank of America, N.A., as lender and agent (the "ABL Parties") (as amended, supplemented or otherwise modified from time to time, the "ABL Facility");

C.    Parent issued two series of 10% Senior Unsecured Notes due June 14, 2019 (as amended, supplemented or otherwise modified from time to time, the "Parent PIK Notes") pursuant to (i) that certain Amended and Restated Note Purchase Agreement, dated as of May 24, 2011, among Parent and the purchasers signatory thereto and (ii) that certain Note Purchase Agreement (together, the "Parent Note Purchase Agreements"), dated as of October 26, 2014, by and among Parent and the purchasers signatory thereto (the holders of both such series of Parent PIK Notes, the "Parent PIK Note Holders");

D.    Holdings issued 16% Senior Unsecured Notes due October 26, 2018 (as amended, supplemented or otherwise modified from time to time, the "Holdings PIK Notes" and

together with the "Parent PIK Notes", collectively, the "PIK Notes") pursuant to that certain Note Purchase Agreement (the "Holdings Note Purchase Agreement" and together with the Parent Note Purchase Agreements, the "Note Purchase Agreements" and each a "Note Purchase Agreement"), dated as of October 16, 2012, among Holdings and the purchasers signatory thereto (the "Holdings PIK Note Holders" and together with the Parent PIK Note Holders, collectively, the "PIK Note Holders");

   E. Law Debenture Trust Company of New York serves as administrative agent (in such capacity, the "PIK Note Administrative Agent") for (i) the Parent PIK Note Holders pursuant to that certain Agency Agreement dated March 27, 2015, among Parent, Law Debenture Trust Company of New York and the holders of the Parent PIK Notes issued under the Parent Note Purchase Agreement dated as of May 24, 2011, and that certain Agency Agreement dated March 27, 2015, among Parent, Law Debenture Trust Company of New York and the holders of the Parent PIK Notes issued under the Parent Note Purchase Agreement dated as of October 26, 2014 (collectively, the "Parent PIK Note Agency Agreement") and (ii) the Holdings PIK Note Holders pursuant to that certain Agency Agreement dated March 27, 2015 among Holdings, Law Debenture Trust Company of New York and the Holdings PIK Note Holders (the "Holdings PIK Note Agency Agreement");

   F. Substantially contemporaneously herewith, the Company Parties (other than Parent) and the New Term Loan Secured Parties will be entering into the New Term Loan Agreement (defined below);

   G. One or more Events of Default (as defined in the ABL Facility) set forth on Schedule 3 (the "ABL Specified Defaults") have occurred under the ABL Facility or are likely to occur under the ABL Facility during the Forbearance Period (defined below);

   H. One or more Events of Default (as defined in the Term Loan Credit Agreement) set forth on Schedule 4 (the "Term Loan Specified Defaults") have occurred under the Term Loan Credit Agreement or are likely to occur under the Term Loan Credit Agreement during the Forbearance Period;

   I. One or more Events of Default (as defined in the Note Purchase Agreements) set forth on Schedule 5 (the "PIK Notes Specified Defaults") have occurred under the Note Purchase Agreements or are likely to occur under the Note Purchase Agreements during the Forbearance Period;

   J. One or more Events of Default (as defined in the New Term Loan Agreement) set forth on Schedule 6 (the "New Term Loan Specified Defaults") have occurred under the New Term Loan Agreement or are likely to occur under the New Term Loan Agreement during the Forbearance Period;

   K. The Company Parties and Term Lenders constituting the Requisite Lenders entered into (i) that certain Forbearance and Third Amendment Agreement, dated as of January 28, 2015; (ii) that certain Second Forbearance Agreement, dated as of February 13, 2015 (as amended and extended); (iii) that certain Third Forbearance Agreement, dated as of April 2, 2015; (iv) that certain Fourth Forbearance Agreement, dated as of November 13, 2015; and (v)

-2-

that certain Fifth Forbearance Agreement, dated as of December 11, 2015, as extended from time to time, whereby such Term Lenders agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to certain of the Term Loan Specified Defaults, subject to the terms and conditions of such agreements (the "Term Loan Forbearance Agreements");

L.    The Company Parties and the ABL Parties entered into (i) that certain Forbearance Agreement and Amendment Number Six to Loan, Guaranty and Security Agreement, dated as of January 28, 2015; (ii) that certain Forbearance Agreement, dated as of February 13, 2015 (as amended and extended); (iii) that certain Forbearance Agreement and Amendment Number Seven to Loan, Guaranty and Security Agreement, dated as of April 24, 2015; (iv) that certain Forbearance Agreement and Amendment Number Eight to Loan Guaranty and Security Agreement dated as of May 21, 2015 (the "ABL Fourth Forbearance Agreement"); (v) that certain Forbearance Agreement and Amendment Number Nine to Loan Guaranty and Security Agreement dated as of November 11, 2015; and (vi) that certain Forbearance Agreement and Amendment Number Ten to Loan Guaranty and Security Agreement dated as of December 11, 2015, whereby the ABL Parties agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to the ABL Specified Defaults, subject to the terms and conditions of such agreements (the "ABL Forbearance Agreements");

M.    The Company Parties and the New Term Lenders entered into (i) that certain First Forbearance Agreement, dated as of November 13, 2015; and (ii) that certain Second Forbearance and Amendment Agreement, dated as of December 11, 2015, whereby the New Term Lenders agreed, among other things, to forbear from exercising rights and remedies against the Company Parties with respect to the New Term Loan Specified Defaults, subject to the terms and conditions of such agreements (the "New Term Loan Forbearance Agreements");

N.    The Supporting Term Lenders wish to further forbear from exercising rights and remedies against the Company Parties with respect to the Term Loan Specified Defaults in connection with this Agreement, subject to the terms and conditions set forth herein;

O.    The Parties have negotiated in good faith at arm's-length and agreed to a further forbearance period to support (x) the Company Parties' efforts to effect a sale of all or substantially all of their assets or a refinancing of their debt obligations that results in an Escrow Release Transaction (defined below) prior to a Collateral Agent Stock Turnover (defined below), (y) the transfer of the Common Stock (defined below) to the Collateral Agent pursuant to a Collateral Agent Stock Turnover and/or (z) the payment of the Transaction Consideration (defined below), as applicable (collectively, the "Transactions"), subject to and consistent with the terms and conditions set forth in this Agreement;

P.    Absent the deposit of the Common Stock and the New Stock Certificate (defined below) into the Escrow Account (defined below) as provided herein, the Supporting Term Lenders would not agree to continue to forbear on the terms provided herein from the exercise of rights and remedies otherwise available to them, the exercise of which would result in material disruption of the Company's operations and deterioration of the value of the Company Parties, including the Company; and

-3-

Q.    The Transactions and the transactions contemplated in the Escrow Agreement and in the New Term Loan Agreement are part of a single negotiated and integrated transaction by and among the Parties to each such agreement without which (x) the Supporting Term Lenders would not agree to continue to forbear on the terms provided herein from the exercise of rights and remedies otherwise available to them; (y) the Company Parties would be subject to the exercise of such rights and remedies; and (z) the Company Parties would need to seek alternatives in order to preserve their value.

NOW, THEREFORE, in consideration of the recitals stated above and the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties agrees as follows:

1.    Definitions and Rules of Interpretation.  For purposes of this Agreement, the defined terms used herein shall have the respective meanings set forth below:

"ABL Parties" has the meaning set forth in Recital B of this Agreement.

"ABL Facility" has the meaning set forth in Recital B of this Agreement.

"ABL Forbearance Agreements" has the meaning set forth in Recital L of this Agreement.

"ABL Fourth Forbearance Agreement" has the meaning set forth in Recital L of this Agreement.

"ABL Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement, dated as of May __, 2015, by and among the Company Parties (other than Parent), the ABL Parties, the Collateral Agent, the Supplemental Agent and the New Term Loan Collateral Agent, as amended, supplemented or otherwise modified from time to time.

"ABL Obligations" means the outstanding Obligations (as such term is defined in the ABL Facility).

"ABL Specified Defaults" has the meaning set forth in Recital G of this Agreement.

"ABL Testing Period" has the meaning set forth in Section 9(k) of this Agreement.

"Acceptable Pre-Turnover Transaction" has the meaning set forth in Section 5(b) of this Agreement.

"Acceptable Pre-Turnover Transaction Consideration" has the meaning set forth in Section 5(b) of this Agreement.

"Administrative Agent" has the meaning set forth in the Term Loan Credit Agreement.

"Agreement" has the meaning set forth in the preamble hereto.

-4-

"<u>Agreement Effective Date</u>" has the meaning set forth in Section 2 of this Agreement.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"<u>Blackstone</u>" means Blackstone Advisory Partners, L.P. before the date of the establishment of the new advisory practice, and thereafter PJT Partners.

"<u>Blackstone Consultation</u>" means consultation with Blackstone by the Restructured Board in connection with the valuation of the components of the Transaction Consideration; provided, that, any such valuation shall not require a fairness opinion.

"<u>Business Day</u>" has the meaning set forth in the Term Loan Credit Agreement.

"<u>Carlyle Group Entities</u>" means Carlyle Mezzanine Partners, L.P.

"<u>Challenge Claim</u>" has the meaning set forth in Section 9(e) of this Agreement.

"<u>Chosen Courts</u>" has the meaning set forth in Section 21(b) of this Agreement.

"<u>Collateral</u>" has the meaning set forth in the Term Loan Credit Agreement.

"<u>Collateral Agent</u>" has the meaning set forth in the Term Loan Credit Agreement.

"<u>Collateral Agent Stock Turnover</u>" has the meaning set forth in Section 3(b) of this Agreement.

"<u>Collateral Agent Stock Turnover Date</u>" has the meaning set forth in Section 3(b) of this Agreement.

"<u>Collateral Documents</u>" has the meaning set forth in the Term Loan Credit Agreement.

"<u>Common Stock</u>" means the common stock, par value $0.01 of the Company.

"<u>Common Stock Liens</u>" has the meaning set forth in Section 3(b) of this Agreement.

"<u>Company</u>" has the meaning set forth in the preamble hereto.  For the avoidance of doubt, the Company shall include the Restructured Company from and after the Collateral Agent Stock Turnover.

"<u>Company Parties</u>" has the meaning set forth in the preamble hereto.

"<u>Compliance Certificate</u>" has the meaning set forth in Section 9(c) of this Agreement.

"<u>Consideration</u>" means cash, equity (including preferred equity), debt (including new debt or rolled-over debt), tangible assets or other tangible property received on account of an Equity Interest in any of the Company Parties or a debt claim against any of the Company Parties.

-5-

"Contingent Amounts" means, with respect to any Relevant Transaction, Net Proceeds of such Relevant Transaction that are receivable after the closing thereof.

"Covenant Testing Date" has the meaning set forth in Section 9(c) of this Agreement.

"Creditor Party" has the meaning set forth in the preamble hereto.

"Debt Instruments" means, collectively, the Term Loan Credit Agreement, the New Term Loan Agreement and the PIK Notes.

"Designated Entity" means, the newly-formed entity designated by the Purchaser to assume the monetary obligations due and payable to Holdings and Parent set forth in Sections 5(c) and 9(e) of this Agreement and the obligations set forth in Sections 2.3, 2.5 and 2.6 of the First Amendment.

"Equity Interest" has the meaning set forth in the Term Loan Credit Agreement (and the correlative meaning with respect to the Restructured Company).

"Escrow Account" means the escrow account established pursuant to the Escrow Agreement and governed by the terms of such Escrow Agreement.

"Escrow Agent" means U.S. Bank National Association, the escrow agent under the Escrow Agreement, together with its successors and assigns under the Escrow Agreement.

"Escrow Agreement" means that certain Escrow Agreement, to be entered into substantially contemporaneously with the Agreement Effective Date, in the form attached hereto as Exhibit A.

"Escrow Release Transaction" means either (x) a Term Lender Payoff or (y) an Acceptable Pre-Turnover Transaction.

"Estate Representative" has the meaning set forth in Section 9(e) of this Agreement.

"Excess Availability Condition" has the meaning ascribed to such term in Section 9(b) of this Agreement.

"First Amendment" means the First Amendment to this Agreement, dated as of December 31, 2015, by and among the Company Parties and the Creditor Parties.

"Forbearance Period" means the period beginning on the Agreement Effective Date and ending on the respective date of the termination of the forbearance period set forth in each of the Term Loan Forbearance Agreements, the ABL Forbearance Agreements and the New Term Loan Forbearance Agreements.

"Foreclosure Transaction" has the meaning set forth in Section 5(c) of this Agreement.

"Fourth Amendment Agreement" means that certain Fourth Amendment Agreement, dated on or about the Agreement Effective Date, by and among the Company, Holdings, the

-6-

Guarantors, the Administrative Agent, the Collateral Agent and the Supplemental Agent, substantially in the form attached hereto as Exhibit D.

"Funded Amount" means $700,000 to be deposited into a segregated account at Holdings on or before the earlier of (i) the commencement of a Prepackaged Bankruptcy or (ii) the earlier of (a) the date on which an Acceptable Pre-Turnover Transaction is consummated and (b) the Collateral Agent Stock Turnover Date, which funds shall be available solely for the benefit of Holdings and Parent to be used, solely in the event of an Acceptable Pre-Turnover Transaction or a Collateral Agent Stock Turnover, to pay all reasonable fees and expenses, including the reasonable and documented professionals' fees and costs, of Holdings and Parent necessary to facilitate the wind down of Holdings and Parent whether through a Prepackaged Bankruptcy or otherwise, and to oversee and facilitate the receipt and distribution of the Transaction Consideration, including, without limitation, fees and expenses of Holdings and Parent necessary to appoint a disbursement agent or to establish a liquidating trust and to appoint a liquidating trustee; provided, that $200,000 of the Funded Amount shall be available solely for the fees and expenses of such fiduciary overseeing the winddown of Parent and/or Holdings. In the event that any portion of the Funded Amount remains after the payment of all fees and expenses described herein, then the remainder shall constitute a portion of the Stock Turnover Transaction Consideration. For the avoidance of doubt, no portion of the Funded Amount shall be used to challenge (x) the liens and/or claims under the Term Loan Credit Documents or New Term Loan Agreement or (y) the validity and/or enforceability of the Transactions or the transactions contemplated by the Escrow Agreement.

"GTSA Adjusted EBITDA" means, for any period, Consolidated Adjusted EBITDA (as defined in the Term Loan Agreement), adjusted to: (i) exclude any limitation on addbacks as specified in (h) of the definition of Consolidated Adjusted EBITDA; (ii) exclude the impacts of foreign currency to the extent that actual rates for such period are different than those assumed in the draft budget of the Company Parties for Fiscal Year 2015; (iii) substitute the term GTSA Transaction Costs for the term "Transaction Costs" used in clause (f) of the definition of Consolidated Adjusted EBITDA; and (iv) for the avoidance of doubt, include within clause (h) any employee retention bonuses paid during such period.

"GTSA Transaction Costs" means the fees, costs and expenses payable by Holdings, the Company or any of the Company's Subsidiaries in connection with the negotiation, execution and delivery of this Agreement and the potential restructuring or workout of the obligations under the Debt Instruments, including, without limitation, the fees and costs of all professional advisors engaged by the Company Parties in connection therewith.

"Guarantors" has the meaning set forth in the Term Loan Credit Agreement.

"Holdings" means Targus Group Holdings, Inc., a Delaware corporation, and any successor thereto.

"Holdings Note Purchase Agreement" has the meaning set forth in Recital D of this Agreement.

-7-

"Holdings Obligations" means the obligation of the Company or the Restructured Company (including a Purchaser pursuant to a Foreclosure Transaction or otherwise), as applicable, to pay the Transaction Consideration and the Funded Amount to Holdings in accordance with and subject to the terms and conditions of this Agreement.

"Holdings PIK Note Agency Agreement" has the meaning set forth in Recital E of this Agreement.

"Holdings PIK Notes" has the meaning set forth in Recital D of this Agreement.

"Holdings PIK Note Holders" has the meaning set forth in Recital D of this Agreement.

"Holdings Stock Release Direction" has the meaning set forth in section 3(c) of this Agreement.

"Holdings Stock Turnover" has the meaning set forth in Section 3(b) of this Agreement.

"Holdings Stock Turnover Date" has the meaning set forth in Section 3(b) of this Agreement.

"Independent Valuation" means a valuation conducted by Duff & Phelps, Mesirow Financial Consulting or another valuation firm mutually agreed to by the Requisite Supporting PIK Noteholders and the Requisite Supporting Term Lenders; provided, that any such valuation shall not require a fairness opinion.    The fees of any valuation firm for any Independent Valuation shall be paid by, and shall be the sole and exclusive responsibility of, the Restructured Company; provided that such fees shall not exceed $200,000 in the aggregate for all Independent Valuations.

In connection with any event or transaction that would permit Holdings (or any liquidating trustee or similar agent for Holdings) to request an Independent Valuation in accordance with the terms of this Agreement (any such event or transaction, a "Valuation Event"), the Requisite Supporting Term Lenders or the Restructured Company, as applicable, shall provide written notice (a "Valuation Notice") via overnight certified mail and electronic copy to Holdings and its counsel of the value determined by the Requisite Supporting Term Lenders or the Restructured Board, as applicable, in connection with such Valuation Event as soon as reasonably practicable after the Requisite Supporting Term Lenders or the Restructured Board, as applicable, makes such determination or, if the Requisite Supporting Term Lenders or the Restructured Board are not required to make a value determination in connection with such Valuation Event, the occurrence of such Valuation Event.    Subject to further extension of time as agreed to by the Requisite Supporting Term Lenders or the Restructured Board, as applicable, in their sole discretion, Holdings shall have seven (7) days after receipt of the Valuation Notice (the "Valuation Request Deadline") to deliver a request for an Independent Valuation with respect to the applicable Valuation Event.    If Holdings fails to deliver a request for an Independent Valuation within such three-Business Day period, Holdings shall be deemed to have irrevocably waived its right to request an Independent Valuation with respect to the applicable Valuation Event and the valuation set forth in the Valuation Notice shall be dispositive.

"Instruments of Transfer" has the meaning set forth in Section 3(a)(iii) of this Agreement.

-8-

"Intercreditor Agreements" means, together, the ABL Intercreditor Agreement and the Term Intercreditor Agreement.

"Joint Venture" has the meaning set forth in the Term Loan Credit Agreement.

"Net Proceeds" means, with respect to any Relevant Transaction, an amount equal to: (i) the Proceeds from such Relevant Transaction, minus (ii) any bona fide direct fees, costs or expenses incurred in connection with such Relevant Transaction and payable to non-affiliated third parties, including, without limitation, (a) income or gains taxes paid or reasonably estimated to be payable by the seller as a result of any gain recognized in connection with such Relevant Transaction, (b) sale, use, stock transfer, real property transfer, transfer, stamp, registration, documentary, recording or similar taxes paid or reasonably estimated to be payable by the seller in connection with such Relevant Transaction, (c) reasonable and customary discounts, commissions and similar amounts payable to non-affiliated third parties, (d) all payments made, and installment payments required to be made on any indebtedness that is secured by any assets subject to such Relevant Transaction (including, without limitation, the ABL Obligations and the New Term Loan Obligations), in accordance with the terms of any lien upon such assets, or that must by its terms, or in order to obtain a necessary non-affiliated third party consent to such Relevant Transaction, or by applicable law, be repaid out of the proceeds from such Relevant Transaction, in each case, other than amounts payable to any Creditor Party on account of the Term Loan Obligations or the PIK Notes, as applicable, and (e) a reasonable reserve for any indemnification payments (fixed or contingent) or purchase price adjustments in respect of such Relevant Transaction, in each case, to the extent not funded with the Funded Amount.

"Net Sales" means net sales calculated in accordance with GAAP and consistent with the Company's past practice. The calculation of Net Sales for any period shall exclude the impact of foreign currency to the extent that actual rates for such period are different than those assumed in the draft budget of the Company Parties for Fiscal Year 2015.

"New Stock Certificate" has the meaning set forth in Section 3(a)(i) of this Agreement.

"New Term Lenders" means the lenders under the New Term Loan Agreement, in their capacities as such; provided, that following an equitization or other conversion of the New Term Loan Obligations or any portion thereof, "New Term Lenders" shall include holders of such Equity Interests or other securities or debt into which the Term Loan or such portion was converted, and their transferees; provided, that the term "New Term Lenders" shall not include the transferee of any such debt claims or Equity Interests pursuant to a Relevant Transaction.

"New Term Loan Agreement" means a term loan agreement to be entered into substantially contemporaneously with the Agreement Effective Date in the form attached hereto as Exhibit C, which will provide for term loans to be made to the Company in an aggregate principal amount of $20 million, and the other agreements related thereto, including, but not limited to, the Term Intercreditor Agreement.

"New Term Loan Administrative Agent" has the meaning ascribed to the term "Administrative Agent" set forth in the New Term Loan Documents.

-9-

"New Term Loan Collateral Agent" has the meaning ascribed to the term "Collateral Agent" set forth in the New Term Loan Documents.

"New Term Loan Documents" has the meaning ascribed to the term "Credit Documents" set forth in the New Term Loan Agreement.

"New Term Loan Forbearance Agreements" has the meaning set forth in Recital M of this Agreement.

"New Term Loan Obligations" has the meaning ascribed to the term "Obligations" set forth in the New Term Loan Agreement.

"New Term Loan Secured Parties" has the meaning ascribed to the term "Secured Parties" set forth in the New Term Loan Agreement.

"Non-Consensual Bankruptcy Filing" has the meaning ascribed to such term in Section 5(h).

"Note Purchase Agreements" has the meaning set forth in Recital D of this Agreement.

"Original Stock Certificate" means any certificate evidencing the Common Stock and Holdings as the record owner thereof.

"Outside Time" means October 30, 2015, at 5:00 p.m. (New York City time).

"Parent" means Targus Holdings, Inc., a Delaware corporation, and any successor thereto.

"Parent PIK Note Agency Agreement" has the meaning set forth in Recital E of this Agreement.

"Parent PIK Notes" has the meaning set forth in Recital C of this Agreement.

"Parent PIK Note Holders" has the meaning set forth in Recital C of this Agreement.

"Parent Note Purchase Agreements" has the meaning set forth in Recital C of this Agreement.

"Party" has the meaning set forth in the preamble hereto.

"Person" has the meaning set forth in the Term Loan Credit Agreement.

"PIK Note Administrative Agent" has the meaning set forth in Recital E of this Agreement and evidenced by the signature page for the specific issuance of Parent PIK Notes and Holdings PIK Notes.

"PIK Notes" means the Holdings PIK Notes and the Parent PIK Notes.

"PIK Note Specified Defaults" are listed on Schedule 5 hereto.

-10-

"Pre-Turnover Transaction" has the meaning set forth in Section 5(a) of this Agreement

"Prepack Documents" means the prepackaged chapter 11 plan (the "Prepackaged Plan"), the related disclosure statement, all material pleadings to be filed in the Prepackaged Bankruptcy and all other related material documents for the Prepackaged Bankruptcy, all of which shall be reasonably acceptable in form and substance to the Company Parties and the Requisite Supporting Term Lenders.

"Prepackaged Bankruptcy" means prepackaged cases of Holdings and/or Parent under chapter 11 of the Bankruptcy Code, to be implemented pursuant to the Prepack Documents.

"Prepackaged Plan" has the meaning set forth in the definition of Prepack Documents.

"Proceeds" means proceeds received from a Relevant Transaction, including, but not limited to, cash, equity, preferred equity and/or debt (including new debt or rolled-over debt).

"Purchaser" has the meaning set forth in Section 5(c) of this Agreement.

"Qualified Marketmaker" has the meaning set forth in Section 16(b) of this Agreement.

"Qualified Transfer" has the meaning set forth in Section 16(b) of this Agreement.

"Release Effective Date" has the meaning set forth in Section 20 of this Agreement.

"Relevant Transaction" means an Acceptable Pre-Turnover Transaction.

"Requisite Lenders" has the meaning set forth in the Term Loan Credit Agreement.

"Requisite Supporting PIK Noteholders" means Supporting PIK Noteholders constituting the Required Holders (as defined in the PIK Notes).

"Requisite Supporting Term Lenders" means Supporting Term Lenders constituting the Requisite Lenders.

"Restructured Board" means the board of directors of the Restructured Company.

"Restructured Company" means the Company or any successor entity after a Collateral Agent Stock Turnover, but does not include any purchaser of the equity or assets of the Company and its U.S. Subsidiaries pursuant to a Foreclosure Transaction or otherwise.

"Sale Transaction" has the meaning set forth in Section 5(a) of this Agreement.

"Specified Defaults" means, collectively, the Term Loan Specified Defaults, the ABL Specified Defaults and the PIK Note Specified Defaults.

"Stock Turnover Transaction Consideration" has the meaning set forth in Section 5(c).

"Stock Turnover Date" means the Collateral Agent Stock Turnover Date or the Holdings Stock Turnover Date, as applicable.

-11-

"Stub Payment Month" has the meaning set forth in Section 9(b) of this Agreement.

"Subsidiary" has the meaning set forth in the Term Loan Credit Agreement.

"Supplemental Agent" has the meaning ascribed to the term "Supplemental Agent" in the Term Loan Credit Agreement.

"Supporting Holdings PIK Noteholders" has the meaning set forth in the preamble to this Agreement.

"Supporting Parent PIK Noteholders" has the meaning set forth in the preamble to this Agreement.

"Supporting PIK Noteholders" has the meaning set forth in the preamble to this Agreement.

"Supporting Term Lenders" has the meaning set forth in the preamble to this Agreement.

"Term Intercreditor Agreement" has the meaning set forth in the Term Loan Credit Agreement.

"Term Lender Payoff" means the repayment in full, in cash, with immediately available funds, of (i) all outstanding Term Loan Obligations and (ii) all outstanding New Term Loan Obligations, each as estimated on Schedule 2 to this Agreement which shall be subject to a reconciliation prior to the payoff, which for the avoidance of doubt shall consist only of the aggregate principal amount of the Loans (as defined in the Term Loan Credit Agreement or the New Term Loan Documents, as applicable) plus any accrued and unpaid interest (including default interest), fees, expenses and any accrued and unpaid principal prepayments (and for the avoidance of doubt, no such prepayment shall include a prepayment premium notwithstanding any provision of the Term Loan Credit Agreement or the New Term Loan Documents to the contrary) and/or undisputed penalties due thereon.

"Term Lenders" means the lenders under the Term Loan Credit Agreement in their capacities as such and, following a Foreclosure Transaction, in their capacity as holders of Equity Interests in the Purchaser (if applicable); provided, that following an equitization or other conversion of the Term Loan or any portion thereof, "Term Lenders" shall include holders of such Equity Interests or other securities or debt into which the Term Loan or such portion was converted and their assignees and transferees; provided, that the term "Term Lenders" shall not include the transferee of any such debt claims or Equity Interests pursuant to a Relevant Transaction.

"Term Loan" has the meaning set forth in the Term Loan Credit Agreement.

"Term Loan Credit Agreement" has the meaning set forth in Recital A of this Agreement.

"Term Loan Credit Documents" has the meaning ascribed to the term "Credit Documents" set forth in the Term Loan Credit Agreement.

-12-

"Term Loan Forbearance Agreements" has the meaning set forth in Recital K of this Agreement.

"Term Loan Obligations" means the Obligations as defined in the Term Loan Credit Agreement.

"Term Loan Secured Parties" has the meaning ascribed to the term "Secured Parties" set forth in the Term Loan Credit Agreement.

"Term Loan Specified Defaults" has the meaning set forth in Recital G of this Agreement.

"Transaction Consideration" means either the Acceptable Pre-Turnover Transaction Consideration or the Stock Turnover Transaction Consideration, as applicable.

"Transaction Consideration Funding Date" has the meaning set forth in Section 5(c) of this Agreement.

"Transaction Value" means:

(i)     with respect to an Acceptable Pre-Turnover Transaction, (x) the total value of the Consideration actually received by the Term Lenders on account of the Term Loan Obligations, before any payment owed as Transaction Consideration, from the Net Proceeds of such Acceptable Pre-Turnover Transaction less (y) the aggregate amount of the accrued and unpaid scheduled interest payments under the Term Loans as of the date of receipt of such Consideration by the Term Lenders; and

(ii)    in connection with a Collateral Agent Stock Turnover, the Transaction Value shall be equal to the Transaction Consideration.

(A) Non-cash Consideration or Proceeds (excluding any Contingent Amounts) as used in this definition shall be valued in the case of an Acceptable Pre-Turnover Transaction, by the Requisite Supporting Term Lenders after (x) a Blackstone Consultation, and (y) if requested in writing by Holdings (or any liquidating trustee or similar agent for Holdings) prior to the Valuation Request Deadline, an Independent Valuation, which shall be dispositive; provided, however, that the foregoing clause (A) shall not apply in the case of a Relevant Transaction that is (w) approved by, or under the supervision of, any court (including, without limitation, any bankruptcy court), (x) consummated after the Restructured Company or its representatives or advisors have undertaken good faith marketing efforts consistent with market practice to sell the assets or Equity Interests subject to such Relevant Transaction, to Persons that are not affiliates of the Restructured Company (unless such marketing or other efforts do not produce or result in any proposals, bids or offers by any Persons other than affiliates of the Restructured Company), (y) subject to any good faith auction or other competitive process consistent with market practice (even if such auction or other competitive process does not produce or result in any proposals, bids or offers by any Persons other than affiliates of the Restructured Company), or (z) consummated through the exercise of any rights or remedies as a creditor of the Restructured Company (including, without limitation, any "credit bid" under section 363(k) or section

-13-

1129(b)(2)(a)(ii) of the Bankruptcy Code or the acceptance of collateral in full or partial satisfaction of obligations pursuant to Section 9-620 of the UCC).

"Transactions" has the meaning set forth in Recital M, as more fully described herein.

"Transfer" has the meaning set forth in Section 16(a) of this Agreement.

"Transferee Acknowledgment" has the meaning set forth in Section 16(a) of this Agreement and attached as Exhibit B hereto.

"York Street Capital Entities" means (i) York Street Mezzanine Partners, L.P. and (ii) York Street Mezzanine Partners II, L.P.

Unless otherwise specified, references in this Agreement to any Section, Recital, Schedule, Exhibit or clause refer to such Section, Recital, Schedule, Exhibit or clause in or to this Agreement.  The words "herein," "hereof," and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement, except as otherwise specified.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including," "includes," and "include" shall be deemed to be followed by the words "without limitation."

2.    ***Agreement Effective Date.***  This Agreement shall become effective as of the date upon which each of the following conditions has been satisfied (such date, the "Agreement Effective Date"):

(a)    (i) the Company Parties; (ii) Term Lenders constituting the Requisite Lenders, (iii) the Administrative Agent; (iv) the Collateral Agent; (v) the Supplemental Agent; (vi) the New Term Lenders; (vii) the New Term Loan Collateral Agent; (viii) the New Term Loan Administrative Agent; (ix) the PIK Note Administrative Agent on behalf of the Holdings PIK Notes; (x) the PIK Note Administrative Agent on behalf of the Parent PIK Notes (solely to the extent that the Supporting Parent PIK Noteholders constitute the Required Holders of the Parent PIK Notes as of the Agreement Effective Date); and (xii) (x) the Carlyle Group Entities, (y) the York Street Capital Entities, and (z) the employees of the Company Parties that are holders of the Holdings PIK Notes; shall have executed and delivered counterpart signature pages of this Agreement to each of the other Parties.  Signature pages to this Agreement that are included in any copy of this Agreement delivered to (x) other Creditor Parties shall be in a redacted form that removes the Creditor Parties' holdings of debt outstanding under the Debt Instruments, and (y) the Company Parties shall be in an unredacted form;

(b)    The Escrow Agreement shall have (i) been executed and delivered by Holdings, the Company, the Supplemental Agent and the Escrow Agent and (ii) become effective;

(c)    The ABL Fourth Forbearance Agreement shall (i)(x) provide that the ABL Parties shall have agreed that the Controlling Term Secured Parties (as defined in the ABL Intercreditor Agreement) shall have the right to purchase all of the ABL Obligations at any time

-14-

following the Agreement Effective Date on the terms set forth in Sections 7.1, 7.2 and 7.3 of the ABL Intercreditor Agreement notwithstanding the existence or continuation of any forbearance by the ABL Lenders and the Company Parties shall agree that no Company Party shall have any consent or approval rights over any such purchase by any Creditor Party, and (y) otherwise be in form and substance reasonably acceptable to the Requisite Supporting Term Lenders, and (ii) have become effective;

        (d)    The Fourth Amendment Agreement shall have been executed and delivered by the parties thereto and shall have become effective;

        (e)    The New Term Loan Agreement shall have been executed and delivered by the parties thereto and shall have become effective; and

        (f)    The Intercreditor Agreements shall have been executed and delivered by the parties thereto and shall have become effective.

        3.    ***The Escrow of the Common Stock.***

        (a)    <u>Delivery of Common Stock</u>.  (i) On or before the Agreement Effective Date, the Collateral Agent shall deliver the Original Stock Certificate to the Company and the Company shall (and Holdings shall cause the Company to) (w) cancel the Original Stock Certificate, (x) reissue the Common Stock represented by a new stock certificate (the "<u>New Stock Certificate</u>") in the name of the Supplemental Agent, as agent for the Term Loan Secured Parties, as the record owner thereof, (y) register the Supplemental Agent, as agent for the Term Loan Secured Parties, as the record owner of the Common Stock on the Company's books and records, and (z) deliver the New Stock Certificate to the Supplemental Agent and (ii) within one (1) Business Day of the Agreement Effective Date, the Supplemental Agent shall deliver the New Stock Certificate, accompanied by instruments of transfer or assignments duly executed by the Supplemental Agent in blank reasonably satisfactory to Holdings (the "<u>Instruments of Transfer</u>") to be held in escrow by the Escrow Agent and released and distributed in accordance with Section 3(b) or 3(c) below upon either a Collateral Agent Stock Turnover or a Holdings Stock Turnover, as applicable, and on the terms and conditions set forth in the Escrow Agreement.

        (b)    <u>Collateral Agent Stock Turnover</u>.  At the earliest to occur of (i) the Outside Time and (ii) the expiration of the Forbearance Period (the earliest such date and time, the "<u>Collateral Agent Stock Turnover Date</u>"), and pursuant to the terms of the Escrow Agreement, the Escrow Agent shall deliver the entire Escrow Estate (as defined in the Escrow Agreement) to the Supplemental Agent or its designee without the necessity of further instruction (other than, if the Collateral Agent Stock Turnover Date is the expiration of the Forbearance Period, notice of the Collateral Agent Stock Turnover, which notice shall be provided by the Supplemental Agent if directed in writing by the Requisite Supporting Term Lenders) (such delivery, the "<u>Collateral Agent Stock Turnover</u>"); provided, that prior to the Collateral Agent Stock Turnover Date, the Company Parties shall be in receipt of the identity of the new members of the Board of the Restructured Company and any necessary documentation to effect the appointment of such new members and such appointment shall be effective upon the Collateral Agent Stock Turnover Date; provided, further, however, that a Collateral Agent Stock

Turnover shall not take place if an Escrow Release Transaction has been consummated before the Collateral Agent Stock Turnover Date.  On the Collateral Agent Stock Turnover Date (if the Escrow Release Transaction has not been consummated), without any further action on the part of or notice to any Person, Holdings shall no longer have any right, title or interest (including any beneficial ownership interest) in or to the Common Stock, including, without limitation, the right to receive and retain dividends, cash payments in respect of the Common Stock or to exercise the voting or other rights and powers that Holdings would otherwise be entitled to exercise in respect of the Common Stock, and all such rights shall immediately become vested in the Supplemental Agent.  Promptly following the Collateral Agent Stock Turnover, the Supplemental Agent shall distribute the Common Stock solely in accordance with directions received by the Supplemental Agent from the Requisite Lenders (and the Company hereby agrees, promptly (and in any event within one (1) Business Day) following any request of the Supplemental Agent occurring on or after the Collateral Agent Stock Turnover, to issue new stock certificates to replace the New Stock Certificate in such names(s) as may be directed by the Supplemental Agent at the direction of the Requisite Lenders).

(c)    Holdings Stock Turnover.  Upon written notice from Holdings to the Supporting Term Lenders (with a copy simultaneously delivered to the Supplemental Agent) that an Escrow Release Transaction has been consummated before the Collateral Agent Stock Turnover Date, (1) the Requisite Supporting Term Lenders shall promptly notify the Supplemental Agent in writing that such an Escrow Release Transaction has been consummated and shall direct the Supplemental Agent in writing to take the actions specified in clause (ii) below (such direction, the "Holdings Stock Release Direction") and (2) upon receipt of such notification and written direction from the Requisite Supporting Term Lenders, the Supplemental Agent shall promptly (and in any event within one Business Day) notify the Escrow Agent in writing that such an Escrow Release Transaction has been consummated.  On the date set forth for such distribution in the Escrow Agreement (such date, the "Holdings Stock Turnover Date"), the Escrow Agent shall distribute the Common Stock and the New Stock Certificate and the Instruments of Transfer to Holdings without the necessity of any further instruction and otherwise in accordance with the terms of the Escrow Agreement (the "Holdings Stock Turnover").  Upon the Holdings Stock Turnover, Holdings shall have sole legal and beneficial ownership of the Common Stock and the New Stock Certificate.  If the Holdings Stock Turnover occurs: (i) the liens in favor of the Supplemental Agent, for the benefit of the Term Loan Secured Parties, and in favor of the New Term Loan Collateral Agent, for the benefit of the New Term Lenders, on the Common Stock and the New Stock Certificate created under the Collateral Documents and the New Term Loan Documents (the "Common Stock Liens") shall be automatically released on the Holdings Stock Turnover Date; (ii) the Supplemental Agent, following its receipt of the Holdings Stock Release Direction, and the New Term Loan Collateral Agent shall deliver to Holdings (and the Supplemental Agent is hereby directed by the Requisite Supporting Term Lenders), at the sole expense of the Company, all documentation reasonably requested in writing by Holdings evidencing such release of liens within five (5) Business Days after the date of the Supplemental Agent's or the New Term Loan Collateral Agent's, as applicable, receipt of such written request; and (iii) Holdings and its designees shall be automatically, without further action, authorized to file all such UCC termination statements and other releases, discharges and terminations of mortgages and other liens and security interests that are required to terminate the Common Stock Liens (without any further action on the part of

-16-

the Supplemental Agent, Term Lenders, New Term Loan Collateral Agent, and the New Term Lenders).

        (d)      <u>Agreements with Respect to Escrow and Stock Turnover</u>.

        (i)      The Parties agree that the transactions described in this Section 3 do not constitute, and shall not be deemed to be, a partial or full foreclosure on the Common Stock or any of the other Collateral, or any other exercise of rights or remedies with respect to the Common Stock or any of the other Collateral, and such transactions shall not discharge the Term Loan Obligations in any respect (it being understood and agreed by the Parties that Holdings is receiving valuable consideration and the Company is giving valuable consideration in exchange for the transactions contemplated by this Agreement including, without limitation, the Transaction Consideration and the agreement by the Supporting Term Lenders to forbear from the exercise of their rights and remedies during the Forbearance Period which agreement is being facilitated by, among other things, Holdings' transfer of the Common Stock into the Escrow Account). The Parties further agree that the Transactions described in Section 3(a) shall not be deemed to be a disposition of the Common Stock by Holdings for federal or state income tax purposes.

        (ii)      The Supporting Term Lenders and the Supporting PIK Noteholders agree that the transactions described in this Section 3, including the delivery of the Escrow Estate (as defined in the Escrow Agreement) to the Escrow Agent pursuant to the terms of this Agreement, shall not constitute a Change of Control under the Term Loan Agreement or the Note Purchase Agreements, respectively.

        4.      ***Rights with Respect to Common Stock While in Escrow Account.*** While the Common Stock and the New Stock Certificate are held in the Escrow Account pursuant to the Escrow Agreement, Holdings shall have and retain all rights with respect to, and beneficial ownership of and control over, the Common Stock; <u>provided</u> that Holdings agrees that it shall not transfer or dispose of the Common Stock and/or the New Stock Certificate or enter into an agreement to do so that is inconsistent with the terms of this Agreement without the consent of the Requisite Supporting Term Lenders. For the avoidance of doubt, while the New Stock Certificate is held in the Escrow Account: (a) Holdings shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Common Stock for any purpose not inconsistent with the terms of this Agreement, the Escrow Agreement or the Term Loan Credit Agreement; and (b) Holdings shall be entitled to receive and retain any and all cash payments, including, but not limited to, cash dividends and other cash distributions payable in respect of the Common Stock to the extent payment of such amounts is permitted under the Term Loan Credit Agreement and this Agreement. To the extent the exercise by Holdings of the voting and other consensual rights with respect to the Common Stock as provided for herein is adversely affected by the arrangements contemplated by the Escrow Agreement, then, at the reasonable request of Holdings (and as and to the extent directed in writing by the Requisite Supporting Term Lenders), the Supplemental Agent shall promptly execute and deliver (or cause to be executed and delivered) to Holdings, all proxies and other necessary instruments reasonably requested by Holdings for the purpose of enabling Holdings to exercise such voting or other consensual rights.

-17-

5.      ***Marketing Period; the Transactions.***

(a)      <u>Escrow Release Transaction</u>.  Until the Collateral Agent Stock Turnover Date, the Company Parties, with the assistance of Blackstone and the Company Parties' other advisors, shall undertake a marketing process and use commercially reasonable efforts to consummate: (1) a sale or other disposition of all of the Common Stock of the Company or substantially all of the Company's and its Subsidiaries' assets, including through a merger or similar transaction (a "<u>Sale Transaction</u>") or (2) a refinancing of all of the Term Loan Obligations and the New Term Loan Obligations (a "<u>Refinancing Transaction</u>") (each of a Sale Transaction and a Refinancing Transaction, a "<u>Pre-Turnover Transaction</u>") in a transaction that qualifies as an Escrow Release Transaction.  As set forth in Section 3(c) of this Agreement, in the event of an Escrow Release Transaction before the Collateral Agent Stock Turnover Date, the Holdings Stock Turnover shall occur.

(b)      <u>Acceptable Pre-Turnover Transaction</u>.

(i)      If the Company Parties consummate a Pre-Turnover Transaction prior to the Collateral Agent Stock Turnover Date that does not result in a Term Lender Payoff, but is otherwise acceptable to both the Requisite Supporting Term Lenders and (only if the New Term Loan Obligations remain outstanding) the New Term Lenders in their respective sole discretion (an "<u>Acceptable Pre-Turnover Transaction</u>"), Holdings shall receive the following amount in cash from the Net Proceeds of such Acceptable Pre-Turnover Transaction without any offset or deduction, which shall be earned upon the  closing of such Acceptable Pre-Turnover Transaction and shall be payable promptly following a final determination of the Transaction Value in connection with such Acceptable Pre-Turnover Transaction (including any Independent Valuation): (A) one percent (1%) of the amount of any Transaction Value up to and including $150 million plus (B) ten percent (10%) of the amount of any Transaction Value in excess of (and solely to the extent in excess of) $150 million (collectively, the "<u>Acceptable Pre-Turnover Transaction Consideration</u>"), subject to clause (h) below.  To the extent the Company (rather than Holdings or Parent) receives the Proceeds of an Acceptable Pre-Turnover Transaction, the Company shall pay or cause to be paid to Holdings the Acceptable Pre-Turnover Transaction Consideration promptly following the determination of the Transaction Value with respect to such Acceptable Pre-Turnover Transaction.  To the extent that Holdings or Parent (rather than the Company) receives the Proceeds of an Acceptable Pre-Turnover Transaction, Holdings or Parent, as applicable, shall promptly turn over such Proceeds to the Administrative Agent, for the benefit of the Term Loan Secured Parties, net of the Acceptable Pre-Turnover Transaction Consideration which balance shall be applied in accordance with the Term Loan Credit Agreement.

(ii)      The Supporting Term Lenders and the New Term Loan Secured Parties agree (x) that any such Acceptable Pre-Turnover Transaction Consideration paid to or received by Holdings and Holdings' rights thereto under this Agreement shall be free and clear of any and all liens, claims and interests of the Term Loan Secured Parties under the Term Loan Credit Documents and the New Term Loan Secured Parties under the New Term Loan Documents, (y) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on or promptly after the Agreement Effective Date any and all releases, terminations and other documents reasonably

-18-

requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on Holdings' right to receive the Acceptable Pre-Turnover Transaction Consideration under Section 5(b)(i) hereof, and (z) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on the date that the Company pays or causes to be paid to Holdings the Acceptable Pre-Turnover Transaction Consideration, any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on the Acceptable Pre-Turnover Transaction Consideration.

(c)    Stock Turnover Transaction.

(i)    In the event of a Collateral Agent Stock Turnover, (A) the Restructured Company shall, on a date (the "Transaction Consideration Funding Date") which is promptly, but no later than four (4) Business Days, after the consummation of a foreclosure transaction by the Term Loan Secured Parties on the assets or stock of the Company (the "Foreclosure Transaction"), pay, or cause the purchaser(s), if any, of the equity or a substantial portion of the assets of the Company and its U.S. Subsidiaries (the "Purchaser") to pay, $750,000 in cash to Holdings without any offset or deduction and (B) Holdings shall be entitled to retain, for distribution to its creditors, any remaining portion of the Funded Amount (collectively, the "Stock Turnover Transaction Consideration") which, in the case of both clauses (A) and (B), shall be paid or delivered to Holdings or, if applicable, any liquidating trustee or other agent designated in writing by Holdings to be distributed pursuant to the Prepackaged Bankruptcy. Parent and Holdings acknowledge that the Funded Amount was delivered to Holdings on or about October 30, 2015 and that portion of the Holdings Obligations has been satisfied.

(ii)    The Supporting Term Lenders and the New Term Loan Secured Parties agree (x) that the Stock Turnover Transaction Consideration paid to or received by Holdings and Holdings' rights thereto under this Agreement shall be free and clear of any and all liens, claims and interests of the Term Loan Secured Parties and the New Term Loan Secured Parties under the applicable Term Loan Credit Documents and New Term Loan Documents, respectively, and (y) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on or promptly after the Agreement Effective Date any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on Holdings' right to receive the Stock Turnover Transaction Consideration under Section 5(c)(i) hereof, and (z) to execute (or to instruct in writing the Collateral Agent, the Supplemental Agent or the New Term Collateral Agent, as the case may be, to execute) on the date that the Restructured Company shall pay or cause to be paid to Holdings the Stock Turnover Transaction Consideration, any and all releases, terminations and other documents reasonably requested by Holdings that are required to effect a release or termination of the security interest in and lien of the Term Loan Secured Parties granted under the Term Loan Credit Documents

-19-

and/or the New Term Loan Secured Parties granted under the New Term Loan Documents, as applicable, on the Stock Turnover Transaction Consideration, provided, however that any delay until such documentation has been filed shall not in any manner limit, hinder, impair or otherwise affect the rights in favor of Holdings provided for herein.  Effective as of the later of (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the Collateral Agent Stock Turnover Date and (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan, Holdings shall not have any further indebtedness, liabilities or obligations owing to the  New Term Loan Secured Parties under the New Term Loan Documents, the New Term Loan Obligations shall be deemed satisfied with respect to Holdings, and each security interest, lien and pledge granted thereunder or in connection therewith in favor of the Collateral Agent in any assets of Holdings shall automatically be released, discharged and terminated, in each case automatically with no further action on the part of the New Term Loan Secured Parties and any distribution payable to the New Term Loan Secured Parties by Holdings under the Prepackaged Plan shall be allocated to holders of general unsecured claims at Holdings; and the New Term Loan Secured Parties expressly authorize Holdings and its designees to release and terminate all UCC financing statements, security interests, mortgages and liens in favor of the New Term Loan Collateral Agent which were filed with respect to Holdings pursuant to, or under the New Term Loan Documents, and at any time and from time to time after such later date, the New Term Loan Secured Parties shall, promptly execute and deliver such other termination statements, lien releases, discharges of security interests, and any other similar discharge or release documents as Holdings (or its assigns) may from time to time reasonably request and prepare to effectuate, or reflect of public record, the release and discharge of such security interests and liens, as applicable.

(d)    [Intentionally Deleted].

(e)    [Intentionally Deleted].

(f)    Transaction Consideration Priority .  Each of the Supporting Term Lenders agrees that the payment of the Term Loan Obligations (including payment of any claim or security or instrument into which the Term Loan Obligations are subsequently converted) shall be subordinated to the Holdings Obligations in the maximum amount of $3.5 million, solely upon the terms and subject to the conditions set forth in the Fourth Amendment Agreement and such subordination is a valid, binding and enforceable subordination provision under Section 510(a) of the Bankruptcy Code.   The subordination provisions set forth in the Fourth Amendment Agreement constitute a continuing agreement of subordination on the terms set forth in the Fourth Amendment Agreement, notwithstanding any modifications or renewals of the Term Loan Credit Documents; provided that any additional advances of monies under the Term Loan Credit Agreement after the Agreement Effective Date shall not be subject to such subordination.  For the avoidance of doubt, the Holdings Obligations shall not be subordinated to the New Term Loan Obligations.

(g)    Means of Implementation.  If a Term Lender Payoff does not occur as a result of a Pre-Turnover Transaction, then the applicable Company Parties may effect the receipt

-20-

of the Transaction Consideration by Holdings, and the further distribution of such Transaction Consideration to the PIK Noteholders in either of the following manners:

(i) *Out-of-Court Implementation.* Notwithstanding anything to the contrary contained in this Agreement and subject to the execution of this Agreement by the applicable and necessary Creditor Parties, the receipt and distribution of the Transaction Consideration shall be consummated in accordance with the terms of this Agreement through out-of-court transactions and without the need for judicial approval or process.

(ii) *In-Court Implementation.* Following the Collateral Agent Stock Turnover, Holdings and Parent may commence a Prepackaged Bankruptcy for Holdings and Parent to effect the receipt and distribution of the Transaction Consideration and any such Prepackaged Bankruptcy shall be paid for through the Funded Amount.

A. <u>Timing of Filing</u>. If a Prepackaged Bankruptcy is required for Holdings and Parent, then the Prepackaged Bankruptcy shall be commenced on a date to be mutually agreed between Parent, Holdings and the Requisite Supporting Term Lenders, <u>provided</u> that the Prepackaged Bankruptcy shall not be commenced on or prior to the date that the Foreclosure Transaction is consummated; <u>provided</u>, <u>further</u>, that, the Prepackaged Bankruptcy shall be commenced no later than February 1, 2016 (or such later date as may be agreed to in writing by Holdings, the Restructured Company and the Requisite Lenders).

B. <u>Definitive Documents</u>. The Prepack Documents shall be consistent with this Agreement, negotiated in good faith by the Parties and acceptable to the Company Parties, the Requisite Supporting Term Lenders and the Requisite Supporting PIK Noteholders and, as applicable, annexed as a supplemental exhibit hereto prior to the commencement of a Prepackaged Bankruptcy.

(h) <u>Non-Consensual Bankruptcy Filing</u>. Notwithstanding anything herein to the contrary, no Transaction Consideration shall be earned by, or payable or paid to Holdings if Holdings, the Company or any other Subsidiary of the Company, without the consent of the Requisite Supporting Term Lenders, either (i) voluntarily commences a bankruptcy or other insolvency proceeding (other than a Prepackaged Bankruptcy of Holdings) or (ii) is subject to an involuntary bankruptcy proceeding that is commenced and for so long as it has not been dismissed (a "<u>Non-Consensual Bankruptcy Filing</u>"); provided, that the foregoing shall not apply to any such bankruptcy or other insolvency proceeding that is commenced with respect to the Company and any Subsidiary of the Company after the Collateral Agent Stock Turnover Date.

6. *Forbearance Period.* During the Forbearance Period:

(a) <u>Supporting Term Lender Forbearance</u>. The Supporting Term Lenders shall, and hereby direct the Administrative Agent and the Collateral Agent to, forbear from the exercise of any rights and remedies against the Company and all of the Company Parties to which they are or may become entitled under the Term Loan Credit Agreement as a direct consequence of the occurrence and continuation of the Term Loan Specified Defaults, subject to

the terms and conditions set forth in this Agreement; provided that such forbearance shall not affect any rights of the Supporting Term Lenders with respect to the Collateral Agent Stock Turnover.

(b)    Supporting PIK Noteholder Forbearance.    The Supporting PIK Noteholders shall, and hereby direct the PIK Note Administrative Agent to, forbear from the exercise of any rights and remedies against the Parent and Holdings, as applicable, and any other Company Parties to which the Supporting PIK Noteholders are or may become entitled as a direct consequence of the occurrence and continuation of the PIK Notes Specified Defaults, subject to the terms and conditions set forth in this Agreement.  For the avoidance of doubt, the Supporting PIK Noteholders shall not have the right to terminate such forbearance during the term of this Agreement so long as any other Creditor Parties remain bound by this Agreement.

7.    **[Intentionally Deleted].**

8.    ***Effect of Term Loan Forbearance Termination.***    Immediately upon the expiration of the Forbearance Period, all forbearance obligations of the Supporting Term Lenders, the Administrative Agent, the Collateral Agent and the Supplemental Agent shall automatically terminate, without any requirement of notice or declaration of any kind. Thereafter, the Supporting Term Lenders, the Administrative Agent, the Collateral Agent, and the Supplemental Agent shall be entitled to exercise and to enforce any and all rights and remedies available to them under the Term Loan Credit Agreement or any other agreements with the Company Parties, as applicable, or with respect to the Collateral, including, without limitation, any and all rights and remedies to which the Supporting Term Lenders, the Administrative Agent, the Collateral Agent and/or the Supplemental Agent are or may become entitled as a consequence of any of the Term Loan Specified Defaults or any other Events of Default (as such term is defined in the Term Loan Credit Agreement) that have occurred prior to, during or after the Forbearance Period, in each case subject to the Intercreditor Agreements.  For the avoidance of doubt, any Stock Turnover Transaction Consideration that may be payable following a Collateral Agent Stock Turnover, as set forth in Section 5(c) hereof, shall be payable notwithstanding the expiration of the Forbearance Period (except as otherwise set forth in Section 5(h) hereof).

9.    ***The Company Parties' Obligations.***    For so long as this Agreement has not been terminated in accordance with its terms, the Company and each other Company Party, where applicable, covenants and agrees to the following:

(a)    Support.    To support and use commercially reasonable efforts and cooperate in good faith with the other Parties to (A) complete the Transactions and all transactions contemplated under this Agreement, and (B) take any and all reasonably necessary actions in furtherance of the Transactions and the transactions contemplated under this Agreement.  From the Agreement Effective Date until the earlier of (i) the date on which (x) Term Lenders holding Term Loans of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding Term Loans and (y) PIK Noteholders holding Holdings PIK Notes of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding Holdings PIK Notes, execute and deliver this Agreement or (ii) the voting deadlines established as part of a Prepackaged Bankruptcy, the Company Parties

-22-

shall use commercially reasonable efforts to cooperate with the Creditor Parties to procure the execution and delivery of this Agreement by additional Term Lenders and additional holders of Holdings PIK Notes.

(b)　　[Intentionally Deleted].

(c)　　Financial Covenants.  The Company hereby covenants and agrees that, during the Forbearance Period, it shall maintain GTSA Adjusted EBITDA and Net Sales (the "GTSA Financial Covenants") of at least the applicable minimum levels set forth in Schedule 7 hereto, tested as of the last day of each fiscal period set forth therein (each a "Covenant Testing Date").  The Company Parties shall deliver to the Administrative Agent and the Supporting Term Lenders a certificate (a "Compliance Certificate"), certified by an officer of the Company, certifying the Company's compliance or non-compliance with the GTSA Financial Covenants and setting forth reasonable detail (including, without limitation, appropriate calculations in connection therewith) with respect to such compliance or non-compliance.  Each Compliance Certificate shall be delivered no later than thirty (30) days after the end of each fiscal period set forth in Schedule 7 annexed hereto; provided that such Compliance Certificate shall be permitted to be delivered no later than forty-five (45) days after the Covenant Testing Date on each month that is a fiscal quarterly reporting period (March, June, September and December).  If a GTSA Financial Covenant is not met as of any Covenant Testing Date, the Requisite Supporting Term Lenders may (but shall have no obligation to) waive compliance with such GTSA Financial Covenant for such testing period.

(d)　　Information Rights.  The Company Parties shall provide the information listed in (i) through (iv) below to the Supporting Term Lenders and the New Term Lenders, subject to that certain Confidentiality and Nondisclosure Agreement dated as of January 30, 2015, as amended, or another comparable non-disclosure agreement; provided, that in the event that the Company Parties fail to deliver any such information to a required recipient on a specified date, the Company Parties shall have five (5) days to cure any such failure:

(i)　　Thirteen-Week Cash Flow Projections.  On the last Friday before each fiscal month commencing with the first full week following the Agreement Effective Date, the Company Parties shall provide a 13-week cash flow and liquidity forecast and on Friday of each week, a weekly and cumulative variance report in the form provided under the Term Loan Forbearance Agreements;

(ii)　　Status Update Call.  Commencing with the week in which the Agreement Effective Date occurs, if requested, the Company Parties shall provide a weekly (or more frequently as may be reasonably requested by the Requisite Supporting Term Lenders) update call with members of the Company Parties' senior management, outside turnaround advisor, and/or financial advisor to provide a status update on the Company Parties' process to effectuate a Pre-Turnover Transaction;

(iii)　　ABL Facility Information.  During the Forbearance Period, copies of all financial statements, reports, notices and other information that are delivered to the ABL Parties under the ABL Facility at any time after the Agreement Effective Date, with such delivery to be made to the Administrative Agent reasonably contemporaneous with the delivery

-23-

of such financial statements, reports, notices or other information to any agent or lender under the ABL Facility.

(iv)    Transaction Process Information.  Each of the following:

A.    on Friday of each week, commencing with the first full week following the Agreement Effective Date, a log of all significant communications and interactions by or on behalf of the Company with (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective refinancing lenders and investors in connection with a potential Refinancing Transaction, which log shall be consistent with a transaction matrix customarily maintained by an investment bank in connection with a sell-side mergers and acquisitions or refinancing engagement;

B.    copies of all executed confidentiality and nondisclosure agreements from (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective lenders and investors in connection with a potential Refinancing Transaction;

C.    access to an electronic data repository for use in due diligence investigations with (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective lenders and investors in connection with a potential Refinancing Transaction;

D.    copies of any teasers, confidential information memoranda, presentations and/or other marketing materials provided to (1) prospective buyers in connection with a potential Sale Transaction and (2) prospective lenders and investors in connection with a potential Refinancing Transaction;

E.    copies of (1) all term sheets, indications of interest and bids (including informal bids) delivered by prospective buyers to the Company or its advisors in connection with a potential Sale Transaction and (2) all term sheets, letters of intent and informal proposals delivered by prospective lenders and investors to the Company or its advisors in connection with a potential Refinancing Transaction; and

F.    copies of (1) all final bids (including supporting documentation, such as transaction documents and financing commitments) delivered by prospective buyers to the Company or its advisors in connection with a potential Sale Transaction and (2) all final proposals (including supporting documentation, such as transaction documents and financing commitments) delivered by prospective lenders and investors to the Company or its advisors in connection with a potential Refinancing Transaction.

(e)    Company Parties' Indemnification.  Following the Collateral Agent Stock Turnover, each Company Party shall indemnify its respective directors and officers for claims or losses arising from and after the Collateral Agent Stock Turnover; provided, however, that

-24-

nothing herein shall impact or impair the Company Parties' obligations to indemnify the directors and officers of the Company Parties for claims or losses arising, or related to acts or omissions taken or not taken, prior to the Collateral Agent Stock Turnover. In addition, the Company Parties shall insure the directors and officers of the Company Parties following the consummation of any of the Transactions or the Foreclosure Transaction (or make satisfactory arrangements therefor, including coordination with the Purchaser, if any, including the Designated Entity), including, without limitation, maintaining the directors' and officers' insurance policies and tail insurance providing coverage substantially similar to, and no less favorable than, the coverage provided prior to the consummation of such Transaction for a six-year period following the effective date of the conclusion of the final dissolution of all of the Company Parties in connection with the Transactions and the Foreclosure Transaction to cover any claims arising prior to the effective date of such Transaction and Foreclosure Transaction regardless of whether the claim is asserted before or after the effective date of such Transaction and Foreclosure Transaction. In the event that Holdings and/or Parent brings an action for breach of this Agreement against the Company or the Supporting Term Lenders, the Restructured Company and the Designated Entity shall reimburse the reasonable and documented legal fees and expenses of Holdings and/or Parent, as applicable, incurred in connection therewith, solely to the extent that Holdings and/or Parent is the prevailing party in such action. The Restructured Company shall be, or shall cause the Purchaser, if any, (including the Designated Entity) to be, responsible (either directly or shall promptly reimburse Holdings and/or Parent, as applicable) for the reasonable and documented legal fees and expenses incurred by Holdings and/or Parent, in an aggregate amount not to exceed $1,000,000, in connection with an action by a Person that is not a Party to this Agreement or any person or entity acting on behalf of such Party seeking to challenge or otherwise invalidate this Agreement (each, a "Challenge Claim"). For the avoidance of doubt, the Parties hereto agree that a receiver, monitor, trustee, custodian, sequestratror, conservator or person functioning in a similar capacity for any Party or for a substantial part of the property or assets of any Party, whether in a proceeding brought under the Bankruptcy Code, similar state law or otherwise (each, an "Estate Representative"), shall be deemed a Party to this Agreement for purposes of a Challenge Claim and, as such, the indemnification for a Challenge Claim set forth in the immediately preceding sentence shall not apply or be available in connection with any action by an Estate Representative seeking to challenge or otherwise invalidate this Agreement. In addition, a Challenge Claim indemnity shall not be applicable to a Challenge Claim brought by a party holding funded debt issued by Holdings or a party acting on behalf of any party holding funded debt issued by Holdings, including, without limitation, an Indenture Trustee for such funded debt.

(f)    Fiduciary Duties. Notwithstanding anything to the contrary set forth in this Agreement, nothing in this Agreement shall require any directors or officers of the Company Parties (in such Person's capacity as such) to take, or cause any party to take any future action, or to refrain, or cause any party to refrain, from taking any future action (including terminating this Agreement), to the extent that any such Person believes on the advice of counsel that such action or inaction is inconsistent with or required or advisable, as applicable, to comply with such Person's fiduciary obligations under applicable law. In addition, notwithstanding anything to the contrary set forth in this Agreement, in the event the Transactions are implemented pursuant to a Prepackaged Bankruptcy, the Company Parties shall at all times and in all respects after the

-25-

petition date of such Prepackaged Bankruptcy act in accordance with applicable law to exercise fiduciary duties as a debtor in possession in the applicable chapter 11 case(s).

(g)    No Interference.  None of the Company Parties shall take, nor shall any of the Company Parties encourage any other Person to take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(h)    Limitations on Indebtedness.  During the Forbearance Period, none of Holdings or the Company shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness (as defined in the Term Loan Credit Agreement), except for Indebtedness (i) existing as of the Agreement Effective Date; (ii) described in (and subject to the terms, conditions and limitations set forth in) clauses (b), (c), (d), (e), (f), (g), (h), (i) (in an amount not to exceed $250,000 during the Forbearance Period), (k), (l), (m), (n), (o), (p), (r), (s), (t) and (u) (in an amount not to exceed $250,000))  of Section 6.1 of the Term Loan Credit Agreement; and (iii) described in (and subject to the terms, conditions and limitations set forth in) Section 6.1(q) of the Term Loan Credit Agreement and Section 10(k) hereof, but solely to the extent each Borrowing (as defined in the ABL Facility) shall be incurred in the ordinary course of business; provided, however that any such Borrowing that is not incurred in the ordinary course of business shall require the prior written consent of the Requisite Supporting Term Lenders.  Nothing in the Term Loan Credit Agreement or this Agreement to the contrary shall prohibit the Company Parties from entering into the New Term Loan Agreement or incurring Indebtedness thereunder.

(i)    Limitations on Liens.  During the Forbearance Period, none of Holdings or the Company shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien (as defined in the Term Loan Credit Agreement) on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien (as defined in the Term Loan Credit Agreement) with respect to any such property, asset, income or profits under the Uniform Commercial Code of any State or under any similar recording or notice statute, except for Liens (as such term is defined in the Term Loan Credit Agreement) (1) existing as of the Agreement Effective Date, (2) described in (and subject to the terms, conditions and limitations set forth in) clauses (b), (c), (d), (e) (f), (h), (i), (j) (k)(i), (m) (securing Indebtedness under Section 6.1(i) of the Term Loan Credit Agreement in an amount not to exceed $250,000 during the Forbearance Period), (n), (o), (p), (q), (r),  (s), (u) and (v) (securing Indebtedness in an amount not to exceed $250,000 during the Forbearance Period) of Section 6.2 of the Term Loan Credit Agreement, and (3) described in Section 6.2(t) of the Term Loan Credit Agreement but solely to the extent Liens existing as of the Agreement Effective Date thereafter extend to after-acquired property. Nothing in the Term Loan Credit Agreement or this Agreement to the contrary shall prohibit the Company Parties from entering into the New Term Loan Agreement or granting Liens thereunder.

(j)    Limitations on Restricted Junior Payments.    During the Forbearance Period, none of Holdings or the Company shall, nor shall it permit any of its Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment (as defined in the Term Loan Credit Agreement), except for Restricted Junior Payments described (and subject to the terms, conditions and limitations set forth in) in Section 6.5(a)(i) of the Term Loan Credit Agreement (other than the absence of any Event of Default), solely with respect to indemnification obligations and expenses.

(k)    Limitation on Amount Outstanding of Revolver Loans.    During the Forbearance Period, the Company Parties shall not permit the aggregate amount of the outstanding Revolver Loans (as defined in the ABL Credit Agreement), at any time during each fiscal period set forth below (each an "ABL Testing Period"), to exceed the amounts (the "Maximum ABL Balance") set forth below for such ABL Testing Period:

Following the Company's entry into the New Term Loan Agreement, the Maximum ABL Balance during each fiscal period set forth below shall not exceed the amount under the column entitled "Maximum ABL Balance (Base)" for such monthly period; provided, that the amounts set forth below for each monthly period under the column entitled "Maximum ABL Balance (Base)" shall be increased on a dollar-for-dollar basis by the aggregate amount of cash interest payments made on the Term Loans and under the New Term Loan Agreement during the period from the Agreement Effective Date through the last calendar day of the prior fiscal period; provided, further, that in no event shall the Maximum ABL Balance during any fiscal period exceed the amount under the column entitled "Maximum ABL Balance (Cap)" for such period. For the avoidance of doubt, the borrowing limits set forth in this Section 9(k) do not constitute reductions to the Revolver Commitments (as defined in the ABL Facility).  No later than two (2) Business Days following the end of each ABL Testing Period, the Company Parties shall deliver to the Administrative Agent and the Supporting Term Lenders a certificate describing in reasonable detail their compliance or non-compliance with the covenant set forth in this Section 9(j) for such ABL Testing Period.

| Monthly Period | Maximum ABL Balance (Base) | Maximum ABL Balance (Cap) |
|---|---|---|
| May 1, 2015 through May 31, 2015 | $16,000,000 | $27,000,000 |
| June 1, 2015 through June 30, 2015 | $16,000,000 | $27,000,000 |
| July 1, 2015 through July 31, 2015 | $12,000,000 | $26,000,000 |
| August 1, 2015 through August 31, 2015 | $8,000,000 | $24,000,000 |

-27-

| September 1, 2015 through September 30, 2015 | $4,000,000 | $22,000,000 |
|---|---|---|
| October 1, 2015 through October 31, 2015 | $2,000,000 | $21,000,000 |
| November 1, 2015, through November 30, 2015 | | $21,000,000 |
| December 1, 2015, through December 31, 2015 | | $21,000,000 |
| January 1, 2016 through January 31, 2016 | | $21,000,000 |

(l)     Payment of Trade Payables.  During the Forbearance Period, the Company shall, and shall cause its Subsidiaries to, pay its and their trade payables in the ordinary course and in a manner consistent with the Company's customary past practice; provided, however, that the Company shall pay each trade payable no earlier than the last five Business Days prior to the date that such payment is due (without the imposition of any interest or penalty), as required by the standard, written payment terms of each of the Company's trade vendors; provided, further, that, the Company may, in the exercise of its reasonable business judgment, seek the consent of the Requisite Supporting Term Lenders (not to be unreasonably withheld, delayed or conditioned) to accelerate the payment of a trade payable.

(m)     Release of Certain Security Interests in Intellectual Property.  The Company and Holdings shall use reasonable best efforts during the Forbearance Period to deliver to the Collateral Agent adequate documentation reflecting the release of the following security interests in certain of the Company Parties' intellectual property: (A) Security Interest (as defined in the Term Loan Credit Agreement) in favor of BHF-BANK AKTIENGESELLSCHAFT dated June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (B) Security Interest (as defined in the Term Loan Credit Agreement) in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(n)     Limitations on Equity Transactions.  Except with the consent of the Requisite Supporting Term Lenders, during the Forbearance Period, neither Holdings, the Company nor any Subsidiary of the Company shall, nor shall permit any of their Subsidiaries to, (i) form any Subsidiary or enter into any Joint Venture; (ii) directly or indirectly sell, assign, transfer, hypothecate, pledge or otherwise encumber or dispose of, or create or issue, any Equity Interests of such entity; (iii) directly or indirectly sell, assign, transfer, hypothecate, pledge or otherwise encumber or dispose of, or create or issue, any Equity Interests of any Subsidiary of such entity; or (iv) materially amend or modify their organizational documents in any manner.

-28-

(o)    <u>Payment of Fees and Expenses</u>.    The Company hereby agrees that promptly following delivery of an invoice to the Company, it shall pay the reasonable and documented fees and expenses of (i) Stroock & Stroock & Lavan LLP, counsel to the New Term Lenders and Supporting Term Lenders and (ii) Kaye Scholer LLP, counsel to the Collateral Agent, the Administrative Agent and the Supplemental Agent.

The obligations of the Company under this clause (o) shall survive the termination of this Agreement with respect to such fees and expenses incurred and payable pursuant to this clause (o) prior to such termination.    For the avoidance of doubt, the covenants and agreements in clauses (b), (c), (d) and (h) through (o) of this Section 9 shall be only for the benefit of the Supporting Term Lenders, the Collateral Agent, the Supplemental Agent and the Administrative Agent and only the Supporting Term Lenders, the Collateral Agent, the Supplemental Agent and/or the Administrative Agent shall be entitled to enforce a breach of, or amend or waive compliance with, such covenants under this Agreement.

(p)    [Intentionally Deleted].

(q)    <u>Turnover of Certain Amounts</u>.    Following the Collateral Agent Stock Turnover Date, to the extent that (i) Parent or Holdings receives (x) payment on account of any receivable that is due and owing to the Company or any of its Subsidiaries; (y) insurance proceeds (other than directors' and officers' insurance proceeds) relating to assets or property of the Company and its Subsidiaries or (z) a tax refund relating to any taxable year during which Parent, Holdings, the Company and its Subsidiaries were part of a consolidated tax filing group, Parent or Holdings, as applicable, shall promptly turn over to the Company the payment on account of such receivable, such insurance proceeds or the portion determined by Parent, Holdings and the Company in good faith of such tax refund that is reasonably allocable to the Company and its Subsidiaries, as applicable; and (ii) the Company and its Subsidiaries receive (x) payment on account of any receivable that is due and owing to Parent or Holdings, (y) insurance proceeds (other than directors' and officers' insurance proceeds) relating to assets or property of the Holdings and/or Parent, or (z) a tax refund relating to any taxable year during which Parent, Holdings, the Company and its Subsidiaries were part of a consolidated tax filing group, Company and its Subsidiaries shall promptly turn over to Holdings and/or Parent, as applicable, the payment on account of such receivable, such insurance proceeds or the portion as determined by Parent, Holdings and the Company in good faith of such tax refund reasonably allocable to Holdings and/or Parent, as applicable.

10.    ***The Supporting Term Lenders' Obligations.***    For so long as a Supporting Term Lender holds or otherwise controls an interest in the Term Loans and as long as this Agreement has not been terminated in accordance with its terms with respect to the Term Loans held by such Supporting Term Lender, each Supporting Term Lender, severally and not jointly. covenants and agrees to perform and comply with the following obligations (only in its capacity as an owner, manager, or holder of any interest in the Term Loans):

(a)    <u>Support</u>.    Such Supporting Term Lender shall use commercially reasonable efforts and shall cooperate in good faith with the Company Parties, to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by any Company Party to support, facilitate, implement, or consummate or otherwise give effect

-29-

to the Transactions in an out-of-court or in-court proceeding with respect to Holdings and/or Parent that is consistent with the terms of this Agreement. From the Agreement Effective Date until the earlier of (i) the date on which Term Lenders holding Term Loans of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding Term Loans execute and deliver this Agreement or (ii) the voting deadlines established as part of a Prepackaged Bankruptcy, such Supporting Term Lender shall use commercially reasonable efforts to cooperate with the Company Parties to procure the execution and delivery of this Agreement by additional Term Lenders; provided, however, that none of the Supporting Term Lenders shall be required to make any payments to other Term Lenders or assume any liabilities or incur any expenses that are not otherwise reimbursed or reimbursable by the Company Parties.

(b)    <u>Support in Prepackaged Bankruptcy</u>.    In the event the receipt and distribution of the Transaction Consideration is implemented through a Prepackaged Bankruptcy of Parent and Holdings, and provided that such Supporting Term Lender has been solicited in accordance with Sections 1125 and 1126 of the Bankruptcy Code (to the extent applicable) and other applicable law, such Supporting Term Lender shall (a) vote all of its Term Loan claims in favor of the Prepackaged Plan by timely delivering its duly executed and completed ballot accepting the Prepackaged Plan and (b) not withdraw or revoke (or causing not to be withdrawn or revoked) such vote.

(c)    <u>Forbearance</u>.    Such Supporting Term Lender agrees to forbear from the exercise of any rights or remedies, including the taking of any enforcement actions, against the Company Parties or any collateral of the Company Parties in connection with the Term Loan Specified Defaults, during the Forbearance Period on the terms set forth in this Agreement.

(d)    <u>Direction to Collateral Agent, Supplemental Agent and Administrative Agent</u>.    Such Supporting Term Lender hereby directs each of the Administrative Agent, the Collateral Agent and the Supplemental Agent to (i) execute and deliver this Agreement, and (ii) take the actions requested of it or them pursuant to and in compliance with this Agreement and the Escrow Agreement, including without limitation, the actions of the Collateral Agent to deliver (or cause to be delivered) the Original Stock Certificate and the actions of the Supplemental Agent to deliver (or cause to be delivered) the New Stock Certificate and Instruments of Transfer in the manner set forth in Sections 3(a) of this Agreement.

(e)    <u>No Interference</u>.    Such Supporting Term Lender shall not, and shall not encourage any other Person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(f)    <u>Compliance with this Agreement</u>.    Such Supporting Term Lender shall support and not interfere with or hinder the Restructured Company's performance of its obligations under this Agreement following a Collateral Agent Stock Turnover, including, without limitation, with respect to payment of the Transaction Consideration, as and when due.

(g)    <u>Certain Rights Unaffected</u>.    Except as otherwise may be expressly set forth in this Agreement, nothing contained herein shall limit: (i) the ability of any Supporting Term

-30-

Lender to confer with the Company Parties, the Administrative Agent, the Collateral Agent, the Supplemental Agent or any other Term Lender or creditor of the Company Parties and their respective advisors, (ii) the right of any Supporting Term Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including without limitation, the right to participate in a Prepackaged Bankruptcy, in each case, in a manner not inconsistent with its obligations under this Agreement, including, without limitation, appearing as a party in interest in any matter to be adjudicated in such Prepackaged Bankruptcy, (iii) the ability of a Supporting Term Lender to sell or enter into any transaction in connection with the Term Loans or any other claims against or equity interests in the Company (subject to the provisions of Section 16 hereof), or (iv) the rights of any Supporting Term Lender under the Term Loan Credit Agreement or any of the other Term Loan Credit Documents.

11.    ***The New Term Lenders' Obligations.***  For so long as a New Term Lender holds or otherwise controls an interest in any New Term Loan and this Agreement has not been terminated in accordance with its terms with respect to the New Term Loan that such New Term Lender holds, each such New Term Lender, severally and not jointly, covenants and agrees to perform and comply with the following obligations (only in its capacity as owner, manager or holder of any interest in the New Term Loan):

(a)    <u>Support</u>.  Such New Term Lender shall use commercially reasonable efforts and shall cooperate in good faith with the Company Parties, to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Company to support, facilitate, implement, or consummate or otherwise give effect to the Transactions in an out-of-court or in-court proceeding with respect to Holdings and/or Parent that is consistent with the terms of this Agreement.

(b)    <u>Support in Prepackaged Bankruptcy</u>.  In the event the receipt and distribution of the Transaction Consideration is implemented through a Prepackaged Bankruptcy of Parent and Holdings, and provided that such New Term Lender has been solicited in accordance with Sections 1125 and 1126 of the Bankruptcy Code (to the extent applicable) and other applicable law, such New Term Lender shall (a) vote all of its holdings of their respective New Term Loan in favor of the Prepackaged Plan by timely delivering its duly executed and completed ballot accepting the Prepackaged Plan and (b) not withdraw or revoke (or causing not to be withdrawn or revoked) such vote.

(c)    <u>No Interference</u>.  Such New Term Lender shall not, nor encourage any other Person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(d)    <u>Compliance with this Agreement</u>.  Such New Term Lender shall support and not interfere with or hinder the Company Parties' performance of their obligations under this Agreement following a Collateral Agent Stock Turnover, including, without limitation, with respect to payment of the Transaction Consideration, as and when due.

(e)    <u>Direction to New Term Loan Administrative Agent and Collateral Agent</u>. Such New Term Lender hereby directs each of the New Term Loan Administrative Agent and

-31-

the New Term Loan Collateral Agent to (i) execute and deliver this Agreement, and (ii) take the actions requested of it or them pursuant to and in compliance with this Agreement.

(f)     *Certain Rights Unaffected.*  Except as otherwise may be expressly set forth in this Agreement, nothing contained herein shall limit: (i) the ability of any New Term Lender to confer with the Company Parties, the New Term Loan Administrative Agent, the New Term Loan Collateral Agent or any other New Term Lender or creditor of the Company Parties and their respective advisors, (ii) the right of any New Term Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including without limitation, the right to participate in a Prepackaged Bankruptcy, in each case, in a manner not inconsistent with its obligations under this Agreement, including, without limitation, appearing as a party in interest in any matter to be adjudicated in such Prepackaged Bankruptcy, (iii) the ability of a New Term Lender to sell or enter into any transaction in connection with the New Term Loans or any other claims against or equity interests in the Company (subject to the provisions of Section 16 hereof), or (iv) the rights of any New Term Lender under the New Term Loan Credit Documents.

12.     ***The Supporting PIK Noteholders' Obligations.***  For so long as a Supporting PIK Noteholder holds or otherwise controls an interest in any PIK Notes and  this Agreement has not been terminated in accordance with its terms with respect to the PIK Notes that such Supporting PIK Noteholder holds, each such Supporting PIK Noteholder, severally and not jointly, covenants and agrees to perform and comply with the following obligations (only in its capacity as owner, manager or holder of any interest in the PIK Notes or as a holder of Equity Interests in any of the Company Parties):

(a)     Support.     Each Supporting PIK Noteholder shall use commercially reasonable efforts, and shall cooperate in good faith with the Company Parties, to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Company Parties to support, facilitate, implement, or consummate or otherwise give effect to the Transactions in an out-of-court or in-court proceeding with respect to Holdings and/or Parent that is consistent with the terms of this Agreement.  From the Agreement Effective Date until the earlier of (i) the date on which PIK Noteholders holding Holdings PIK Notes of at least 66 2/3% in outstanding aggregate principal amount and majority in number of all of the outstanding PIK Notes execute and deliver this Agreement or (ii) the voting deadlines established as part of a Prepackaged Bankruptcy, such Supporting PIK Noteholder shall use commercially reasonable efforts to cooperate with the Company Parties to procure the execution and delivery of this Agreement by additional holders of Holdings PIK Notes; provided, however, that none of the Supporting PIK Noteholders shall be required to make any payments to other PIK Noteholders or assume any liabilities or incur any expenses that are not otherwise reimbursed or reimbursable by the Company Parties.  To the extent that the Supporting Parent PIK Noteholders do not constitute the Required Holders of the Parent PIK Notes as of the Agreement Effective Date, promptly upon the Supporting Parent PIK Noteholders constituting the Required Holders of the Parent PIK Notes, such Supporting Parent PIK Noteholders shall direct the PIK Note Administrative Agent to execute this Agreement in its capacity as such on behalf of the Parent PIK Notes.

(b)     Support in Prepackaged Bankruptcy.     In the event the receipt and distribution of the Transaction Consideration is implemented through a Prepackaged Bankruptcy

-32-

of Parent and Holdings, and provided that such Supporting PIK Note Holder has been solicited in accordance with Sections 1125 and 1126 of the Bankruptcy Code (to the extent applicable) and other applicable law, each Supporting PIK Noteholder shall (a) vote all of its holdings of their respective PIK Notes in favor of the Prepackaged Plan by timely delivering its duly executed and completed ballot accepting the Prepackaged Plan and (b) not withdraw or revoke (or causing not to be withdrawn or revoked) such vote.

(c)    No Enforcement of Remedies.  Such Supporting PIK Noteholder shall not take or instruct the taking of, under or relating to the PIK Notes or otherwise, any action against or in respect of Company Parties that constitutes or would constitute an enforcement action or remedy.

(d)    No Interference.  Each Supporting PIK Noteholder shall not, nor encourage any other Person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Transactions.

(e)    No Acceleration.  Unless a chapter 11 filing has occurred, each Supporting PIK Noteholder shall not accelerate or support the acceleration of the PIK Notes under the terms of the applicable Note Purchase Agreement for any default or event of default that has occurred or may occur thereunder.

(f)    Compliance with this Agreement.  Such Supporting PIK Noteholder shall support and not interfere with or hinder the Company Parties' performance of their obligations under this Agreement prior to a Collateral Agent Stock Turnover.

(g)    Direction to PIK Note Administrative Agent.  The Supporting Holdings PIK Noteholders represent and warrant to the PIK Note Administrative Agent that the Supporting Holdings PIK Noteholders constitute Required Holders (as such term is defined in the Holdings Note Purchase Agreement) and the Supporting Holdings PIK Noteholders have all requisite power and authority to direct the PIK Note Administrative Agent pursuant to and in accordance with the Holdings Note Purchase Agreement and the Holdings PIK Note Agency Agreement.  The Supporting Parent PIK Noteholders represent and warrant to the PIK Note Administrative Agent that the Supporting Parent PIK Noteholders constitute Required Holders (as such term is defined in the Parent Note Purchase Agreements) and the Supporting Parent PIK Noteholders have all requisite power and authority to direct the PIK Note Administrative Agent pursuant to and in accordance with the Parent Note Purchase Agreements and the Parent PIK Note Agency Agreements.  In their respective capacities as Required Holders under the Holdings Note Purchase Agreement and the Parent Note Purchase Agreements, as applicable, the Supporting Holdings PIK Noteholders and Supporting Parent PIK Noteholders hereby (i) direct the PIK Note Administrative Agent to (A) execute and deliver this Agreement and (B) take the actions requested of it pursuant to and in compliance with this Agreement and (ii) agree to provide direction to the PIK Note Administrative Agent, to the extent necessary, to take actions pursuant to and in compliance with this Agreement.

-33-

13.      ***Trust for the Benefit of Holdings and Parent.***  The board of directors of each of Holdings and Parent shall have the right at their sole discretion to establish one or more liquidating trusts for the benefit of their respective stakeholders and subsequently dissolve notwithstanding anything to the contrary in the Term Loan Credit Agreement or the Note Purchase Agreements and no such actions shall constitute an Event of Default (as defined in the Term Loan Credit Agreement and the Note Purchase Agreements).  Upon the assignment to the liquidating trust by Holdings and Parent of all of its rights hereunder, including the right to receive the Stock Turnover Transaction Consideration, the liquidating trustee(s) appointed to administer such liquidating trust(s) shall be responsible for: (a) receiving, accounting for and distributing the Stock Turnover Transaction Consideration to the creditors of Holdings; and (b) administering the liquidating trust.  The Transaction Consideration received by Holdings (or any liquidating trustee(s) or agent designated in writing by Holdings) shall be used to satisfy the obligations owed to the creditors of Holdings prior to any subsequent distribution to the Parent, as the holder of equity of Holdings.  In the absence of the appointment of any liquidating trustee(s) under this Section 13, Holdings and Parent, as applicable, shall have the rights set forth in clauses (a) and (b) above.  All fees and expenses incurred by Parent and Holdings in connection with establishing any liquidating trust and subsequently dissolving, including, without limitation, any compensation payable to any liquidating trustee and any reserve established to fund the ongoing administration of any liquidating trust, shall be funded from the Funded Amount.  The Creditor Parties hereby consent to the establishment of any liquidating trust hereunder to facilitate the wind down of Holdings and Parent and agree to execute any and all documents reasonably requested by Holdings or Parent to effectuate the same.  The Term Lenders further agree (i) that all assets of any liquidating trust established under this Section 13 shall be free and clear of any and all liens, claims and interests of the Term Lenders under the applicable Term Loan Credit Documents, and (ii) to execute any and all releases, terminations and other documents reasonably requested by Holdings or Parent that are required to effect a release or termination of such liens, claims and interests upon establishment of such liquidating trust(s).

14.      ***No Withdrawal of Support.***  No Party to this Agreement shall withdraw or revoke its support of this Agreement unless this Agreement has been terminated in accordance with its terms, or if such Party is no longer subject to this Agreement solely by reason of assignment permitted hereby.

15.      ***Acknowledgements.***  Each Party acknowledges that no securities of the Company are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of the Company Parties.

16.      ***Limitations on Transfers.***

(a)      <u>Transfers</u>.  No Creditor Party shall, to the extent such Creditor Party is a holder of a Debt Instrument or any other claim or lien against or Equity Interest in the Company, (i) sell, transfer, assign, pledge (other than ordinary course pledges and rehypothecation agreements), grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Creditor Party's interest in a Debt Instrument, or any other claim against or Equity Interest in the Company, in whole or in part, or (ii) grant any proxies, deposit any of such Creditor Party's interests in a Debt Instrument, or any other claim

-34-

against or Equity Interest in the Company, into a voting trust, or enter into a voting agreement with respect to any such interest (other than stockholders agreements and other organizational documents with respect to the Restructured Company) (collectively, the actions described in clauses (i) and (ii), a "Transfer"), unless such Transfer is to another Creditor Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Company a transferee acknowledgment substantially in the form attached hereto as Exhibit B (the "Transferee Acknowledgment") in accordance with the notice provisions hereof.  With respect to such transferred Debt Instrument (or interest therein), and any other claim against the Company, held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Creditor Party set forth in this Agreement.  Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement solely to the extent of such transferred rights and obligations but shall otherwise remain party to this Agreement as a Creditor Party with respect to any interest in a Debt Instrument or other claim not so transferred. Any Transfer made in violation of this section 16(a) shall be deemed null and void and of no force or effect, regardless of any prior notice provided to the Company, and shall not create any obligation or liability of any Company Party to the purported transferee (it being understood that the putative transferor shall continue to be bound by the terms and conditions set forth in this Agreement).

        (b)     Qualified Marketmaker.  Notwithstanding anything to the contrary herein, (i) a Creditor Party may Transfer any claim to an entity that is acting in its capacity as a Qualified Marketmaker (defined below) (a "Qualified Transfer") without the requirement that the Qualified Marketmaker be or become a Creditor Party, provided that such Qualified Transfer shall only be valid if the Qualified Marketmaker subsequently Transfers such claim to a transferee that is a Creditor Party (or becomes a Creditor Party at the time of the Transfer pursuant to a Transferee Acknowledgment) within five (5) Business Days of its acquisition thereof and (ii) if a Creditor Party, acting solely in its capacity as a Qualified Marketmaker, acquires a claim from a holder of claims that is not a Creditor Party, it may Transfer such claim without the requirement that the transferee be or become a Creditor Party with respect to such claim. For purposes hereof, a "Qualified Marketmaker" shall mean an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company Parties (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company Parties (including debt securities or other debt), in its capacity as a dealer or market maker in such claims and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

        (c)     Additional Claims.  To the extent a Creditor Party acquires additional Debt Instruments (including an increase in the amount of Debt Instruments held by it when it became a Party to this Agreement) or other claims against a Company Party, other than solely in its capacity as a Qualified Marketmaker as provided in Section 16(b) above, such Creditor Party agrees that all such additional Debt Instruments or other claims shall automatically and immediately be deemed to be subject to this Agreement, including the obligation to support the Transactions.

-35-

(d)    <u>Exceptions; Termination of Transfer Restriction</u>.    The provisions of Section 16(a) shall not apply to any Transfer of a Debt Instrument, or any other claim against or Equity Interest in the Company to a purchaser pursuant to a Relevant Transaction.  In addition, the Administrative Agent, the Collateral Agent and the Supplemental Agent may each resign from the respective capacities as such in accordance with the Term Loan Credit Agreement.  The provisions of this Section 16 shall terminate on the Release Effective Date.

17.    ***Further Assurances.***  From and after the Agreement Effective Date, each of the Parties agrees to promptly execute and deliver all such agreements, instruments, and documents and to take all such further actions as any of the Parties may reasonably deem necessary from time to time to carry out the intent and purpose of this Agreement, and to consummate the transactions contemplated hereby, including, without limitation, the timely transfer of the Transaction Consideration to Holdings.

18.    ***The Company Parties' Representations and Warranties.***  In order to induce the Creditor Parties to enter into and perform their obligations under this Agreement, the Company Parties hereby represent, warrant, and acknowledge, severally and jointly, as follows:

(a)    <u>Authority</u>.  (i) Each Company Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all of the requisite corporate, partnership, or other power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery, and performance by it of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action (corporate, partnership, or otherwise) on the part of it and no other proceedings on the part of it is necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    <u>Validity</u>.  This Agreement has been duly executed and delivered by each Company Party and constitutes the legal, valid, and binding agreement of it, enforceable against it in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(c)    <u>No Conflict</u>.  The execution, delivery, and performance by each Company Party of this Agreement (when such performance is due) does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its or their certificates of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party other than a breach that constitutes a Specified Default.

(d)    <u>Authorization of Governmental Authorities and Creditors</u>.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by any Company Party of this Agreement.

-36-

(e)      No Reliance.  Each Company Party (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Creditor Parties, and based on such information as such Company Party has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon the Creditor Parties' express representations, warranties, and covenants in this Agreement, and it acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)      Integrated Agreement.  Each Company Party acknowledges that this Agreement, the Escrow Agreement, the New Term Loan Agreement and the Transactions contemplated in such agreements have been negotiated by the relevant Parties and are part of a single integrated transaction.

(g)      No Other Agreements, etc.  No Company Party has entered into, or agreed to enter into, any agreement, side letter or other arrangement relating to the Transactions other than as set forth herein, the New Term Loan Agreement, the Escrow Agreement and the Term Loan Credit Documents.

(h)      Ratifications of Term Loan Obligations under the Term Loan Credit Agreement by the Company Parties.

(i)      As of the Agreement Effective Date, the aggregate principal balance of all of the outstanding Term Loan Obligations under the Term Loan Credit Agreement is approximately $170.7  million (which amount does not include interest, fees, expenses or other amounts which are chargeable or otherwise reimbursable under the Term Loan Credit Agreement and the other Term Loan Credit Documents).

(ii)      All of the Term Loan Obligations are secured by a legal, valid and enforceable first priority security interest in and Lien (as defined in the Term Loan Credit Agreement) on the Collateral in favor of the Collateral Agent or the Supplemental Agent, as applicable, on behalf of the Term Lenders, as described in the Collateral Documents, subject to the terms of the ABL Intercreditor Agreement.  All of the Term Loan Obligations are hereby ratified and confirmed in all respects.

(iii)      Other than as provided herein, there are no understandings or agreements relating to the Term Loan Obligations other than the Term Loan Credit Documents and each applicable Company Party reaffirms, confirms and ratifies the effectiveness and continuing validity of the Term Loan Credit Agreement and each of the other Term Loan Credit Documents to which it is a party.

(iv)      None of the Administrative Agent, the Collateral Agent, the Supplemental Agent nor any of the Term Lenders is in default under any of the Term Loan Credit Documents or has otherwise breached any obligations to the applicable Company Parties.

-37-

(v)     There are no offsets, counterclaims or defenses to the Term Loan Obligations, or to the rights, remedies or powers of the Administrative Agent or any of the Term Lenders in respect of any of the Term Loan Obligations or any of the Term Loan Credit Documents.

(vi)     The execution and delivery of the Term Loan Forbearance Agreements and/or this Agreement have not established any course of dealing between the parties hereto or created any obligation, commitment or agreement of the Administrative Agent, the Collateral Agent, the Supplemental Agent or any of the Term Lenders with respect to this Agreement.

(i)     <u>Ratifications of Obligations under the PIK Notes by the Company Parties</u>.

(i)     As of the Agreement Effective Date, the aggregate principal balance of all of the outstanding Parent PIK Notes is approximately $51.1 million and the Holdings PIK Notes is approximately $5.6 million (which amount does not include interest, fees, expenses or other amounts which are chargeable or otherwise reimbursable under the respective Note Purchase Agreements or Parent PIK Note Agency Agreement or Holdings PIK Note Agency Agreement, as applicable).

(ii)     Other than as provided herein, there are no understandings or agreements relating to the PIK Obligations other than the respective Note Purchase Agreements and each Company Party reaffirms, confirms and ratifies the effectiveness and continuing validity of the Note Purchase Agreements to which it is a party.

(iii)     Neither the PIK Note Administrative Agent nor any of the holders of the PIK Notes is in default under any of the respective Note Purchase Agreements or has otherwise breached any obligations to the Company Parties.

(iv)     There are no offsets, counterclaims or defenses to the PIK Obligations, or to the rights, remedies or powers of the PIK Note Administrative Agent or any of the holders of the PIK Notes in respect of any of the PIK Obligations or any of the Note Purchase Agreements.

(j)     <u>No Defaults</u>.  Except for the Specified Defaults, no Defaults or Events of Default, as defined in the Debt Instruments, exist on the date hereof.

(k)     <u>Corporate Structure; Common Stock</u>.  The corporate and organizational structure of the Company Parties as of the Agreement Effective Date is as set forth on Schedule 1 hereto.  The Common Stock evidenced by the Original Stock Certificate represents all of the issued and outstanding Equity Interests of the Company.  Holdings (i) is the legal and beneficial owner of the Common Stock evidenced by the Original Stock Certificate, and (ii) has good and valid title to the Common Stock evidenced by the Original Stock Certificate, free and clear of all liens, claims and encumbrances (other than those under the Collateral Documents and the Escrow Agreement).

19.     ***The Creditor Parties' Representations and Warranties.***  To induce the Company Parties to enter into and perform their obligations under this Agreement, each Creditor Party

-38-

(other than, except in the case of clauses (a) and (b) below, the Administrative Agent, the Collateral Agent, the Supplemental Agent, the New Term Loan Administrative Agent, the New Term Loan Collateral Agent and the PIK Note Administrative Agent), severally but not jointly, represents, warrants, and acknowledges, as to itself only, as follows:

(a)    Authority.  (i) Such Creditor Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all the requisite corporate, partnership, or other power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery, and performance by such Creditor Party of this Agreement and the consummation by such Creditor Party of the transactions to be consummated by such Creditor Party contemplated herein have been duly authorized by all necessary action (corporate, partnership, or otherwise) on the part of such Creditor Party.

(b)    Validity.  This Agreement has been duly executed and delivered by such Creditor Party and constitutes the legal, valid, and binding agreement of such Creditor Party, enforceable against such Creditor Party in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(c)    No Conflict.  The execution, delivery, and performance by such Creditor Party (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or, in the case of an entity, any of its subsidiaries or its or their certificates of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it, or, as applicable, any of its subsidiaries is a party.

(d)    Authorization of Governmental Authorities and Creditors.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by such Creditor Party of this Agreement.

(e)    No Reliance.  Such Creditor Party (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Company or any officer, employee, agent, or representative thereof, and based on such information as such Creditor Party has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that such Creditor Party has relied upon the Company's express representations, warranties, and covenants in this Agreement, and such Creditor Party acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)    Title.  With respect to each Supporting Term Lender, Supporting PIK Noteholder and New Term Lender, such Creditor Party is the legal or beneficial holder of, and

-39-

has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to the debt outstanding under the Debt Instruments in the aggregate principal amount set forth on its signature page hereto (and in the case of a nominee, it has due and proper authorization to act on behalf of, and to bind, the beneficial owner of such Debt Instruments). Such Creditor Party's interest in the Debt Instruments held by it is free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrances of any kind that would adversely affect in any way such Creditor Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

(g)    <u>Integrated Agreement</u>.    Each Creditor Party acknowledges that this Agreement, the Escrow Agreement, the New Term Loan Agreement and the Transactions contemplated in such agreements have been negotiated by the relevant Parties and are part of a single integrated transaction.

(h)    <u>No Other Agreements, etc</u>.    Each Creditor Party has not entered into, or agreed to enter into, any agreement, side letter or other arrangement relating to the Transactions other than as set forth herein, the New Term Loan Agreement, the Escrow Agreement, and the Term Loan Credit Documents.

20.    ***Releases***.    On the Release Effective Date, (a) the Parties shall be deemed to unconditionally release the other Parties from any and all claims, intercompany claims, obligations, suits, judgments, damages, rights, causes of action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, assertable on behalf of or derivative of the Parties, based in whole or in part upon actions taken solely in their respective capacities described herein or any omission, transaction, agreement, event or other occurrence taking place on or before the Release Effective Date in any way relating to the Transactions and any related instruments, documents or agreements and (b) the Parties will each be deemed to have forever released and covenanted with the other Parties not to sue or otherwise seek recovery from the other Parties on account of any claim, including any claim or cause of action based upon tort, breach of contract, or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the consummation of the Transactions in any way related to the Company Parties or their businesses and affairs, <u>provided</u>, <u>however</u>, that in the instance of either (a) or (b), no Party shall be released from any act or omission that constitutes gross negligence or willful misconduct as determined by final order by a court of competent jurisdiction; <u>provided</u>, <u>further</u>, <u>however</u>, that the releases set forth in this paragraph shall not release any Party's performance or obligations under this Agreement or under any of the Debt Instruments except as expressly set forth herein.  For the purposes of this Section 20 and the releases set forth herein, "Parties" shall also include all of the assets and property of each of the Parties, and each Party's current and/or former members, officers, directors, employees, counsel, advisors, professionals, or agents.  The "<u>Release Effective Date</u>" shall be (1) in the case of a Term Lender Payoff, the date of the occurrence of the Term Lender Payoff, (2) in the case of an Acceptable Pre-Turnover Transaction, (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the date upon which the Acceptable Pre-Turnover Transaction Consideration has been paid to or received by Holdings, or (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance

-40-

with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan and (3) in the case of a Collateral Agent Stock Turnover, (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the Collateral Agent Stock Turnover, or (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan.

21.    ***Governing Law; Jurisdiction.***

(a)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)    By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement, shall be brought, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City or, if applicable, following the commencement of a bankruptcy case, the applicable bankruptcy court (the "Chosen Courts"). By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

22.    ***Entire Agreement.***  This Agreement and the Escrow Agreement (including, for the avoidance of doubt, the Exhibits hereto and thereto) constitute the entire agreement with respect to the Transactions and supersede all prior and contemporaneous agreements, representations, warranties, term sheets, proposals, and understandings of the Parties, whether oral, written, or implied, as to the subject matter hereof; provided, however, that any confidentiality agreement executed by any Creditor Party and any Company Party shall survive this Agreement and shall remain in full force and effect in accordance with its terms.

23.    ***Amendment or Waiver.***  Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by the Company Parties, the Requisite Supporting Term Lenders, and the Requisite Supporting PIK Noteholders, and the New Term Lenders; provided, that any amendment of this Agreement affecting the rights or obligations under this Agreement of the Administrative Agent, the Collateral Agent, the Supplemental Agent, the New Term Loan Administrative Agent, the New Term Loan Collateral Agent or the PIK Note Administrative Agent shall require the written consent of each such Party. No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

24.    ***Specific Performance; Remedies Cumulative.***  This Agreement is intended as a binding commitment enforceable in accordance with its terms. Each Party acknowledges and

-41-

agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach of this Agreement would result in damages that would be difficult to determine with certainty.  It is understood and agreed that money damages would not be a sufficient remedy for any such breach of this Agreement, and that any non-breaching Party shall be entitled to obtain specific performance and injunctive relief as remedies for any such breach, and each Party further agrees to waive, and to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with requesting such remedy.  In furtherance of the foregoing, the Supporting Term Lenders and the Collateral Agent consent to the entry of injunctive relief, and such other rights and remedies as described in the foregoing sentence, in the event the Requisite Supporting Term Lenders fail to direct the Supplemental Agent or the Supplemental Agent fails to (i) notify the Escrow Agent of the consummation of an Escrow Release Transaction pursuant to this Agreement, or (ii) permit Holdings to exercise the rights provided for in Section 4 of this Agreement (Rights with Respect to Common Stock in Escrow Account) pursuant to the terms of this Agreement.  Such remedies shall not be deemed to be the exclusive remedies for the breach of this Agreement by any Party or its representatives.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy by any Party hereto shall not preclude the simultaneous or later exercise of any other such right, power, or remedy hereunder.

25.    *Construction.*  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

26.    *Receipt of Information; Representation by Counsel.*  Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

27.    *Binding Effect; Successors and Assigns.*  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors, assigns, heirs, transferees, executors, administrators, and representatives, in each case solely as such parties are permitted under this Agreement.

28.    *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  The signatures of all of the Parties need not appear on the same counterpart.  Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed signature page of this Agreement.

29.    *Headings; Schedules and Exhibits.*  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the

-42-

interpretation hereof.   References to sections, unless otherwise indicated, are references to sections of this Agreement.

30.     **Severability and Construction.**   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

31.     **Waiver of Jury Trial.**   EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY, AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM, OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN), OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 31 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.   THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

32.     **Notices.**   All notices and other communications given, provided or made pursuant to this Agreement shall be in writing and shall be deemed effectively given, provided, made or received: (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail, and if not so confirmed, then on the next Business Day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.   All communications shall be sent:

To the Company and its Subsidiaries at:

Targus Group International, Inc.
1211 North Miller Street
Anaheim, California 92806
Attn:  Sherry Abbott, General Counsel
sabbott@targus.com

*With a copy (which shall not constitute notice) to:*

-43-

O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Attn: Jennifer Taylor
jtaylor@omm.com

To Parent and Holdings (by email only):

Targus Holdings, Inc. and Targus Group Holdings, Inc.
1211 North Miller Street
Anaheim, California 92806
Attn:  Christopher Layden
layden@yorkstreetcapital.com

*With a copy (which shall not constitute notice) to:*

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of Americas
New York, New York 10036
Attn:  Adam Rogoff and Anupama Yerramalli
arogoff@kramerlevin.com and ayerramalli@kramerlevin.com

To the Administrative Agent or the Collateral Agent at:

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attn: Jeffery Rose
jrose@wilmingtontrust.com

*With a copy (which shall not constitute notice) to:*
Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attn: Michael Messersmith and Alan Glantz
michael.messersmith@kayescholer.com and alan.glantz@kayescholer.com

To the Supplemental Agent at:

Cortland Capital Market Services LLC
225 W. Washington Street, 21st Floor
Chicago, Illinois 60606
Attn: Joanna Anderson, Christopher Capezuti and Legal Department
joanna.anderson@cortlandglobal.com, chris.capezuti@cortlandglobal.com and

-44-

legal@cortlandglobal.com

*With a copy (which shall not constitute notice) to:*

Kaye Scholer LLP
Three First National Plaza
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attn: Michael Messersmith and Alan Glantz
michael.messersmith@kayescholer.com and alan.glantz@kayescholer.com

To a Supporting Term Lender at the notice information provided on its signature page hereto:

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Daniel Ginsberg
blawrence@stroock.com, jgoldstein@stroock.com, and dginsberg@stroock.com

To the New Term Loan Administrative Agent or New Term Loan Collateral Agent at:

Wilmington Savings Fund Society, FSB
WSFS Bank Center
500 Delaware Avenue, 11th Floor
P.O. Box 957
Wilmington, Delaware 19899
Attn: Patrick Healy
phealy@wsfsbank.com

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attn: Brett Lawrence, Jayme Goldstein and Daniel Ginsberg
blawrence@stroock.com, jgoldstein@stroock.com, and dginsberg@stroock.com

To a New Term Lender at the notice information provided on its signature page hereto.

*With a copy (which shall not constitute notice) to:*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982

-45-

Attn: Brett Lawrence, Jayme Goldstein and Daniel Ginsberg
blawrence@stroock.com, jgoldstein@stroock.com, and dginsberg@stroock.com

To the PIK Note Administrative Agent:

Law Debenture Trust Company of New York
400 Madison Avenue, Suite 4D
New York, NY 10017
Attn: Frank Godino and Thomas Musarra
frank.godino@lawdeb.com and thomas.musarra@lawdeb.com

*With a copy (which shall not constitute notice) to:*

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178-0061
Attn: Steven Reisman
sreisman@curtis.com

To a Supporting PIK Noteholder at the notice information provided on its signature page hereto.

or to such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

33.    ***Consideration.***  The Company and each other Party hereby acknowledge that no consideration, other than that specifically described in this Agreement, shall be due or paid to any Party for its agreement to support the Transactions in accordance with the terms and conditions of this Agreement.

34.    ***No Third-Party Beneficiaries.***  This Agreement shall bind and inure to the benefit of the Parties hereto (or any other Person that may become a Party to this Agreement in accordance with the terms of this Agreement) and no other Person shall be a third-party beneficiary hereof; provided that any Person that is released pursuant to Section 20 shall be deemed to be an intended third party beneficiary of Section 20 as of the Release Effective Date; provided further, than any liquidating trustee or similar agent on behalf of Holdings and/or Parent shall have all the rights and obligations of Holdings and/or Parent hereunder.

35.    ***Confidentiality.***  The Parties agree that any applicable confidentiality agreement entered into in connection with the Debt Instruments applies to this Agreement.

36.    ***No Public Announcement.***  Except as may be required in connection with a Prepackaged Bankruptcy, other bankruptcy or legal proceeding, or to obtain the support of additional Creditor Parties to execute this Agreement, each Party agrees that it shall not make any announcement or disclosure regarding the Company Parties, the Agreement, the Escrow Agreement or the transactions contemplated without the prior written consent of the other Parties hereto, which shall not be unreasonably withheld.  The Company Parties shall not (a) use the name of any Creditor Party in any public manner without such Creditor Party's prior written

-46-

consent or (b) disclose to any Person (including, for the avoidance of doubt, any other Creditor Party) other than counsel and advisors to the Company Parties and the Supporting Term Lenders, the principal amount, or percentage of, Debt Instruments or any other equity or debt securities or interests of the Company Parties held by any Creditor Party; provided, however, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of each series of Debt Instrument held by the Creditor Parties as a group and to make any and all such disclosures as are required by law.

37.    ***Reservation of Rights.***  Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries).  If the transactions contemplated by this Agreement are not consummated, or if this Agreement is terminated with respect to a Party for any reason, the Parties (or if less than all Parties, the Parties with respect to which this Agreement is terminated) fully reserve any and all of their rights, remedies, or interests.

38.    ***No Admissions.***  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any Person, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Agreement except as expressly set forth herein.  This Agreement and the Transactions are part of a proposed settlement of a dispute among the Parties.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this Agreement.

39.    ***Termination; Survival.***  This Agreement shall terminate following the earliest to occur of (the "Termination Date"): (i) the consummation of a Term Lender Payoff, (ii) if an Acceptable Pre-Turnover Transaction is consummated, (x) in the event that receipt and distribution of the Transaction Consideration will be consummated entirely on an out-of-court basis in accordance with Section 5(g)(i) of this Agreement, the payment to, or receipt by, Holdings of the Acceptable Pre-Turnover Transaction Consideration and, (y) in the event that a Prepackaged Bankruptcy of Holdings and Parent is required in accordance with Section 5(g)(ii) of this Agreement, then the effective date of the Prepackaged Plan, and (iii) in the event of a Collateral Agent Stock Turnover, the first Business Day on which both the Prepackaged Bankruptcy and any voluntary proceeding under chapter 7 of the Bankruptcy Code or other wind-down process for the Company and its U.S. subsidiaries have been consummated.  Upon the Termination Date, no Party shall have any continuing liability or obligation to any other Party hereunder except as otherwise provided herein; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the Termination Date.  Notwithstanding the foregoing, the following provisions of this Agreement shall survive the Termination Date: (i) the last paragraph

-47-

of Section 1, and (ii) sections 5(f), 9(e), 9(f), 9(o), and 20-39, together with any defined terms used in such Sections.

*[Signature pages follow]*

-48-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

**Company Parties**

**TARGUS GROUP INTERNATIONAL, INC. (the "Company") (as Obligor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS, INC.  (as Guarantor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS GROUP HOLDINGS, INC. ("Holdings") (as Obligor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS GROUP US LLC (as Guarantor under the Term Loan)**

By: _____
    Name:
    Title:

**TARGUS HOLDINGS, INC. ("Parent")**

By: _____
    Name:
    Title:

**<u>Administrative Agent and Collateral Agent</u>**

**WILMINGTON TRUST NATIONAL ASSOCIATION (as successor Administrative Agent and Collateral Agent)**

By: _____

      Name:

      Title:

**<u>PIK Note Administrative Agent</u>**

**LAW DEBENTURE TRUST COMPANY
OF NEW YORK**

By: _____
          Name:
          Title:

**Supporting Creditors**

**[SUPPORTING CREDITOR]**

By: _____

    Name:

    Title:

**Notice Information**

_____

_____

_____

**<u>Holdings of Debt Instruments:</u>**

Term Loans: _____

New Term Loans: _____

PIK Notes: _____

# **SCHEDULE 1**

**Corporate and Organizational Structure**

NY 75934768v10

## **SCHEDULE 2**

**Term Lender Payoff**

NY 75934768v10

## SCHEDULE 3

### ABL Specified Defaults

The term "ABL Specified Defaults" means the Defaults or Events of Default (each as defined in the ABL Facility) arising as a result of any of the following:

(i)    The Parent and each other Obligor's failure to deliver to the Agent no later than December 31, 2014, the information required to be delivered under Sections 10.1.2(a), (d), and (e) of the ABL Facility for the Fiscal Year ended September 30, 2014, which failures constitute Events of Default under Section 12.1(c) of the ABL Facility.

(ii)    The Company's failure to comply with Section 10.1.3 of the ABL Facility with respect to the delivery of notice of any Specified Default and the effects thereof, any exercise of remedies by the Collateral Agent with respect to the Common Stock and the Stock Certificate, the entry into this Agreement, and the occurrence of the Stock Turnover Date or any Material Adverse Effect resulting from the foregoing or the transactions contemplated hereby, which failure constitutes an Event of Default under Section 12.1(c) of the ABL Facility.

(iii)    The occurrence of an Event of Default under Section 12.1(c) of ABL Facility, with respect to the disposition of Common Stock and Stock Certificate in connection with the transactions contemplated by this Agreement and by the Escrow Agreement to the extent such transactions constitute a failure to comply with Section 10.2.6 of the ABL Facility.

(iv)    The breach or inaccuracy of any representation, warranty or other written statement of an Obligor (as defined in the ABL Facility) made in connection with any Loan Documents (as defined in the ABL Facility) or transactions contemplated thereby when given solely as a result of  the existence of the Specified Defaults and the effects thereof, any exercise of remedies by the Collateral Agent with respect to the Common Stock and the Stock Certificate, the entry into this Agreement, and the occurrence of the Stock Turnover Date, which breach or inaccuracy constitutes an Event of Default under Section 12.1(b) of the ABL Facility.

(v)    The occurrence of an Event of Default under Section 12.2(c) of the ABL Facility with respect to the Company's failure to comply with Section 10.2.2 of the ABL Facility as a result of the existence of: (i) Security Interest in favor of Enhanced Capital Connecticut Fund I, LLC dated November 15, 2011 which was recorded at Reel/Frame No. 4663/0854 of the United States Trademark Office; (ii) Security Interest in favor of First Union National Bank dated August 31, 2000 which was recorded at Reel/Frame No. 2148/0647 at the United States Trademark Office and at Reel Frame No. 11103/0163 at the United States Patent Office; (iii) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (iv) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(vi)    The failure to comply with Section 10.2.14, 10.2.17 of the ABL Facility and a Default or an Event of Default under Section 12.1(c), 12.1(i) and Section 12.1(m) of the ABL

NY 75934768v10

Facility arising on account of the effectiveness of the GTSA, including the consummation of the transactions contemplated by Section 3.1(a) and Section 3.1(b) of the GTSA.

(vii)    Any Default or Event of Default under Section 12.1(i) or Section 12.1(m) of the Loan Agreement on account of the Collateral Agent Stock Turnover and any Material Adverse Effect in respect of actions taken in connection therewith.

(viii)    The occurrence and continuance of the Term Loan Specified Defaults and the PIK Notes Specified Defaults which each constitute an Event of Default under Section 12.1(f) of the ABL Facility.

(ix)    The failure to deliver a Financial Plan not later than sixty (60) days after the beginning of the Fiscal Year commencing October 1, 2015, as required under Section 10.1.2(f) of the Loan Agreement, constitutes an Event of Default under Sections 12.1(c) and 12.1(f) of the Loan Agreement.

(x)    The failure to comply with the GFTSA Financial Covenants (as defined in the GTSA) and to deliver a compliance certificate in respect thereof as required under Section 9(c) of the GTSA, which constitutes a default under the Term Loan Documents and an Event of Default under Section 12.1(f) of the Loan Agreement.

(xi)    The failure to deliver a certificate setting forth the total amount of unpaid cash interest due under the Term Loan Documents for November 2015, and thereafter as required under Section 9(b) of the GTSA, which constitutes a default under the Term Loan Documents and an Event of Default under Section 12.1(f) of the Loan Agreement.

(xii)    The failure to deliver a certificate describing in reasonable detail compliance with the covenant set forth in Section 9(k) for the ABL Testing Period (as defined in the GTSA) ending October 31, 2015, which constitutes a default under the Term Loan Documents and an Event of Default under Section 12.1(f) of the Loan Agreement.

NY 75934768v10

# SCHEDULE 4

## Term Loan Specified Defaults

The term "Term Loan Specified Defaults" means the following Defaults or Events of Default:

(i)     The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make a scheduled payment of the Term Loans in the amount of $475,000 each on the last day of each of the second, third and fourth Fiscal Quarters of 2015 and the last day of the first Fiscal Quarter of 2016 in accordance with Section 2.9 of the Term Loan Credit Agreement.

(ii)    The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make a prepayment of the Term Loans in the amount of $1,800,000 (plus any interest due and payable in connection with such prepayment) no later than two (2) Business Days after the date on which the Compliance Certificate for each of the first, second, and third Fiscal Quarters of 2015 was required to be delivered in accordance with Section 2.11(c) of the Term Loan Credit Agreement.

(iii)   The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make any additional prepayment of the Term Loans under Section 2.11(g) of the Term Loan Credit Agreement in the event that the Company determines that the actual Consolidated Excess Cash Flow required to be prepaid under Section 2.11(e)(ii) of the Term Loan Credit Agreement for the Fiscal Year ending on September 30, 2014 exceeds the actual amount prepaid under Section 2.11(e)(ii) of the Term Loan Credit Agreement for such Fiscal Year.

(iv)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 2.11(g) of the Term Loan Credit Agreement with respect to the delivery of the prepayment certificate required to accompany the prepayment of the Term Loans under Section 2.11(c) for each of the first, second, and third Fiscal Quarters of 2015 and any additional prepayment of Consolidated Excess Cash Flow under Section 2.11(e) of the Term Loan Credit Agreement for the Fiscal Year ending on September 30, 2014.

(v)     The occurrence of an Event of Default under Section 8.1(a) of the Term Loan Credit Agreement with respect to the Company's failure to make interest payments due on the Term Loans at any time prior to and during the Forbearance Period, other than as specifically contemplated by Section 9(b) of this Agreement (except as a result of the failure of the Excess Availability Condition to be satisfied).

(vi)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(c) of the Term Loan Credit Agreement with respect to the Fiscal Year ending on September 30, 2014 and September 30, 2015.

(vii)   The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(d) of the

NY 75934768v10

Term Loan Credit Agreement with respect to the delivery of the Compliance Certificate required to accompany the financial statements of the Company and its Subsidiaries for the Fiscal Year ending on September 30, 2014 and September 30, 2015.

(viii)    The occurrence of a Default or an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(f) of the Term Loan Credit Agreement with respect to the delivery of notice of any Term Loan Specified Default and the effects thereof, the entry into this Agreement, the occurrence of the Stock Turnover Date or any effect thereof, or any Material Adverse Effect resulting from the foregoing or the transactions contemplated hereby.

(ix)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 5.1(o) of the Term Loan Credit Agreement with respect to the delivery of the certificate referred to therein that is required to accompany the financial statements of the Company and its Subsidiaries for the Fiscal Year ending on September 30, 2014 and September 30, 2015.

(x)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement, if any, with respect to the Company's failure to obtain a private rating issued by S&P with respect to its senior secured debt during the Forbearance Period in accordance with Section 5.15 of the Term Loan Credit Agreement.

(xi)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 6.8(a) of the Term Loan Credit Agreement with respect to the last Fiscal Quarter of 2014 and the first, second, third and fourth Fiscal Quarters of 2015, and the first Fiscal Quarter of 2016.

(xii)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 6.8(b) of the Term Loan Credit Agreement with respect to the last Fiscal Quarter of 2014 and the first, second, third and fourth Fiscal Quarters of 2015, and the first Fiscal Quarter of 2016.

(xiii)    The occurrence of an Event of Default under Section 8.1(c) of the Term Loan Credit Agreement with respect to the disposition of Common Stock and Old Stock Certificate in connection with the transactions contemplated this Agreement and by the Escrow Agreement, including the occurrence of the Collateral Agent Stock Turnover, to the extent such transactions constitute a failure to comply with Section 6.9 or Section 6.10 of the Term Loan Credit Agreement.

(xiv)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Term Loan Credit Agreement with respect to the Company's failure to comply with Section 6.2 of the Term Loan Credit Agreement as a result of the existence of: (i) Security Interest in favor of Enhanced Capital Connecticut Fund I, LLC dated November 15, 2011 which was recorded at Reel/Frame No. 4663/0854 of the United States Trademark Office; (ii) Security Interest in favor of First Union National Bank dated August 31, 2000 which was recorded at Reel/Frame No. 2148/0647 at the United States Trademark Office and at Reel Frame No. 11103/0163 at the United States Patent Office; (iii) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated

June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (iv) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(xv)    The occurrence of an Event of Default under Section 8.1(d) of the Term Loan Credit Agreement with respect to the breach of any representation, warranty, certification or other statement made or deemed made in any Term Loan Credit Document or in any statement or certificate at any time given by any Company Party or any of its Subsidiaries in writing pursuant to the Term Loan Credit Agreement solely as a result of the existence of the Term Loan Specified Defaults, the entry into this Agreement, and the occurrence of the Stock Turnover Date.

(xvi)    The occurrence of an Event of Default under Section 8.1(k) of the Term Loan Credit Agreement with respect to the disposition of Common Stock and the New Stock Certificate in connection with the transactions contemplated by the Escrow Agreement and as a result of the Collateral Stock Turnover to the extent such transaction constitutes a Change of Control.

(xvii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Term Loan Credit Agreement with respect to the ABL Specified Defaults, provided that the ABL Parties have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived such ABL Specified Defaults.

(xviii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Term Loan Credit Agreement with respect to the PIK Notes Specified Defaults, provided that the Supporting PIK Noteholders have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived, PIK Notes Specified Defaults.

(xix)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Term Loan Credit Agreement with respect to the "Specified Defaults" set forth in that certain Second Forbearance Agreement, dated as of December 11, 2015, by and among the Company Parties and the New Term Loan Secured Parties.

(xx)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement as a result of the failure to deliver a Financial Plan required under Section 5.1(i) for the Fiscal Year commencing October 1, 2015.

(xxi)    The occurrence of an Event of Default under Section 8.1(e) of the Term Loan Credit Agreement as a result of the failure to deliver the certificate required to be delivered under section 9(b) of the GTSA for each of November 2015 and December 2015, the failure to comply with the GTSA Financial Covenants (as defined in the GTSA) set forth in section 9(c) of the GTSA and to deliver a compliance certificate in respect thereof, and the failure to deliver the certificate required to be delivered under section 9(k) of the GTSA for the ABL Testing Period ending October 31, 2015.

Sch 4-5

## SCHEDULE 5

### Specified PIK Notes Defaults

The term "PIK Notes Specified Defaults" means the Defaults or Events of Default (each as defined in the PIK Notes) arising as a result of any of the following:

(i)      The occurrence of an Event of Default under Section 6.2(b) of the Holdings Note Purchase Agreement as a result of Holdings' failure to deliver to the Holdings PIK Note Holders the information required to be delivered under the first sentence of Section 5.2 and Sections 5.2(a), (b), (d), (e), and (f) of the Holdings Note Purchase Agreement.

(ii)      The occurrence of an Event of Default under Section 5.2(b) of the Parent Note Purchase Agreement as a result of Parent's failure to deliver to the Parent PIK Note Holders the information required to be delivered under the first sentence of Section 4.2 and Sections 5.2(c), (e), (g), (h), and (i) of the Parent Note Purchase Agreement.

(iii)      The occurrence of an Event of Default under Section 6.1(a), 6.2(a), and/or 6.2(b) of the Holdings Note Purchase Agreement as a result of Holdings' failure to give a Change of Control Notice (as defined in the Holdings Note Purchase Agreement), make a Change of Control Offer (as defined in the Holdings Note Purchase Agreement) or prepay the Holdings PIK Notes prior to the Change of Control Payment Date (as defined in the Holdings Note Purchase Agreement) as required under Section 1.2(b) of the Holdings Note Purchase Agreement.

(iv)      The occurrence of an Event of Default under Section 5.1(a), 5.2(a), and/or 5.2(b) of the Parent Note Purchase Agreement as a result of Parent's failure to give a Change of Control Notice (as defined in the Parent Note Purchase Agreement), make a Change of Control Offer (as defined in the Parent Note Purchase Agreement) or prepay the Parent PIK Notes prior to the Change of Control Payment Date (as defined in the Parent Note Purchase Agreement) as required under Section 1.2(b) of the Parent Note Purchase Agreement.

(v)      The occurrence of an Event of Default under Section 6.2(b) of the Holdings Note Purchase Agreement as a result of the occurrence of events that are prohibited under the Senior Loan Documents (as defined in the Holdings Note Purchase Agreement) in violation of Section 5.3 of the Holdings Note Purchase Agreement.

(vi)      The occurrence of an Event of Default under Section 5.2(b) of the Parent Note Purchase Agreement as a result of the occurrence of events that are prohibited under the Senior Loan Agreements (as defined in the Parent Note Purchase Agreement) in violation of Section 4.3 of the Parent Note Purchase Agreement.

NY 75934768v10

## SCHEDULE 6

### New Term Loan Specified Defaults

The term "New Term Loan Specified Defaults" means the following Defaults or Events of Default:

(i)    The occurrence of a Default or an Event of Default under Section 8.1(k) as a result of the Collateral Agent Stock Turnover (as defined in the GTSA).

(ii)    The occurrence of a Default or an Event of Default under Section 8.1(a) arising from any non-payment of interest amounts on the Loans from the Forbearance Effective Date through and including January 4, 2016.

(iii)    The occurrence of a Default or an Event of Default under Section 8.1(e) of the Credit Agreement with respect to the Company's failure to comply with Section 5.1(f) of the Credit Agreement with respect to the delivery of notice of any Specified Default and the effects thereof, the entry into this Agreement, the occurrence of the Stock Turnover Date or any effect thereof, or any Material Adverse Effect resulting from the foregoing or the transactions contemplated hereby.

(iv)    The occurrence of an Event of Default under Section 8.1(c) of the Credit Agreement with respect to the disposition of Common Stock and Old Stock Certificate in connection with the transactions contemplated this Agreement and by the Escrow Agreement to the extent such transactions constitute a failure to comply with Section 6.9 or Section 6.10 of the Credit Agreement.

(v)    The occurrence of an Event of Default under Section 8.1(c)(i) of the Credit Agreement with respect to the Company's failure to comply with Section 6.2 of the Credit Agreement as a result of the existence of: (i) Security Interest in favor of Enhanced Capital Connecticut Fund I, LLC dated November 15, 2011 which was recorded at Reel/Frame No. 4663/0854 of the United States Trademark Office; (ii) Security Interest in favor of First Union National Bank dated August 31, 2000 which was recorded at Reel/Frame No. 2148/0647 at the United States Trademark Office and at Reel Frame No. 11103/0163 at the United States Patent Office; (iii) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated June 18, 1999 which was recorded at Reel/Frame No. 1928/0644 at the United States Trademark Office and at Reel Frame No. 10086/0859 at the United States Patent Office; and (iv) Security Interest in favor of BHF-BANK AKTIENGESELLSCHAFT dated January 13, 1998 which was recorded at Reel/Frame No. 1678/0748 at the United States Trademark Office and at Reel Frame No. 08896/0937 at the United States Patent Office.

(vi)    The occurrence of an Event of Default under Section 8.1(d) of the Credit Agreement with respect to the breach of any representation, warranty, certification or other statement made or deemed made in any Credit Document or in any statement or certificate at any time given by any Company Party or any of its Subsidiaries in writing pursuant to the Credit Agreement solely as a result of the existence of the Specified Defaults, the entry into this Agreement, and the occurrence of the Stock Turnover Date.

NY 75934768v10

(vii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Credit Agreement with respect to the ABL Specified Defaults, provided that the ABL Parties have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived such ABL Specified Defaults.

(viii)    The occurrence of an Event of Default under Section 8.1(b)(iii) of the Credit Agreement with respect to the PIK Notes Specified Defaults, provided that the Supporting PIK Noteholders have agreed to (and continue to) forbear from exercising any rights or remedies they may have with respect to, or have permanently waived, PIK Notes Specified Defaults.

(ix)    The occurrence of Events of Default arising under (u) Section 8.1(k) as a result of the Collateral Agent Stock Turnover (as defined in the GTSA), (v) Section 8.1(a) arising from any non-payment of interest amounts on the Loans from the Forbearance Effective Date through and including January 4, 2016, (w) Section 8.1(e) as a result of the failure to deliver a Financial Plan required under Section 5.1(i) for the Fiscal Year commencing October 1, 2015, (x) Section 8.1(e) as a result of the failure to deliver the certificate required to be delivered under section 9(b) of the GTSA for each of November 2015 and December 2015, the failure to comply with the GTSA Financial Covenants (as defined in the GTSA) set forth in section 9(c) of the GTSA and to deliver a compliance certificate in respect thereof, and the failure to deliver the certificate required to be delivered under section 9(k) of the GTSA for the ABL Testing Period (as defined in the GTSA) ending October 31, 2015, (y) Section 8.1(b)(iii) with respect to the "Specified Defaults" as defined in that certain Fifth Forbearance Agreement dated as of December 11, 2015, by and among Company, Holdings, certain subsidiaries of Company party thereto, Wilmington Savings Fund Society, FSB, and the lenders party thereto, and (z) Section 8.1(b)(iii) with respect to the "Existing Events of Default" as defined in that certain Forbearance Agreement and Amendment Number Ten to Loan, Guaranty and Security Agreement dated as of December 11, 2015 by and among Company, Holdings, certain subsidiaries of Company party thereto, Bank of America, N.A., as agent, and the lenders party thereto.

NY 75934768v10

## SCHEDULE 7

### Term Lender Financial Covenants

**I.      Minimum GTSA Adjusted EBITDA**

| Fiscal Period Ending | Minimum GTSA Adjusted EBITDA |
|---|---|
| May 2, 2015 | $10,202,000 |
| May 30, 2015 | $12,548,000 |
| July 4, 2015 | $15,795,000 |
| August 1, 2015 | $17,966,000 |
| August 29, 2015 | $20,305,000 |
| October 3, 2015 | $24,208,000 |

**II.      Minimum Net Sales**

| Fiscal Period Ending | Minimum Net Sales |
|---|---|
| May 2, 2015 | $210,090,000 |
| May 30, 2015 | $235,386,000 |
| July 4, 2015 | $266,705,000 |
| August 1, 2015 | $294,877,000 |
| August 29, 2015 | $326,221,000 |
| October 3, 2015 | $366,535,000 |

# EXHIBIT A

**Escrow Agreement**

# **EXHIBIT B**

**Transferee Acknowledgment**

Ex. B-1

NY 75934768v10

<u>Transferee Acknowledgment</u>

The undersigned is executing and delivering this Transferee Acknowledgment pursuant to the Global Forbearance and Transaction Support Agreement (the "Agreement"), dated as of ____, 2015, by and among the Company Parties, the Supporting Term Lenders, the New Term Lenders, the Supporting PIK Noteholders, and any other party becoming a Party thereto.  Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement.

By executing and delivering this Transferee Acknowledgment, the undersigned hereby (i) represents and warrants to the Company Parties that it has acquired the amount and class of Debt Instruments set forth below, (ii) adopts and approves the Agreement and agrees, effective commencing on the date hereof and as a condition to the undersigned becoming the holder of the Debt Instrument, to be bound by and to comply with the representations and warranties of the Creditor Parties pursuant to the Agreement.  The undersigned ratifies all actions duly taken by the Company Parties prior to the date hereof and specifically ratifies and approves all agreements and other instruments that have been duly executed and delivered by or on behalf of the Company prior to such date.

Accordingly, the undersigned has executed and delivered this Transferee Acknowledgment as of _____, 2015.

Debt Instrument:
Principal Amount:

**[NAME OF TRANSFEROR OF DEBT INSTRUMENT**

By: _____

    Name:
    Title:
    Address:

**[NAME OF TRANSFEREE OF DEBT INSTRUMENT**

By: _____

    Name:
    Title:
    Address:

*Transferee Acknowledgement to Agreement*

## **EXHIBIT C**

**New Term Loan Agreement**

Ex. C-1

**EXHIBIT D**

**Fourth Amendment Agreement**

Ex. D-1

NY 75934768v10